```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                       15-CR-381(RJD)
 3   UNITED STATES OF AMERICA,
                                       United States Courthouse
 4                                     Brooklyn, New York
            -against-                  June 18, 2018
 5                                     10:00 a.m.
     VITALY KORCHEVSKY and,
 6   VLADISLAV KHALUPSKY

 7            Defendants.
     ------------------------------x
 8              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                BEFORE THE HONORABLE RAYMOND J. DEARIE
 9           UNITED STATES SENIOR DISTRICT JUDGE
                        BEFORE A JURY
10   APPEARANCES
     For the Government:      RICHARD P. DONOGHUE, ESQ.
11                           United States Attorney
                             Eastern District of New York
12                           271 Cadman Plaza East
                             Brooklyn, New York 11201
13                           BY:  RICHARD M. TUCKER, ESQ.
                                  JULIA NESTOR, ESQ.
14                           Assistant United States Attorneys

15   For Defendant Korchevsky:SULLIVAN BRILL
                             115 Broadway, 17th Floor
16                           New York, NY 10006
                             BY:  STEVEN G. BRILL, ESQ.
17                                JAMES L. HEALY, ESQ.

18                           RACHEL BRILL, ESQ.
                             263 Domenech Avenue
19                           San Juan, P.R. 00918

20   For Defendant Khalupsky: FEDERAL DEFENDERS OF NEW YORK
                             One Pierrepont Plaza
21                           Brooklyn, NY 11201
                             BY:  MILDRED WHALEN, ESQ.
22                                LaKEYTRIA W. FELDER, ESQ.

23   Court Reporter:         Rivka Teich, CSR, RPR, RMR, FCRR
                             718-613-2268 RivkaTeich@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

PROCEEDINGS

1            (In open court.)

2            THE COURTROOM DEPUTY:  All Rise.

3            THE COURT:  I was out of town over the weekend and I

4    haven't had a chance to study these letters and the

5    attachments that come with them.  I certainly have a gist of

6    it.  But I have a couple of questions.

7            First of all, with respect to the forgery of bank

8    accounts, is it not my recollection that Igor finally admitted

9    to doing just that at trial?

10           MS. WHALEN:  Your Honor, I believe that he admitted

11   to forging those bank documents.  He did not admit to having

12   sent them to an attorney in Latvia.  And the position of the

13   Government that it was some kind of funny business and they

14   were the victims of loses of $150,000, that still stands.

15           THE COURT:  I'm focusing on his trial testimony.  I

16   thought he admitted those series of letters of the exact same

17   amounts on different company stationary.

18           MS. WHALEN:  If I could clarify.  The documents we

19   showed him were in light of your Honor's ruling that we

20   couldn't bring in extrinsic evidence of the Latvian bank

21   fraud.  So what we did is we found these other frauds.

22           THE COURT:  Your Honor, did not rule.  His Honor

23   said you could examine that on the Latvian matter on the issue

24   of credibility.  All right.  You certainly didn't proffer any

25   extrinsic evidence that I precluded.  Let's keep the record

PROCEEDINGS

1    clear.

2              MS. WHALEN:  What I'm trying to explain -- our

3    understanding was we weren't permitted to introduce extrinsic

4    evidence.  While we were investigating the Latvian documents,

5    we found that fraudulent documents had created and sent to

6    other individuals that happened to be the same, of the same

7    month that the Latvian bank fraud was conducted.  I believe

8    that Mr. --

9              THE COURT:  They were different documents than the

10   ones that were the subject of cross-examination.

11             MS. WHALEN:  What they were is, Mr. Dubovoy created

12   false documents for the same month, July 2013, where he

13   altered the numbers.  He sent them to a realtor.  He then sent

14   an exact copy of those that had been further altered in terms

15   of the account number and the account holder, and sent those

16   to a friend of his, that in the proffer he later acknowledged

17   to the Government was the owner of Everest Construction.

18             THE COURT:  During his trial testimony, which is

19   what my focus is now, he acknowledged that those documents

20   were obviously not legitimate and they were prepared in

21   connection with the Latvian attempt to acquire the hotel.

22             MS. WHALEN:  No, your Honor.  I'm sorry.  It clearly

23   wasn't clear.

24             There were three sets of documents that we

25   confronted him with.  The first were the actual phony bank

PROCEEDINGS

1    records for July 2013.  Those are the bank records that the

2    government in Latvia is claiming were forged.  But the copies

3    that we have are the genuine copies, we don't have a copy of

4    the forgery.

5         The second documents that we showed the witness were

6    forgeries of that same month of bank statements but they were

7    sent to other individuals for other purposes not related to

8    the Latvian bank or the Latvian hotel transfer.

9         THE COURT:  All right.  So then he's interviewed and

10   he admits to the Government that he created false documents in

11   connection with the Latvian deal.  And the other aspect of it

12   is that he owned additional companies that he did not

13   disclose.  And his reasons for not disclosing, he said they

14   had no assets.

15        As your letter says, he was impeached at trial

16   regarding the forgeries.  What else is it that want to do with

17   it?  You want to bring out the fact of during the interview on

18   the 16th he admitted that he created false documents?

19        MS. WHALEN:  Your Honor, I think that we --

20        THE COURT:  One at a time, Mr. Brill, please.

21        MR. BRILL:  Of course.

22        MS. WHALEN:  If your Honor is not considering my

23   motion to strike his testimony --

24        THE COURT:  It's rather extraordinary.  Motion to

25   strike, much less a motion to preclude.  I'm trying to get at

PROCEEDINGS

1  the hub of your --

2          MS. WHALEN:  I guess what I want the Court to do in

3  the absolute minimum is to give a curative instruction.

4          We've drafted one that would say, "You heard

5  testimony from Igor Dubovoy as a witness for the Government.

6  And I'll instruct you that Mr. Dubovoy has lied and failed to

7  disclose information concerning a number of matters.

8          "First, Igor Dubovoy falsified dozens of documents

9  on numerous occasions to purchase real estate.  This occurred

10  during the time frame of the conspiracy to commit wire fraud

11  and was charged within the District of New Jersey.

12          "Second, Igor Dubovoy failed to disclose a number of

13  bank accounts on the financial affidavit he completed as part

14  of his cooperation agreement and guilty plea.

15          "Third, Igor Dubovoy falsified bank records in an

16  attempt to purchase a Latvian hotel in 2013.  He provided

17  these false documents to an attorney in Latvia in the attempt

18  to purchase the hotel.  Any money he claims to have paid

19  toward this venture should be considered by you to be an

20  effort to complete this crime.

21          "I will instruct you further at the close of the

22  case on how to consider witnesses who have been impeached.

23  But at this point I instruct you consider any testimony you

24  have heard from Igor Dubovoy with extreme care."

25          Your Honor, if I could just add a little bit as to

PROCEEDINGS

1    why we think the more extraordinary remedy is required in this

2    case.  The reason we think a more extraordinary remedy is

3    required is because it appears the Government did absolutely

4    nothing to follow up on the Latvian bank fraud claim.  They

5    presented papers to the Court and to the defense trying to

6    preclude us from cross-examining about this incident.  They

7    made it seem that there was no evidence out there, other than

8    the Latvian Government's claim that this fraud had taken

9    place.  And that the defense cross-examination on this topic

10   would be considered harassment.

11         Your Honor, the Government got the Latvian claim in

12   January 2018.  They appeared to simply have asked the

13   witnesses about it, and when the witnesses denied it they did

14   nothing further.  The Boni bank records, and they are in

15   evidence now as Defendant's exhibit HH, show that on July 3rd,

16   exactly as stated in the Latvian bank account, money was

17   transferred between DBM and Boni.

18         THE COURT:  I read your letter.  Now let me ask you

19   a question, is there any authority for this?

20         MS. WHALEN:  Your Honor, the authority I think -- I

21   think, your Honor, the authority is that the Government has

22   presented these witnesses as truthful.  I don't have specific

23   authority in this circuit to strike the witness' testimony in

24   its entirety, but given the procedure of the Government in

25   this case to hide a specific incidents of money laundering

PROCEEDINGS

1   dead in the center of this money laundering conspiracy, the

2   efforts that the Government failed to take to follow up, and

3   then the presentation that they made with this witness talking

4   about his cooperation agreement, talking about if he lied it

5   would be taken away, the jury is going to be left, while they

6   recognize there is impeachment, they have been given no

7   further instruction, no further evidence to the extent of how

8   serious this is.  How seriously it should be considered.

9           The Government is then going to present Arkadiy

10  Dubovoy and we believe he has the same problems in his case.

11  They are going to be able to sanitize his testimony.  None of

12  us can have any confidence that what he will say is the truth.

13          Mr. Brill confronted Igor Dubovoy about lying on the

14  stand.  And he told us that he wouldn't; but in fact, he

15  didn't disclose all of this.

16          THE COURT:  I have your letter.  I'm going to read

17  it more carefully.  I'd like to see the proffer instruction.

18  It's rather extraordinary.  I've never heard it from the

19  Court.  Would I not be usurping the jury's instruction, not to

20  mention your own?

21          MS. WHALEN:  In this instance a fraud is perpetrated

22  on this jury.  This witness has been presented as a truthful

23  witness, your Honor.  I don't think that can stand.  I think

24  the professional --

25          THE COURT:  The Government doesn't boast for the

PROCEEDINGS

1   truthfulnesses for the witnesses, of its witnesses.  Their

2   obligation is to put testimony on that they understand is

3   truthful.

4           MS. WHALEN:  But, your Honor, when they go through

5   the cooperation agreement and they go through these enormous

6   penalties that will proceed if this witness is not truthful,

7   and then the witness is shown not to be truthful, the jury

8   needs to be instructed on that.

9           THE COURT:  They are going to be instructed on it,

10  how to consider the testimony of such people.  Why isn't this

11  your testimony?  Why can't you bring this all out in the

12  normal course of cross-examination?

13          MS. WHALEN:  Are we going to be allowed to bring out

14  the fact that the day after he testified they spoke to him and

15  elicited additional information?

16          THE COURT:  Why not?

17          MS. WHALEN:  We can put that 302 into evidence?

18          THE COURT:  I haven't seen the 302, but why not?

19  Why not bring out the fact that the day, after he admitted

20  that he prepared phony documents.  It's all about credibility.

21  I'm not standing in your way on that issue.  I'm asking a very

22  simple legal question, is there any precedent for this sort of

23  thing?  I've never heard of it, to be honest with you.

24          MS. WHALEN:  I think that Professional Rule of

25  Conduct 3 --

PROCEEDINGS

1       THE COURT:  You're accusing the Government -- you're

2  not only accusing the Government of being slipshod of their

3  handling of the Latvian matter, you're accusing the Government

4  of perpetrating a fraud of the Court.

5       MS. WHALEN:  I'm not arguing that the Government is

6  perpetrating a fraud.  But that the interview they conducted

7  after the fact makes it clear that Mr. Dubovoy was not

8  transparent in all of his discussions with them.  That he lied

9  in his proffers and withheld information.  And I think they

10  have an obligation to notify the Court as to that.  And I

11  think that since the jury in this case is the tribunal, that

12  the jury needs to be notified as well.

13       THE COURT:  What he admitted to in the interview, in

14  the post-testimony interview, is the essentially what he

15  admitted to during his trial testimony.

16       MS. WHALEN:  He admitted that he had done it dozens

17  of times, not just once, which we didn't know about that, it

18  wasn't presented to the jury.

19       THE COURT:  He did testify -- I have to look at it

20  more carefully, he did testify that he done it over and over

21  again.

22       MS. WHALEN:  I don't believe that he did.

23       THE COURT:  Your colleague brought out a series of

24  letters, one after the other.

25       MS. WHALEN:  Two letters and one actual bank

PROCEEDINGS

1  account -- two e-mails and one actual bank account.

2          THE COURT:  I have more confidence in your

3  recollection than mine.

4          MS. WHALEN:  I don't believe -- it doesn't rise to

5  the dozens of times that he had admitted to the Government.

6          The second thing that he did not admit is the fact

7  that after he forged the documents he provided them to an

8  attorney in Latvia.  The Government on their direct has left

9  an impression that Igor was somehow a victim in this case in

10  losing $150,000; that's not what it is.

11          THE COURT:  For what it's worth, and it's not worth

12  anything, when he left the witness stand I didn't have that

13  impression, but that's a different matter.

14          Well, I'm sorry, I guess I'm an old-fashioned guy.

15  I want to look at this more carefully.  I think my gut tells

16  me the thing to do is bring old Igor back and let you have it

17  at.

18          MS. WHALEN:  No, your Honor.  No one can trust that

19  what he says is the truth.

20          THE COURT:  Is that my function?

21          MS. WHALEN:  Judge --

22          THE COURT:  A lot of what he said is the truth,

23  obviously, because both, all sides, brought it out.  A lot of

24  what he said is the truth.

25          MS. WHALEN:  Judge, my concern is that when a

PROCEEDINGS

1    witness has perjured himself and when a witness has

2    deliberately withheld information from the Government, putting

3    him back on the stand adds some air of credibility to him,

4    aura of creditability that he's somehow worthy of listening to

5    again.  I don't believe that that's appropriate.

6              If the Court is not going to strike his testimony

7    and the Court is unhappy with my curative instruction, I think

8    that some curative instruction should be given.  But recalling

9    him, putting him back on the stand, making it look like he

10   understands his oath to tell the truth, I do not want that

11   remedy, your Honor.

12             THE COURT:  I don't understand.  You just summarized

13   in rather impressive fashion all his failings and you want to

14   make sure the jury understands them.  Why can't you do that

15   through his testimony his cross-examination?

16             MS. WHALEN:  Is the Government doing to be permitted

17   to redirect him?

18             THE COURT:  What are they going to do?

19             MS. WHALEN:  I don't know, but any attempt to

20   sanitize this is not an acknowledgment of what he's done.

21             This is a case where there have been millions of

22   dollars transferred from bank accounts and there is no record

23   of where that money has gone.  It appears that there are shell

24   companies all over the world that have received these assets.

25   So for these individuals to come in and lie and say, okay,

1085

PROCEEDINGS

1   maybe I do a couple of years in jail but I've got millions to

2   get me through is a real issue in this case.

3           I think it goes to the fact of whether these people

4   made a calculated business decision as to what they were going

5   to do and what they were going to have after they completed

6   this prosecution.  I think it goes to their credibility.  I

7   don't think they can be trusted.

8           THE COURT:  It may very well, I'm not arguing that

9   point.  What I'm saying is, what are the outer limits of my

10  authority?  You haven't given me the authority.  In fairness

11  to you, I know you regard this as a serious issue, I want to

12  continue this more carefully.  We'll continue the discussion.

13          I have another matter, and I'll give you time to

14  respond.  Another matter that just came up.  Ms. Mulqueen told

15  me just before I took the bench that one of the jurors, juror

16  seven, a gentleman with a lengthy hair, salt and pepper,

17  called her this morning -- and Ellie, you'll stop me if I

18  misstate this.

19          COURTROOM DEPUTY:  I will.

20          THE COURT:  Said that he wondered whether or not he

21  could have an opportunity to speak to the judge before trial

22  today.  And Ellie probing a little bit said, What is the

23  nature of it?  He said, Well, you recall the judge told us not

24  to discuss the case at all.  Ellie said, Yes.  And he said,

25  Well, I'd like to discuss the case.  And she said, Is there

PROCEEDINGS

1    anything you can tell me about it?  He paused and said, Well,

2    actually I'm the person who said something in the jury room.

3            That's it, right, Ellie?

4            COURTROOM DEPUTY:  Correct.

5            THE COURT:  There you have it.  I'll give you time

6    to come to contemplate that development.  I'm not going to

7    delay the starting trial if everybody is here, but at some

8    point we're going to have to speak to this chap, speak to what

9    he's got.  Ellie advised to him not to discuss the case.  She

10   asked him, did he understand the instruction, he assured that

11   he did.  She told him going forward no further discussions, he

12   said he wouldn't.  There you have it.

13           Let me go back to studying these and we'll continue

14   this discussion later in the day.

15           I take it Igor is not about to get on a plane for

16   Katmandu or anything of the sort?

17           MR. TUCKER:  Mr. Dubovoy is back in Atlanta, but can

18   be back in New York quickly if needed.  If we learn today that

19   he's going to be recalled, he can be back in New York by

20   tomorrow.

21           THE COURT:  I'm not going to make any decisions

22   until I feel I fully consumed this.  Relax for a few minutes.

23   I'll be back once we have our jury.

24           (Brief recess.)

25           THE COURT:  Have a seat.  I think what we'll, do

PROCEEDINGS

1    unless you have better thought, is speak to this chap at the

2    break.  The question I have for you is, would you prefer that

3    I interview him privately with the reporter of course, or is

4    it your preference that I interview him here in open court?

5           My personal experience is jurors are a little more

6    forthcoming in the comfort of an office, but I certainly

7    appreciate the fact that you rather see it in live-time his

8    responses.  Obviously we would have to follow up and I intend

9    to do that at the break.

10          One thing we know for sure, I haven't yet completed

11   reviewing these documents.  We know for sure if the Government

12   is aware one of its witnesses has given false testimony, it

13   has an obligation to do something about it.  With that

14   thought, we'll get underway, to be continued.

15          MR. TUCKER:  Your Honor, should I put my witness on

16   the stand?

17          THE COURT:  I think we may be down a juror.  You can

18   bring your witness in.

19          (Whereupon, the witness resumes the stand.)

20          THE COURT:  The witness, Arkadiy Dubovoy, is he

21   going to need an interpreter?

22          MS. NESTOR:  Yes, your Honor.

23          (Jury enters.)

24          THE COURT:  Good morning, folks.  Please be seated,

25   everyone.  Welcome back.

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1    We are ready for our next witness, Mr. Tucker.

2    MR. TUCKER:  Your Honor, this is a continuation of

3 the testimony of Agent Shahrani.

4    THE COURT:  Yes, indeed.  I remind the witness

5 having previously been sworn you remain under oath.

6    THE WITNESS:  Yes, your Honor.

7    (Witness takes the witness stand.)

8 SAMAD SHAHRANI, called as a witness, having been previously

9 first duly sworn/affirmed, was examined and testified as

10 follows:

11    MR. TUCKER:  May I inquire, your Honor?

12    THE COURT:  Yes, sir.

13 DIRECT EXAMINATION

14 BY MR. TUCKER:  :

15 Q    Good morning, Agent Shahrani.

16 A    Good morning.

17 Q    Before we ended the day on Thursday you were describing

18 your forensic review of the images of those two computers that

19 were seized in the Ukraine in November 2012; is that right?

20 A    That's correct.

21 Q    Just to orient the jury and the Court, as you testified

22 about image 4A, you'll be referring to 3500SS2, which is

23 before you?

24 A    That's correct.

25 Q    Please remind us, did you see any evidence on image 4A

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1  that that computer had been used to run a program called

2  SQLMap?

3  A     I did.

4  Q     S-Q-L Map; is that right?

5  A     Yes.  We pronounce it sequel for convenience, but it's

6  SQL.

7  Q     Before we broke you were explaining SQL.  Can you explain

8  what SQLMap is?

9  A     As I said SQL is a language for constructing a database.

10  SQLMap is a tool that is used to map out the structure of

11  databases.  It's a hacking tool.  Basically it can enumerate a

12  database, so describe the structure, the database, the names.

13  If you think of a database as a Excel spreadsheet, the names,

14  columns, the rows, the individual pages inside of the

15  workbook, for lack of a better term.  Then SQLMap can inject

16  commands.  So it can interact with the database and try to get

17  data out of the database.

18  Q     Is that technique sometimes called SQL injection?

19  A     It is.

20  Q     What indications on image 4A did you see that that

21  computer had been used to run SQLmap?

22  A     The reverse SQLmap log files.

23  Q     Explain to the jury what a SQLmap log file is?

24  A     Sure.  When you're using a variety of programs most of

25  them leave log files.  A log file is a record of what an

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1  individual program did.  In the case of hacking tools, or

2  penetration tools, things like that usually they will contain

3  data about what the program found, what it was told to do,

4  what it found, then just logs that.  The reason you keep those

5  log files is if you didn't have them you wouldn't know what a

6  program did.  It would be like asking a question and not

7  listening to the answer.  The log files record the answers to

8  the questions that the SQLmap tool received.

9  Q    Do those log files include, among other things, the dates

10  and times that the SQLmap tool is used and information about

11  data that was extracted, if any data was extracted?

12  A    Typically, yes.

13  Q    Did you see indications on image 4A that SQLmap had been

14  used to target the newswire, PR Newswire.

15  A    I did.

16  Q    Please tell the jury what you saw.

17  A    So I believe I'll be referring to page 18.

18  Q    Of 3500?

19  A    Yes, 3500SS2.

20  Q    Tell the jury what you saw.

21  A    So basically there were indications that connections had

22  been made from the SQLmap tool to media.prnewswire.com,

23  amongst other addresses.

24  Q    So it's clear, Agent Shahrani, as you're referring to SS2

25  did you author that report?

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1  A    No, I didn't author this report, but I verified the

2  results.

3  Q    So you personally witnessed the facts in evidence that

4  you're testifying about?

5  A    That's correct.

6  Q    What was the date -- what were the dates associated with

7  the SQLmap sessions targeting the PR Newswire domain?

8  A    So the two, initially it looks like it was May 30 of 2012

9  and then May 31 of 2012.

10  Q    Did you see any evidence of information or data being

11  downloaded from PR Newswire systems?

12  A    Yes, there were artifacts in Firefox that indicated that

13  specific files had been downloaded.

14  Q    Can explain, what is Firefox?

15  A    So Firefox is the Mozilla web browser.  Just like there

16  is a variety of word processing programs, there are a variety

17  of web browsers. There is also Firefox, which is made by

18  Mozilla; people are familiar with Internet Explorer; Chrome

19  which is made by Google, a variety of other flavors.

20  Q    In this instance you saw evidence that Firefox had been

21  used to take data from the PR Newswire domain?

22  A    There was, there had been a download.

23  Q    Did you see indications in those log files that that

24  computer image 4A had been used to target Business Wire using

25  that SQLmap software you just described?

SAMAD SHAHRANI - DIRECT - MR. TUCKER

1   A    I did.

2   Q    What did you see?

3   A    On, it looks like, March 16 and March 24 there was

4   indications of connection to R.B2HM.com, which I previously

5   mentioned in the testimony was associated with Business Wire.

6   Q    For the record, Agent Shahrani, March 16 and March 24 of

7   what year?

8   A    Sorry, of 2012.

9   Q    Did you see any other references to the Newswire

10  companies in your review of that image 4A?

11  A    I did.

12  Q    What did you see?

13  A    There were other accesses including Marketwired.

14  Q    Did you review the contents of a folder called trading?

15  A    I did.

16  Q    That folder, trading, was that in that file hierarchy

17  that we looked at on Friday?

18  A    Yes, by default part of the hierarchy.

19  Q    Do you recall what the file above trading was the parent

20  file for trading?

21         MS. WHALEN:  Your Honor, is 3500SS2 in evidence?

22         THE COURT:  I don't believe it is.

23         MR. TUCKER:  I'm not offering it, your Honor.  The

24  witness is using it to refresh his recollection.

25         MS. WHALEN:  I think the witness is reading.  He's

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1   pointing to pages and going through the documents.  If it

2   refreshes his recollection, he can review it and testify to

3   it.  I think right now he's reading from a document not in

4   evidence.

5          THE COURT:  Who prepared this document?

6          THE WITNESS:  This document was prepared by Mandiant

7   Corporation.

8          THE COURT:  SS --

9          MR. TUCKER:  2, your Honor.

10          THE COURT:  2.  And what did you do once you

11   received it?

12          THE WITNESS:  So I received the report, I went

13   through the records that it refers to, and verified that the

14   information was accurate.

15          THE COURT:  I see.  I'll hear the objection.  How

16   should we proceed?

17          MR. TUCKER:  I can continue to move on.  I think the

18   witness -- I think I can continue to move on, your Honor.

19          THE COURT:  You can continue to move on.  Why don't

20   you just move on.

21          MR. TUCKER:  I'll move on, your Honor.

22          THE COURT:  But if you're going to refer to the

23   document for any reason let us know.  It's apparent at times,

24   but let us know if you need to refer to that document to

25   refresh your recollection.

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1          THE WITNESS:  Yes, your Honor.

2          THE COURT:  Go ahead, sir.

3    BY MR. TUCKER:  :

4    Q    Agent Shahrani, you testified a moment ago that you saw

5    folders that referred to the different news wires from your

6    own personal review?

7    A    That's correct.

8    Q    Tell the jury what you saw.

9    A    So basically, like I said, the folders contained names

10   after a specific directory, the directories structures

11   reflected the names of sites that had been accessed.

12   Q    Agent Shahrani, did you personally take your own notes

13   about those different folders found in image 4A?

14   A    I did.

15   Q    Is that 3500SS7 that's before you?

16   A    I did.

17          MR. TUCKER:  The witness will refer to that in the

18   course of his testimony, with the Court's permission?

19          THE COURT:  That's your notes?

20          THE WITNESS:  Yes, your Honor.

21          THE COURT:  In the process of verifying the

22   information?

23          THE WITNESS:  That's correct, your Honor.

24          THE COURT:  SS7.  Let's us know if you're going to

25   refer to it.

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1        MR. TUCKER:  Thank you, your Honor.

2        Just for the witness, Ms. Mulqueen?

3        COURTROOM DEPUTY:  Certainly.

4        MR. TUCKER:  Showing the witness what is marked for

5   identification as Government's Exhibit 408.

6        COURTROOM DEPUTY:  408?

7        MR. TUCKER:  Correct, and 409.

8   BY MR. TUCKER:  :

9   Q    Do you recognize those documents?

10  A    I do.

11  Q    Where did you find them?

12  A    They were found in a directory Business Wire.com and they

13  appear to be output of SQLmap and other tools being run.

14  Q    So it's clear, that was the Business Wire.com folder on

15  image 4A?

16  A    That's correct.

17  Q    Printouts of files?

18  A    These are copies of text files that were on the system.

19  Q    Did you review 408 and 409 prior to your testimony today?

20  A    I did.

21  Q    Are they fair and accurate copies of two of the files

22  found in that Business Wire.com folder?

23  A    Yes.

24        MR. TUCKER:  The Government moves 408 and 409 in

25  evidence.

1096

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1        THE COURT:  Any objection?

2        MR. HEALY:  No objection, your Honor.

3        THE COURT:  Received 408 and 409.

4        (Government Exhibit 408 & 409, was received in

5   evidence.)

6        MR. TUCKER:  May we publish?

7        THE COURT:  Go ahead.

8   BY MR. TUCKER:

9   Q     Look at 408, Agent Shahrani, can you tell us what is the

10  title of this file?

11  A     The file is hack.txt.

12  Q     So it's clear, did you name this file hack.txt?

13  A     No, that's the file in the system.

14  Q     So this is the name of the file as saved in that Business

15  Wire.com folder on image 4A?

16  A     Yes.

17  Q     What is this document, generally, now that the jury can

18  see it?

19  A     As I mentioned early, one of the purposes of SQLmap was

20  to enumerate a database, that's basically what this is, as you

21  can see.  It lists the available databases then the structure

22  of it.  So the databases of Business Wire own, then it lists

23  out the tables.  If you think of, like I said, the database,

24  then there are a number of tables inside of it.  Those tables

25  contain information and you can reference that data using SQL

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1    commands.

2    Q    Certain of the data in Government's Exhibit 408, does

3    that out from a program like SQLmap?

4    A    Yes.

5    Q    Now are there also references in this document to what

6    appear to be Business Wire user login credentials and

7    passwords?

8    A    There are.

9    Q    Turning to page six of 408 -- page 9, first.  Can I ask

10   you to read this text, please, that I'm highlighting in my

11   copy.

12   A    Operator:X1CK2lgb8KvVg:nextphazenew.

13   Q    Showing you what is in evidence now as Government's

14   Exhibit 409.  Directing your attention to this text here, what

15   is this text here?

16   A    It says admins.

17   Q    What is an admins?

18   A    Typically admin is a abbreviation for administrator.

19   Administrator is someone who has high-level access to a

20   computer system or to a computer network.

21   Q    There are a number of names then at Business Wire.com

22   based on the formatting of the different names, what are

23   those?

24   A    It appears to be e-mail address or login then followed by

25   a colon, then a looks like a password.  For the last four

SAMAD SHAHRANI − DIRECT − MR. TUCKER

1   there, the long alphanumeric stream, that could be different

2   kind of identifier, but the end of it thereafter the last

3   colon does appear to be passwords.

4   Q    Also directing your attention to the top, what does it

5   say here?

6   A    It says from the Business Wire.com site, it says then

7   create password page.

8   Q    Read this highlighted page.

9   A    Old pass singsing, with no spaces.  The new pass is

10  singsing333!.

11  Q    Agent Shahrani, in your −− I'm going to show the witness,

12  and just the witness, what is marked for identification as

13  Government's Exhibit 411 and 444.  Do you see those, agent

14  Shahrani?

15  A    I do.

16  Q    What are those?

17  A    Those are output from the Marketwired.com directory.

18  Q    So it's clear, are those files that you found in a folder

19  called Marketwired.com on image 4A?

20  A    That's correct.

21  Q    Are they fair and accurate copies of those specific files

22  that you found on there?

23  A    These are pronounced of text files.

24       MR. TUCKER:  The Government moves 411 and 444 into

25  evidence.

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1        THE COURT:  Any objection?

2        MR. HEALY:  No objection.

3        MS. WHALEN:  No objection.

4        THE COURT:  Received.

5        (Government Exhibit 411 & 444, was received in

6   evidence.)

7        MR. TUCKER:  May we publish, your Honor?

8        THE COURT:  Yes, sir.

9   BY MR. TUCKER:

10  Q    Now that the jury can see, what was the name of this file

11  in evidence, 411?

12  A    FTP_users.text.

13  Q    What is FTP?

14  A    The file transfer protocol, a long-standing method for

15  transmitting files from one system to another on the Internet.

16  Q    Agent Shahrani, I neglected to clarify this.  I'm going

17  to show what you is in evidence as 409, what is the file name

18  of this second document that was found in the Business

19  Wire.com file?

20  A    Hack2.txt.

21  Q    So you found hack and hack2.txt in that Business Wire

22  folder?

23  A    That's correct.

24  Q    Back to Government's Exhibit 411.  This was again found

25  in the Marketwired document folder on 4A?

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1    A    Correct.

2    Q    Directing your attention here to this first series of

3    digits, what is that?

4    A    That is an IP address and IPv4.  There are two kinds of

5    IP addresses out there.  This is the more common version that

6    people see.  There is also a longer version, IPv6.

7    Q    What is an IP address?

8    A    IP address is Internet protocol address.  Everything that

9    connects to the Internet has to have an address so you send

10   data to and from it.  There are a lot of different ways to

11   think of it, like a mailbox or a phone number.  And basically

12   when a device is connected to the Internet, it says this is my

13   IP address, if you need to send me data, send data to me at

14   this address.  Then when you send a query to a website, the

15   server knows where to send the data back to.

16        Also so you can talk to the servers.  We all do

17   things by Google.com.  But when you type that in, your

18   computer doesn't actually go to Google.com, it doesn't go to

19   the word Google.com.  It looks up the IP address then it goes

20   to that.  A lot of this happens behind the scenes.

21   Q    Agent Shahrani, after that IP address you testified

22   about, appear the words distribution:passw0rd, but the zero in

23   the word password is a zero; is that right?

24   A    Yes.

25   Q    Did you see a number of other entries that appear to be

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1  passwords?

2  A     Yes.  As you look through this you can see a number of

3  different, whether combinations of usernames and passwords,

4  some of them are very similar, indicating maybe there was an

5  iteration.  Like people typically, when they are forced to

6  change their password, it's fairly common to make finer

7  changes to the password.

8  Q     You saw a references to Marketwired as well?

9  A     That's correct.

10  Q     Showing what you is in evidence as Government's Exhibit

11  444.  What is the title of this file, Agent Shahrani?

12  A     The title is employees.txt.

13  Q     The same file name that you found in that Marketwired.com

14  file on image 4A?

15  A     That's correct.

16  Q     This document includes references to e-mail addresses

17  associated with Marketwired; is that right?

18  A     That's correct.

19  Q     Does it also include what looks to be passwords:

20  changeme and Aloha28?

21  A     A collection of e-mail addresses or usernames and

22  potentially phone numbers, then what appear to be passwords.

23  Q     For the record, Agent Shahrani, this is a 14-page

24  document; is that right?

25  A     I believe so, yes, there are hundreds of records.

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1   Q    So fair to say this is just a sample of login credentials

2   and user IDs associated with the different newswires?

3   A    Yes.  It depends on the size of the company.  Without

4   knowing how many employees or how many accounts are set up,

5   it's at least a portion and potentially all of them.

6   Q    This is a sample of the documents you found on image 4A?

7   A    Yes.

8   Q    There were others?

9   A    Yes.

10          MR. TUCKER:  Ms. Mulqueen, for just the witness.

11          COURTROOM DEPUTY:  Just the witness.

12  Q    What is marked for identification as Government's Exhibit

13  413, do you recognize this document?

14  A    Yes, I do.

15  Q    What is this document?

16  A    This is from the PR Newswire directory.

17  Q    There was a PR Newswire image on 4A?

18  A    Yes.

19  Q    There were directories on PR Newswire.com, Business

20  Wire.com and Marketwired.com?

21  A    Yes.

22  Q    Is it a fair and accurate copy of one of those files in

23  PR Newswire.com's directory?

24  A    Yes.

25          MR. TUCKER:  We move 413 into evidence.

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1      THE COURT:  Any objection?

2      MR. HEALY:  No objection.

3      MS. WHALEN:  No objection.

4      THE COURT:  It is received.

5      (Government Exhibit 413, was received in evidence.)

6      MR. TUCKER:  May we publish it?

7      THE COURT:  Yes.

8  BY MR. TUCKER:

9  Q    So now that the jury can see what is in evidence as

10 Government's Exhibit 413, what is the title of this file?

11 A    So the title is SSH_passwords.txt.

12 Q    What is SSH agent Shahrani?

13 A    SSH is the secure show.  When you're using a command line

14 interface, like commonly it's a secure way of logging into a

15 server.  So if you're SSHing into this, say if you're SSHing

16 into a server, you're connecting to the server, if you're

17 making an SSH connection you're, unless it's a tech company

18 for instance, it's usually a pretty high-level user, usually

19 it's an administrator to the server.

20 Q    If a person has SSH login credentials, to what extent to

21 could they potentially access to the system?

22 A    Depending on whose SSH credentials, they could have

23 anywhere from guest access all the way up to administrative

24 privileges and the ability to do whatever they wanted.

25 Q    This last entry is Jwatkins: it looks like h4ppyj0y, the

SAMAD SHAHRANI - DIRECT - MR. TUCKER

1    A is a four, and the O is a zero; is that right?

2    A    Yes, with an exclamation point at the end.

3    Q    Thank you.

4         MR. TUCKER:  Just for the witness, Ms. Mulqueen.

5         COURTROOM DEPUTY:  For the witness only.

6    Q    Showing the witness what is marked for identification

7    Government's Exhibit 407T, do you recognize this document,

8    Agent Shahrani?

9    A    I do.

10   Q    What is it?

11   A    This is a transcript of Skype messages that's been

12   translated that were located on item 4A.

13   Q    First after all, what is Skype?

14   A    Skype is a chat tool.  It can be used both for -- more

15   commonly people think of it as a video conferencing tool, but

16   it has a text chat feature as well.  Originally I believe it

17   was an independent company but was bought by Microsoft years

18   ago.  Skype and Skype for business.

19   Q    You said this came from image 4A?

20   A    That's correct.

21   Q    Are the chats set forth here in the chat message column

22   and the other associated data to the left and in the column

23   chat ID a fair and accurate copy of the Skype log from that

24   image 4A?

25   A    Yes.

SAMAD SHAHRANI - DIRECT - MR. TUCKER

1   Q    There is also a column that says translation, was that on

2   the original computer?

3   A    No, I believe that was done by the FBI.

4   Q    So it's clear, Agent Shahrani, is this each and every

5   Skype message that you observed on image 4A?

6   A    No, this is just a sampling.

7          MR. TUCKER:  We move to admit 407T.

8          THE COURT:  Any objection?

9          MR. HEALY:  No objection.

10         MS. WHALEN:  No, your Honor.

11         THE COURT:  Received in evidence.

12         (Government Exhibit 407T, was received in evidence.)

13         MR. TUCKER:  May I publish?

14  Q    Now that the jury can see, this is a log of chat messages

15  or exchanges from image 4A?

16  A    That's correct.

17  Q    Based on your review of this particular log of Skype

18  messages, were you able to identify which username was

19  associated with the actual user of image 4A?

20  A    Yes.

21  Q    What was that?

22  A    Vaiobro, V-A-I-O-B-R-O

23  Q    What is Vaiobro?

24  A    Vaiobro is a brand name for Sony computer series.  VAIO

25  is commonly laptops, I believe they may also have a desktop

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1  line as well.

2  Q    Agent Shahrani, have you reviewed the contents of 407T?

3  A    I have.

4  Q    Generally, in these Skype messages did you observe

5  discussions about computer hacking specifically hacking the

6  newswire companies?

7  A    I did.

8  Q    I'm going to ask you to read a few portions of this

9  document.  Could you read this first message that appears on

10  407T on the first page?

11  A    From Vaiobro.  It says, forward the lists to me.  I'm

12  curious.

13  Q    That was sent on June 19, 2012; is that right?

14  A    That's correct.

15  Q    According to the logs?

16  A    Right, that's according to the log.

17  Q    Would you continue reading this next message, please?

18  A    Also from Vaiobro, since I'm not aware of anything of

19  importance except for Business

20  Wire/PRnewswire/Marketwired/Globenewswire.

21        That's with slashes between each of the companies.

22  Q    Is Globenewswire another news company like Business Wire,

23  PRnewsire and Marketwired?

24  A    It is.

25  Q    On to the second page of 407T, would you read this

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1    highlighted text also from June 19, 2012?

2    A    Utkatra, we'll called that Utkatra, says, is there really

3    a chance to hack them?

4            Then Vaiobro says, PR or globe are a possibility.

5    Business Wire has been shut.

6    Q    Third page of Government's Exhibit 407T, this is a

7    message that was sent on June 26, 2012; is that right, this

8    last message?

9    A    Yes.

10   Q    I'm going to start here at the end of page two, read that

11   highlighted text?

12   A    This is from Vaiobro.  It says, I'm trying to restore PR

13   Newswire.

14   Q    Then there is a pasted additional discussion into that

15   message?

16   A    Yes, it appears to be somebody copy and pasted one

17   message into another.

18   Q    Read for the record the portions of text that I'm

19   highlighting Agent Shahrani?

20   A    This is again from Vaiobro.  It says -- this was

21   copy/pasted from the hackerM, didn't you hack

22   Globenewswire.com and Business Wire.com?

23           Then a subsequent message, hello.  I need access to

24   the database or the editorial of Globenewswire.com, Business

25   Wire.com, payout one link for 40K, next one is 100K plus

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1   interest further on or a large one-time lump sum.  So is it

2   just those two sites that are of interest?  Basically yes.

3   Q    Now turning your attention -- that was sent on 8/3/12,

4   correct?

5   A    Yes.

6   Q    Turning to this next message from 9/8/2012, September 8,

7   2012, can you read that?

8   A    From Vaiobro, wouldn't you like to finish up Business

9   Wire PR Newswire?  If it holds on, then it's possible we can

10  make 200-300K every season.

11  Q    Moving on to the fourth page of 407T, turning to a

12  message that was sent on October 10, 2012, who sent this

13  message?

14  A    This is Vaiobro again.

15  Q    The image of user 4A?

16  A    Yes.

17  Q    Read that.

18  A    As to PR, I got several e-mail addresses of their

19  staffers.  I'm hacking their hosting right now.

20  Q    Can you read the next entry here?

21  A    There is a number of shells as well as SQL data inside

22  the hosting.

23  Q    On that same date Vaiobro received a message, what are

24  you busy with; is that right?

25  A    Yes, from user Eminazazov.

SAMAD SHAHRANI - DIRECT - MR. TUCKER

1    Q    How do Vaiobro respond?

2    A    Vaiobro says, hacking PR Newswire.com.

3    Q    So it's clear, Agent Shahrani, the majority of these

4    messages that you were reading they were originally not in

5    English?

6    A    It appears to be Cyrillic, I'm not sure what specific

7    dialect.

8    Q    Page seven of 19, I'm going to ask you to read these from

9    October 12, 2012, that I'm highlighting for you now, who sent

10   these messages?

11   A    Again these are from Vaiobro.  The messages is, PR

12   Newswire, a pal of mine came to see me today.  He said he had

13   already made around 30K before the reporting season starts.

14   It's regarding Marketwired, with PR Newswire can you make ten

15   times that much.

16   Q    Moving on to nine of 19, Government's Exhibit 407T.  This

17   is a message from October 17, 2012, Jackpot_1721; is that

18   right?

19   A    That's correct.

20   Q    Read the highlighted text here, again the translation in

21   is English?

22   A    Now is there an opportunity to search through the tickers

23   as the news appears one to two days before, but the admin

24   panel does not retain it so it leaves.

25   Q    How does Vaiobro respond on that same date?

SAMAD SHAHRANI - DIRECT - MR. TUCKER

1   A    Vaiobro says, I have already shown you how to look for

2   it.

3   Q    Turning your attention to page 12 of 407T, this is a

4   message on October 26, 2012.  Vaiobro, could you read the

5   highlighted text for the record?

6   A    It says, I got the new name for the PRN group and the key

7   for the group.  I'm only missing a user account.

8   Q    I want to turn your attention to image 6B, that was the

9   other image that you examined; is that right?

10  A    That's correct.

11  Q    What kind of operating system was 6B running?

12  A    Windows 7 personal computer.

13  Q    Did that particular computer have a name?

14  A    Yes, it's called war, W-A-R.

15  Q    Did you find any tools that you would associate with

16  hacking or penetration testing on that computer?

17  A    I did.

18  Q    Did those tools include SQLmap?

19  A    They did.

20  Q    Did you see any SQLmap log files on image 6B?

21  A    There were.

22  Q    Were any associated with Business Wire domains?

23  A    Yes.

24  Q    Tell the jury.

25  A    If can I refer to the notes here?

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1  Q    So Agent Shahrani, for the record are you referring to

2  3500SS3?

3  A    Yes.

4  Q    Did you author that report?

5  A    No.

6  Q    What is that report?

7  A    A Mandiant report that was commissioned I believe by the

8  Secret Service to look into these drives.  Then I went through

9  and verified the contents of what I'm going to speak about.

10 Q    Turning your attention to Business Wire, did you see any

11 SQLmap log files associated with Business Wire?

12 A    I did.

13 Q    What were the dates of those files?

14 A    There were a number of files basically beginning on

15 March 19, 2012, moving all the way through to dates around the

16 31st, March 31, 2012.

17 Q    I neglected to ask you, Agent Shahrani, on 6B, on your

18 forensic review, were you able to determine the period of time

19 that computer was in use?

20 A    Yes, the last system activity for this device was October

21 late, October 2012, I think the 19th.

22 Q    Did you also see SQLmap log files associated with

23 Marketwired domains?

24 A    Yes.

25 Q    What were the dates of those log wires creations?

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1    A    I'll just refer to this.

2    Q    So SS3?

3    A    Yes, this is SS3.  You're saying Marketwired?

4    Q    Yes.

5    A    So for Marketwired there is logs, a number of logs here,

6    Marketwired looks like it begins around May 2, 2012.

7    Q    So it's clear, Agent Shahrani, when you're seeing log

8    files and associated dates, what is the significant of those

9    dates?

10   A    Typically with those dates it's saying that's the date,

11   that the day on the computer system that the logs were

12   generated.

13   Q    Does that mean based on that analysis, that was the date

14   that the program was run, that SQLmap was run?

15   A    Assuming that the date on the computer is correct, right,

16   because the system draws this from the computer's date, then

17   that would be the date that these files were, these SQLmap

18   commands, were run, then these files were created as a result

19   of SQLmap.

20   Q    Does you see evidence of data being extracted using

21   SQLmap?

22   A    Yes.

23        MR. TUCKER:  Just for the witness.

24        COURTROOM DEPUTY:  Just the witness.

25   Q    Showing the witness what is marked for identification

SAMAD SHAHRANI – DIRECT – MR. TUCKER

1    Government's Exhibit 427, do you recognize this document,

2    agent Shahrani?

3    A    I do.

4    Q    What is it generally?

5    A    It's a file called employee.CSV, Common Separated Values.

6    So typically if you are copying data out of a database, not

7    from one database to another database, but just to kind of

8    have it as a human readable format, it's export data is a

9    Common Separate Value file.  If you look at this in a text

10   file you basically see all the data you're seeing here, but

11   delineated by columns separating it out.

12   Q    Is this document a fair and accurate copy of that file

13   employee.CSV that you found -- withdrawn.

14            Where did you find this particular image?

15   A    This was found on the work computer.

16   Q    Image 6b?

17   A    Correct.

18            (Continued on next page.)

19

20

21

22

23

24

25

SHAHRANI – DIRECT – MR. TUCKER

1  DIRECT EXAMINATION

2  BY MR. TUCKER::

3  Q     Is this is a fair and accurate copy, if you were to print

4  it out, of the document that you found on that war computer in

5  image 6B?

6  A     Yes.  To get this kind of layout you'd have to load into

7  something like Excel or some viewer that would display it

8  properly, but, yes, this is a fair and accurate copy.

9  Q     The data that it contains is the same.

10  A     It should be, yes.

11        MR. TUCKER:  Your Honor, the government moves to

12  admit Government Exhibit 427.

13        THE COURT:  Any objection.

14        MR. HEALY:  No objection.

15        MS. WHALEN:  No objection.

16        THE COURT:  427 received.

17        (Government Exhibit 427, was received in evidence.)

18        MR. TUCKER:  May we publish?

19        THE COURT:  Go ahead.

20        (Exhibit published.)

21  BY MR. TUCKER::

22  Q     I'll zoom in here a little bit, Agent Shahrani.  So one

23  of these columns is called email; is that right?  I'm trying

24  to highlight it here.

25  A     I think it's EM_email.  It's hard to read.

SHAHRANI - DIRECT - MR. TUCKER

1   Q    Zoom in even more here.

2   A    EM_email, yes.

3   Q    Among the entries in that column are there references to

4   a market wire domain?

5   A    Yes, there are several.

6   Q    Did you also see associated employee information and

7   passwords for those entries?

8   A    Yes.  There is a variety of information stored, but if

9   you move there's a field called EM_password, and then also

10  other fields EM_name, underscore first -- underscore name --

11  excuse me.  EM_name_first and then another field called

12  EM_name_last.

13  Q    And, again, this was data that you extracted from image

14  6B, that computer called war; is that right?

15  A    That's correct.

16  Q    Did you observe any documents that appeared to be press

17  releases, specifically market wire press releases on image 6B?

18  A    I did.

19  Q    How many approximately?

20  A    Dozens.

21  Q    I'm showing you what's been marked for identification,

22  just for the witness, Ms. Mulqueen.

23           THE COURTROOM DEPUTY:  Just for the witness.

24  Q    As Government Exhibit 405.

25           THE COURTROOM DEPUTY:  405.

SHAHRANI – DIRECT – MR. TUCKER

1   BY MR. TUCKER::

2   Q    Is this one of those documents that appear to be a press

3   release?

4   A    It is.

5   Q    And again, where did you find this?

6   A    This was found on the war system.

7   Q    That's image 6B?

8   A    Correct.

9   Q    Is that a fair and accurate copy of the files extracted

10  from image 6B?

11  A    Yes.

12         MR. TUCKER:  Your Honor, the government moves to

13  admit Government Exhibit 405 into evidence.

14         THE COURT:  405.  Any objection?

15         MR. HEALY:  No objection.

16         MS. WHALEN:  No, Your Honor.

17         THE COURT:  Received.

18         (Government Exhibit 405, was received in evidence.)

19         MR. TUCKER:  May we publish, Your Honor?

20         THE COURT:  Yes.

21         (Exhibit published.)

22  BY MR. TUCKER::

23  Q    Agent Shahrani, you testified this was one of dozens

24  press releases from image 6B; is that right?

25  A    Yes.

SHAHRANI – DIRECT – MR. TUCKER

1    Q     What's the headline here?

2    A     TIBCO software reports Q2 non-GAAP, which is an

3    accounting term, EPS grows 24 percent to 26 cents.

4    Q     Agent Shahrani, at the bottom of this document there is

5    some text, what is that?

6    A     Right.  So that's the file name.

7    Q     This was the file name of this particular document as

8    extracted from image 6B?

9    A     That's correct.

10   Q     Now, Agent Shahrani, the press releases that you observed

11   on image 6B, in what format were they stored?

12   A     Most of them were in .rar files.

13   Q     Is that .R-A-R?

14   A     Right.

15   Q     What's the .rar file?

16   A     So it's kind of a running theme, it's yet another format.

17   So in this case it's most similar to what people probably are

18   familiar with as zip files.  It's a compressed file format.

19   So there are, again, of variety of different compression

20   algorithms that can be used, they generate a variety of

21   different file names, some are better at compressing say

22   video, others are better at compressing text or other content.

23   In this case the person chose to make it a .rar file.  I don't

24   know why but it's a fairly common compression algorithm.

25   Q     Are you familiar with a program call WinZip?

1118

SHAHRANI – DIRECT – MR. TUCKER

1    A    I am.

2    Q    Could WinZip be used to unpack or unzip a .rar file?

3    A    Certainly.

4    Q    I'm going to show you what's in evidence as Government

5    Exhibit 323.

6              Agent Shahrani, I'm going to direct your attention

7    here to this icon that appears in the bottom of the system

8    tray.  Is that icon familiar to you?

9    A    Yes, it appears to be the WinZip icon for Windows.

10   Q    So it's clear, this WinZip icon could be used to open a

11   .rar file; is that right?

12   A    Sure.  That icon suggests that WinZip is open on that

13   computer and then that program would be able to create or open

14   a .rar file.

15   Q    Agent Shahrani, did you see any chat logs on that image

16   6B, the war computer?

17   A    I did.

18              MR. TUCKER:  Just for the witness, Ms. Mulqueen.

19              THE COURTROOM DEPUTY:  Witness only.

20   BY MR. TUCKER::

21   Q    I'm showing the witness what's been marked for

22   identification as Government Exhibit 406T.

23              Do you recognize that document Agent Shahrani?

24   A    I do.

25   Q    What is it generally?

SHAHRANI – DIRECT – MR. TUCKER

1   A    So these are excerpts of chat logs.  You can see

2   timestamp sender, and the original it's written in Cyrillic

3   alphabet, and then the translation into English is on the far

4   right.

5   Q    Are these fair and accurate copies of excerpts of chat

6   logs that you personally observed on image 6B?

7   A    Yes.

8           MR. TUCKER:  Your Honor, the government moves to

9   admit Government Exhibit 406T in evidence.

10          THE COURT:  406T, any objection?

11          MR. HEALY:  No objection.

12          MS. WHALEN:  No, Your Honor.

13          THE COURT:  Thank you, Counsel.  Received.

14          (Government Exhibit 406T, was received in evidence.)

15          MR. TUCKER:  May we publish, Your Honor?

16          THE COURT:  You may.

17          MR. TUCKER:  Thank you.

18          (Exhibit published.)

19          THE WITNESS:  Yes.

20   Q    Agent Shahrani, so the jury can see what you were

21   starting to explain, this is the timestamps for the different

22   chats.

23   A    Correct, as recorded by the chat file.

24   Q    This wasn't Skype, right?

25   A    No, this was not Skype.

SHAHRANI – DIRECT – MR. TUCKER

1    Q     This was a different chat platform?

2    A     Correct.

3    Q     I'm going to turn your attention to certain excerpts

4    here.

5          On the second page of this document, would you read

6    the highlighted text here, the English translation, Agent

7    Shahrani?

8    A     Sure.  It says HTTP://glomosome, so

9    G-L-O-M-O-S-O-M-E.Business Wire.com and then a slash question

10   mark ID equals eight.  It says:  Got this one.  Here is the

11   admin.

12         And then the same HTTP://glomosome.Business

13   Wire.com/admin/index.php.  It says:  It's on the secure server

14   no, but still plus something else.

15   Q     That message, that series of messages were sent on

16   February 27th, 2012?

17   A     Yes.

18   Q     And, by the way, so it's clear, Agent Shahrani, these

19   entries say to and from and the username here is N dash dash

20   dash; is that right?

21   A     Yes.

22   Q     That N dash dash dash, that was the user of 6B, according

23   to these logs?

24   A     According to the logs.

25   Q     Turning your attention to the fourth page of 406T.  I'm

SHAHRANI - DIRECT - MR. TUCKER

1    going to ask you read these series of messages from

2    March 27th, 2012.  I'm going to highlight the text here, Agent

3    Shahrani, just bear with me for a moment.

4           Would you read that text for the jury, please.

5    A    When you get back here write to me right away, there are

6    several problems.  The first and largest is that PR is fucked

7    up.  They detected the module and removed all our shit there.

8    They took away that temporary server.  I haven't gone on to

9    the new one yet, I'm waiting.  This happened on the 13th.

10          The second problem, your guys were detected, they

11   were trading with very big money and there was a lot of fuss

12   about them, about how it's not the season and when it was the

13   season they traded.

14   Q    Again, those messages were sent from the user of 6B on

15   March 27th, 2012?

16   A    Correct.

17   Q    Turning your attention to the next page, there are a

18   series of messages to the user of 6B on that same date.  Would

19   you read the highlighted text, please, for the jury.

20   A    Sure.  It says:  And find out and also that shell there

21   see about raising privileges.  Also there is an admin account

22   for biz on the main site.

23   Q    Agent Shahrani, did you see any forensic evidence that

24   that image 6B, that computer 6B had connectivity to the IP

25   address 94.100.218.42?

SHAHRANI - DIRECT - MR. TUCKER

1    A    I did.

2    Q    We'll refer to that as the 42 IP address going forward?

3    A    Okay.

4    Q    What did you see?

5    A    There were logs and records that were recovered from the

6    system that indicated or that had that IP address present in

7    them.

8    Q    If I could just show the witness --

9         THE COURTROOM DEPUTY:  Witness only.

10   Q    -- what have been marked for identification as Government

11   Exhibits, I'm going to show you a series, Agent Shahrani, 435,

12   431, 432, 433, and 434.

13   A    Okay.

14   Q    Do you recognize these documents generally, Agent

15   Shahrani?

16   A    I do.

17   Q    Are these fair and accurate copies of files that you

18   extracted from image 6B?

19   A    They are.

20        MR. TUCKER:  Your Honor, the government --

21        THE COURT:  I didn't hear the very last part of your

22   question from image?

23        MR. TUCKER:  6B, Your Honor.

24        THE COURT:  6B.

25        MR. TUCKER:  I apologize.

1123

SHAHRANI – DIRECT – MR. TUCKER

1   A     Yes, they are.

2               MR. TUCKER:  Your Honor, the government moves to

3   admit Government's Exhibits 432, 433, 434, and 435 into

4   evidence.

5               THE COURT:  Not 431?

6               MR. TUCKER:  And 431, Your Honor.  Thank you.

7               THE COURT:  Any objection?

8               MR. HEALY:  No objection.

9               MS. WHALEN:  No objection.

10              THE COURT:  They are received.

11              (Government Exhibit 431, 432, 433, 434, and 435,

12   were received in evidence.)

13              MR. TUCKER:  Thank you, Your Honor.  May we publish?

14              THE COURT:  Go ahead.

15              (Exhibit published.)

16   Q     Turning your attention to what's now in evidence as 435,

17   Government Exhibit 435.

18   A     All right.

19   Q     You testified that there is evidence linking image 6B to

20   the IP address 9410218.42; is that right?

21   A     That's correct.

22   Q     I'm highlighting that particular IP address there.  Is

23   that right, Agent Shahrani?

24   A     Yes, that's correct.

25   Q     This came from a file called Exploit; is that right?

SHAHRANI - DIRECT - MR. TUCKER

1    A    That's correct.

2    Q    Please explain to the jury the significance of the IP

3    address appearing here in Government's Exhibit 435?

4    A    So that address appearing there it says the L Host, which

5    is the local host.  This output is from a tool called

6    Metasploit, M-E-T-A-S-P-L-O-I-T, all one word.  From --

7    actually I think the Armitage front-end, like the graphical

8    image interface.  And that's Armitage, A-R-M-I-T-A-G-E, I

9    believe.

10            So basically the system is configured to use that as

11    the local address.

12    Q    Let's take a step back.  First of all, what is

13    Metasploit?

14    A    Metasploit is one of the probably most popular, if not

15    the most popular, penetration testing/hacking tool that's out

16    there.  It's -- the reason it's called Metasploit is it

17    basically has just a huge variety a meta, a variety of

18    exploits, hence the name Metasploit that can be used to attack

19    a number of different systems in a number of different ways.

20    So it's kind of like Swiss Army knife.  It's got a variety of

21    different tools you can use.  It can do port scanning, which

22    is basically mapping out computers, it can then find an

23    vulnerability, like identifying systems that have

24    vulnerability, then exploit the system and then provide

25    reports.

SHAHRANI – DIRECT – MR. TUCKER

1  Q    So is Metasploit like SQLmap in that it can be a

2  penetration testing tool?

3  A    Yeah.  Like SQL map is much more limited in terms of just

4  kind of focusing on SQL databases, whereas Metasploit can

5  target a much broad array of targets.

6  Q    So is this information, among other things, log data

7  associated with the use of that Metasploit tool?

8  A    It is.

9  Q    And that again is from image 6B?

10  A    That's correct.

11  Q    Now, please explain what it means, what this particular

12  entry means Set L Host with that 42 IP address.

13  A    Right.  So basically you're saying that's the local host.

14  The data should be coming back or you should be communicating

15  with that host.  That is the -- when the Metasploit is running

16  when it's going out, there might be a remote host, a target,

17  but then it should be communicating back to the local host.

18  Now that may not necessarily be the computer, the attacker's

19  computer it might be a computer that they control like a

20  different server, but they're basically saying I control this

21  or this is an IP address that you should be talking back to.

22  Q    Right.  So let me ask you a couple of questions about

23  that.  First, is the local host chosen by the user of that

24  Metasploit software?

25  A    Yeah, that's something that you set.

SHAHRANI – DIRECT – MR. TUCKER

1    Q    You were explaining a moment ago that this may not be a

2    true IP; is that right?

3    A    Not necessarily -- it doesn't -- I'm sorry, semantics.

4    So it is a true IP, but it may not necessarily be the

5    attacker's home or the IP address where they physically are.

6    In some cases you will run a tool like this and you'll have it

7    communicate it right back to you, right?  If I'm the

8    administrator of the system or perhaps not a very good hacker,

9    you might have it send the data right back to you, but that's

10   traceable, right.  So in a lot of cases you will set the

11   system up so there's some level of deniability, this is what

12   we refer to as a proxy, so there is basically someone between

13   you.  Instead of me walking into the store and stealing

14   something and handing it right over to the person that had me

15   steal it, I use a cutout.  There is a server or one or more

16   servers between them and me.

17   Q    So that allows the user to conceal their actual IP

18   address?

19   A    Yes.

20   Q    By the way, Agent Shahrani, when you use a hotspot, a

21   mobile hotspot do you get an IP address assigned when you turn

22   on a hotspot?

23   A    Yes, normally, like I said earlier, if you're connecting

24   to the Internet with any kind of device, your device has to

25   have an IP address, there may be several IP addresses between

SHAHRANI – DIRECT – MR. TUCKER

1    it.  If you're using a hotspot, typically you're getting

2    assigned an IP address from whatever cellular tower or

3    communication system you're talking to.

4    Q    So that IP address would be different from, say, one's

5    home IP if they were logging in through, you know, a usual

6    cable modem or something like that?

7    A    Sure.  If you have an IP address, like I said, these IP

8    addresses are assigned by whoever is giving you Internet

9    access.  So if your Internet access is from your home cable

10   system, that's going to be one IP address, but then if you

11   use, say, your cell phone, not connected to your wireless at

12   the house, you just use your cell phone on Verizon or whatever

13   network to go to a different -- or if you go to a web page,

14   even though you're physically at your house, those two

15   different devices, your home computer and your phone would

16   have two different addresses.

17   Q    Agent Shahrani, did you also see evidence linking that

18   image 6B to the email address warninggp@gmail.com?

19   A    I did.

20   Q    I'm going show you first what's in evidence now as

21   Government's Exhibit 431.  Again, this was a file that you

22   found on image 6B?

23   A    Yes, but I should note that here it's called

24   gitconfig.txt, so that it's readable, right?  We had to make

25   some minor file name changes.  On the system it was actually

1    called .gitconfig, but the content is the same.

2    Q    The point of putting it into a text file was so it could

3    be printed and marked as an exhibit?

4    A    Yes.  Basically the way the system was configured before,

5    if you don't change the extension in Windows like that

6    typically it doesn't recognize that as a text file.

7    Q    The email address here, just for the record?

8    A    The email address is warning, W-A-R-N-I-N-G, and the

9    letter G and the letter P @gmail.com.

10   Q    What is git or github, Agent Shahrani?

11   A    So git is hard to explain.  So when you're working on

12   software, just like -- when you're working on software you

13   need to be able to keep track of how many different versions

14   of a piece of software you have, right?  You're changing the

15   code.  Some of those -- so sometimes if it's just you, it's

16   not really hard to do what's called version control, right?

17   I'm the only working on it so it's easy for me to track and I

18   remember what I did yesterday, I remember what I did two days

19   ago, no big deal.  If you're working with two or more people,

20   or let's say you're a company like Microsoft and you've got

21   thousands of people working on a piece of code, you need to

22   have what's called a code management system and git is

23   basically that.  It's a open source freeware kind of system

24   that you can use to basically manage your software.

25             So you will have a username, you can set up a

SHAHRANI – DIRECT – MR. TUCKER

1  username for it, you can log into it, so if I make a change

2  you can track it.  So if you set up git, you create what's

3  called a repo, a repository, and I apologize for the names, I

4  don't make them up, this is industry standard so, so you make

5  a repository and then into that repository people can make

6  push and pull requests so they can basically say, okay, I want

7  to check out a copy of this data, make some changes and then I

8  can put my changes back in.  It's basically just a software

9  development and tracking platform.

10  Q    So just to be clear, would you associate the use of git

11  with individuals who have some experience and expertise in

12  writing computer code?

13  A    Yeah, it's especially recently.  I mean it's an industry

14  standard now, like git is a pretty common tool, but, yeah,

15  it's not something that the average person would use.  It's

16  something that people that are programmers or have some

17  familiarity with programming languages would be interested in.

18  It's not of much use to anybody else.

19  Q    Showing you what's in evidence as Government Exhibit 432.

20  This file is called TheLog; is that right?

21  A    Yes, here it's called TheLog.  I think -- yeah, I think

22  it was originally called TheLog.txt as well.

23  Q    And what is it?

24  A    It's just -- it's a log file like a github log file.

25  Q    It's associated with github, right --

SHAHRANI - DIRECT - MR. TUCKER

1    A    Yes.

2    Q    -- what you were just describing?

3    A    Yes.  Just so I'm clear.  There's two separate things.

4    There's git, and then there's github, which is -- which uses

5    git.  So github is like a website that kind of lets a lot of

6    these repositories talk to each other.  You can have a git

7    repository that doesn't use github, but lots of people use

8    github because it lets you trade code back and forth, right?

9    If you're a programmer there's a better than average chance

10   that somebody's already solved a problem that you're looking

11   at and so you can go to github, take a piece of somebody's

12   code, use it in your project if you needed to.

13   Q    Turning to your attention to page 11 of that document, is

14   there a reference in this github log to that email address you

15   were testifying about earlier, warninggp@gmail.com?

16   A    There is, yeah.  You can see basically in the log here

17   where the user.email value -- user.email.value was set to

18   warninggp@gmail.com.

19   Q    Showing you what's in evidence as Government Exhibit 433.

20   This was a file called License; is that right?

21   A    Yes.  But I believe on the system it was actually called

22   License.log.

23   Q    What was this file?

24   A    It looks like a Metasploit license keep or license log.

25   You can see about eight lines down it says, license status

SHAHRANI - DIRECT - MR. TUCKER

1   activation, okay.  User warninggp@gmail.com.  And it says,

2   Metasploit community.

3   Q    And Metasploit that was that suite of software you

4   described like a Swiss Army knife a little while ago?

5   A    Right.  Metasploit is a very common hacking and pen

6   testing tool.

7   Q    I'm showing you what's in evidence as Government

8   Exhibit 434.  What is this document generally?

9   A    So this is the output of a file -- so here it's basically

10  listed as Mozilla_history.XLSX, but it's actually output from

11  a file called Places.SQlight.

12  Q    What is the significance of that?

13  A    So it's basically just Mozilla history.  This is the way

14  that Mozilla, the web browser stores some of the activity that

15  you participated in, sites you visited, things you've done.

16  It's in something called the SQlight, which, surprise, is

17  SQL-based.  Basically it's a different flavor of SQL.  It's

18  just how Mozilla tends to store stuff locally.

19          And in this case what it is -- the output here is

20  information it gathered, basically what we say is cached when

21  somebody was using Mozilla.  So you use your web browser your

22  computer typically goes out to whatever site you want, gets

23  the information it needs to display the images, right,

24  CNN.com, all the photographs and the text, things like that,

25  and usually the web browser does what's called caching and

SHAHRANI – DIRECT – MR. TUCKER

1   stores some of that stuff locally.

2           You can clear the cache, but you don't have a whole

3   lot of control about what the system does or doesn't cache.

4   So basically when you visit a website, the browser will cache

5   what it wants to cache and it wouldn't be something that would

6   be obvious to you.

7   Q    Did this particular entry from the cache reference that

8   email address, warninggp@gmail.com?

9   A    Right.  So what you can see here is basically somebody

10  went to mail dot–– sorry, I didn't mean to put an arrow there.

11  You can see that somebody went to mail.Google.com, so Gmail,

12  and there's some emails that came in, you know, learn how to

13  use Metasploit community edition, warninggp@gmail.com.

14  Another one says verify your email address.

15          THE COURT:  Little slower, please.

16  A    Sorry.  It says:  Learn how to use Metasploit community

17  edition, which we saw in the earlier exhibit, and then it says

18  in the email address warninggp@gmail.com, then another request

19  to verify their email address and a number of other emails

20  that appear to be associated with the email address

21  warninggp@gmail.com.

22  Q    There's an entry for, pretty Kiev girls at

23  warninggp@gmail.com?

24  A    Right.  The structure of that is it's a little hard to

25  tell because it looks like there might be some characters that

SHAHRANI – DIRECT – MR. TUCKER

1   were in there they were in a different alphabet that this

2   system doesn't display, that's why some of those look unusual.

3   But, primarily, it looks like what you're looking at is a

4   subject of an email and then the recipient.

5        So the subject was, you know, verify your email

6   address, and the recipient was warninggp@gmail.com.

7   Q    Just so it's clear, Agent Shahrani, these documents we're

8   look at, these are instances on image 6B that show or suggest

9   that the user used the email address warninggp@gmail.com?

10  A    Right.  What this basically suggests is somebody that had

11  access to that email account logged into that account on this

12  computer and in so doing using webmail and in so doing it left

13  these artifacts behind.

14  Q    Agent Shahrani, did you also conduct some forensic review

15  of images of computers that were seized from the defendant,

16  Vitaly Korchevsky's house on the day of his arrest on

17  August 10, 2015?

18  A    I did.

19  Q    How did that process work generally?

20  A    Pretty much the same.  There were images that were taken

21  of the systems and I reviewed them.

22  Q    I apologize I think I misspoke, defendant Korchevsky

23  arrested on August 11th, 2015; is that right?

24  A    I believe so.  I believe the images were taken during a

25  search of the residence.

SHAHRANI – DIRECT – MR. TUCKER

1   Q    You weren't there for --

2   A    No --

3   Q    -- that particular search?

4   A    -- no, I wasn't.  That was conducted, I think, by our

5   Computer Analysis Response Team, CART.

6   Q    Did you subsequently review the images that were taken?

7   A    I did.

8   Q    What software did you use to conduct that review?

9   A    FTK.

10           THE COURT:  Sorry.

11           THE WITNESS:  Oh, sorry, FTK, the Forensic Toolkit.

12   BY MR. TUCKER::

13   Q    That's some of the same software that you told the jury

14   about on Thursday?

15   A    Right, the same style of software.  I'm not sure if it

16   was the exact same version, but...

17   Q    May I just show the witness, Ms. Mulqueen, what's been

18   marked for identification as Government's Exhibit 424.

19           THE COURTROOM DEPUTY:  Witness only.

20   Q    Do you recognize this document, Agent Shahrani?

21   A    I do.

22   Q    What is it?

23   A    So there is basically -- there was basically, like we

24   said with cache images, right, with cached data, this was a

25   cached email.

SHAHRANI - DIRECT - MR. TUCKER

1   Q    And where was this image found?

2   A    It was found -- I'm referring to my notes.

3   Q    Which notes are you referring to?

4   A    Sorry.  So this is 3500SS-7.

5   Q    Thank you.

6   A    So this was found on -- this is 424, correct?

7   Q    Correct.

8   A    Yes.  This was found on a image of a Dell computer.

9   Q    Is this a fair and accurate copy of that fragment that

10  was found on that Dell computer that you personally saw in

11  your FTK review?

12  A    Basically, just so you understand, the way that this

13  stuff is found on the systems is -- so this was I believe a

14  .HTM file and so it's basically a HTML code, right.  So HTML

15  is what most web pages are written in, so depending on the

16  browser that you look at it in, it will look a little bit

17  different, like what gets displayed might change a little bit,

18  but in terms of this representing an accurate rendering of

19  what you would get if you look at it now, yes.  If you were

20  looking at it through, you know, the webmail or something

21  there might be more things -- you can see there are images

22  that are missing with the question marks and things like that,

23  but, yes, it's accurate.

24         MR. TUCKER:  Your Honor, the government moves to

25  admit Government's Exhibit 424.

SHAHRANI – DIRECT – MR. TUCKER

1   THE COURT:  424.  Any objection?

2   MR. HEALY:  No objection, Your Honor.

3   THE COURT:  Received.

4   (Government Exhibit 424, was received in evidence.)

5   MR. TUCKER:  May we publish, Your Honor?

6   THE COURT:  Yes.

7   (Exhibit published.)

8   BY MR. TUCKER::

9   Q   So now that the jury can see, Agent Shahrani, you

10  indicated the data missing, can you just explain so the jury

11  can see what you mean by that?

12  A   Yes.  Like I said, this is an HTM -- it's a HTML file,

13  right, so if you looked at just the raw data it would be very

14  difficult to read as a human.  So what this is is that this is

15  basically what that HTML file looks like when you look at it

16  through a web browser, but because this is excerpted from a

17  webmail interface and the computer that we looked at it on

18  wasn't connected to the Internet, there are certain things

19  that are missing.  Like in this particular case you can see

20  it's displaying question marks where there would be some sort

21  of image, a logo, something like that.  But in terms of the

22  substantive content, the text, it's accurate.

23  Q   What's the email address I just highlighted on this

24  document that was extracted from that Dell image file?

25  A   Dubovoy1, that's D-U-B-O-V-O-Y, and then the number

SHAHRANI – DIRECT – MR. TUCKER

1    1@gmail.com.

2    Q    Looking at the second page, can you read this text from

3    that same exhibit?

4    A    Sure.  It says Bill To:  Igor Dubovoy, 6240 Crested Moss

5    Drive, Alpharetta, Georgia, 30004, United States.  Then there

6    is a phone number (678)665-7771.

7    Q    What is this document generally, Agent Shahrani, or what

8    does it appear to be?

9    A    It appears to be from receipt from Microsoft for buying

10   Office365.

11   Q    What's Office365?

12   A    Office365 is a -- I guess you can go both ways.  It's

13   basically the latest version of Microsoft Office.  I think

14   it's web-based as well as something that you can download onto

15   your home computer.

16            MR. TUCKER:  Ms. Mulqueen, just for witness.

17            THE COURTROOM DEPUTY:  Witness only.

18   Q    I'm showing the witness what have been marked for

19   identification as Government's Exhibit 418 --

20   A    Okay.

21   Q    -- and 426.

22            Do you recognize these documents, Agent Shahrani?

23   A    I do.

24   Q    Where did you find these?

25   A    So these were taken from SC4, which was an image of a --

SHAHRANI – DIRECT – MR. TUCKER

1    I'm sorry, I'm referring again to SS7.  This is a Lenovo

2    laptop that was imaged during that same search I referenced.

3    Q    The Lenovo laptop that was imaged during the search of

4    defendant Vitaly Korchevsky's residence?

5    A    That's correct.

6    Q    Are these fair and accurate copies of the data, certain

7    data found on that image SC4?

8    A    Yes.  Again, with the same caveats since it's the webmail

9    interface there are some things that aren't displayed properly

10   but in terms of the text content, yes.

11              MR. TUCKER:  Your Honor, the government moves to

12   admit Government's Exhibit 418 and 426 and their corresponding

13   translations 418T and 426T in evidence.

14              THE COURT:  Any objection?

15              MR. BRILL:  No objection.

16              THE COURT:  They're received.

17              (Government Exhibit 418T and 426T, were received in

18   evidence.)

19              MR. TUCKER:  May I publish, Your Honor?

20              THE COURT:  Go ahead.

21              (Exhibit published.)

22   BY MR. TUCKER::

23   Q    Looking now at what's in evidence as Government

24   Exhibit 418, this document is obviously not in English, but is

25   there a reference to particular email address here?

SHAHRANI – DIRECT – MR. TUCKER

1   A    Right.  You can see a reference to the email address

2   VMARKEN, V-M-A-R-K-E-N@BK.ru.

3   Q    Now looking at 418T, the English translation of that

4   document, I'm going to turn your attention to really where it

5   says, your computer has incorrect local time installed which

6   is why your email interface is displayed incorrectly.  We

7   strongly recommend that you set the clock.

8        Did I read that right?

9   A    That's correct.

10  Q    Is there a reference here to that email address,

11  VMARKEN@BK.RU?

12  A    There is.

13  Q    Now that the jury can see it, please explain what they're

14  looking at here?

15  A    Sure.  As I said before, because of the way this is being

16  displayed, the content is stored because it's an artifact,

17  some things aren't being displayed properly here.

18       So when you're accessing webmail, something like

19  Gmail or Yahoo email or something like that, there is a lot of

20  stuff happening in the background that you don't see.  There's

21  kind of -- there's probably like a basic HTM, but a lot of the

22  contents that you're seeing, the emails, your inbox, things

23  like that, that's usually generated by some other kind of

24  scripting language.  Typically it's something like JavaScript.

25       So what you're seeing here is basically portions of

SHAHRANI - DIRECT - MR. TUCKER

1    that JavaScript, portions of things that got downloaded with

2    this file.  And when we try to view it in our forensic

3    software or whatever browser this was opened in, that script

4    in the background looked around and realizing something was

5    wrong and through up an error message.  If you were looking at

6    this properly, that is on the actual webmail system, you

7    wouldn't see that.

8    Q     Just so it's clear, Agent Shahrani, what is webmail?

9    A     Right, so webmail is --

10            THE COURT:  Give me a just a second.  Ms. Brill, are

11   you all right?

12            MS. BRILL:  I'm trying to be.  Thank you, Your

13   Honor.  Maybe one more sip of water.

14            THE COURT:  Maybe one more sip, maybe not.

15            If you need a break just wave.  We're going to take

16   a break in 10 minutes unless you need one now.

17            MS. BRILL:  I think it worked.  Thank you, Your

18   Honor.

19            THE COURT:  Okay.  I'm sorry.  Go ahead.

20   BY MR. TUCKER::

21   Q     What's webmail, Agent Shahrani?

22   A     Webmail is basically a web-based email system.  Most

23   people today probably are more familiar with webmail than the

24   traditional versions of email, but in a very short summary of

25   it:  You have a couple of different systems you can use when

SHAHRANI – DIRECT – MR. TUCKER

1    you read your email, right.  Old style when you were

2    connecting to IMAP, like Internet mail application service,

3    your computer would reach out to the mail server, download a

4    copy of all the emails and store it locally.  Your phones,

5    other devices things like that probably still do that.  They

6    reach out and get a copy of either the protocol called POP and

7    there's a protocol called IMAP.  But in general, basically

8    they reach out, they get a copy of the mail and they store it

9    locally.

10            With the rise of webmail, that's different.  So you

11   can -- if you've accessed your, say, Gmail or Yahoo mail, or

12   whatever, or hotmail account from a web browser, those

13   messages aren't really being downloaded to your computer, they

14   are being shown, they're being displayed to you, like you can

15   see them, but there aren't like duplicate copies of that

16   stored locally and pretty much when you close the web browser

17   your system loses access to those mails.

18            Now, obviously, there are other things that you can

19   set and configure so that you can have that mail copied to you

20   locally, but fundamentally if you're using a webmail

21   interface, you see the emails, they are stored on the remote

22   server, they stay there, you look at them, when you're done

23   the web browser closes and the only thing that will be left on

24   the local computer would be, as I said, artifacts, things were

25   that cached, bits and pieces that are left behind by the

SHAHRANI - DIRECT - MR. TUCKER

1  browser.

2  Q    Like what we're looking at here in Government

3  Exhibit 418?

4  A    Correct.

5  Q    And showing you what's in evidence as 426 and 426T.  Is

6  that the same sort of thing, Agent Shahrani?

7  A    Right, so same sort of thing.  This came from -- this is

8  a file that was listed as, basically in short, inbox then to a

9  square parenthesis around a one.  So inbox square parenthesis,

10  number one, close parentheses, dot HTM.  So same kind of

11  thing, right.

12        This is -- you can see across the top here in the

13  translated version, this look likes it's kind of the

14  navigation bar at the top of an email system like you'd

15  expect, or if not the navigation bar the interface, and then

16  it also has at the end of it the username or the email address

17  VMARKEN@BK.RU.

18  Q    Agent Shahrani, what's metadata?

19  A    Metadata is data about data.  So if -- lets take an

20  example that's been in the news somewhat, right.  So if you

21  talk about a phone call, the phone call itself, the

22  conversation that a person has with another person, that would

23  be the data, right, that's the content of the call.  But the

24  metadata for that would be the time that the call was placed,

25  the duration of the call, where the two people were, right, if

SHAHRANI – DIRECT – MR. TUCKER

1    it's a cellular conversation, the GPS location or other

2    location data for one party and that same data for the other

3    party.  So basically it's information about the file itself or

4    about something.  It doesn't necessarily have to be a file,

5    you could have metadata about lots of different things.

6    Q    Were you able to identify any metadata associated with

7    Government's Exhibit 418?

8    A    Yes.

9    Q    And did that metadata include a last modified date?

10   A    Yes.

11   Q    What did you learn?

12   A    The last modified date was mid 2012 or -- yeah.

13   Q    The last modified date for this document?

14   A    I believe so was -- sorry, I'd have to refer.

15   Q    Okay.

16        MR. TUCKER:  May I just have moment, Your Honor?

17        THE COURT:  Yes.

18   Q    Agent Shahrani, one other question here, this domain

19   VK.RU, what's the significance of that?

20   A    It's a Russian email provider, I believe.

21        MR. TUCKER:  Your Honor, if I could have just one

22   moment.  I apologize trying to find something or I'll just

23   move on.  Seems not.

24   Q    Agent Shahrani, just so we're clear, Government

25   Exhibit 418, sitting here today, do you remember the date

SHAHRANI - DIRECT - MR. TUCKER

1    modified for this particular document?

2    A    I don't.

3    Q    Agent Shahrani, we talked about a few specific examples

4    of files that you were able to find on images associated with

5    the defendant Korchevsky's media; is that right?

6    A    That's correct.

7    Q    Is that everything that you looked at on Korchevsky's

8    media?

9    A    No.

10   Q    Was that everything that the FBI was able to identify --

11   A    Yes.

12   Q    -- on Korchevsky's media?

13            MR. TUCKER:  Just one moment, Your Honor.

14            Could I just show the witness, Ms. Mulqueen?

15            THE COURTROOM DEPUTY:  Witness only.

16            MR. TUCKER:  Witness only.

17   Q    I'm showing the witness what's been marked for

18   identification as Government's Exhibit 4 -- 826.

19            THE COURTROOM DEPUTY:  8-2-6.

20            MR. TUCKER:  8-2-6.

21   Q    Agent Shahrani, turning to the second page of this

22   document, do you recognize that entry?

23   A    I do.

24   Q    Now, agent Shahrani, what is Government's Exhibit 826?

25   A    This looks like it could be metadata for the file I

SHAHRANI - DIRECT - MR. TUCKER

1  mentioned, inbox with the parenthesis number 2.HTM.

2  Q    So it's clear, that was Government Exhibit 418; is that

3  right?

4            MR. HEALY:  Objection.

5            THE COURT:  What's the objection?

6            MR. HEALY:  I don't believe that's what the witness

7  said.  I believe that's --

8            THE COURT:  I understand him to be referring -- tell

9  us exactly -- first of all, lets go back to 826 --

10            MR. TUCKER:  Yes.

11            THE COURT:  -- what is it?

12  BY MR. TUCKER::

13  Q    What is Government's Exhibit 826?

14  A    That's the metadata for the exhibit that you showed just

15  before this.

16  Q    So that's -- you were testifying earlier about data?

17  A    Right, if you set it down again --

18            THE COURT:  The metadata for 418 in evidence?

19            THE WITNESS:  Correct.  So this is the metadata, as

20  I said, that 418 was originally stored as inbox with the

21  parentheses 2.HTM.  This is the metadata for that.

22            THE COURT:  Clear, Mr. Healy.

23            MR. HEALY:  Yes, Your Honor.

24            MR. TUCKER:  Your Honor, the government offers

25  Government's Exhibit 826.

SHAHRANI – DIRECT – MR. TUCKER

1          THE COURT:  Any objection?

2          MR. HEALY:  No objection, Your Honor.

3          THE COURT:  Received 826 in evidence.

4          (Government Exhibit 826, was received in evidence.)

5          MR. TUCKER:  May we publish, Your Honor?

6          THE COURT:  Go ahead.

7          (Exhibit published.)

8          THE COURT:  Go ahead, then we will take your break.

9          MR. TUCKER:  This is my last question, Your Honor --

10    my last two.

11          So, Agent Shahrani, this makes reference to that

12    domain that you mentioned earlier, inbox bracket 2.HTM; is

13    that right?

14    A    That's correct.

15    Q    Does this reflect the metadata you were testifying about

16    earlier of last modified?

17    A    Yes.  That's December 10th, 2014 at 16:25 eastern

18    standard time.

19    Q    So it's clear, that's the last modified time of this

20    Government's Exhibit 418 which is in evidence?

21    A    Correct.

22    Q    And, Agent Shahrani, would you explain to the jury the

23    limitations of the last modified and what it means?

24    A    Sure.  So last modified depends on a lot of variables,

25    right.  Depending on how the system is configured, whether the

SHAHRANI - DIRECT - MR. TUCKER

1   date and time on the local computer are set properly.  So if

2   everything is set correctly on the system, then typically the

3   last modified date reflects accurately, but what a

4   modification is depends on what some of the systems are,

5   right?  So if the file is copied, there are other stages or

6   other steps that can be done to a file that could change it.

7   But, typically, the last modified date is the last time the

8   file was modified.  So if it's sitting there and nothing has

9   been done to it, it hasn't been edited or changed typically

10  the last modified date reflects that.

11              MR. TUCKER:  No further questions, Your Honor.

12              THE COURT:  All right.  We will take our mid-morning

13  break, folks, do not discuss the case.  We will resume in

14  about 12 minutes.

15              THE COURTROOM DEPUTY:  All rise.

16              (Jury exits courtroom.)

17              THE COURT:  Okay, you can step down for a few

18  minutes.

19              THE WITNESS:  Thank you, Your Honor.

20              THE COURT:  I think, folks, relative to the

21  gentleman I discussed earlier in the morning, I think maybe

22  the best way to do this would be to take a few minute -- to

23  break for lunch just a few minutes early, I think it would be

24  less apparent to the rest of the jurors.  Do you all have a

25  view on whether or not you want to do this in open court or

SHAHRANI – DIRECT – MR. TUCKER

1    defer to the courtroom and the court reporter.

2              MR. BRILL:  For Mr. Korchevsky, we have no problem

3    with the Court in private speaking to the juror initially.

4              THE COURT:  Yes, of course.  And you'll get that

5    conversation of course.

6              Ms. Whalen, you're views.

7              MS. WHALEN:  Our preference would be to do it in

8    open court, Your Honor.

9              THE COURT:  Then we will do it in open court.

10             MS. WHALEN:  Thank you.

11             (Recess.)

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SAMAD SHAHRANI – CROSS – MR. HEALY

 1                    (The following takes place out of the presence of

 2      the jury.)

 3                    THE COURT:  Where is our witness?

 4                    MR. TUCKER:  He's out in the hall, Judge.

 5                    THE COURT:  Have a seat, folks, while we await the

 6      witness.

 7                    (Pause in the proceedings.)

 8                    THE COURT:  Here he comes.

 9                    (Witness enters courtroom.)

10                    THE COURT:  I tell you I keep the whip cracking,

11      right.  I guess I have to tell everybody else too.

12                    (Witness resumes the stand.)

13                    THE COURT:  All right, cross-examine.

14                    MR. HEALY:  Thank you, Your Honor.

15                    (Pause while counsel confer.)

16      CROSS-EXAMINATION

17      BY MR. HEALY:

18      Q    Good afternoon, Agent Shahrani.

19      A    Good afternoon, counselor.

20      Q    I'd like to start with something that I think that I'm on

21      firm footing here, I want to talk about IP addresses and hot

22      spots.

23      A    Okay.

24      Q    You told the government on direct that an IP hot spot

25      allows someone to have a different IP address than their home

SAMAD SHAHRANI - CROSS - MR. HEALY

1    IP address; is that correct?

2    A    Typically, yes.

3    Q    But you agree with me that people buy mobile hot spots

4    for reasons other than concealing their home Wi-Fi IP address,

5    correct?

6    A    Yes.

7    Q    In fact, people buy mobile hot spots so that they can

8    have access to the internet when they may not have Wi-Fi

9    service; is that correct?

10   A    Yes.

11   Q    Perhaps when they're traveling?

12   A    Yes.

13   Q    And you'd also agree with me that any time you log in

14   from a mobile device or a computer when you're not at home,

15   you're going to get a different IP address than your home

16   IP address?

17   A    Assuming that you don't VPN into your home computer and

18   then connect through that, yes.

19   Q    Absolutely assuming that.

20         You'd agree with me that, for example, anybody

21   that's logged in through the Eastern District of New York

22   Wi-Fi will have a different IP address than their home

23   IP address.

24   A    Yes.

25   Q    In fact, they'll have the same IP address, correct?

SAMAD SHAHRANI – CROSS – MR. HEALY

1    THE COURT:  Same IP address?

2    A    Excuse me?

3    Q    The same IP address.

4         If you've logged into this Wi-Fi, this Eastern

5    District of New York Wi-Fi, anyone who logs into that will

6    have the same IP address, correct?

7    A    Depending on how the server is configured, so there are a

8    lot of variables to what you're asking.

9    Q    I'll withdraw that.  We don't need any more details.

10   A    Yeah.

11   Q    I want to start with talking about the two computers that

12   you examined that were seized on August 11th, 2015.  I believe

13   you told us that you examined a Lenovo computer?

14   A    Yes, SC-5 and SC-40.

15   Q    Yes.

16   A    Yes.

17   Q    And you examined a Dell computer?

18   A    That's correct.

19   Q    And when you examined those, you found some artifacts

20   that referred to a VMarken?

21   A    That's correct.

22   Q    I want to talk about those in a moment.  I'd like to talk

23   about specifically some other things.

24        Would you agree with me that the hard copy images

25   from those computers occupy tens of thousands of pages?

SAMAD SHAHRANI – CROSS – MR. HEALY

1   A     Assuming that you could put some of that content and

2   print it out, sure.

3   Q     And when you searched those tens of thousands of pages,

4   you were searching for connections that would tie those

5   computers to the hackers; is that correct?

6   A     We would search for a variety of different things.  We

7   would be looking for information, yes, that might tie them to

8   the hackers but other information that's also relevant to the

9   investigation.  It is not an either/or kind of possibility.

10  You'd look for anything that might be relevant to the

11  investigation.

12  Q     I didn't mean to imply exclusively, I just wanted to know

13  if you searched for evidence tying the computers to the

14  hackers and I think you told us yes.

15            Did you find any evidence of Loscal?

16  A     No.

17  Q     And you didn't find any evidence of Rupion?

18  A     No.

19  Q     You didn't find any evidence of the IP address

20  83.133.126.96?

21  A     That's a remarkably specific question that without

22  reference I couldn't say one way or the other.

23  Q     Were you even asked to look for that?

24  A     Without referring to notes, I don't know.

25  Q     You didn't find any evidence of Warning GP, did you?

SAMAD SHAHRANI – CROSS – MR. HEALY

1    A    On the SC-4 and SC-5 systems?

2    Q    Correct.

3    A    No.

4    Q    You didn't find any evidence of Vladimir Kopienko (ph)?

5    A    No.

6    Q    You didn't find any evidence of an email address vip2000?

7    A    No.

8    Q    You didn't find any evidence of an email address

9    stargate11?

10   A    No.

11   Q    You didn't find any evidence of an email address

12   positive1?

13   A    No.

14   Q    You didn't find any evidence of Valera Pychnenko?

15   A    No.

16   Q    You didn't find any evidence of Vaiobro?

17   A    No.  But that being said, the Vaiobro name wouldn't

18   necessarily -- that's s chat name, not a computer name or

19   system name.

20   Q    But you didn't find it?

21   A    Correct.

22   Q    Now, you testified you're aware those two computers, the

23   Lenovo and the Dell, were seized on August 11, 2015, correct?

24   A    I don't recall the exact date but they were seized

25   pursuant to a search at the defendant's residence.

SAMAD SHAHRANI - CROSS - MR. HEALY

1    Q    And --

2    A    Or, excuse me, the computers themselves were imaged, I

3    don't believe the computers themselves were seized.  I believe

4    they were copied and then I reviewed those copied images.

5    Q    Would you agree with me if they were seized subject to a

6    search warrant, they were no longer in the possession of the

7    person who had them prior to the seizure?

8    A    Well, as I said, I don't believe that the systems were

9    physically seized, I believe that they were imaged and

10   normally if a system is imaged in place the system remains

11   with the user or the owner.

12   Q    Fair enough.

13             From your examination of those two computers, you

14   don't know who had them prior -- who had possession of them

15   prior to August 11th, 2015, do you?

16   A    When you say those two computers, do you mean SC-4 and

17   SC-5 or do you mean the original, the War and Alex PC systems?

18   Q    No, no, we're still talking about the Dell and Lenovo,

19   I'd like to just use those.

20   A    Sure, I just want to make sure we're talking about the

21   same thing.  Could you repeat the question.

22   Q    From your examination of those two computers, you have no

23   information, no evidence as to who actually possessed them

24   prior to their being seized and imaged on August 11, 2015?

25   A    There was data on there from -- well, I mean there was

SAMAD SHAHRANI – CROSS – MR. HEALY

1  personal data relating to individuals on the system but I'm

2  not sure exactly what you mean by proof of who owned the

3  systems before then -- that date.

4  Q    I wasn't asking for proof, I was just asking if you had

5  any information that on a given day, let's say April 3rd,

6  2012, who actually was in possession of that computer?

7  A    Not that I'm aware of, no.

8  Q    And you don't actually know who purchased that computer

9  based on your examination of the images?

10 A    No, based on the examination of the images I don't but

11 that doesn't mean we don't have that information from another

12 method.

13 Q    But you yourself?

14 A    No, I personally have no idea.

15 Q    And you yourself don't know who installed anything on

16 either of those computers?

17 A    No, I don't.

18 Q    Now, you told us that on the Dell computer you extracted

19 something that's in evidence as --

20         MR. HEALY:  This is in evidence, Ms. Mulqueen.

21         THE CLERK:  Certainly.

22 Q    It's in evidence as 424.

23 A    Correct.

24 Q    And we refer to this -- you referred to this as

25 Office 365?

SAMAD SHAHRANI – CROSS – MR. HEALY

1   A     A receipt for the purchase.

2   Q     A receipt for Office 365.  Now, you don't know who

3   installed this on that Dell computer, do you?

4   A     No.

5   Q     And you don't know who was in possession of the computer

6   when it was installed, do you?

7   A     No, I don't.

8   Q     You do know or we do know from this exhibit that it was

9   billed to Igor Dubovoy, correct?

10  A     That's the email address listed, yes.

11  Q     Now, you also talked about a couple of artifacts that

12  were found on the Lenovo computer, do you recall that?

13  A     I do.

14  Q     And I'm going to show you what is in evidence as

15  Exhibit 418 and this is the original version which is in

16  Cyrillic.

17        MR. HEALY:  Mr. Tucker, could I get the translated

18  version which would be 418-T?

19        (Pause.)

20        MR. HEALY:  This is 418-T.

21  Q     I just want to make sure that we are referring to the

22  same exhibit.  Is this the exhibit that corresponds to the

23  metadata that you told the jury about in 836, this particular

24  original artifact?

25  A     No, I believe the metadata was for 426 -- no, I'm sorry,

SAMAD SHAHRANI - CROSS - MR. HEALY

1    yeah, it's 418.

2    Q     It was this exhibit?

3    A     Yeah, I believe so.

4    Q     This one says that says Registration Log in here, this

5    one?

6    A     Yeah, that's what you're saying is 418?

7    Q     Yes.

8    A     I believe so, yes.

9    Q     And I believe you told the jury that the message that

10   Mr. Tucker highlighted and it's still highlighted that "your

11   computer has the incorrect local time installed" popped up

12   because the system ascertained that the incorrect local time

13   was installed?

14   A     Well, no.  So, what it is is -- how to explain this --

15   so, if you looked at this file as the raw html, right, the raw

16   code, you wouldn't see that message because that code, there's

17   a little piece of java script or some kind of code that is

18   running, when you open this up in a web browser it runs, and

19   because we were looking at it in a forensic box -- a forensic

20   review system, that script in the background noticed that

21   something was off, basically it couldn't communicate with its

22   home server because our forensics systems are not connected to

23   the internet so it can't ping out and get like the date and

24   time information, all the stuff it is wanting, so it just

25   generated an error message.  If you looked at the raw html

SAMAD SHAHRANI – CROSS – MR. HEALY

1   code, you'd see that error message and a variety of other

2   potential error messages in there because the raw code

3   contains most of what could be displayed.  So, that doesn't

4   mean that the individual computer that this file was recovered

5   from had a time and date setting correctly, it means that

6   because we tried to display it on our forensic computer in a

7   human readable format as opposed to giving it as a very

8   jumbled html file, the browser read some of the code and

9   generated that error message because it couldn't talk out to

10  what it expected to.  That doesn't mean that the system itself

11  it was recovered from had a misconfigured time key.

12  Q    So, basically that has no significance, that statement at

13  the top of that?

14  A    Correct.

15  Q    So, it could have had a correct date and time code or it

16  could have had an incorrect date and time code?

17  A    Yeah, basically, like I said, it is an artifact, that's

18  all it is.  If you looked at this on a normal system or on the

19  system itself, you probably wouldn't have seen it or you might

20  have seen it on the system itself because it wasn't able to

21  talk out to the servers it was expecting to.  Like I said,

22  with web mail there's a lot of stuff that's loaded behind

23  scenes so when you get an artifact, depending on how you

24  display it, there's lots of things that you would never

25  normally see unless there was an error.

Holly Driscoll, CSR
Official Court Reporter

SAMAD SHAHRANI – CROSS – MR. HEALY

1   Q    But you did tell us that 836, which had a date and time

2   in December of 2014, that actually may be an incorrect date

3   and time?

4   A    The metadata for the file, that's what was displayed but

5   without knowing more details about the nature of the system

6   and some of the configurations, I can't say that that was

7   certainly the time.

8   Q    That's all I wanted to know, we don't know for certain

9   that that's the correct date and time.

10  A    Right, without more information, no.

11  Q    I want to turn for a minute and talk a little bit about

12  4-A and 6-B, those are the computers that I might refer to as

13  the Alex PC and the War PC.

14  A    Okay.

15  Q    Now, and if you need, by the way, Agent, to refer to the

16  SS-2 and SS-3, that's fine, I know you were referring to those

17  on your direct testimony.

18  A    Okay.

19  Q    I want to talk first about the Alex PC which is 4-A.

20  A    Okay.

21  Q    So, in your examination of the Alex PC or in your

22  verification of the original examination of the Alex PC, would

23  you agree with me that the computer is only indicated

24  potentially for being used as intrusion between November

25  of '11 and November of 2012.  And if you want, you can refer

SAMAD SHAHRANI – CROSS – MR. HEALY

1   to page one, I believe that's contained in the report on page

2   one.

3   A     So, yeah, no, I think that's fair.

4   Q     But, in fact, as you testified, the three newswire

5   services that we've been talking about, PR Newswire,

6   Business Wire and Marketwired, actually have indications that

7   are significantly after the first indication, significantly

8   after November of 2011, correct?

9   A     I don't know of the exact dates for some of those

10  intrusions.

11  Q     Well, if we look at what you testified to, I believe you

12  told the jury -- and I believe this is indicated on page nine

13  of SS-2 -- that the first indication of an SQL report -- and

14  if I use the wrong language, please correct me -- the first

15  indication of an SQL report was actually in March of 2012; is

16  that correct?

17  A     Right, yeah, there's a file here, r2b2hn.com.

18  Q     Then the first indication of a PR Newswire SQL report was

19  in May, May 30th of 2012?  I believe that's on page 19.

20  A     That appears -- sorry, what was the date again?

21  Q     I believe you said it was May 30th, 2012; is that

22  correct?

23  A     Yes, that appears to be.

24  Q     And although the report indicates that the last date that

25  that computer, that Alex PC had access or made an intrusion

SAMAD SHAHRANI – CROSS – MR. HEALY

1  attempt was in November of 2012, in fact the report limits

2  even further when it was used in conjunction with each

3  newswire service; so, for example, Business Wire, the last

4  intrusion evidence is September 8th of 2012, and again would

5  be page nine?

6  A    In, let's see, some of the chat history -- if you're

7  saying September 8 of 2012, I think that's just referencing

8  chat history --

9  Q    Well, it could be earlier; can you tell from that when

10 the last SQL intrusion was?

11 A    The last record on here says -- or the last that's noted

12 on this particular one seems to be March 24th of 2012, that's

13 the last SQL map.  I should note that just because an SQL map

14 was run on that date, that doesn't mean that the information

15 gathered from the SQL map was not used at a later date and

16 time to commit an intrusion.  These are the logs -- like you

17 wouldn't need to rerun the SQL map multiple times over a

18 period of time to get this, you could run it once or twice,

19 get the information you needed and then use that information

20 at a letter date and there wouldn't necessarily be log files

21 or any records left on the system of that event.

22 Q    Depending on what the information was?

23 A    Right, depending on what the information was and

24 depending on what tools you used.

25 Q    So, in fact we'll talk about that in a bit.

SAMAD SHAHRANI – CROSS – MR. HEALY

1              I also think that that report that you reviewed and

2    verified indicates that the hackers reached different levels

3    of access on the different servers, is that fair to say?

4    A    In the conversation they had they discussed certain

5    levels of penetration that they mentioned in the system and

6    also discussed elevating their privileges which is a fairly

7    common tactic.

8    Q    When you say "they" discussed, who is "they"?

9    A    The conversations that are occurring between the hackers

10   or the individuals.

11   Q    Fair enough.  I'm actually talking about what the

12   forensic examination determined which you said you reviewed is

13   that, as I understand it, that, for example, the finding was

14   that PR Newswire was researched, is that fair to say?

15   A    You could use the term researched, you could say scanned,

16   you could say cased, that would be synonymous.

17   Q    That's a fairly low level of access, correct?

18   A    It would -- I would say it is more of a preliminary step

19   as opposed to -- like I said, it is similar to casing a

20   location, you're not maybe breaking into it but you're looking

21   for vulnerabilities, you're looking for weaknesses, so it

22   would be an early step in the intrusion process.

23   Q    And that Marketwired and Business Wire had been accessed

24   is the term that I believe was used in the report?

25   A    That's correct.

SAMAD SHAHRANI – CROSS – MR. HEALY

1    Q    But none of those domains were actually compromised which

2    is the highest level, correct, according to that report?

3    There's a table on page eight if it refreshes your

4    recollection.

5    A    Right.  So, according to the information -- well, again,

6    there's kind of a semantics issue here where if you say you

7    accessed the system without further details is something that

8    can have many different meanings; you can be a hacker and say

9    that you successfully accessed the system by breaking into it,

10   you could also say you accessed the system by logging on to

11   their public website.  In the context of hackers, typically if

12   you're saying you accessed a system, it means you breached it,

13   but without more context I couldn't say.

14   Q    You couldn't say whether any of those reached the level

15   of compromise, that was my question?

16   A    Sorry.  So, yes, if you're asking if these were SQL --

17   the SQL map sessions were compromised, there were database

18   dumps that were present on there which would indicate that the

19   systems -- that that data had been extracted from the target

20   systems which would indicate that there was some kind of

21   compromise.

22   Q    So, are you saying that that report is incorrect?

23   A    No, I'm saying it is a semantic differential, saying a

24   system was accessed can have many meanings, it is not a -- it

25   is an open term that could be interpreted several different

SAMAD SHAHRANI – CROSS – MR. HEALY

1    ways.

2    Q    We'll disregard the table in the chart then.

3         Let's talk about it this way.  You talked about data

4    dumps and documents; those documents aren't necessarily press

5    releases, correct?

6    A    No, those documents –– so, some of the documents we

7    discussed were user names, passwords, login-s, things that you

8    would need to access the system to obtain press releases and

9    other content.

10   Q    Or try to access the system?

11   A    Or attempt to access the system.  Although having those

12   user names and passwords in and of themselves would suggest

13   that there had been an access of information that the ultimate

14   user, that the typical user wouldn't have access to, that they

15   would have had to have done something to obtain that

16   information.

17   Q    Absolutely, Agent, I don't mean to imply that there was

18   no hacking going on.  I'm just trying to get a little more

19   precision on exactly when and where things were done.

20        And before we move on to the War computer, can we

21   agree that any data that was taken off of the newswire

22   services from this particular computer had to happen in the

23   case of Business Wire after March of 2012?

24   A    Based off of the records that we were able to locate, the

25   materials that we were able to see on the system, that's

SAMAD SHAHRANI – CROSS – MR. HEALY

1    consistent but that doesn't mean there weren't other systems

2    used that the hackers didn't -- basically that's off of what

3    we have here.

4    Q    That's my question, off of this computer?

5    A    Off of this information, that's correct.

6    Q    And for PR Newswire, for this particular computer, any

7    information that was obtained had to be after May 30th of

8    2012, that was the date you told us?

9    A    Well, on or after.

10   Q    I'm happy to go with on or after.

11   A    Sure.

12   Q    And with Marketwired, where I don't believe you told us

13   and we'll just go with general first evidence of intrusion,

14   May 15th of 2012?

15   A    That sounds correct, yes.

16   Q    Let's talk briefly about the War computer, that would be

17   of 6-B.  You want to refer to SS-3 is the report you're

18   referring to.

19   A    Okay.

20   Q    So, according to the indications in the forensic review

21   of that computer, the first instance of any malicious activity

22   was in February 20th -- on or about February 20th, 2012; is

23   that correct?

24   A    Yes, I believe -- let me verify that, yes.  You said

25   February --

SAMAD SHAHRANI - CROSS - MR. HEALY

1   Q    20th.  On page one.

2              (Pause.)

3   A    Yeah, I'm looking at the actual original, the session

4   info.  Yes, that sounds correct.

5   Q    And you told the jury that actually with respect to each

6   newswire service, the dates are somewhat later.  So, for

7   Marketwired you told us the first SQL intrusion was on May 2nd

8   of 2012; is that correct?

9   A    I believe so.

10  Q    And that for Business Wire it was in March of 2012?

11  A    That sounds correct.

12  Q    And for PR Newswire it was in March also of 2012,

13  March 26th?

14  A    Yes, let me double-check just to make sure.

15  Q    That would be on page 37 if I'm not mistaken.

16  A    Yes, sounds right.

17  Q    And then the last intrusion for anything on this computer

18  that there's any forensic evidence is October 19th of 2012?

19  A    That sounds correct but, again, I'd like to clarify.  The

20  last -- saying that the last intrusion is just the last scan,

21  the last logs, the records on here, that doesn't mean there

22  weren't other intrusions.  I'm just saying from the records

23  here.

24  Q    From the records you reviewed, that's all we can ask you

25  to talk about.

SAMAD SHAHRANI – CROSS – MR. HEALY

1   A      Yeah.

2   Q      So, to be clear finally, any information that was

3   obtained by this War computer, 6-B, for Marketwired had to

4   have been obtained after May 2nd of 2012?

5   A      On this particular computer?

6   Q      Yes?

7   A      Yes.

8   Q      Only referring to this particular computer.

9   A      Yes.

10  Q      And then on Business Wire I believe it is March 19th of

11  2012?

12  A      That's correct.

13  Q      And PR Newswire on March 26 of 2012?

14  A      That's correct.

15         MR. HEALY:  No further questions.

16         THE COURT:  All right.

17         Ms. Whalen.

18         (Continued on next page.)

19

20

21

22

23

24

25

SHAHRANI - CROSS - MS. WHALEN

1    CROSS-EXAMINATION

2    BY MS. WHALEN:

3    Q    Good afternoon.

4    A    Good afternoon, counsel.

5    Q    I'm going to show you what's been previously marked and

6    entered into evidence as Government Exhibit 323.

7    A    Okay.

8    Q    And I think you were asked about it on Thursday of last

9    week.

10   A    That's correct.

11   Q    Okay.  And so at the top of the document, you testified

12   that this was sent from the e-mail address of Vladislav

13   Khalupsky?

14   A    According to the header information, yes.

15   Q    And then it was sent on December 12th -- December 18th,

16   2013?

17   A    Correct.

18   Q    And --

19   A    Again, based on the header.

20   Q    Based on the header.

21          So let's -- assuming -- we are just reading into

22   evidence what the header says.

23   A    Yes.

24   Q    And that it was at 1:52 p.m., correct?

25   A    Right, but with an unknown time zone.

Denise Parisi, RPR, CRR
Official Court Reporter

SHAHRANI - CROSS - MS. WHALEN

1  Q    That's correct.  I believe that was your testimony on

2  Thursday.

3  A    That's correct.

4  Q    And it was sent to the address vkhalupsky2002@yahoo.com,

5  according to the header.

6  A    Correct.

7  Q    And just going to the second page, I think you also

8  reviewed this in your testimony on Thursday, correct?

9  A    Yes.

10  Q    Okay.  And you saw, and I believe you were asked about,

11  dolphintenet.odessa.ua, correct?

12  A    Yes, I was.

13  Q    And there's a series of numbers, 195.138.72.114, correct?

14  A    Correct.  That's an IP address.

15  Q    That's an IP address, great.

16        There's also what appears to be an IP address in

17  front of it.  It's 192.168.0.100, correct?

18  A    That's correct.

19  Q    Now, first going back to dolphintenetodessa.UA.  TENET.UA

20  is a telecommunications company in Ukraine, correct?

21  A    If you say so.  I'm sorry, I'm not intimately familiar

22  with --

23        THE COURT:  If you don't know, I don't know.

24  A    Okay.  I don't know.

25  Q    Did you do any investigation into -- I'm assuming you did

Denise Parisi, RPR, CRR
Official Court Reporter

1    not do any investigation since you don't know about it.

2    A    Correct.

3    Q    And this -- trying to get information about this company

4    was not part of the mutual legal assistance treaty activity

5    that you -- that took place in this case, correct?

6    A    I don't know.

7    Q    Looking at this IP address, since you didn't do any

8    investigation into TENET, you don't know how many individuals

9    or how many devices could be connected to this IP address,

10   correct?

11   A    I have no idea.

12   Q    And then this other IP address 192.168.0.100, that's part

13   of a series of IP addresses that are reserved for private

14   Internets, correct?

15   A    Yeah.  Typically -- it's called reserve address, so that

16   basically suggests that it's an internal network.  In this

17   case, since this is Webmail and it's Google, it might be a

18   Google internal IP address.  Basically, there were public

19   facing IP addresses that everybody is kind of familiar with,

20   and then there's a reserved or series of reserved internal

21   blocks that you are supposed to use inside of your network,

22   and that would be one of those reserved addresses.

23   Q    Okay.  And so -- while this address 19513872114 would be

24   unique --

25   A    Typically, that's a public facing IP address, so that

SHAHRANI – CROSS – MS. WHALEN

1   would be unique on the Internet -- unique on the public

2   Internet.  That doesn't mean that somebody couldn't set up

3   their own you know weird internal network and then reassign

4   that.  But, yes, in terms of something you could access on the

5   Internet, that would be unique.

6   Q    And so generally, though, these 192.168 numbers, they can

7   be repeated in internal networks from business to business,

8   correct?

9   A    Sure.  If we all went to our individual homes and if you

10  had, like, a Wi-Fi router and you had multiple devices

11  connected to that, all of us would probably have a 192

12  address, something internal to that network.  That's fairly

13  standard.

14  Q    Now, there was also some discussion about time of this --

15  the time of this e-mail, and I think, as you indicated, on the

16  header on the front of the e-mail, it says 1:52 p.m., correct?

17  A    Correct.

18  Q    But we have no direct information because we don't know

19  what time zone, correct?

20  A    Right.  But I think if you look at the header, it will

21  give you the time zone.

22  Q    Okay.  And so just going through the time zone, we have a

23  time at the top, the first line, 10:52.28 2013.

24  A    Mm-hmm.

25  Q    We then have another time above the line that says

SHAHRANI - CROSS - MS. WHALEN

1    content-type.  Again, it says, Wednesday, December 18, 2013,

2    and that gives 10:52.27, correct?

3    A    Yeah.

4    Q    And that has a minus 0800, and you indicated that that

5    was Pacific Standard Time, correct?

6    A    Yeah.  Minus 800 is -- most servers are run on, as I

7    said, UTC, Universal Time Code, it's basically Greenwich Mean

8    Time, and that way you can -- no matter where your server is,

9    everybody is kind of operating off of the same time code.  You

10   basically have to have something like that set up otherwise

11   the Internet doesn't really work.  So, in this case, the time

12   would be 10:52.27 or 10:52.28 depending on when it moved from

13   server to server.  There's -- obviously, if somebody moves

14   from one server to another, there's a little bit of lag time.

15   Q    And then there's one more time down four -- four lines

16   from the bottom next to -- it says date, and it says,

17   Wednesday, 18, December 2013, 20 52 27 and then it has plus

18   0200, correct?

19   A    That's correct.

20   Q    And that would be UTC plus two hours, correct?

21   A    Correct.  I'm not sure exactly what the non-UTC time zone

22   would be.  It's somewhere in Europe, I would assume.

23   Q    You have no knowledge -- you have no personal knowledge

24   that this is the time zone in Ukraine, correct?

25   A    Yeah.  I'm sorry, I don't know what the time zone is

SHAHRANI - CROSS - MS. WHALEN

1   Ukraine is.

2   Q    And then I'm also going to show you -- it's been

3   marked -- what's been admitted into evidence as Government

4   Exhibit 323-A1, and you've seen this before, correct?

5   A    Yes, I have, on Thursday.

6   Q    And this was -- I believe this was the attachment to 323?

7   A    Yes.

8   Q    And I believe that you testified -- and I believe you

9   testified that there were letters "E N" displayed on the

10  monitor.

11  A    Yes.  You can see them there.

12  Q    And I believe that it was your testimony that this meant

13  that the computer was configured to English, correct?

14  A    Well, if you have that in the lower corner, that's

15  basically a setting that you can change, so you can toggle

16  what language it displays.  Normally, for most of us, if you

17  are a monolingual user, you don't have the language packs

18  installed, so that doesn't appear.  If you are bilingual or

19  speak multiple languages or are working in multiple languages

20  for whatever reason, you can install a language pack, and then

21  normally the option to switch between the languages can be

22  presented.

23  Q    Okay.

24       So this is a setting that can be changed on the

25  computer, the language of display, correct?

SHAHRANI - CROSS - MS. WHALEN

1   A     Yeah.  That's -- I think it's a setting in the control

2   panel for Windows.  You can configure it to display in

3   whatever language you have a pack installed for.

4   Q     Okay.

5           And then also --

6   A     And you also might have to install those language packs

7   to have foreign languages displayed properly in general.  For

8   instance, Cyrillic Arabic, sometimes you have to install a

9   pack otherwise the data looks kind of garbled.

10  Q     And let's just -- sorry.  I think you testified as to the

11  time in the corner being 1:25 p.m., correct?

12  A     That's what's it's displaying, yes.

13  Q     I think as you're saying, we don't know that that's the

14  actual time.  That's just the time that the computer is

15  configured to, correct?

16  A     That's correct.

17  Q     Okay.  And then also, I believe, you testified today --

18  oh, here it is -- you testified as to on the left-hand side of

19  the exhibit, sort of the last icon displayed on the left-hand

20  side, I think you testified that that was a WinZip icon?

21  A     I'm sorry, you mean the right-hand side?

22  Q     I'm sorry, I have real problems with right and left.

23  A     Okay.

24  Q     So --

25  A     Yes.  So on the right, as we're looking at the exhibit,

SHAHRANI - CROSS - MS. WHALEN

1    the rightmost icon?

2    Q    Yes.

3    A    Okay.

4    Q    Is that the WinZip?

5    A    It appears to be.

6    Q    And that's -- I think you testified that that was a way

7    to look at files that had been compressed through the zip

8    program, correct?

9    A    Yeah.  WinZip can both compress and decompress files.

10   Q    And then -- and I believe also you testified that -- I

11   think it was on Thursday -- as to the date of the computer.

12   A    Right.  It looks like it's displayed as 18 12 2013, so

13   it's a European kind of date format.

14   Q    And then today, you testified about a number of -- you

15   testified somewhat on Thursday and then again today about a

16   number of computers that had been imaged that you had

17   reviewed, correct?

18   A    That's correct.

19   Q    And you testified, I believe, about 4-A?

20   A    Yes.  4-A was Alex PC.

21   Q    Alex PC.

22        And then you testified about 6-B which, I think, was

23   named War?

24   A    Yes.

25   Q    And these two -- these two images were from laptops that

SHAHRANI - CROSS - MS. WHALEN

1   were seized in Kiev, Ukraine, correct?

2   A    I don't know if they were laptops.  I just know they were

3   personal computers.

4   Q    But some kind of personal computer that was seized

5   pursuant to a mutual legal assistance treaty search, correct?

6   A    I believe so, yes.

7   Q    And they were seized in Ukraine, correct?

8   A    I believe so, but that's a -- that's what I was told, but

9   you would have to speak with the --

10  Q    So you have no personal knowledge as to where it is.

11  A    Correct.

12  Q    But in reviewing the images of these computers, you were

13  able to determine the last date that the computers had been

14  accessed, correct?

15  A    That's correct, yeah, we discussed that.

16  Q    And I believe that 4-A was last accessed on

17  November 16th, 2012?

18  A    Yes, that's correct.

19  Q    Okay.  And 6B was last accessed on December 19th, 2012?

20  A    October 19th, 2012.

21  Q    October, sorry.

22       And then you were asked to review a number of

23  exhibits -- I'm just going to list them.  You were asked to

24  review them today.  437, 408, and 409.

25  A    Yes.

SHAHRANI - CROSS - MS. WHALEN

1    Q    Government Exhibit 411 and 444?

2    A    Yes.  The output files from SQLmap.

3    Q    So those were the output files from the computers, or at

4    least one of the computers, that was seized, you believe, in

5    Ukraine, correct?

6    A    Yes.

7    Q    And then you also looked at 413, 407 and 407-T?

8    A    Yes.

9    Q    427, 405, and 406-T?

10   A    Yes.

11   Q    And then 431, 432, 433, 434, and 435, correct?

12   A    Correct.

13   Q    And all of those were files from the Alex PC or the War

14   PC, correct?

15   A    Correct.

16   Q    And all of those files were in the computers that were

17   seized on November 16th, 2012, correct?

18   A    Yes.  They were -- the files that were provided to me

19   that were seized and provided to the secret service and then

20   to us.

21   Q    So in any event, the folders that you saw, all of those

22   government exhibits that I just referred to, all of those

23   exhibits came from the computers that you reviewed and the

24   images of those computers?

25   A    Yes, that's correct.

SHAHRANI - CROSS - MS. WHALEN

1   Q    Alex PC and War, correct?

2   A    Correct.

3   Q    Those files were contained in the computers that were

4   last accessed on November 16th, 2012, and October 19th, 2012.

5   A    Correct.

6            MS. WHALEN:  No further questions.

7            THE COURT:  I'm sorry, did you say you are finished?

8    Ms. Whalen?

9            MS. WHALEN:  I'm sorry.  I said no further

10  questions.  I apologize.

11           THE COURT:  Thank you.

12           All right.  Any redirect?

13           MR. TUCKER:  No, Your Honor.

14           THE COURT:  Thank you, sir.  You may step down.

15           Next witness.

16           (Witness steps down.)

17           THE COURT:  Who is the next witness?

18           MS. NESTOR:  Your Honor, the government calls Louis

19  DiPietro.

20           (Short pause.)

21           THE COURTROOM DEPUTY:  Good afternoon, sir.  I'm

22  going to ask you to please step my way.  I'm going to ask you

23  to please take the stand and raise your right hand.

24           (Witness takes the stand.)

25           (Witness takes the witness stand.)

DIPIETRO – DIRECT – MS. NESTOR

1    LOUIS DIPIETRO, called as a witness, having been first duly

2    sworn/affirmed, was examined and testified as follows:

3              follows:

4              THE WITNESS:  I do.

5              THE COURTROOM DEPUTY:  Thank you.  Please have a

6    seat.

7              State and spell your name for the record.

8              THE WITNESS:  Sure.  It's Louis DiPietro, L-O-U-I-S,

9    DiPietro, D-I-P-I-E-T-R-O.

10             THE COURT:   Go ahead, Ms. Nestor.

11             MS. NESTOR:  Thank you, Your Honor.

12   DIRECT EXAMINATION

13   BY MS. NESTOR:

14   Q    Good afternoon, Mr. DiPietro.

15   A    Good afternoon.

16   Q    Where do you work?

17   A    I work for Panera Bread Company.

18   Q    What is Panera?

19   A    Panera is a bakery/caf restaurant concept that owns,

20   operates, and franchises bakery cafs.

21   Q    Where are you based out of?

22   A    Needham, Massachusetts.

23   Q    And where are Panera's headquarters?

24   A    In St. Louis, Missouri.

25   Q    What do you actually do for Panera?

DIPIETRO – DIRECT – MS. NESTOR

1    A    I am the general counsel.

2    Q    How long have you been with Panera?

3    A    Twelve years roughly.

4    Q    I'm sorry?

5    A    Just over 12 years.

6    Q    How long have you been general counsel at Panera?

7    A    About last three and a half years.

8    Q    So what is your role being general counsel of Panera?

9    A    I manage the legal department at Panera, supervise

10   attorneys, and am responsible for all legal matters related to

11   Panera Bread Company.

12   Q    And prior to being general counsel, what was your role at

13   Panera?

14   A    I was the deputy general counsel and I had similar

15   duties.

16   Q    Between January 2010 and July 2017, was Panera a public

17   company?

18   A    Yes.

19   Q    As part of your responsibilities as general counsel, back

20   before 2017, were you familiar with the earnings process for

21   Panera?

22   A    Yes.

23   Q    Please explain what your role was.

24   A    I participated in the drafting and reviewing and approval

25   of quarterly earnings releases through that entire process.

DIPIETRO - DIRECT - MS. NESTOR

1    Q     Did you also participate in the drafting and approval of

2    other press releases?

3    A     I -- other nonfinancial press releases, I would approve

4    them.  I wasn't as actively involved in the drafting of those

5    press releases.

6    Q     How did the earnings process at Panera work generally?

7    A     Once the financial quarter ended, the financial results

8    would be finalized, and then between that time and the

9    ultimate earnings release, we would begin the process of

10   finalizing the information to be included in the press

11   release, press releases would then be drafted, they would be

12   drafted, rewritten, then would go through a number of

13   different levels of approval through internal and external

14   advisors.  Once the press release was then completed, it would

15   then be sent to -- for distribution.

16   Q     And how -- would there be a significant steps in the

17   approval process once it was finalized?

18   A     Yes.  It would have to be approved by the finance

19   department; the chief financial officer; myself, the general

20   counsel; as well as external auditors and external legal

21   counsel.

22   Q     Generally speaking, what information is included in the

23   earnings press releases?

24   A     Earnings press release would -- first and foremost, it

25   would include the main information, included would be the

DIPIETRO - DIRECT - MS. NESTOR

1  financial results, so the revenues, profits, loss -- or loss,

2  as well as other important key financial metrics which my be

3  important in the industry, so comparable store sales or

4  margins or other related financial metrics.

5  Q    And what's a point of releasing earnings?

6  A    It is the way that we distribute financial results to the

7  investment community.  We -- that is the manner in which,

8  through that and through SEC filings, we announce to the

9  public how we performed in a given quarter.

10  Q    Is it relevant to your shareholders?

11  A    Yes.

12  Q    And explain that, please.

13  A    So we would announce our -- the date that we would be

14  releasing earnings so that that was on the calendar clearly of

15  our analysts and/or the investor community.  We would then

16  release our earnings and they would anticipate those, they

17  would -- we would issue guidance previously of what we

18  expected throughout the year so investors were interested in

19  seeing whether or not we delivered according to what we told

20  investors we expected would occur, so it was a very important,

21  and it was followed by a conference call with investors and

22  analysts the day after we would release those earnings to ask

23  questions about them.

24  Q    Was the integrity of earnings releases important to

25  Panera?

DIPIETRO – DIRECT – MS. NESTOR

1    A    Yes.

2    Q    Why?

3    A    It was important because it was –– because our financial

4    results were first and foremost important to shareholders.

5             Additionally, it was important for the integrity of

6    our earnings and our financial results that we had an

7    opportunity to disclose and to discuss with franchise –– I'm

8    sorry –– with shareholders, how our results were, how we were

9    performing and how we were –– whether or not we were meeting

10   the expectations of investors and if our business was

11   performing well generally.

12   Q    Were the earnings releases kept confidential within

13   Panera?

14   A    Yes.

15   Q    Tell us about how that requirement existed within Panera

16   generally.

17   A    Well, we had a broader policy of confidentiality,

18   particularly around earnings releases and financial results,

19   given the materiality of the information.  So individuals who

20   work for the company were required to keep the information

21   confidential and to also not use that information as well.

22   They could not use the information regarding earnings to trade

23   or otherwise participate, sell, or buy stock, or disclose that

24   information, period, whether or not for the intent of making a

25   sale or a purchase, but keeping that confidential for the

DIPIETRO – DIRECT – MS. NESTOR

1    purposes I just discussed about the integrity of the markets

2    and given the legalities related to the disclosure material

3    information of the sort.

4    Q    Now, once your earnings releases were drafted, what

5    happened to them?

6    A    Once they were drafted and approved, we would send them

7    to the third party that was responsible for issuing those

8    press release widely the wire.

9    Q    Which newswires have you used in the past?

10   A    Marketwired, PR Newswire.  Those were the two that I'm

11   recalling specifically.

12   Q    Did you pay these newswires to distribute your press

13   releases?

14   A    Yes, we did.

15   Q    Did you have an expectation of once you provided the

16   press release to the newswire, it would keep it confidential?

17   A    Yes.

18   Q    Why use newswires?

19   A    They are -- they are really built to widely disseminate

20   information across the press.  We would not have the

21   capabilities necessarily, other than through an e-mail list or

22   something similar to that.  It was -- we were required by the

23   SEC to publicly disclose in a manner that is reasonably likely

24   to reach shareholders, and that was the most efficient way to

25   make sure that that occurred.

DIPIETRO - DIRECT - MS. NESTOR

1  Q    Now you talked about public disclosure.  Was there a

2  requirement that the public disclosure be at the same time?

3  A    Yes.

4  Q    And why is that?

5  A    It's to -- for the -- to make sure there's a level

6  playing ground.  There's -- I mean, it's -- you know, there's

7  actually a regulation called fair disclosure so everyone

8  receives the information and no one has that information

9  before anyone else.

10  Q    Did you learn at some point that the newswire you had

11  been using to distribute Panera's press releases had been

12  compromised?

13  A    Yes.  I actually think I read it through the news before.

14  That was the first time I heard about it.

15  Q    Do you remember which newswire it was, sitting here

16  today?

17  A    I don't remember which one it was exactly.

18  Q    What did you do in response to learning this information?

19  A    I think -- I think I reached out to -- or I know I

20  reached out to our finance group, the folks who were

21  responsible for reporting results externally, asked them if

22  they had seen it; and then obviously wanted to make sure that

23  there was nothing that we had done or was related to us that

24  had been compromised to make sure that there was no data issue

25  with respect to the information as we maintained it.  That was

DIPIETRO - CROSS - MR. BRILL

1   what I had thought about immediately, and it became pretty

2   clear that this was something that happened outside of our

3   reach.

4           MS. NESTOR:  No further questions, Your Honor.

5           THE COURT:  Any cross-examination for this

6   gentleman?

7           MR. BRILL:  Just a few.  Thank you, Judge.

8   CROSS-EXAMINATION

9   BY MR. BRILL:

10  Q    Good afternoon, Mr. DiPietro.

11  A    Yes.

12  Q    How are you?

13  A    Good.  Thank you.

14  Q    Just a couple things.

15          You just told us that you found out that the

16  newswire services had been intruded upon.  I think you said

17  you read it in the news.

18  A    Yes.

19  Q    Did you read it -- do you have any recollection as to the

20  date?  Was it in August of 2015?

21  A    It was -- I believe that's around the time frame, yes.

22  Q    Okay.  And so is it fair to say that you had no knowledge

23  that the newswire services that Panera Bread was utilizing had

24  been compromised until that point?

25  A    I don't know -- I know at one point we may have received

DIPIETRO – CROSS – MR. BRILL

1    a call from somebody.  I don't recall when that was that

2    something had occurred, but I believe it was during that time

3    frame when I read it online, what was the first time I had

4    heard about it.

5    Q    Okay.

6              Would it be fair to say, Mr. DiPietro, that as

7    someone who is general counsel for Panera Bread, that you

8    would -- in using newswire services, that you had an

9    expectation that your data -- Panera Bread's data -- would be

10   secure?

11   A    Yes.

12   Q    And would it be fair to say that if that data was indeed

13   compromised, that would be something that you, as general

14   counsel for Panera Bread, would want to know about?

15   A    Yes.

16   Q    You told us that there is a process in drafting press

17   release earnings statements or earnings statement press

18   releases, correct?

19   A    Yes.

20   Q    Yes.

21              And my question to you is that there comes a point

22   where Panera Bread will submit that press release to a

23   newswire service for distribution; is that a fair statement?

24   A    Yes.

25   Q    In the course -- in your involvement in that process of

DIPIETRO – CROSS – MS. FELDER

1    drafting and submitting, do you -- have you had experiences

2    where you have edited that press release once it's been

3    submitted?

4    A    I am aware where we have edited some of the text around

5    potentially guidance for some of the information.  The actual

6    results, one, we wouldn't send them along until the actual --

7    in our EPS, the earnings per share number, was final.

8    Q    But you would have the power, so to speak, to edit a

9    document even after you submitted it to the press release.

10   A    Until it was issued, yes.

11            MR. BRILL:  Thank you so much, Mr. DiPietro.

12            THE COURT:   Ms. Felder?

13            MS. FELDER:  Yes, Your Honor.

14   CROSS-EXAMINATION

15   BY MS. FELDER:

16   Q    Good afternoon.

17   A    Good afternoon.

18   Q    Just a few questions for you.

19            You testified that there is an earnings process that

20   you undertake, correct?

21   A    Yes.

22   Q    And a part of that process is evaluating when to make

23   information public in terms of the earnings calendar, correct?

24   A    Yes.

25   Q    And there are quarterly earnings calendar?

PROCEEDINGS

1   A    They were -- yes.  Quarterly, we would release earnings.

2   Q    You would release it quarterly; however, investors know

3   that the schedule is forthcoming, correct?

4   A    Yes.

5   Q    And because there is this process, and there's an

6   earnings calendar, it's anticipated that your company would,

7   at some point, publish the earnings reports.

8   A    Yes.

9   Q    And there's nothing about that calendar that is

10  confidential, correct?

11  A    The calendar itself, no.

12  Q    There's nothing about the calendar that contains material

13  information?

14  A    Not that -- not the quarterly scheduled financial

15  results, no.

16  Q    And it is routine practice, you would say, or maybe you

17  would agree, that investors in the investor community

18  anticipates these earnings calendars in earnings reports,

19  correct?

20  A    Yes.

21          MS. FELDER:  No further questions.

22          THE COURT:  Thank you.

23          Anything further, Ms. Nestor?

24          MS. NESTOR:  No, thank you, Your Honor.

25          THE COURT:  Thank you very much.  You may step down.

PROCEEDINGS

1              (Witness steps down.)

2              THE COURT:  Folks, I have a little piece of business

3    to attend to, so we're going to take an early lunch.  We will

4    resume at two o'clock.  Enjoy your lunch.  Do not discuss the

5    case.

6              THE COURTROOM DEPUTY:  All rise.

7              I'm just going to remind the jurors, please, to

8    bring your notes with you.

9              (Jury exits.)

10             THE COURT:  Have a seat, folks.  We'll have this

11   fellow in here momentarily.

12             (Short pause.)

13             (Juror enters.)

14             THE COURT:  Good afternoon, sir.  Have a seat.

15             Just for the record, your name is Lioz Hagler.

16             THE JUROR:  Hagler, yes.

17             THE COURT:  Ms. Mulqueen brought to my attention

18   earlier this morning that there was something you wanted to

19   speak to me about given the nature of the proceedings and the

20   rules of the Court.  This all has to be done in open court.

21             So what's on your mind?

22             THE JUROR:  On Friday, unfortunately -- Thursday,

23   rather, one of the breaks in the lunch -- not lunch break, the

24   breaks in the jury room, somebody asked -- not asked, but it

25   was informal discussion about -- well, informal discussion on

Denise Parisi, RPR, CRR
Official Court Reporter

PROCEEDINGS

1    basically different things, and one thing, you know, vague and

2    tangentially related to the case, but not exactly, like, you

3    know, how many witnesses are we going to have today, you know,

4    et cetera, et cetera, and I responded carelessly,

5    unfortunately.  My response to one of those inquiries -- one

6    of those statements was -- this was -- sorry.  Sorry.  Take it

7    back a step.  This is when Mr. -- Igor -- the main witness.

8    I'm drawing a blank now because I'm kind of nervous.

9              THE COURT:  Mr. Dubovoy?

10             THE JUROR:  Dubovoy.  Thank you.  Basically, I

11   responded -- I'm trying to think exactly what my response was,

12   but it was along the lines of -- well -- I don't want to

13   misquote, since I'm, you know, here.  It was along the lines

14   of, he's the -- you know, the main -- the key prosecution

15   witness, so we might be here -- he's probably going to be here

16   all day, and that was pretty much it.

17             After I said it, I kind of, you know, realized that

18   that was a very dangerous statement.  How many people heard

19   it?  I don't know.  I mean, we've had -- I won't say -- not to

20   throw anybody else under the bus, but others have been saying,

21   you know, small things.  Even today, somebody mentioned

22   something along the lines of, is it -- was the witness saying

23   backslash versus regular slash.  Now, is it -- does it impact

24   the case?  I can't say.  But I understand that I made a very

25   dangerous statement, and hopefully not fatal statement, on

PROCEEDINGS

1    Friday -- Thursday, and I just, you know, in all good

2    conscience, I couldn't keep it from the Court.

3            THE COURT:  Well, we're very grateful for that.

4    That takes a little courage --

5            THE JUROR:  Yeah, and I understand the

6    ramifications, unfortunately.

7            THE COURT:  They can be, as you said, deadly.

8            THE JUROR:   Yes.

9            THE COURT:  Let me ask you a couple questions.

10           That was the sum and substance of your comment, that

11   we may be here all day?

12           THE JUROR:  Well, the part that I felt uncomfortable

13   in retrospect saying was the fact that it was the key

14   prosecution witness, therefore, we'll be here all day.  It

15   wasn't that he would be here all day.  It was the fact that I,

16   kind of, referenced -- I felt uncomfortable, you know, again,

17   after the fact that I said, you know, key prosecution witness,

18   and I didn't want that, you know, that -- I was fearful that

19   that could have been leading.

20           THE COURT:  Identifying, in your view, as a key

21   prosecution witness?

22           THE JUROR:  The key prosecution witness, yeah,

23   right.

24           THE COURT:  Was there any discussion that that

25   triggered?

Denise Parisi, RPR, CRR
Official Court Reporter

PROCEEDINGS

1        THE JUROR:  No, no.  I don't think there was a reply

2   from anybody.  I don't know how many heard it either.  That's

3   the other thing.

4        THE COURT:  Okay.  And you don't recall how many

5   people, if any, may have heard it.

6        THE JUROR:  I would imagine, and honestly, you know,

7   pondering this all weekend, I don't remember who put the

8   initial query out there, so I would assume that person, you

9   know, would have.  I could see, you know -- I was toward the

10  right side of the jury room -- the jury break room, so I

11  would -- I could envision, you know, at least four or five

12  people hearing it.

13       THE COURT:  Well, it's apparent to me, Mr. Hagler,

14  that you are, despite this misstep, you are scrupulously

15  attempting to abide by my instructions.  Please do better as

16  we go forward.

17       THE JUROR:  Understood.

18       THE COURT:  I will make it clear to everyone that

19  when I say no discussion about the case, I don't mean just

20  about the merits of the specific testimony, any aspect of the

21  case at all because it can trigger an exchange that would be

22  unfortunate --

23       THE JUROR:  Right.

24       THE COURT:  -- and not called for.

25       So I thank you for your time.  Let's close the book

Denise Parisi, RPR, CRR
Official Court Reporter

PROCEEDINGS

1    on this, put it in the past, and please continue to abide by

2    my instructions.

3              THE JUROR:  Thank you.  I apologize.

4              THE COURT:  Thank you, sir.

5              THE COURTROOM DEPUTY:  Okay.

6              (Juror exits.)

7              THE COURT:  Unless anybody has any postmortems, I

8    think we will leave it at that.  See you at two o'clock.

9              MR. GOPSTEIN:  Your Honor, just one --

10             THE COURT:  One postmortem.

11             MR. GOPSTEIN:  -- point with regard to this

12   afternoon's witnesses.

13             THE COURT:  Yes.

14             MR. GOPSTEIN:  In their letter last night, defense

15   counsel had requested a continuance for Thomas Carocci who --

16   I think he's our fourth scheduled witness for the afternoon,

17   I'm not sure if he will get on any way, on the grounds that we

18   have produced additional material over the weekend.

19             THE COURT:  I understood your colleague here to say

20   we're going to delay his appearance.

21             MR. GOPSTEIN:  I've spoken with Ms. Whalen and

22   Mr. Brill, and Ms. Whalen advised that she was going to defer

23   to Mr. Brill.  We were okay with delaying it, but I spoke with

24   both of them in court today and Mr. Brill advised that he was

25   fine with going forward with Mr. Carocci's testimony today if

Denise Parisi, RPR, CRR
Official Court Reporter

PROCEEDINGS

1    we get to it, and so I wanted to put that on the record.

2              THE COURT:  All right.  Very well.  See you at

3    two o'clock.

4              MR. GOPSTEIN:  Thank you, Your Honor.

5              (Lunch recess taken.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1                A F T E R N O O N    S E S S I O N

2                (The following takes place out of the presence of

3    the jury.)

4                THE COURT:  You've got a witness for us?

5                MR. TUCKER:  Yes, the agent is getting him.

6                (Witness enters courtroom.)

7                THE COURT:  Is this Mr. Ferguson?

8                THE WITNESS:  Yes.

9                THE COURT:  Come on up.

10               Have a seat.

11               (Witness takes the stand.)

12               (Jury enters courtroom.)

13               THE COURT:  Please be seated, everyone.

14               Next witness please.

15               MR. TUCKER:  Yes, Your Honor, the government calls

16   Alistair Clark Ferguson.

17               (Witness sworn by the clerk.)

18               THE CLERK:  Please state and spell your name for the

19   record.

20               THE WITNESS:  Sure, Alistair Clark Ferguson,

21   A-L-I-S-T-A-I-R, F-E-R-G-U-S-O-N.

22               THE COURT:  Mr. Tucker.

23               MR. TUCKER:  Thank you, Your Honor.

24               (Witness takes the witness stand.)

25   ALISTAIR CLARK FERGUSON, called as a witness, having been

ALISTAIR FERGUSON - DIRECT - MR. TUCKER

1    first duly sworn/affirmed, was examined and testified as

2    follows:

3    DIRECT EXAMINATION

4    BY MR. TUCKER:

5    Q    Good afternoon, Mr. Ferguson.

6    A    Hello.

7    Q    Where are you employed, sir.

8    A    I work at West Corporation.

9    Q    What is West Corporation, very generally?

10   A    West is a company that provides communication services

11   quite broadly.

12   Q    How long have you worked at West?

13   A    Since April 2018.

14        THE COURT:  Excuse me.  Let's pull the microphone

15   closer.

16        (Pause.)

17   Q    My question was how long have you worked at West,

18   Mr. Ferguson?

19   A    Since April 2018.

20   Q    Before that where did you work?

21   A    I worked at NASDAQ Corporation.

22   Q    When did you start at NASDAQ?

23   A    February 2016.

24   Q    And before you went to work at NASDAQ where did you work?

25   A    I worked at Marketwired.

ALISTAIR FERGUSON - DIRECT - MR. TUCKER

1   Q    How did you come to work at NASDAQ from Marketwired?

2   A    NASDAQ acquired Marketwired in February 2016.

3   Q    When did you join Marketwired initially?

4   A    In January 2014.

5   Q    Does Marketwired still exist in some form today?

6   A    The company does not, the technology has been integrated

7   into NASDAQ and now West Services.

8   Q    Focusing your attention of the period of time between

9   January 2014 and February 2016 when you were employed by

10  Marketwired, what were your responsibilities?

11  A    I was responsible for the infrastructure and the security

12  program, my title was VP Infrastructure and Chief Information

13  Security Officer.

14  Q    When you say VP --

15  A    Vice president, I'm sorry.

16  Q    Did you have employees under your supervision?

17  A    Yes, approximately 35.

18  Q    Where do you live, sir?

19  A    I live in Ottawa, Canada.

20  Q    What was Marketwired's general business?

21  A    Marketwired provided press release services for clients.

22  Q    What kinds of services?

23  A    So, we help people get messages out about their earnings,

24  about leadership changes, that kind of thing, so helping them

25  meet their regulatory obligations and support communications.

ALISTAIR FERGUSON - DIRECT - MR. TUCKER

1   Q    And that was in part by distributing press releases?

2   A    Yes.

3   Q    Where was Marketwired based?

4   A    Toronto, Canada.

5   Q    Did Marketwired have any competitors or peer companies

6   that offered similar services?

7   A    So, Business Wire and PR Newswire would be a couple in

8   North America, yeah.

9   Q    Did Marketwired specialize in any particular sector of

10  businesses for issuing press releases?

11  A    No, it was quite broad across quite a number of sectors.

12  Q    How did Marketwired's customers provide press releases to

13  Marketwired for distribution?

14  A    So, customers would access our service through a browser,

15  connect over the internet to our portal.  They'd log in,

16  authenticate themselves with an ID and a password and then

17  once they were in the portal they would provide the

18  information when they wanted the release to be published and

19  the things like the title, headline and the body of the

20  release.

21  Q    All right.  Just to unpack that a bit, was that portal

22  referred to as the CS3 portal?

23  A    Yes.

24  Q    Please tell the jury what the CS3 portal was?

25  A    CS3 is the name of the press release services which we

Holly Driscoll, CSR
Official Court Reporter

ALISTAIR FERGUSON - DIRECT - MR. TUCKER

1    provided for clients in the U.S. region.

2    Q    Now, you testified that Marketwired employees had to log

3    in to the CS3 portal before they could upload press releases?

4              THE COURT:  Did you say employees?

5    Q    I'm sorry, Marketwired customers had to log into the

6    Marketwired portal before they could upload press releases?

7    A    That's correct.

8    Q    They'd need a user name and a password?

9    A    Yes.

10   Q    And the different preferences that Marketwired customers

11   were able to choose when they uploaded press releases, one of

12   those was when a press release would be published?

13   A    Yes.

14   Q    And were they also able to select how the press releases

15   would be distributed?

16   A    Yes.  So, they would select from a variety of end points,

17   typically under their contract they would have predetermined a

18   group of end points, but the press releases would go out to

19   end points which are media channels and then out through email

20   and out through an investor relations website.

21   Q    Just so it is clear, those end points could include news

22   websites and news publications among other things?

23   A    Yes.

24   Q    And users of the CS3 applications could also make

25   formatting choices about the press releases?

ALISTAIR FERGUSON - DIRECT - MR. TUCKER

1    A    Yes.

2    Q    Once they'd done all that, what was the next step in the

3    upload process?

4    A    So, in interacting with portal they'll upload the body of

5    the content and then they'll click confirm and that would

6    signal our editorial team that a new release had been

7    submitted and required attention.

8    Q    And what would happen after that?

9    A    So, our editorial team would review the press release for

10   any kind of spelling mistakes, incorrect information,

11   formatting issues; with things like financial tables we wanted

12   to make sure that it was really clear in the final product.

13   Q    Would the Marketwired editorial staff make substantive

14   changes to press releases sometimes?

15   A    Sometimes but it would be -- once their job was done it

16   would be returned to the client for approval.

17   Q    If substantive changes were made, how did that process

18   work?

19   A    They would edit the content within the web portal and

20   save the changes and return a proof to the client for review.

21   Q    Would those edits be made in conjunction with the client?

22   A    Yes.

23   Q    Once a press release was ready to be released and the

24   appointed time of distribution arrived, what happened then,

25   Mr. Ferguson?

ALISTAIR FERGUSON - DIRECT - MR. TUCKER

1    A    At the appointed time the unencrypted information would

2    be sent out over the media channels to each of the end points

3    that were selected for the release.

4    Q    So, at that point Marketwired would distribute the final

5    press releases?

6    A    Yes.

7    Q    Is that right?

8    A    Yes.

9    Q    Was it important for Marketwired to ensure that the draft

10   press releases it received were kept confidential between that

11   initial time of upload and the appointed release time to the

12   public?

13   A    Yes.

14   Q    Why?

15   A    It's part of the confidentiality agreement that we had

16   with the customers that their information would be maintained

17   confidential until the appointed time of release.

18   Q    Why was that important?

19   A    It is important for the clients to have their information

20   disclosed simultaneous to investors and shareholders under

21   regulatory laws and so that's why we were a trusted provider

22   of the service in meeting those obligations.

23   Q    Was that confidentiality incorporated into the end user

24   agreements that Marketwired had with its customers?

25   A    Yes, it was.

ALISTAIR FERGUSON - DIRECT - MR. TUCKER

1    Q     Mr. Ferguson, in that pile in front of you are some

2    documents that have been marked for identification as

3    Government's Exhibits 831 through 842.  Do you see that pile,

4    sir?

5    A     Yes.

6    Q     What are these documents generally?

7    A     These are copies of press releases that were submitted

8    into our CS3 system.

9    Q     So, these are the draft press releases --

10   A     Yes.

11   Q     -- as initially uploaded by Marketwired employees to

12   Marketwired system?

13   A     By customers into the CS3 system, yes.

14   Q     And did you provide those to the government at the

15   government's request?

16   A     Yes, I did.

17   Q     And how did you go about extracting or obtaining these

18   draft press releases from the Marketwired systems?

19   A     So, we -- the information is maintained in a database

20   system and so we applied a query on the specific information

21   that the government requested and extracted the files,

22   provided them to you.

23   Q     Are these true and accurate copies of those press

24   releases from the Marketwired archives, Government's Exhibits

25   831 through 842?

1204

ALISTAIR FERGUSON - DIRECT - MR. TUCKER

1    A     Yes, they are.

2              MR. TUCKER:  Your Honor, the government moves to

3    admit Government's Exhibits 831 through 842.

4              THE COURT:  Any objection?

5              MS. BRILL:  There is, Your Honor.  May we have voir

6    dire or explain at the bench?

7              THE COURT:  Well, if the voir dire is related to

8    your objection --

9              MS. BRILL:  The objection is it is being admitted

10   for what they were described to be, yes.

11             THE COURT:  I think you better come on over.

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1           (The following takes place at side-bar.)

2           THE COURT:  Yes, ma'am.

3           MS. BRILL:  Before I start, that similar pile is in

4    front of the witness?

5           MR. TUCKER:  Correct, identical.

6           MS. BRILL:  Your Honor, I will believe that the

7    government just got from the witness that these will be the

8    press releases as uploaded by the client.  In addition, the

9    government will from this witness elicit -- hopes to elicit

10   foundation for a chart that will include a couple of items;

11   one of the items will be the time that the press release was

12   released to the public but one of the items will also be the

13   time that the press release was uploaded by the client.

14           So, there will be a column for the time it was

15   uploaded, there will be a column for the time it was released,

16   there will be a column of the press releases that were

17   uploaded and there will be a column of the press releases that

18   were released.  And so it is -- but I believe that there are

19   indications from the discovery that we have gotten and from my

20   study of those documents that these documents in front of Your

21   Honor are not copies.  I understand that's what the witness

22   said but there are indications that they may not be copies of

23   what was uploaded by the client at the time that's going to be

24   on the chart that the government seeks to admit.

25           THE COURT:  They are not what he said they were?

SIDEBAR CONFERENCE

1           MS. BRILL:  They're not what -- they may not be --

2   let me put it this way, they may not be what the government

3   elicited they were which is the press releases that were

4   uploaded at the particular time that's going to be on the

5   chart.

6           THE COURT:  Well, ask him, you can have some voir

7   dire.

8           MS. BRILL:  Some voir dire.

9           (End of side-bar.)

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FERGUSON – VOIR DIRE – MS. BRILL

1          (In open court.)

2          THE COURT:  Go ahead, Ms. Brill.

3          MS. BRILL:  Your Honor, can I go to the podium?

4          THE COURT:  Of course.

5          MS. BRILL:  Before I get to the podium can I have

6   Exhibit 405 that's already in evidence?

7          (Pause while counsel confer.)

8   VOIR DIRE EXAMINATION

9   BY MS. BRILL:

10  Q    Mr. Ferguson, in front of you is a pile of documents

11  numbered 831 to 842, is that right?

12  A    Yes.

13  Q    And you've testified in answers to the prosecutor's

14  questions that those are the press releases as uploaded by the

15  client, right?

16  A    That's correct.

17  Q    When they went to the portal and said confirmed?

18  A    Yes.

19  Q    And those are maintained by your company, whether it was

20  Marketwired or NASDAQ or West as it is now; is West also a

21  wire company?

22  A    We are, yes.

23  Q    All right.  So, I want to show you what's already been

24  marked as Exhibit 405 and that is, as you can see, I'm sure

25  there's a way to make it a little bit smaller --

FERGUSON - VOIR DIRE - MS. BRILL

1          MS. BRILL:  Everybody can see this, it is an

2    exhibit.

3          THE CLERK:  Okay.

4    Q    As everybody can see, this is a TIBCO press release; is

5    that what it looks like from the top?

6    A    Yes.

7    Q    And on the bottom there's some markings?

8    A    Yes.

9    Q    And that looks like something that came from TIBCO

10   perhaps that's on the document as it is uploaded to your

11   company?

12   A    It looks like the name of the document as it was printed.

13   Q    It looks like the name of the document as it was printed?

14   A    The string of characters I'm seeing here looks like a

15   Word document name of the file.

16   Q    But does it look like it was part of the document?

17   A    That is -- what I mean is I think it looks like in the

18   way that that file was generated that it is the name of the

19   file of the document.

20   Q    And that document -- Exhibit 405 is a document that was

21   extracted from a computer in the Ukraine, that is what

22   Exhibit 405 is, and those markings are on the bottom as

23   highlighted by the government.

24          MR. TUCKER:  Objection, Your Honor.

25          THE COURT:  Can we have a question?

FERGUSON – VOIR DIRE – MS. BRILL

1   Q    Can you look at Exhibit 831.

2   A    Yes.

3   Q    Do you see those same markings at the bottom of

4   Exhibit 831?

5   A    Yes, it is a TIBCO press release.

6   Q    And you see the same markings on the bottom?

7   A    Yes.

8   Q    Now, look at Exhibit 832, that's an exhibit from Edwards

9   Corporation or some -- Edwards something, right?

10  A    Yes.

11  Q    And that exhibit does not have the markings on the

12  bottom?

13  A    Right.

14  Q    What about that exhibit indicates to you that it was

15  uploaded?

16  A    The fact that we've taken it out of our system from the

17  database in the area where the client had uploaded it is how

18  this is -- how I can verify that this is from the client.

19  Q    All right.  So, you took it out of the area where things

20  are uploaded?

21  A    Yes, the database, CS3.

22  Q    I want you to look at one more document and then I do

23  just have a very few questions about that.

24          So, we see from a TIBCO document, from the area that

25  it was uploaded that there's markings on the bottom, you see

Holly Driscoll, CSR
Official Court Reporter

FERGUSON - VOIR DIRE - MS. BRILL

1   from the Edwards document that there aren't markings on the

2   bottom when it is uploaded; can you look at Exhibit 840.

3   A    Got it.

4   Q    840 is also a TIBCO press release, right?

5   A    Yes.

6   Q    Different quarter, different contents, different press

7   release, right?

8   A    Yes.

9   Q    But that has no markings on the bottom, right?

10  A    That's right.

11  Q    So, for some reason TIBCO uploaded one with markings and

12  one without markings?

13  A    Yes.

14  Q    You talked about how things get changed in your database;

15  do you maintain those changes in another area?

16  A    The changes are maintained in the CS3 database itself.

17  Q    Is the CS3 database what you searched in order to come up

18  with documents 831 to 842?

19  A    Yes, it is.

20  Q    So, you went to the CS3 -- there's no other database,

21  it's just the CS3 database?

22  A    That's correct.

23  Q    And they have the documents that are uploaded and the

24  documents that are edited and then resubmitted, for lack of a

25  better word?

FERGUSON — VOIR DIRE — MS. BRILL

1    A    Yes.

2    Q    And there's no way to distinguish between which documents

3    were uploaded and not changed and which documents were

4    uploaded and changed in the CS3 database, correct?

5    A    The system itself has an audit log which maintains the

6    changes so we have a trail of information indicating when

7    information in a press release is changed.

8    Q    So, when did the information on the press release that's

9    exhibit for identification 831 change and the markings were

10   removed?

11   A    After the client uploaded the document and they clicked

12   confirm the editorial team would have done the cleanup on the

13   document.

14   Q    And then would it not have replaced the document in this

15   CS3 database, as you just testified?

16   A    The document would have been adjusted, it would not have

17   been replaced.  There would be a new version of the

18   information maintained in the database.

19   Q    Would the old version of the information be maintained in

20   the database?

21   A    Yes.

22            MR. TUCKER:  Your Honor, could we have a breach side

23   bar?

24            THE COURT:  I don't think it is necessary.

25            Do you have anything else?

Holly Driscoll, CSR
Official Court Reporter

FERGUSON – DIRECT – MR. TUCKER

1         MS. BRILL:  Hold on.  (Pause.)

2    Q    The TIBCO press release for the quarter that's in front

3    of you that's marked as exhibit for identification 831.

4    A    Yes.

5    Q    How many of those press releases are in the CS3

6    database -- would be in the CS3 database?

7         THE COURT:  That's not proper voir dire, with all

8    due respect, Ms. Brill.

9         I'm going to receive the documents.  Let's go.  831

10   to 842 now in evidence.

11        (Government Exhibit 831 through 842, were received

12   in evidence.)

13        MR. TUCKER:  Thank you, Your Honor.  May we publish?

14        THE COURT:  Go ahead.

15   DIRECT EXAMINATION

16   BY MR. TUCKER:

17   Q    So, Mr. Ferguson, looking at 831 for a minute, just so it

18   is clear for the record, the documents that you, and I guess

19   West today, but were extracted from Marketwired systems, those

20   were provided in Word document form right?

21   A    Yes.

22   Q    So a .doc or .docx, right?

23   A    That's correct.

24   Q    They certainly weren't provided to the government printed

25   out with Government's Exhibits?

FERGUSON - DIRECT - MR. TUCKER

1    A    No.

2    Q    Now, each one of those Word documents, electronic

3    documents that was provided to the government had a file name

4    associated with it, right?

5    A    Correct.

6    Q    Was this the file name associated with this particular

7    TIBCO press release?

8    A    That's my understanding, yes.

9    Q    And that's based on your review and what you produced,

10   right?

11   A    Yes.

12   Q    So, these other files now in evidence, 832 for instance,

13   it would have a file name also, right?

14   A    Yes.

15   Q    We just didn't label it at the bottom?

16   A    Correct.

17   Q    So, all you can tell from this particular footer is that

18   this was the file name associated with this particular draft

19   press release, is that right?

20   A    Yes.

21   Q    Thank you.

22         Mr. Ferguson, in front of you is a pile of

23   documents -- and Ms. Mulqueen will bear with me for a

24   moment -- these documents have been marked for identification

25   as Government Exhibits 4541, 4542, 4543, 4544, 4551, 4554,

FERGUSON - DIRECT - MR. TUCKER

1   4592, 4594, 4620, 4625, 4674 and 4675; is that right,

2   Mr. Ferguson?

3   A    Yes.

4   Q    And you've had a chance to review those prior to your

5   testimony here today?

6   A    I have.

7   Q    What are these documents generally?

8   A    These documents are the final releases on behalf of our

9   clients.

10  Q    Are these printed off of Marketwired's website?

11  A    Yes.

12  Q    And did you personally print these and mark these?

13  A    No.

14  Q    Did you personally verify that these are in fact the

15  final press releases as stored in the Marketwired website?

16  A    I did.

17  Q    And Mr. Ferguson, these press releases reflect

18  distribution dates of the final press releases?

19  A    Yes.

20  Q    Those reflect distribution dates and times?

21  A    They do.

22  Q    Does Marketwired or its subsequent companies, do they

23  edit the press releases on the Marketwired system after they

24  are distributed?

25  A    No.

FERGUSON – DIRECT – MR. TUCKER

1   Q    So, if these were printed out within the last few weeks,

2   you would expect these to be the same press releases as they

3   were distributed during their distribution times on the

4   documents?

5   A    Yes.

6           MR. TUCKER:  Your Honor, the government moves to

7   admit that series of exhibits.  I can read them again if the

8   Court wishes.

9           THE COURT:  I think -- Ellie, you have them?

10          THE CLERK:  Yes, I believe I do.

11          THE COURT:  Madame?

12          MS. BRILL:  To these documents, no objection, Your

13  Honor.

14          THE COURT:   Received.

15          (Government Exhibit 4541, 4542, 4543, 4544, 4511,

16  4554, 4592, 4594, 4620, 4625, 4674, and 4675, were received in

17  evidence.)

18          MR. TUCKER:  Thank you, Your Honor.

19          May we publish?

20          THE COURT:  Go right ahead.

21  Q    All right.  So, once again, Mr. Ferguson, this was a

22  series of final press releases.  I am just going to show you

23  one example.  This is what's in evidence now as Government's

24  Exhibit 4674, is that right?

25  A    Yes.

1216

FERGUSON – DIRECT – MR. TUCKER

1    Q    And is this final press release that corresponds to

2    what's in evidence as Government's Exhibit 831?

3    A    Yes, it is.

4    Q    So, it is the same date of distribution, June 28, 2012?

5    A    Yes.

6    Q    Same headline?

7    A    Yes, it is.

8    Q    So, that series of second documents, those are the final

9    press releases as issued from the draft press releases we

10   admitted a moment ago?

11   A    That's correct.

12             MR. TUCKER:  Just for the witness, Ms. Mulqueen.

13   Q    I'm showing the witness what's been marked for

14   identification -- it is a CD marked Government's Exhibit 802.

15             Do you recognize that CD, Mr. Ferguson?

16   A    I do.

17   Q    What is it?

18   A    This is the CD containing the files that we provided to

19   the government.

20   Q    All right.  What kind of files are on Government's

21   Exhibit 802?

22   A    It would list all of our press releases from the time of

23   2009 through 2014 and the other documents that we've provided.

24   Q    Does it include submission dates and times and

25   distribution dates and times for all the Marketwired's press

FERGUSON – DIRECT – MR. TUCKER

1   releases during that period?

2   A     It does.

3   Q     And did you personally extract all that data from

4   Marketwired systems?

5   A     I supervised it and ensured it was correct.

6   Q     Are these records kept by the Marketwired in the ordinary

7   course of business?

8   A     They are.

9   Q     How are they used by Marketwired?

10  A     It's a history of our service to the client, so it would

11  be used for billing purposes as well as on request if there

12  was any confusion around what we -- how we had handled the

13  information, it would be available.

14  Q     Is this data populated in Marketwired systems through a

15  manual or an automated process?

16  A     Through an automated process.

17  Q     Does that occur close in time to the events being

18  described?

19  A     Yes.

20  Q     And you personally verified the data on 802?

21  A     I have.

22  Q     Do you recognize your signature and the date on it?

23  A     Yes.

24        MR. TUCKER:  Your Honor, the government moves to

25  admit Government's Exhibit 802 and its contents into

FERGUSON – DIRECT – MR. TUCKER

1   evidence.

2              THE COURT:  802.

3              MS. BRILL:  No objection.

4              THE COURT:  Received.

5              MR. TUCKER:  Thank you, Your Honor.

6              (Government Exhibit 802, was received in evidence.)

7   Q    One question before we move on, Mr. Ferguson.  The data

8   that's stored on 802, is that in Pacific time?

9   A    It is.

10  Q    Okay.  Now, just for the witness, I'm going to show the

11  witness what's been marked for identification as 802-2.

12             THE CLERK:  802-2?

13             MR. TUCKER:  Yes.

14  Q    Do you recognize this chart, Mr. Ferguson?

15  A    I do.

16  Q    Did you make this chart?

17  A    I did not.

18  Q    Did you personally verify the information it contains?

19  A    I did.

20  Q    Is this derived from what's now in evidence as

21  Government's Exhibit 802?

22  A    It is.

23  Q    Is this a small excerpt of the data that's on there?

24  A    That's correct.

25  Q    Just so it is clear, have the times in this excerpt been

FERGUSON - DIRECT - MR. TUCKER

1    harmonized to Eastern time?

2    A    Yes, that's correct.

3         MR. TUCKER:  Your Honor, the government moves to

4    admit Government's Exhibit 802-2 into evidence.

5         THE COURT:  Any objection?

6         MS. BRILL:  Only subject to our previous objection

7    to the admission in evidence of the documents that are

8    referenced on the chart.

9         THE COURT:  I see.  Subject to that, 802-2 is now in

10   evidence.

11        (Government Exhibit 802-2, was received in

12   evidence.)

13        MR. TUCKER:  Thank you, Your Honor.

14        May we publish?

15        THE COURT:  Please.

16        MR. TUCKER:  Okay.

17   Q    So, now that the jury can see, Mr. Ferguson, so is this

18   the type of data that is stored on the CD now in evidence as

19   Government's Exhibit 802?

20   A    Yes, it is.

21   Q    So, it includes information like the distribution date

22   and time and the submission date and time?

23   A    That's correct.

24   Q    Just working from left to right, can you explain to the

25   jury what the significance is of the RowNum column is?

Holly Driscoll, CSR
Official Court Reporter

FERGUSON - DIRECT - MR. TUCKER

1    A    Sure, that's just a row in the database system where this

2    record is provided, extracted from.

3    Q    PRID, what's that?

4    A    It's the press release ID.

5    Q    Is that a unique identifier assigned by Marketwired?

6    A    By the system for this release.

7    Q    What's release type?

8    A    That's the title that the client would have provided for

9    the release.

10   Q    And the distribution date?

11   A    It is the date and time that the client selected for the

12   release to be distributed.

13   Q    And the source?

14   A    The source is the name of the company that we're

15   providing the service to.

16   Q    Just so it is clear, Mr. Ferguson, that is the

17   distribution date and time selected by the user and that is

18   the actual distribution time?

19   A    Yes, it is.

20   Q    CPID, what's that?

21   A    It is an internal identifier for the company that we're

22   servicing, so in this case 126798 connects to TIBCO

23   Q    Company name?

24   A    In some cases the companies might have a department

25   within so we stored that separately in the database.

1221

FERGUSON – DIRECT – MR. TUCKER

1   Q    Submission date?

2   A    That's the point in time when they uploaded the file

3   ahead of clicking confirm.

4   Q    And so it is clear, Mr. Ferguson, these last two columns,

5   that's not Marketwired data, right?

6   A    No, it is not.

7   Q    Those are just corresponding exhibit numbers; is that

8   right?

9   A    That's correct.

10  Q    So, at this point this chart reflects the draft press

11  releases and the final distributed press releases that you

12  just authenticated?

13  A    That's correct.

14  Q    And, again, that just a small fragment of the data from

15  802?

16  A    Correct.

17        MR. TUCKER:   Just for the witness, Ms. Mulqueen.

18  I'm showing the witness what's been marked for identification

19  as Government's Exhibit 4627.

20  Q    Do you recognize that document, Mr. Ferguson?

21  A    I do.

22  Q    What is it?

23  A    There is an Oracle final press release.

24  Q    Is this copied from the Marketwired website?

25  A    Yes, it is.

FERGUSON - DIRECT - MR. TUCKER

1   Q     Is this a fair and accurate copy of a final press release

2   that was distributed as shown here?

3   A     Yes, it is.

4              MR. TUCKER:  Your Honor, the government moves to

5   admit Government's Exhibit 4627 into evidence.

6              THE COURT:  4627, all right, just checking my notes.

7              , any objection?

8              MS. BRILL:  No objection.

9              THE COURT:  4627 in evidence.

10             (Government Exhibit 4627, was received in evidence.)

11             MR. TUCKER:  May we publish?

12             THE COURT:  Go ahead, yes, sir.

13  Q     So, for the record, Mr. Ferguson, this is an Oracle press

14  release dated December 18, 2013, is that right?

15  A     That's correct.

16  Q     And the distribution time on this was 16:04 east coast

17  time or 4:04 p.m. east coast time?

18  A     Yes.

19  Q     Now, Mr. Ferguson, I'm going to show you what's in

20  evidence as Government's Exhibit 323.  Have you seen that

21  document prior to your testimony here today?

22  A     Yes.

23  Q     How did you see this document?

24  A     The government provided it to me for review.

25  Q     Based on your -- well, my first question, Mr. Ferguson,

FERGUSON – DIRECT – MR. TUCKER

1    is have you looked at the text in Government's Exhibit 423?

2    A    Yes, I have.

3    Q    And does this text correspond to the distributed press

4    release now in evidence, 4627?

5    A    It does.

6    Q    It's excerpt?

7    A    It is an excerpt, I found it matching on both page four

8    of the --

9    Q    Directing your attention to page four, just to look for a

10   couple of examples, there's some text here -- tell me if I

11   read this right:  As of November 30th, 2013, approximately

12   $2 million in estimated revenues related to hardware systems

13   support contracts.

14           THE COURT:  I think you may have misspoken, I think

15   you meant 323, not 423, correct?

16           MR. TUCKER:  I apologize, Your Honor, this is, for

17   the record, 323-A1.

18   Q    And that text I just read, direct your attention back to

19   4627 which is in evidence, does that correspond to this text

20   here:  As of November 30th, 2013, approximately $2 million in

21   estimated revenues related to hardware systems support

22   contracts?

23   A    That's correct.

24   Q    And there's also references to Oracle Corporation, Q2,

25   2014, year-to-date financial results condensed?

FERGUSON - DIRECT - MR. TUCKER

1    A    Yes.

2    Q    Does that correspond to the fifth page of 4627, that same

3    text?

4    A    Yes, it does.

5    Q    And the numbers in the table, in 4627, do you see those

6    numbers in a different format but they're in 323-A1?

7    A    Yes, it's sprinkled in, it is not formatted well but it

8    is in the section just under the title.

9    Q    Just for the record, you tapped on your screen basically

10   in the middle of this screen shot; is that right?

11   A    Yes.

12   Q    Mr. Ferguson, based on your knowledge of Marketwired

13   systems, does this appear to be a final distributed

14   Marketwired press release that's in Government's

15   Exhibit 323-A1?

16   A    It looks like the final release but it's not the final

17   release because it's not sort of containing fully human

18   readable, the fact that it's not formatted well and it has a

19   bunch of dashes suggests it has special characters in it.

20   Q    When you say "special characters," what do you mean by

21   that?

22   A    More system characters such as we would store it when it

23   is in the database.

24   Q    In Marketwired's database?

25   A    Yes.

Holly Driscoll, CSR
Official Court Reporter

FERGUSON – DIRECT – MR. TUCKER

1        MR. TUCKER:  Just for the witness, Ms. Mulqueen.

2        THE CLERK:  Just for the witness.

3        MR. TUCKER:  Thank you.

4   Q    I'm showing the witness what's been marked for

5   identification as Government's Exhibit 802-1.

6   A    Yes.

7   Q    Which is a two page document.  Mr. Ferguson, is this an

8   excerpt from all of the uploaded data stored on that CD,

9   Government's Exhibit 802, corresponding to the Oracle press

10  release you were just testifying about?

11  A    It is.

12  Q    Is the first page as it appears in the database and the

13  second page harmonized to east coast time?

14  A    Yes, that's correct.

15       MR. TUCKER:  Your Honor, the government moves to

16  admit 802-1 into evidence.

17       THE COURT:  Any objection?

18       MS. BRILL:  No objection.

19       THE COURT:  802-1 in evidence.

20       (Government's Exhibit 802-1 received in evidence.)

21       MR. TUCKER:  May we publish, Your Honor?

22       THE COURT:  Go ahead.

23  Q    So, turning to the second page of 802-1, this reflects a

24  submission time of 12/17/2013 at 10:34 a.m., is that right?

25  A    That's correct.

FERGUSON – DIRECT – MR. TUCKER

1   Q    And distribution date and time of December 18th, 2013 at

2   16:04 p.m. east coast time; is that right?

3   A    Yes, that's correct.

4   Q    And that corresponds to what we see on the face of the

5   final press release, 4627?

6   A    Correct.

7   Q    December 18, 2013, 16:04 east coast time; is that right?

8   A    Yes.

9   Q    Mr. Ferguson, please remind us when you came to work for

10  Marketwired initially?

11  A    January 2014.

12  Q    What led to your hiring there, if you know?

13  A    The company had experienced some pretty significant

14  systems problems, breaches, and as part of the strengthening

15  the program they hired me as the Chief Information Security

16  Officer.

17  Q    Did Marketwired make efforts to improve its cyber

18  security posture?

19  A    Significant.

20  Q    Even with those efforts did Marketwired continue to be

21  the target of malicious cyber activity after you joined the

22  company?

23  A    Yes.

24       MR. TUCKER:  No further questions, Your Honor.

25       THE COURT:  All righty.

Holly Driscoll, CSR
Official Court Reporter

FERGUSON – CROSS – MS. BRILL

1      Ms. Brill?

2      MS. BRILL:  Yes, Your Honor.

3  CROSS-EXAMINATION

4  BY MS. BRILL:

5  Q    When were you acquired by NASDAQ?

6  A    Marketwired?

7  Q    When was Marketwired acquired by NASDAQ I should ask?

8  A    February 2016.

9  Q    And was a disclosure made to NASDAQ that the systems had

10 been severely compromised, do you know?

11 A    Yes.

12 Q    Yes, you know and, yes, the disclosure was made?

13 A    Yes.

14 Q    So, referring again only to the uploaded press releases,

15 not to the distributed press releases.

16 A    Okay.

17 Q    Is it your testimony that you maintain all of the

18 uploaded press releases as uploaded?

19 A    That's correct.

20 Q    And do you maintain separate copies of all of the

21 uploaded as edited?

22 A    Yes, that's what becomes the final.

23 Q    So, there are several different versions maintained in

24 your system, the uploaded version, any edits that might be

25 made and the final distributed version?

FERGUSON - CROSS - MS. BRILL

1    A    Yes.

2    Q    You have all of those in your system?

3    A    Yes.

4    Q    So, let me just talk a little bit about the editing that

5    does take place.  I mean you spoke about the fact that it is

6    handed over to your editors or your editorial team, right,

7    once it is uploaded and editing can be as simple as

8    formatting, right?

9    A    Correct.

10   Q    It could be as simple as removing the markings that I was

11   talking about earlier, right?

12   A    Yes.

13   Q    And it could also be a little more complex like changing

14   words, right?

15   A    Yes, that's true.

16   Q    Changing numbers?

17   A    Yes, that's correct.

18   Q    Changing paragraphs?

19   A    Yes, under the client's direction.

20   Q    And under the client's direction you could also add and

21   subtract pages, right?

22   A    Yes.

23   Q    There's a system in place, there's a protocol in place

24   for the press releases to be altered even after they're

25   uploaded on your portal, right?

FERGUSON – CROSS – MS. BRILL

1    A    That's correct.

2    Q    I'm going to talk a little bit also about -- and when

3    those documents are edited, nothing changes about the uploaded

4    time?

5    A    Not the submission time, that's maintained from the

6    original submission.

7    Q    Even after you send it over to the client for an okay and

8    bring it back?

9    A    Submission time --

10   Q    Yes, for distribution?

11   A    That's correct, it stays the same.

12   Q    So, you spoke a little bit about confidentiality and

13   you're aware, are you not, that there's a -- do you have a

14   relationship with your clients that requires that the

15   documents be kept confidential, your company has that

16   relationship, right?

17   A    That's correct.

18   Q    And it is important for the company to keep those

19   documents confidential?

20   A    Yes.

21   Q    It is important for Marketwired and it is important for

22   the corporation, right?

23   A    Correct.

24   Q    And that's the service that you offer, that's what the

25   clients contract?

FERGUSON – CROSS – MS. FELDER

1    A    Yes.

2    Q    And part of keeping the documents confidential you would

3    agree is keeping the system secure, right?

4    A    Correct.

5    Q    So, if the security is breached, then Marketwired, the

6    company is not fulfilling its obligation to keep the documents

7    confidential, would that be fair to say?

8    A    Correct.

9         MS. BRILL:  I don't have any further questions.

10        THE COURT:  Thank you.

11        Anything else?

12   CROSS-EXAMINATION

13   BY MS. FELDER:

14   Q    Good afternoon, Mr. Ferguson.

15   A    Hello.

16   Q    I'd like to show you what was previously admitted as

17   Government Exhibit 323-A1.

18   A    Yes.

19   Q    You testified that the government provided you with this

20   document, correct?

21   A    Yes.

22   Q    When were you provided with this?

23   A    Within the last week.

24   Q    Did you ever see this document or text prior to the

25   government showing it to you?

FERGUSON - CROSS - MS. FELDER

1    A    No.

2    Q    Did you review the CS3 portal to compare this document to

3    whatever is in the portal?

4    A    I compared it to the final release, I didn't compare it

5    to what was in the portal.

6    Q    You testified that your clients would upload information

7    to that portal, correct?

8    A    Yes.

9    Q    And they would upload the body content of the press

10   release, correct?

11   A    Yes.

12   Q    One other question, do you know the source of this text?

13        THE COURT:  I'm sorry, I didn't hear the end of

14   that.

15   Q    Do you know the source of this text?

16   A    The source of the text?

17   Q    Yes.

18   A    I only know that it looks like the other document, I

19   don't know where it came from.

20   Q    You have no personal knowledge of where it came from,

21   correct?

22   A    No.

23   Q    Or what computer it was on, correct?

24   A    No.

25   Q    And it's not anything similar to what you've seen in the

FERGUSON – CROSS – MS. FELDER

1    portal, correct?

2    A    I didn't look in the portal for this document.

3              MS. FELDER:  No further questions.

4              THE COURT:  Thank you.

5              Anything else?

6              MR. TUCKER:  No, Your Honor.

7              THE COURT:  Thank you, Mr. Ferguson.  Appreciate it.

8    Step down.

9              Next witness.

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JAMES GIMBI - DIRECT - MR. TUCKER

1          MR. TUCKER:  The Government calls James Gimbi.

2              (Witness takes the witness stand.)

3   JAMES GIMBI, called as a witness, having been first duly

4   sworn/affirmed, was examined and testified as follows:

5              THE WITNESS:  I do.

6              COURTROOM DEPUTY:  Please have a seat state and

7   spell your name for the record.

8              THE WITNESS:  My name is James Gimbi, J-A-M-E-S,

9   G-I-M-B-I.

10             MR. TUCKER:  May I inquire, your Honor?

11             THE COURT:  Yes, sir.

12  DIRECT EXAMINATION

13  BY MR. TUCKER:  :

14  Q    Good afternoon, Mr. Gimbi.  Where are you employed, sir?

15  A    I work for the United States Senate.

16  Q    What do you do for the Senate?

17  A    I am a cyber security legislation policy adviser.

18  Q    What does that mean to be a cyber security legislation

19  policy adviser?

20  A    Sure.  So my role is to help a Senator deal with cyber

21  security issues as they come up and draft legislation

22  direction for potential future changes.

23  Q    How long have you been working in the Senate?

24  A    Since January.

25  Q    How long is your fellowship?

JAMES GIMBI – DIRECT – MR. TUCKER

1   A    The fellowship lasts until December 31, 2018.

2   Q    Where were you employed prior to the Senate?

3   A    Mandiant.

4   Q    What is Mandiant?

5   A    Mandiant is a cyber security consulting firm.  And the

6   company does a range of cyber security professional services,

7   consulting, specializing most specifically in incident

8   response and forensic analysis.

9   Q    When you say incident response, what do you mean by that?

10  A    Incident response is the practice of helping an

11  organization when a company or Government agency is dealing

12  with a breach, a hacker, once they have found a way into the

13  environment.  So that might include first identifying the full

14  scope of an incident, as well as developing a plan to extract

15  the attacker from the environment and prevent them from coming

16  back again.

17  Q    What is your educational background?

18  A    I went to the Rochester Institute of Technology.  And had

19  a, received a Bachelor's degree with honors in information

20  security and forensics.

21  Q    Have you received specialized training in information

22  security and forensics?

23  A    I have.

24  Q    Please tell the jury a little about that.

25  A    There was the Bachelor's degree, which again focused

JAMES GIMBI - DIRECT - MR. TUCKER

1  heavily on analysis, techniques and procedures.  As well as

2  evidence handling and processes that would help surrounding

3  the delivery of an incident response engagement.

4          Since working at Manhattan I have taken several

5  classes, as well as taught several classes, for federal law

6  enforcement and others.

7  Q    Focusing on the teaching for a moment, please tell the

8  jury and the Court a little about the type of classes you

9  taught?

10  A    Sure.  So the classes I taught were analysis techniques,

11  forensic methods and offensive techniques for corporate

12  clients, new consultants at the company, conferences and

13  federal law enforcement.

14  Q    During your time at Mandiant, about how many different

15  clients have you provided cyber forensic and information

16  security consulting services?

17  A    Somewhere in the order of 95.

18  Q    What was that time period?

19  A    From 2012 June 2012 until just this last January.

20  Q    Are you being paid in connection with your testimony here

21  today, Mr. Gimbi?

22  A    I'm being reimbursed for travel; aside from that, no.

23          MR. TUCKER:  At this time the Government offers

24  Mr. Gimbi as an expert in information security, computer

25  forensics and cyber incident responses.

JAMES GIMBI - DIRECT - MR. TUCKER

1            THE COURT:  Either counsel wish to exam at this

2     point?

3            MS. BRILL:  Your Honor, if I could just say, is this

4     witness going to be giving an opinion?

5            THE COURT:  He's being offered as an expert witness,

6     I assume he is.

7            MR. TUCKER:  Yes.

8            MS. BRILL:  There is no voir dire, your Honor.  That

9     was my only question.

10            THE COURT:  Very well.

11            MS. FELDER:  No objection, your Honor.

12            THE COURT:  Ladies and gentlemen let me interject

13     for just a second.  You heard a term I myself don't generally

14     use, that of opinion witness -- of an expert witness, excuse

15     me.  This has nothing to do with this gentleman.  I would say

16     this no matter who was called and proffered to the jury as a

17     so-called expert witness.

18            You are the judges of facts, all facts.  Even facts

19     about which an opinion or expert witness will testify to.  If

20     you believe that the evidence does not support an opinion

21     expressed, you're free to reject it.  If you think the

22     background or experience of an expert witness is not

23     sufficient to support an opinion or opinions expressed by that

24     witness, you're free to reject it.  If you think there is

25     other evidence in the case that convenes what an opinion or

JAMES GIMBI – DIRECT – MR. TUCKER

1    expert witness has to say, you're free to reject.

2           Which is why I choose the label opinion witness

3    rather than expert witness so that the jury is not in any way

4    confused that on all facts in dispute, all facts, you the jury

5    are the judges of those facts.  Okay.  So bear that in mind.

6           As I said, I say this to you regardless of who the

7    witness is.  I refer to him as an opinion witness, lawyers

8    will often hear, as you've already heard, refer to them as

9    expert witnesses.  But you're the expert.  You're the ultimate

10   finder of all facts.  Okay.  Please continue.

11          MR. TUCKER:  Thank you, your Honor.

12   BY MR. TUCKER:

13   Q    Mr. Ferguson, I want to return your attention to

14   June 2013.  Did there come a time when you were part of a

15   Mandiant incident response team that worked in engagement at

16   Marketwired?

17   A    Correct.  My last is Gimbi, yes.

18   Q    I'm sorry, Mr. Gimbi.  I apologize.  Mr. Gimbi.

19          THE COURT:  You have to correct that incident,

20   didn't you?

21   Q    My apologies, Mr. Gimbi.

22          What was your understanding of the events that led

23   up to that engagement at Marketwired?

24   A    My understanding is that the Secret Service had notified

25   Marketwired that there had been a breach.  They had advised

JAMES GIMBI – DIRECT – MR. TUCKER

1  that they seek expert assistance to deal with the breach.

2  Q    Did you have to travel anywhere as part of your work in

3  that engagement?

4  A    I did.  I went to Toronto twice.

5  Q    All together, how long did you work on that project?

6  A    It was about two weeks on site, and another I would say

7  four to six weeks offsite.

8  Q    Did you have anybody else with you from Mandiant when you

9  responded to Marketwired?

10  A    Yes.

11  Q    Who was -- approximately how many other people were with

12  you?

13  A    Two other consultants on the case.

14  Q    When you arrived at Marketwired, what were your

15  objectives?

16  A    The objectives were first to understand the full scope of

17  the incident.  And the second objective was to remove the

18  attacker from the environment.  The third was to prevent

19  attacks from happening again.

20          THE COURT:  Would you move a little closer to the

21  microphone.

22          THE WITNESS:  Is this better?

23          THE COURT:  We'll see.

24  Q    Mr. Gimbi, could you just restate your answer, what your

25  objectives were, I couldn't hear?

JAMES GIMBI - DIRECT - MR. TUCKER

1    A    The objectives were to identify the full scope of the

2    breach; remove the attacker from the environment; and third,

3    prevent the similar attack from happening again.

4    Q    So focusing on the first role, identifying the full scope

5    of the incident, what does that mean?

6    A    Full scope means we're looking to understand everything

7    that the attacker had done in terms of every system that they

8    had interacted with and ideally all the data that they would

9    have had accessed to and were removed from the environment.

10   Q    And removed from the environment, what does that mean?

11   A    To copy data from a victim network work onto some other

12   network, often for some other use distribution or re-sale.

13   Q    When you say remove the attacker from the environment?

14   A    Excuse me -- yes.

15   Q    What do you mean?

16   A    That would mean to take away whatever means of access

17   that they have.  If they are getting in through the back door,

18   we close the back door and lock it.

19   Q    When you conduct an incident response in a case like

20   this, what is the pace or level of urgency?

21   A    The pace depends very much on a few different factors.

22   Most importantly the type of attack they are, what you're

23   dealing with and the risk tolerance of the client.  You would

24   treat, for instance, when you talk about type of attacker a

25   nation state espionage organization is very different than how

JAMES GIMBI - DIRECT - MR. TUCKER

1    you treat an organization that was actively stealing money at

2    a very high rate from the organization.

3    Q    How would those differ?

4    A    When you're dealing with an intelligence agency or an

5    agent of a nation state, you generally don't want them to know

6    that you know that they are there until you fully understand

7    everywhere they are so you can remove them from the

8    environment faster than they would be able to respond and dig

9    deeper in.

10        When you're dealing with a financially motivated

11   attacker, the incentives change.  You want to do everything

12   you can to stop the loss of capital as soon as you can.

13   Q    What was the tempo like for the Marketwired engagement?

14   A    A little bit in between.

15   Q    Tell the jury the general methodology that you and your

16   team employed at Marketwired?

17   A    You take whatever facts you have available to you.  In

18   this case I believe we had a few different IP addresses that

19   were reported as malicious.  As well as a sea full of what we

20   were told was evidence collected by the Secret Service.  And

21   we look to see if anything would have lined up with those

22   pieces of evidence could be found in artifacts in

23   Marketwired's actual environment.

24        From there you follow the leads.  So you work with

25   this one fact that you have, timeline around that, look at

JAMES GIMBI – DIRECT – MR. TUCKER

1    what happened on the system at that point, learn more about

2    the scope, if they had moved laterally, moved to another

3    machine.  You would complete -- or excuse me, continue that

4    process until you stop finding new things essentially.

5    Q    What kind of evidence did you obtain and review in your

6    work at Marketwired?

7    A    The two primary sources of evidence were log files from

8    various services and file system information from forensic

9    images.

10   Q    What are log files?

11   A    Log files are computer files, often flat text files, that

12   are dynamically generated; that is to say, actively added as a

13   computer does what a computer would normally do, different

14   types of logs for different sources of events.

15       You may have a log every time somebody logs into a

16   computer.  For instance, every time you sign into your

17   computer your computer keeps track of what you did, what the

18   username was, whether or not it was successful, and stores

19   that for later inspection.

20   Q    So those are records of the activity that the system is

21   undergoing?

22   A    Correct.

23   Q    You mentioned that you also examined forensic images,

24   please explain what you mean by that?

25   A    Forensic image is a bit for bit copy of a hard drive of a

JAMES GIMBI - DIRECT - MR. TUCKER

1    computer.

2    Q    What kind of thing to us look for when you look at

3    forensic imagings?

4    A    When you're looking at a forensic image, you're generally

5    trying to understand what an attacker actually performed while

6    they were effecting or on you might say a system.  So you can

7    find evidence of them creating, removing files, collecting

8    files.  You could find evidence of what, potentially evidence,

9    of what directories they had seen, commands that they had run,

10   and other such things.

11   Q    When you do a review of a forensic image are you looking

12   for malware?

13   A    Yes.

14   Q    What is malware?

15   A    Malware is software that is designed for some malicious

16   purpose, hence malware.  Malware with a back door that lets

17   you have access to a machine that you're not supposed to have

18   access to.  It can be a key logger, which tracks everything

19   that person types, or it can be something like ransomware.

20   Q    In your review of the web logs from Marketwired's

21   systems, did you see evidence of malicious activity?

22   A    Yes.

23   Q    Did you also see evidence of malware on Marketwired

24   systems?

25   A    Yes.

JAMES GIMBI - DIRECT - MR. TUCKER

1   Q    By the way, you've been talking about reviewing forensic

2   images; is that right?

3   A    Yes.

4   Q    Did you look at the actual machines that were operating

5   Marketwired systems while they were online?

6   A    No.

7   Q    Why the images?

8   A    An image is for the purpose of being forensically sound.

9   If can you get an image of a computer -- if a computer is on

10  and active in production mode, the contents of the hard drive

11  are constantly changing.  Most digital artifact, just like

12  real artifacts, have a life span of sorts.  Like a foot print

13  in mud is somewhat ephemeral, weather can make it go away.  So

14  what we're basically doing is taking a cast of the system so

15  we know actually what was on at the time of analysis, or time

16  of collection rather.

17  Q    Based on your overview of the forensic images and logs,

18  were you able to determine when the malicious activity

19  targeting Marketwired systems began?

20  A    Yes.

21  Q    When?

22  A    February of 2010.

23  Q    Did that malicious activity occur on and off after that

24  during at arrival of the Mandiant team?

25  A    Yes.

1244

JAMES GIMBI - DIRECT - MR. TUCKER

1    Q     You arrived in June of 2013?

2    A     Correct.

3    Q     You testified that the earliest evidence of malicious

4    activity was in February 2010.  In your experience, Mr. Gimbi,

5    do malicious cyber attackers sometimes take measures to remove

6    or conceal evidence of their activities?

7    A     Yes.

8    Q     What kinds of measures?

9    A     Well, you would most commonly see an attacker delete or

10   modify log files.  Probably the lowest hanging fruit, we call

11   an anti-forensic.

12   Q     You said lowest hanging fruit?

13   A     Lowest hanging fruit, I guess easiest thing to do with

14   the highest impact.

15   Q     That was anti-forensic activity?

16   A     Yes.

17   Q     What is the point of modifying or deleting log files?

18   A     The two big points would be first to slow down an

19   investigation generally.  And the second would be to obfuscate

20   attribution attempts, make it harder to work.

21   Q     When you say attribution attempts, figuring out who the

22   attacker is?

23   A     Yes.

24   Q     Were you able to determine how the attackers gained

25   access to Marketwired systems initially?

JAMES GIMBI – DIRECT – MR. TUCKER

1   A     Yes.

2   Q     What did they do?

3   A     They used a technique known as SQL injection or SQL

4   injection on a front Internet based Marketwired application.

5   Q     Briefly, remind us what SQL injection is?

6   A     Taking a quick step back, SQL is a database, common

7   database.  A database is like a big filing cabinet, lots of

8   drawers in it, and in the drawers are folders containing data.

9   Similarly, a database is a series of tables that contain rows

10  and columns full of information.

11          So a SQL injection attack is when you find a way to

12  ask for information from one of those digital filing cabinets

13  that you should not get your hands on, that you should not

14  have access to.

15  Q     Do SQL injection query sometimes allow attackers to

16  extract information?

17  A     Yes.

18  Q     Do they also allow attackers to gain a sense of the

19  architecture of the target system?

20  A     Yes.

21  Q     Now, SQL injection queries, can they be run with

22  preexisting programs like SQLmap?

23  A     Sure.  There is a large amount of preprograms.

24  Q     Is it also possible to have a SQL injection query using

25  nothing more than a Internet browser window?

JAMES GIMBI – DIRECT – MR. TUCKER

1    A    Yes.

2    Q    What part of the Marketwired system did they initially

3    target with SQL injection queries?

4    A    There was an application that we refer to as CS3

5    application that was used to among other things to submit

6    press releases by, used to submit press releases for clients.

7         MR. TUCKER:  Ms. Mulqueen, just for the witness.

8         COURTROOM DEPUTY:  Just the witness.

9    Q    Showing you what is marked for identification as

10   Government's Exhibit 710.  Can you see that on your screen,

11   Mr. Gimbi?

12   A    I can.

13   Q    What is this document generally?

14   A    This is an illustration of how the CS3 application and

15   another application UK or U.S. distribute was architected.  So

16   every picture of a computer tower here represents a different

17   machine or virtual machine.  It illustrates the relationship

18   how they work together in order to build this application, the

19   CS3 application.

20   Q    Does this document fairly and accurately represent a

21   portion of Marketwired, correct?

22   A    Yes.

23   Q    Would that assist your testimony?

24   A    Yes.

25        MR. TUCKER:  We admit 710 for demonstrative

JAMES GIMBI - DIRECT - MR. TUCKER

1    purposes.

2              THE COURT:  For demonstrative purposes.  Objections?

3              MR. HEALY:  No objection.

4              MS. FELDER:  No objection.

5              THE COURT:  In evidence.

6              (Government Exhibit 710, was received in evidence.)

7              MR. TUCKER:  May we publish?

8    Q    Mr. Gimbi, can you indicate now on Government's Exhibit

9    710 the portions of Marketwired systems architecture that

10   supports that CS3 application?

11   A    On the left-hand side -- we see two boxes, one very large

12   box and one small.  On the left-hand side working from the top

13   down we have a --

14   Q    Sorry, if you tap on your screen it will light up.

15   A    Excellent.  So here we have what is known as an F5 load

16   balancer, I'll come back to that in a second.  Let's start

17   with the database.

18              This cylinder down here represents that filing

19   cabinet, the digital filing cabinet.  That is a file that is

20   stored redundantly on these two systems here, MW128 and MW127.

21   Those would be referred to as the database servers, the actual

22   physical computers that are the interacting with that database

23   file.

24   Q    Are those sometimes called back end servers?

25   A    Yes.

JAMES GIMBI - DIRECT - MR. TUCKER

1  Q    What about those two servers, MW101 and MW015, how do

2  they factor into the CS3 application?

3  A    They are called front end servers.  These are the actual

4  web servers that are providing the user with a web experience

5  when they request the application address.

6            So for instance, pretending this is Google for a

7  second.  You go to Google.com, these are the servers

8  responding to you.

9  Q    What is the F5 appliance?

10  A    F5 appliance is a load balancer.  So when you're talking

11  about an application that has a lot of requests coming in,

12  it's desirable to have redundant series of servers.  So

13  basically if something goes wrong with one server, too many

14  requests for one to handle all of the requests, the load

15  balancer will distribute those requests across multiple

16  servers.

17  Q    So the CS3 application, it's constituent parts, is that

18  F5 load balancer, then the four servers MW10, MW15, MW128,

19  MW127?

20  A    That's correct.

21  Q    Did you review the web log files for that CS3

22  application?

23  A    I did.

24  Q    Did you see indications that the attacker was using the

25  SQL injection technique that you testified about?

JAMES GIMBI - DIRECT - MR. TUCKER

1    A    I did.

2            MR. TUCKER:  May I show the witness, Ms. Mulqueen?

3            COURTROOM DEPUTY:  Certainly.

4    Q    Showing you what is marked for identification

5    Government's Exhibit 711.  Do you recognize this document,

6    Mr. Gimbi?

7    A    I do.

8    Q    Is this an excerpt from the web logs for the CS3

9    application?

10   A    It is.

11   Q    Is this just a tiny excerpt of a very, very large log?

12   A    It is.

13   Q    Is this a fair and accurate excerpt?

14   A    It is.

15           MR. TUCKER:  The Government moves to admit 711 in

16   evidence.

17           THE COURT:  711, any objection?

18           MS. BRILL:  No objection.

19           MS. FELDER:  No objection.

20           THE COURT:  Received.

21           (Government Exhibit 711, was received in evidence.)

22           MR. TUCKER:  May we publish?

23           THE COURT:  Go ahead.

24   BY MR. TUCKER:

25   Q    Mr. Gimbi, now that the jury can see, can you explain

1250

JAMES GIMBI - DIRECT - MR. TUCKER

1   what the significance of this web log excerpt is to you?

2   A    Sure.  So we were referring to the fact that different

3   services keep different logs.  Websites keep their own logs.

4   A website keeping its own log, we refer to as a a web log.

5           Here we see three different lines of a web log text

6   file.  I know it looks like that it's just jumbled up, that's

7   because there is not enough space.

8           Each line is represented with the start of, each

9   line with an IP address in the beginning.  So we see

10  77.123.63.15 in the beginning, that's the first line.  The

11  next line 77, that's line two.  Then 178.1776.936.114 is the

12  third line.

13  Q    So three entries on this excerpt?

14  A    That's correct.

15  Q    Please continue.

16  A    Each one of those three entries in this log represent one

17  request coming through from a visitor to the website that the

18  website server had to respond to.

19  Q    What is that website is that reflected here?

20  A    It is not reflected, I don't think, in this document

21  itself.  But it is the CS3 application.  We pulled it from the

22  CS3 front end servers.

23  Q    Is the path here, the upper, the left-hand corner?

24  A    Yes.

25  Q    Tell us what you mean by path and what I mean by path?

JAMES GIMBI – DIRECT – MR. TUCKER

1    A    A path is the partial or entire, how to phrase, path to a

2    website.  If you go to, for instance sticking with Google.com,

3    you decide you want to see what the news from Google might be,

4    you can go to Google.com/news.  The news part is the remainder

5    of the path.  Here we see again /MW/cookietext is the final

6    part of the web address.  So this would have been something

7    along the lines of secured up Marketwired.com/cookietext.  The

8    remainder of this is also part of the path up until that

9    point.

10   Q    What is the significance of this highlighted text, test,

11   what is happening?

12   A    So again with the full path this would be at top of the

13   URL bar in the user's browser.  We see up by the cookie

14   texting a valid request, that's just the request for a page,

15   non-malicious part of the CS3 application.  After the question

16   mark we see manipulations from an attacker.  We see HTP.print

17   which is an oracle function.  An oracle is the developer of

18   the database that we were referring to earlier.  So this is an

19   oracle function that allows you to essentially print any

20   designated text at the end of a specified web page.

21   Q    Is that the HTP.print command?

22   A    Yes.

23   Q    What text did the user try to print with this particular

24   HTP.print command?

25   A    The word test.  So in essence what you would get is the

JAMES GIMBI – DIRECT – MR. TUCKER

1    expected contents of the page cookie_text, followed by "test"

2    at the very bottom of the page, literally the four characters

3    T-E-S-T.

4    Q    The web page would look exactly the way Marketwired would

5    want it to look and the word test would appear on the bottom?

6    A    Yes.

7    Q    What is the point of doing that?

8    A    It's a way of validating that you found a real

9    vulnerability.

10   Q    That's a SQL injection of vulnerability?

11   A    That's a SQL injection of vulnerability.

12   Q    What is the significance of the next entry?

13   A    Essentially the same.  Let's work through from just

14   beyond the obviously change of the text.

15            We notice that the IP address in the first line and

16   second line are the same.  We also notice that the string

17   here, the user agent string, which I'll come back to is also

18   the same.

19   Q    User agent string?

20   A    User agent string.

21   Q    Continue.

22   A    The IP address is the same, which is a strong indication

23   that the requests came from the same machine or at least the

24   same network.  Again an IP address is essentially your address

25   on the Internet.  So two requests coming from the same IP

JAMES GIMBI - DIRECT - MR. TUCKER

1   address is a strong indicator you may be dealing with the same

2   or a related individual or machine making the request.

3            The significance of the user agent string -- I don't

4   know if you can clear this again or for me -- the user agent

5   string, I'll go ahead and underscore each of these.  So that

6   string, is the same for both the -- excuse me sloppy

7   underlying -- is the same for the first log entry and the

8   second log entry.

9   Q     So it's clear, among other things user agent string first

10  two entries refers to Windows NT?

11  A     Yes, NT5.1.

12  Q     What is a user agent string, what does to do?

13  A     User agent string tells the web page information about

14  your computer, about the languages that you like to use, and

15  about the device that you're on -- excuse me, the web browser

16  that you're using.  The idea here is, if you're a web

17  developer you can customize what gets returned to the user

18  based on what is appropriate to them.  If I have a user who

19  speaks Italian, I want to make sure if I see indicators that

20  they use Italian language text on the browser I will want to

21  return them in Italian that web page.  Similarly if I see --

22  sorry.

23  Q     Go ahead.

24  A     If I see that they are coming from Firefox versus Chrome,

25  I may treat the page differently.  Or if I see they are coming

JAMES GIMBI - DIRECT - MR. TUCKER

1    from a hand-held phone versus a full-sized computer, I may

2    serve them slightly different texts.

3            It's meant to be useful for developer from a

4    forensic stand point.

5            It's highly likely these three requests came from

6    the same web browser.  Further cemented by the identical

7    vulnerability and by the similarity of the time stamps.

8    Q    So it's clear, the first two requests came from the same

9    web browser, is that what you mean?

10   A    Yes.

11   Q    So it's clear, there are dates and times for these first

12   entries the one 17 February 2010 at 1138 minus 800?

13   A    Yes.

14   Q    The second entry it looks like it's 14:38 this is minus

15   500, so it's about 17 seconds later?

16   A    That's right.

17   Q    If this particular SQL injection query would have run,

18   what is the text that would appear on the bottom of the

19   screen?

20   A    The text would look exactly what we see here, with the

21   exception that when text is rendered from this format there is

22   a symbol here, the %20.  %20 would render it as a space

23   instead of percent 20.

24            So ultimately what this would look like is the word

25   ya, followed by a space, followed by hacker, followed by a

JAMES GIMBI - DIRECT - MR. TUCKER

1    space, followed by neebatso.

2    Q    Did that same SQL injection command show up again in the

3    web log here in the, entry which occurs about 40 seconds later

4    at 11:39:19, on 17 February, 2010?

5    A    Yes.

6    Q    Forty-five seconds?

7    A    Yes.

8    Q    Mr. Gimbi, what is the significance of these three

9    entries?

10   A    Well, again, we see the first two are likely coming from

11   the same user same browser.  The last one is identical to the

12   second request coming from at a different IP address with a

13   different user agent string.  This is a strong indicator that,

14   very highly consistent with somebody realizing they have found

15   a real vulnerability, customizing it in some way which is

16   common in pen-testing hacker culture, and sharing with a

17   second individual.

18   Q    Just so it's clear, when you pen-testing?

19   A    That's penetration testing.  Penetration testing, the

20   practice of hacking for a legitimate purpose, usually with a

21   way of finding vulnerability so a company can fix them.

22   Q    Mr. Gimbi, before any attacker could use the SQL

23   injection queries, would they have had to log in to the CS3

24   application with a valid username and password?

25   A    They would either log in or be able to create an account

JAMES GIMBI - DIRECT - MR. TUCKER

1    with -- they would have to be able to create a valid account

2    with a specific code.

3    Q      The bottom line is they couldn't use these

4    vulnerabilities without getting past that first login layer?

5    A      That's correct.

6    Q      So it's clear, Mr. Gimbi, this is the first indications

7    that you saw in the CS3 web logs of malicious activity

8    targeting Marketwired and CS3 specifically?

9    A      First successful.  There was some scanning that happened

10   before.

11   Q      What is scanning generally?

12   A      Automated procedure to make sure -- not to make sure --

13   to see if you can identify, again low hanging fruit, low

14   effort, high value vulnerability before you put in a manual

15   effort to put your own hole in the system.

16   Q      Did the web logs reflect additional SQL injection queries

17   targeting the CS3 application after these?

18   A      Yes.

19   Q      What did you see?

20   A      Two broad categories.  Number one, specific queries

21   trying to extract certain pieces of information from the

22   database.

23          And then secondly, after that we saw many, many,

24   many requests for wholesale extraction of the contents of the

25   database press releases.

JAMES GIMBI - DIRECT - MR. TUCKER

1   Q      Just so it's clear, when you say extraction, that's

2   taking data out of Marketwired systems?

3   A      Correct.

4   Q      And that extraction involved press releases?

5   A      Correct.

6   Q      Was also some the data that was extracted employee

7   information from Marketwired employees?

8   A      It was.

9   Q      Why might a malicious cyber attacker might want to steal

10  employer information?

11  A      Well, the primary cause is for use for what we call

12  escalation of privileges.

13  Q      What is that?

14  A      Essentially with most breaches, nearly every breach I've

15  worked on, the attacker will get access to an employer and

16  have some level of access.  Usually the level of access the

17  individual who they were able to hack into, whatever user that

18  may have been.  Different users of course have different

19  levels of access.  So some users may be able to access a

20  certain set of data, some users are able to change a certain

21  set of data, others not.

22         An attacker, depending on what their goals are,

23  depending on what they are looking to accomplish, may require

24  more access than they originally have.  Stealing credentials,

25  usernames and passwords, is the easiest way to do that.

JAMES GIMBI – DIRECT – MR. TUCKER

1   Q    In the course of your work in this engagement at

2   Marketwired, were you provided with files that federal agents

3   had recovered from computers overseas?

4   A    I was.

5   Q    What did you do with those files generally?

6   A    I catalogued the information that was on those files and

7   made a record of what they represented.

8   Q    I'm going to show what you what is in evidence as

9   Government's Exhibit 411, which is ftpusers.txt.  And 444,

10  which is employees.txt.  Have you seen these documents prior

11  to your testimony here today?

12  A    I have.

13  Q    Were those among the documents provided to you in the

14  Mandiant time by federal authorities?

15  A    They were.

16  Q    What did you conclude about these documents, specifically

17  Government's Exhibit 444?

18  A    We concluded that it was highly, highly likely that they

19  were the output of specific SQL queries that we had seen in

20  our network.  Evidence that we were able to identify

21  Marketwired logs, mapped nearly identically to what we saw on

22  the Secret Service disk.

23  Q    So you were able to replicate some of those same SQL

24  queries?

25  A    Yes.

JAMES GIMBI - DIRECT - MR. TUCKER

1    Q    You got same the output?

2    A    Same output.  And there were other factors.  The blast

3    modified time stamps of the files matched perfectly when the

4    requests had gone through; which is to say, they were created

5    and manipulated at the same time that the queries were seen on

6    the Marketwired side.

7    Q    Showing the witness Government's Exhibit 711.  There is a

8    reference to iwire.  What is that?

9    A    In this case iwire can be the name of the account running

10   the web service application.

11   Q    What does that mean?

12   A    So a web service is the software that actually sends a

13   page back to you when you make a request.  You go to

14   Google.com, somebody sends you that logo in that back, that

15   somebody is a programmer on a Google server somewhere.  The

16   program that's running, we call that a web server, is very

17   similar to programs we're familiar with, Word or Solitaire or

18   your web browser, in that there needs to be an actual user who

19   is logged on to the computer, an account logged on to the

20   computer to run those applications.  So in this case, iwire is

21   simply the name of the account that is running the web server

22   application.

23   Q    Did you see evidence that the attackers were elevating

24   the privileges of this iwire account after these initial login

25   entries February 2010?

JAMES GIMBI - DIRECT - MR. TUCKER

1    A    I did.

2    Q    What is the significance of that, that elevating the

3    privileges?

4    A    The elevation of privileges in this case would have

5    allowed somebody who was able to control queries from the

6    iwire account, in this case the attacker, would be able to

7    essentially take control of the database system.  They were

8    able to run commands as if directly from the keyboard.

9    Q    Showing you what is in evidence, 710.  Did that elevating

10   of privileges of the iwire account allow for lateral movement

11   within Marketwired systems?

12   A    Yes.

13   Q    What does that mean?

14   A    It means that because of successful privilege escalation

15   they were able to make modifications or changes, moved to the

16   back end applications from the front end application, or back

17   end servers to the front end servers.

18   Q    They were able to increase their access to Marketwired?

19   A    Yes.

20   Q    And facilitate data extraction?

21   A    Yes.

22   Q    Did you see indications in the web logs that the

23   attackers were successfully extracting press releases, draft

24   press releases, from the CS3 application?

25   A    Yes.

JAMES GIMBI – DIRECT – MR. TUCKER

1  Q    Tell the jury what you saw.

2  A    We saw the development of five, I believe it was five,

3  different methods for extracting press releases using this

4  application over the course of several years.  So they used

5  different techniques, but at a rate that showed that they were

6  automating on the back end, meaning write a program to do it

7  for them.

8        So they found a technique, they would have manually

9  figured out exactly how to get what they want and apply that

10  into a network and do that over and over again.

11  Q    Did you see that activity from February 10 through your

12  arrival at Marketwired in the summer 2013?

13  A    Yes.

14  Q    Based on your review of web logs and the associated data,

15  approximately how many draft press releases were the attackers

16  able to extract from Marketwired systems during that period?

17  A    Somewhere around the order 120,000.

18  Q    120,000 unique press releases?

19  A    Right.

20  Q    Did you see evidence that the attackers were targeting

21  another part of Marketwired systems, that is the UK distribute

22  server, shown here on Government's Exhibit 710?

23  A    Yes.

24  Q    What did you see?

25  A    We saw attacker log into that application.  And using the

JAMES GIMBI – DIRECT – MR. TUCKER

1   access that they had from that -- from that application,

2   manipulate the secure one server, right here, so that they

3   could access data that was stored on the server over here.

4   Q    A few questions about that.  First, the UK distribute

5   server, what web domain or flat fronting domain?

6   A    USdistribute.com.

7   Q    This was a server that made USdistribute.com work for

8   Marketwired?

9   A    Yes.

10  Q    Secure one is a back end server?

11  A    Yes.

12  Q    You mentioned a NAS a minute ago, what is a NAS?

13  A    NAS is network attached storage server, another term for

14  file server.  A NAS server basically allows users to place and

15  modify files on a network while gaining access to somebody

16  else's computer.

17  Q    Through this of targeting the UK distribute server, the

18  attackers were able to extract data from the NAS among other

19  locations?

20  A    Yes.  And the NAS, again, was on the internal network.

21  Q    Not even connected to the Internet directly?

22  A    No.

23  Q    You said that the attackers had to log into the

24  USdistribute.com site, can you explain how they did that?

25  A    There would have been a login prompt.  They use the

JAMES GIMBI – DIRECT – MR. TUCKER

1    credentials, username and password, demo and demo.

2    Q    The username is demo and the password was demo?

3    A    Yes.

4    Q    That facilitated this initial entry?

5    A    Yes.

6    Q    Did your review of this portion of Marketwired system and

7    the associated web logs, reflect the attackers able to install

8    web shells?

9    A    Yes.

10   Q    What is a web shell?

11   A    A web shell is a form of malware, which can have many

12   purposes, but ultimately is just a particular way of getting a

13   computer to do something, a script.  Most often it allows

14   attackers to run commands against the web server that they

15   have infected.

16   Q    If you're able to extract data using SQL injection

17   queries, why might you use a web shell?

18   A    Well, again, there were multiple different attempts -- or

19   excuse me, different methods that were used, several methods

20   to extract press releases had been cycled through and this was

21   another one of their methods.  It's also possible there were

22   of different press releases on this web server than on the

23   back end database.

24   Q    Did you see other evidence that the attackers were using

25   Marketwired login credentials to extract date from Marketwired

JAMES GIMBI — DIRECT — MR. TUCKER

1   systems?

2   A    Yes.

3        MR. TUCKER:  If I could just show just the witness

4   what is marked for identification as Government 712.

5        COURTROOM DEPUTY:  Just the witness.

6   Q    Do you recognize this document generally, Mr. Gimbi?

7   A    I do.

8   Q    What is it?

9   A    Another web log from Marketwired application.

10  Q    This is another excerpt from are the CS3 web logs?

11  A    Yes.

12  Q    This is from March 27, 2010?

13  A    Yes.

14  Q    Is this a fair and accurate excerpt from those web logs?

15  A    It is.

16       MR. TUCKER:  Move 712 into evidence.

17       THE COURT:  712, any objection?

18       MR. HEALY:  No objection.

19       THE COURT:  712 received.

20       (Government Exhibit 712, was received in evidence.)

21       MR. TUCKER:  May we publish, your Honor?

22       THE COURT:  Go ahead.

23  BY MR. TUCKER:

24  Q    Turning your attention to a few rows on this web log

25  excerpt, Mr. Gimbi.  Can you explain for the jury the

JAMES GIMBI - DIRECT - MR. TUCKER

1    significance of these highlighted entries here DKHOO and

2    password at password.  Also this reference to

3    rgibson@iwire.com and the password daustin8?

4    A    These are different attempts to, requests, submitting

5    username and password for authentication, login attempts.  We

6    can see that the requests map two different login pages,

7    including the Mwire_login2 and just login2 by itself.  There

8    is also a NASDAQ login here.  I think that was it for this

9    case, or for this instance.

10         These would have been or did map, at least the

11   rgibson and the daustin8 are credentials that were Marketwired

12   employee credentials.

13   Q    Did you confirm that with representatives from

14   Marketwired during the course of the engagement?

15   A    We did.

16   Q    How did you determine that these were not simply

17   Marketwired employees logging into their systems in an

18   authorized way?

19   A    There are a couple of factors.  First, these IP addresses

20   we see here mapped again to IP addresses we saw the attacker

21   using earlier.  Secondly, Marketwired actually went and spoke

22   with personnel to validate whether or not they were logging

23   into this application at these times.  The personnel said that

24   they had not.

25   Q    On that first point.  It's the same IP address that we

JAMES GIMBI - DIRECT - MR. TUCKER

1   looked at earlier Government's Exhibit 711?

2   A    It is.

3               (Continued on next page.)

GIMBI – DIRECT – MR. TUCKER

1  Q    In the course of your review of these Web logs and the

2  other forensic analyses that you conducted, did you see

3  evidence that the attackers were manipulating the Web logs?

4  A    Not the Web logs, but other logs.

5  Q    What kinds of logs did you see them manipulating?

6  A    There was a log that the application itself -- the

7  Marketwired developers had built into their application; and

8  the log was not nearly as comprehensive, it didn't show area

9  distance, but what it did show was the last time that a user

10 would have logged into an application.

11 Q    Did you see manipulation of those logs, those application

12 logs?

13 A    We did.

14 Q    What did you see?

15 A    I saw the attacker specifically query for specific IP

16 addresses, so the attacker knew that they were coming from

17 specific IP addresses and made an effort to remove any entries

18 containing those IP address from the logs.

19 Q    What would be the point of that?

20 A    The point would be to, again, evade detection that a

21 breach had happened in the first place.  And then, secondly,

22 if the breach were detected, it would cover their tracks; it

23 would make it more difficult to investigate.

24 Q    Did your forensic review uncover any evidence linking the

25 malicious activity to the IP address 94.100.28.42?

GIMBI - DIRECT - MR. TUCKER

1   A     Yes.

2   Q     What did you find specifically?

3   A     That IP address was used for extracting press releases

4   from the Marketwired application.

5   Q     Was one of your objectives in responding to Marketwired

6   to identify who the hackers were?

7   A     No.

8   Q     In the course of your work, did you reach any conclusions

9   or uncover any evidence that might relate to the identities or

10  locations of the attacker?

11  A     The conclusions that we could come to were based off of

12  two sources -- again, this was not a primary objective -- but

13  first analyzing the IP addresses where all of the theft had

14  come from, we realized that most of them had been cycled

15  through for proxies, things like tour and other redirect

16  methods, basically obfuscating where the requests had come

17  from making it harder to tell exactly what server the requests

18  had been issued from.

19          We did notice that an unusually high number of those

20  IP addresses were based out of the Ukraine, but aside from

21  that, we didn't notice any trends.

22          Beyond that, the other conclusion we could come to

23  again is that whatever server or computer the Secret Service

24  had recovered their artifacts from would have been involved in

25  the malicious activity that we saw in Marketwired.

GIMBI - DIRECT - MR. TUCKER

1          MR. TUCKER:  Your Honor, can I have a moment to

2     confer with my colleagues?

3          THE COURT:  Yes.

4          (Short pause.)

5     Q    Mr. Gimbi, were there subsequent teams that from Mandiant

6     that responded to Marketwired after your work on that project

7     completed?

8     A    Yes.

9     Q    Preparing for your testimony today, did you review the

10    reports prepared by the subsequent teams?

11    A    I did.

12    Q    Just generally, based on your review of those reports,

13    did you see some of the same hacking techniques being employed

14    after you left Marketwired in the summer of 2013?

15    A    Yes.

16    Q    Those included SQL injection queries and the use of Web

17    shells?

18    A    Yes.

19    Q    And did they also include the use of stolen login

20    credentials from Marketwired employees?

21    A    Yes.

22    Q    Mr. Gimbi, even while you were at Marketwired during the

23    summer of 2013, was Marketwired still an ongoing target of

24    malicious cyber activity?

25    A    They were.

                    GIMBI - DIRECT - MR. TUCKER

 1              MR. TUCKER:  Your Honor, I have no further

 2    questions.

 3              THE COURT:  Well, I think we can all use a break

 4    right about now, so we will take our afternoon break.  We will

 5    resume in about 12 minutes.

 6              THE COURTROOM DEPUTY:  All rise.

 7              (Jury exits.)

 8              THE COURTROOM DEPUTY:  You can step down, sir.

 9              (Witness steps down.)

10              THE COURT:  All right.

11              (Witness resumes the stand.)

12              THE COURT:  I want to talk some more at the end of

13    the day about subject matter of our early morning discussion.

14              (Jury enters.)

15              THE COURT:  Okay.  Please be seated, everyone.

16              Before we begin the cross-examination, I want to add

17    a little footnote to the schedule that we gave you last week,

18    drawing your attention to Thursday, which is an unusual day,

19    we start at one o'clock, but that's after lunch, so make sure

20    you have some lunch beforehand, okay?  We'll take a somewhat

21    extended break in the middle of the afternoon to get you

22    refreshed, but we will start at 1:00 and we are not going to

23    stop for lunch, okay?

24              All right.  Cross-examine, Mr. Healy?

25    CROSS-EXAMINATION

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

GIMBI – CROSS – MR. HEALY

1  BY MR. HEALY:

2  Q    Good afternoon, Mr. Gimbi.

3  A    Good afternoon.

4  Q    I just want to be clear, you and Mandiant, your company

5  at the time, you didn't design the Marketwired system, did

6  you?

7  A    No.

8  Q    And, in fact, you didn't maintain the Marketwired system

9  prior to 2013, did you?

10 A    No.

11 Q    You, Mandiant -- you and Mandiant were hired in June of

12 2013 by Marketwired's attorneys, correct?

13 A    Correct.

14 Q    And that was because the Secret Service had notified them

15 that there was a compromise in their system, correct?

16 A    Correct.

17 Q    And your team came in to do your incident response,

18 correct?

19 A    Yes.

20 Q    And in the course of your incident response, one of the

21 things you told the jury earlier is between the time you were

22 called in in June going back to February of 2010, there had

23 been evidence of hacking, correct?

24 A    Yes.

25 Q    About three year's period?

GIMBI - CROSS - MR. HEALY

1    A    And change, yes.

2    Q    And change.

3         And Marketwired was unaware of this, correct, until

4    the Secret Service informed them.

5    A    To the best of my knowledge, yes.

6    Q    Now, when you came in, you explained that you had a

7    three-part objective, and one of the objectives was to prevent

8    future intrusions, correct?

9    A    Yes.

10   Q    And the way you did that, for example, in this case, was

11   you made very specific recommendations; for example,

12   implementing keyword blocks.

13   A    Yes.

14   Q    And removing malicious Web shells from the server?

15   A    Yes.

16   Q    And disabling the accounts that you told us the hackers

17   were using to upload those Web shells, correct?

18   A    Yes.

19   Q    And putting in HTTP Web log monitoring to see what was

20   going to be happening, correct?

21   A    Yes.

22   Q    And implementing file integrity monitoring on some of

23   those servers that were in the architecture trunk, correct?

24   A    Yes.

25   Q    And when your team finished, which I believe was on or

GIMBI - CROSS - MR. HEALY

1   around June 19th of the 2013, you testified that even then

2   there was still some evidence that Marketwired was under

3   attack, correct?

4   A    Yes, with the caveat of the exact finishing date, I'm not

5   sure of, but I know that we continued to be continuously

6   engaged through and into July.

7   Q    Correct.  And I was going to ask you, do you recall that

8   Mandiant was hired again in July to come back to Marketwired?

9   A    I'm aware that that happened, yes.

10  Q    And at that time, they did a follow-up incident response.

11  A    Yes.

12  Q    And they found that because -- they found that because an

13  employee reported that someone had logged into his 3 -- CS3

14  account and used it while he was on vacation.

15  A    I don't recall that, but that may be in the report.

16  Q    You don't recall.

17          And isn't it true that the Mandiant team found that

18  data had been removed from the server between June 24th and

19  July 30th?

20  A    June 24th and July 30th of 2013?

21  Q    Of 2013.

22  A    I believe so.  I would have to check to be absolutely

23  sure.

24  Q    And at the end of that process, your team, Mandiant,

25  instituted another set of containment steps that they advised

GIMBI – CROSS – MR. HEALY

1    Marketwired to take, correct?

2    A    From the second breach?

3    Q    Yes.

4    A    I would presume so, but I -- again, I was not directly

5    part of that procedure.

6    Q    And are you aware that in November of 2013 Mandiant was

7    called back again to Marketwired by their attorneys?

8    A    Yes.

9    Q    And at that time, again, an incident response was

10   initiated.

11   A    Correct.

12   Q    And they did an analysis on the servers, and what they

13   found is that again there had been an intrusion.

14   A    Yes.

15   Q    And they found that the intrusion, the earliest evidence

16   of any compromise, was on November 17th of 2013.

17   A    Okay.

18   Q    And would you agree with me, Mr. Gimbi, that that

19   indicates that Mandiant did their job very well, that there

20   was no intrusion between July 30th, 2013, and October 17th of

21   2013?

22   A    I'm sorry, could you rephrase the question?

23   Q    Sure.

24        When Mandiant left the second time, July 30th of

25   2013, they had put in place recommendations to secure the

GIMBI – CROSS – MR. HEALY

1    system.

2    A    Right.

3    Q    When they came back in November, they indeed found that

4    there had been another intrusion, but that intrusion just

5    started on October 17th of 2013, correct?

6    A    From my reading of the report, I believe so, yes.

7    Q    So that the server was secure from the date of July 30th,

8    2013, to October 17th of 2013.

9    A    I would always hesitate to use that language.  Frankly,

10   most systems are simply not going to be perfectly secure, and

11   if you're not starting from a mature standpoint already,

12   there's always going to be holes.  It's just a matter of

13   whether or -- it's always -- there will always be holes.  It's

14   a matter of whether or not the attacker who was interested in

15   getting into the network is aware that they are there.  So I

16   would not ever say that something was secure as a matter of

17   fact.

18   Q    And, in fact, my question was probably not correctly

19   phrased.  My question is:  There was no evidence that there

20   was any hacker intrusion between those two dates, July 30th,

21   2013, and November 17th of 2013.

22   A    I would not be able to refer to that directly from my

23   experience aside from what I had seen in the reports.

24   Q    Do you recall anything that you saw in the reports that

25   indicated anything to the contrary?

GIMBI - CROSS - MR. HEALY

1   A    No.

2   Q    And then after Mandiant left in November of 2013, are you

3   aware that they were called back again in June of 2014?

4   A    That sounds correct.

5   Q    And, again, they initiated the same type of incident

6   response.

7   A    I know there was various types of services we provided.

8   I don't remember if that particular one was an incident

9   response or compromised assessment.

10  Q    Whatever we call it, are you aware that when they did

11  their analysis, they determined that the earliest evidence of

12  compromise was in February of 2014?

13  A    I don't recall that.

14  Q    Are you aware that even though if there was evidence of

15  compromise, this time there was no evidence of any information

16  exposure.

17            THE COURT:  Is this something you were involved in?

18            THE WITNESS:  No.

19            MR. HEALY:  Your Honor, he testified that he

20  reviewed all the subsequent reports prior to his testimony,

21  and some of the government's questions referred to information

22  contained in those reports.

23            THE COURT:  All right.  Go ahead.

24  A    I'm sorry, what was the question?

25  Q    I wondered if you were aware that when they did their

GIMBI – CROSS – MR. HEALY

1   either compromise report or incident response report that they

2   found that even though there had been some tempted intrusion

3   that there had been no information exposure?

4   A    That does sound familiar from the 2014 report, yes.

5   Q    Essentially, it was still locked down from the good job

6   that Mandiant did in November of 2013.

7   A    Again, I would always be careful with --

8   Q    There was no evidence --

9   A    Yes.  Yes.

10  Q    And then they came back again in August of 2014; are you

11  aware of that?

12  A    Yes.  I'm aware that there was another engagement in

13  2014.

14  Q    And at that time, during that investigation, they did

15  find that there was some exposure.

16  A    Information exposure?  Information theft?

17  Q    Yes.

18  A    I remember seeing something along those lines in the

19  reports, yes.

20  Q    And are you aware that the exposure was limited to the

21  dates of July 18th, 2014, to July 22nd of 2014?

22  A    I do not remember the specific dates.

23         MR. HEALY:  No further questions, Your Honor.

24         THE COURT:  All right.

25         Ms. Felder?

GIMBI – CROSS – MS. FELDER

1    CROSS-EXAMINATION

2    BY MS. FELDER:

3    Q    Mr. Gimbi, you testified that in your review, malicious

4    activity was noted as early as February of 2010?

5    A    Yes.

6    Q    And your team arrived in June of 2013?

7    A    Correct.

8    Q    The scope of your work was not to determine who the

9    actual actors were, correct?

10   A    Correct.

11   Q    The scope of your work was just to determine what type of

12   intrusions there were --

13   A    Right.

14   Q    -- and how to secure the system; is that right?

15   A    And where applicable, identify the stolen data.

16   Q    Were there sophisticated techniques used to intrude the

17   particular S -- CS3 application?

18   A    It depends on how you define "sophisticated."  I would

19   say no.

20            THE COURT:  Would I say yes?

21   A    So one -- I'm trying to determine what kind of depth is

22   useful here.

23   Q    Let me give you an example.

24            An S Q L or SQL injection, is that considered

25   sophisticated?

GIMBI – CROSS – MS. FELDER

1   A    It's not considered sophisticated, but sophisticated

2   hackers do use it.

3   Q    And what about malware?

4   A    All -- most every hacker would use malware, yes.

5   Q    But you would agree that typically average computer user

6   would not know how to create a SQLmap or a SQL injection,

7   correct?

8   A    Well, most of those tools, like, when you are talking

9   about SQLmap, are things that you can just Google and download

10  and run, that's point click.  There's very little level of

11  sophistication that needs to go into that, and I would

12  certainly say that most people would dabble with testing --

13  kind of cut their teeth and get started by downloading

14  prebuilt tools like those.

15           (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

GIMBI - CROSS - MS. FELDER

1   BY MS. FELDER:  (Continuing.)

2   Q    But you were hired to secure the system; correct?

3   A    We were hired to investigate what had happened with

4   regard to a particular breach and to provide recommendations

5   surrounding those observations.

6   Q    And you made those recommendations; correct?

7   A    The head of our team was charged with drafting the

8   specific recommendations.

9   Q    Right, but those recommendations were implemented to

10  secure the system?

11  A    With mixed consistency, I believe due to technical

12  limitations on the team.  For instance, I'm aware that

13  technical blocks around certain keywords were able to be

14  implemented right away as soon as we requested those, but more

15  advanced recommendations I think had taken them more time.

16  Q    Right that's understandable.  You testified you would be

17  hesitant to every say that any system is perfectly secure; is

18  that right?

19  A    That's correct.

20  Q    But there are steps that you can take to make it more

21  secure than it was?

22  A    That's correct.

23  Q    Especially after you've identified the techniques used to

24  intrude the system; correct?

25  A    Yes.

SN        OCR        RPR

GIMBI – CROSS – MS. FELDER

1    Q    Another technique used by the actors was the use of

2    employee usernames and passwords?

3    A    Correct.

4    Q    And once you have those provisions you will access the

5    system; correct?

6    A    Assuming that the passwords had not changed or there

7    isn't any other sort of other block prohibiting the IP address

8    from going through, yes.

9    Q    There's one example of an employee complaining that his

10   credentials were used to access the CS-3 portal; correct?

11   A    Can you rephrase the question?

12   Q    An employee complained that his CS-3 credentials were

13   used to access the system when he was on vacation?

14   A    I'm not sure about a complaint, but there was a

15   relationship where we had Marketwired personnel ask specific

16   individuals whether or not certain logins were connected to

17   their legitimate activity.

18   Q    What I mean is that the company became aware that

19   employees' credentials were being used; correct?

20   A    Yes.

21   Q    In an unauthorized way; correct or at least it was not

22   used by that particular employee; correct?

23   A    Yes.

24   Q    So user names and passwords can be used without someone's

25   permission or knowledge; correct?

SN        OCR        RPR

GIMBI - CROSS - MS. FELDER

1    A    Yes.

2    Q    And in this case that happened.  I believe you gave the

3    example of the username Demo and a password being used?

4    A    Yes.

5    Q    And that password was used to infiltrate the system?

6    A    That password was used to access the system.  I'm not

7    sure if there's a particular definition around the word

8    "infiltration."

9    Q    Access the system is sufficient.  So you would agree that

10   once an actor has your e-mail, your password, they can use

11   those credentials to access your personal system or your

12   professional system; correct?

13   A    They may be able to if an individual is reusing

14   passwords.

15   Q    Correct.  As long as the password stays the same, they

16   can use it?

17   A    Right.  And if they had used the same password on two

18   different services, yes.

19   Q    Right.  In terms of what you testified to earlier, the

20   actors in this particular case they used various techniques to

21   hide their tracks; correct?

22   A    They used at least one technique to hide their tracks.

23   Q    What technique was that?

24   A    They deleted log entries from the -- from an application

25   log.

SN        OCR        RPR

PADRES – DIRECT – MS. NESTOR

1  Q    And you were able to determine that because you have the

2  forensic tools to do that; correct?

3  A    Yes.  It was in the logs.

4  Q    Thank you.  No further questions.

5            THE COURT:  Anything else?

6            MR. TUCKER:  No, Your Honor.  Thank you.

7            THE COURT:  Thank you, sir, you may step down.

8            (Witness excused.)

9            THE COURT:  Next witness, please.

10            MS. NESTOR:  The Government calls Bret Padres.

11            THE COURTROOM DEPUTY:  Please take the stand and

12  raise your right hand.

13            (Witness sworn/affirmed.)

14            THE COURTROOM DEPUTY:  Have a seat and state and

15  spell your name for the record.

16            THE WITNESS:  Bret, B-R-E-T, Padres, P-A-D-R-E-S.

17            (Witness takes the witness stand.)

18  BRET PADRES, called as a witness, having been first duly

19  sworn/affirmed, was examined and testified as follows:

20  DIRECT EXAMINATION

21  BY MS. NESTOR:

22  Q    Good afternoon.

23  A    Good afternoon.

24  Q    Where are you employed?

25  A    The Crypsis Group.

SN      OCR      RPR

PADRES – DIRECT – MS. NESTOR

1   Q    What is the Crypsis Group?

2   A    A cyber security professional services consulting firm.

3   Q    What is your position at the Crypsis Group?

4   A    The CEO.

5   Q    Crypsis is C-R-Y-P-S-I-S; is that correct?

6   A    Correct.

7   Q    Can you tell us what your responsibilities are at

8   Crypsis?

9   A    In addition to being the CEO, I help run investigations.

10  So we help people with data breaches when they believe that

11  somebody has gained unauthorized access to their data and we

12  can help remediate or prevent that from happening again.

13  Q    Are you testifying here today in your capacity as the CEO

14  of Crypsis Group?

15  A    Yes.

16  Q    Were you retained by the Government?

17  A    Yes.

18  Q    Are you testifying her today pursuant to a retention by

19  the Government?

20  A    Yes.

21  Q    And are you being paid to testify here today?

22  A    Yes.

23  Q    How much are you being paid?

24  A    I think to date our invoices have been somewhere in the

25  neighborhood of $200,000.

SN        OCR        RPR

PADRES – DIRECT – MS. NESTOR

1   Q     When you did -- withdrawn.

2            When you joined Crypsis Group -- when was that,

3   first of all.

4   A     I joined the firm in January of 2017.

5   Q     What did you do prior to that?

6   A     Prior to the Crypsis Group I was at a firm called Stroz

7   Friedberg.

8   Q     What is Stroz Friedberg?

9   A     Similar to the Crypsis Group it is also a cyber security

10  professional services firm.

11  Q     Can you tell us briefly what that means, a cyber security

12  professional services firm?

13  A     We are consultants that help people both proactively and

14  reactively.  Reactively meaning when people believe there's

15  been a cyber security incident and they need help

16  investigation what has occurred, what is the scope of what has

17  occurred.  And then proactively means before there's a cyber

18  security incident, help prevent, help secure their network so

19  there is not an incident; help protect from individuals

20  gaining access to their network.

21  Q     How long were you at Stroz?

22  A     Close to nine years.

23  Q     And what positions did you hold generally while there?

24  A     While at Stroz Friedberg I was director of digital

25  forensics, director of incident response and managing director

SN        OCR        RPR

PADRES – DIRECT – MS. NESTOR

1  of cyber resilience.

2  Q    And what were your main duties while you were at Stroz?

3  A    Typically my main duties were to lead large

4  investigations, to help with policies and procedures about how

5  we help to structure and go about those investigations,

6  hiring, mentorship and sort of build the practice of mostly

7  incident response, data breach response.

8  Q    Part of your duties was data breach response?

9  A    Correct.  Many of the breach responses that were

10  performed at Stroz Friedberg during the time I was there --

11  well, I left.

12  Q    What did you do before Stroz?

13  A    I was the director of incident response at a company

14  called Mandiant.

15  Q    Did you have similar responsibilities there?

16  A    Similar.  Maybe the one difference being that at Mandiant

17  I was -- it had less to do with the proactive work and it was

18  mostly reactive work.  So it was all data breach response not

19  the proactive, help people prevent this from happening.

20  Q    And before Mandiant where were you?

21  A    I was at firm MZM, a firm that was acquired by Athena and

22  I was the director of cyber operations.

23  Q    And what did you do in that position?

24  A    I was a contractor for the Government and we did

25  counterintelligence operations.  It was less like Stroz

SN       OCR       RPR

PADRES - DIRECT - MS. NESTOR

1  Friedberg or the Crypsis Group or Mandiant.  It was government

2  work and counterintelligence.

3  Q    What did you do before Athena?

4  A    I was a special agent with the Office of the Inspector

5  General at the postal service where I did investigations in

6  computer crime.

7  Q    Do you also have specialized training in forensics work?

8  A    I do.

9  Q    What is that?

10  A    I had certification in what's known at EnCase.  EnCase

11  certification is a standard software package and standard

12  certification for professionals in the digital forensics

13  field.  I have a reverse engineering certification and reverse

14  engineering malware which is taking software and tearing it

15  apart and trying to understand what its application is.  I

16  have --

17  Q    While -- go ahead.

18  A    And I have a certification, computer information systems

19  security professional certification.

20  Q    While at Stroz and currently at Crypsis Group, have you

21  handled hundreds of investigations?

22  A    I have, yes.

23  Q    And have you testified in connection with your work at

24  Crypsis Group?

25  A    I have.

PADRES – DIRECT – MS. NESTOR

1   Q    Have you been qualified as an expert?

2   A    Yes.

3   Q    An expert in computer forensic analysis?

4   A    An expert in digital forensics, correct.

5   Q    And while at Stroz did you also testify as an expert?

6   A    Yes.

7          MS. NESTOR:  Your Honor, at this time we offer

8   Mr. Padres as a witness for information security, computer

9   forensics and cyber incident response.

10          THE COURT:  Any inquiry at this time.

11          MR. BRILL:  No, Your Honor.

12          THE COURT:   Proceed.

13   BY MS. NESTOR:

14   Q    I want to turn your attention to March of 2012.  Did

15   there come a time when you were part of a Stroz team that

16   worked on an engagement at PR Newswire?

17   A    Yes.

18   Q    And what was briefly what was your understanding of what

19   events lead to that engagement?

20   A    We were hired by PR Newswire.  It's my understanding that

21   they were approached by law enforcement with information that

22   they may have had an intrusion into the network, that someone

23   may have gained unauthorized access to their networks.

24   Q    What were you hired to do by PR Newswire?

25   A    We were hired to supplement their team and help them

PADRES – DIRECT – MS. NESTOR

1   investigate whether in fact there was an unauthorized access

2   to their network and what the scope was and then assist with

3   them providing information to law enforcement should we find

4   information.

5   Q    What did your team do when you were hired in March of

6   2012?

7   A    Initially we responded on site to their data center and

8   collected information from a number of their servers and began

9   analysis to determine whether or not unauthorized access was

10  gained to those servers or the PR Newswire environment.

11  Q    What were your preliminary determinations?

12  A    Fairly quickly upon initial analysis we determined that

13  unauthorized access was gained to their environment.

14  Q    What did you do once you determined that?

15  A    One of the things we did was deployed a network

16  traffic-capture device.  It's something we call a sniffer.  So

17  we put this device on the network that allows us to collect

18  network traffic and that allows us then to analyze that

19  traffic to examine the contents of what kind of communication

20  is going on between the PR Newswire network and other systems

21  on the internet.

22  Q    Generally what types of evidence did you collect when you

23  were hired by PR Newswire in March of 2012 other than the

24  standard information?

25  A    We collected a number of images, meaning we copied the

SN        OCR        RPR

PADRES – DIRECT – MS. NESTOR

1  system's several web serves, application servers, log server,

2  meaning a server that collects and maintains web access logs

3  and a file transfer server, a secure file transfer server.  We

4  made a copy of one of those as well.

5  Q    You collected server images?

6  A    Yes.

7  Q    The sniffer data we discussed?

8  A    Yes.

9  Q    And some web access logs?

10  A    Correct.

11  Q    Now, did there come a time when you were retained by the

12  Government in this case?

13  A    Yes.

14  Q    What were you asked to do?

15  A    So, I was asked to take possession of a number of items

16  that were in possession of Stroz Friedberg, examine that data,

17  perform analysis and come to opinions with regard to the

18  extent and method in which there was a compromise of the PR

19  Newswire environment.

20  Q    Did you see the data from Stroz?

21  A    Yes.

22  Q    What data?

23  A    A number of the web servers, application servers, a log

24  server and the FTP server.

25  Q    What's an FTP server?

PADRES – DIRECT – MS. NESTOR

1   A    FTP stand for file transfer protocol.  So the FTP server

2   is a server that is placed on the internet to allow people to

3   transfer files to and from that server.  PR Newswire needed

4   people to transfer files to their environment and copy files

5   from their environment and to do so they used this server

6   called FTP server.

7   Q    Did you prepare any reports summarizing your findings in

8   the course of this engagement?

9   A    Yes.

10  Q    Would those assist you in your testimony today?

11  A    Yes.

12  Q    And did you prepare reports during your time at Stroz as

13  well?

14  A    I did.

15  Q    And would those help you in your testimony today?

16  A    Yes.

17        MS. NESTOR:  With the Court's permission, I'd like

18  to hand the witness 3500-BP-1 and 3500-BP-2.

19        THE COURT:  Okay.  BP-1 and 2.

20        MS. NESTOR:  Your Honor, I'm handing up a binder of

21  exhibits which I will mark for evidentiary purposes in a few

22  moments.

23  BY MS. NESTOR:

24  Q    Generally did you see evidence of malicious activity on

25  the PR Newswire servers in your most recent review after you

SN        OCR        RPR

PADRES – DIRECT – MS. NESTOR

1    were retained by the Government?

2    A    Yes.

3    Q    What were your findings?

4    A    I found that as early as April of 2010 that there was

5    unauthorized access gained to the PR Newswire network.

6    Q    And, to be clear, the servers that you testified that you

7    received from Stroz and reviewed, what was the time span of

8    those servers?  Are you referring to your materials,

9    3500-BP-1?

10   A    I am.  So, these were servers that we made copies of in

11   March of 2012 so they would have contained data up to March of

12   2012.

13   Q    Now, would they have been up to March of 2012 or they're

14   decommissioned servers that were taken offline earlier?

15   A    It is my understanding that they were taken offline prior

16   to that time period.

17   Q    Now, in your experience -- withdrawn.

18        When you said that you found malicious activity on

19   PR Newswire's servers, can you be mere specific about what you

20   found?

21   A    Sure.  There was back door malicious programs, back door

22   malicious programs placed on the server that allowed

23   individuals to bypass normal authentication methods and have

24   access to the servers without having to authenticate or log

25   into those servers directly.

SN        OCR        RPR

PADRES - DIRECT - MS. NESTOR

1    Q    What do you mean by back door?

2    A    So, normally you might log into a system and be presented

3    with a prompt asking for a username and password and have to

4    provide valid username and password credentials.  If you place

5    a back door on a system and get it to run, then you access

6    that back door, you can bypass that normal authentication

7    then.

8    Q    Were you able to determine whether the individuals that

9    were accessing or compromising PR Newswire used measures to

10   conceal their malicious activity?

11   A    Yes.

12   Q    Tell us about that.

13   A    So, they were able to install applications on the system

14   that allowed them to remove log data and hide their

15   activities.

16   Q    Were you able to determine how the hackers gained access

17   to PR Newswire's computer system initially?

18   A    So, I was able to see that -- in this April of 2010 time

19   frame that there was an exploit launched against the web

20   servers but the specific exploit that gave them access to the

21   environment, I was unable to determine that and I believe

22   that's because the log entries that would have given me that

23   information were missing and they were deleted.

24   Q    Were you able to determine how the intruders actually

25   maintained access to the PR Newswire system after they gained

PADRES – DIRECT – MS. NESTOR

1  access, after the initial intrusion?

2  A    In addition to the web-based back doors that were found

3  on the system, we found that they replaced the -- one of

4  these -- there's a program on these systems called SSH.  It's

5  a shell program that people use to log into these servers.

6  They had replaced the normal program with a trojanized version

7  of this program that had additional functionality and instead

8  of just logging the person in as normal, it also then sent a

9  copy of that individual's credentials out of the network to

10  the attacker.

11  Q    Why would a malicious cyber actor want to steal employee

12  information and login credentials in this way?

13  A    It would allow that person to gain access to other

14  systems.  It would also allow that person to maintain access

15  to the systems if, in fact, somebody did discover their back

16  door and removed those back doors they would have these valid

17  credentials that they can use to get back into the network.

18  Q    Now, you previously testified in March of 2012 you were

19  retained -- while you were at Stroz you were retained by PR

20  Newswire and you installed the sniffer.  Did the sniffer alert

21  you of anything?

22  A    Yes.  In fact, that's how we initially found these

23  credentials being sent outside the network.  We were looking

24  at the sniffer data we saw what we thought was unusual

25  traffic.  We discovered where it was coming from on several

PADRES – DIRECT – MS. NESTOR

1    systems.  We investigated it further and found this trojanized

2    SSH process.  Upon further investigation we found that it had

3    this functionality of sending these credentials out.  They

4    were encoded so we couldn't initially see them.  And that's

5    what sort of led us -- the sniffer data is what led us to

6    discover this SSH program sending out this data.

7    Q    Did you determine where the credentials were being sent?

8    A    A number of locations.  I can remember the Ukraine was

9    one of the IP addresses that the data was being sent to.

10   Q    So you were able to determine where the data was being

11   sent based on the IP address?

12   A    Correct.

13   Q    Does that mean that in March of 2012 when you were doing

14   your work for PR Newswire you saw evidence of intrusion

15   through the sniffer itself?

16   A    Yes.

17   Q    Were you able to determine whether the malicious

18   intruders were able to extricate press releases from the PR

19   Newswire's servers?

20   A    Yes.

21   Q    Would you tell us what were able to learn about that?

22   A    There were scripts installed on the application server

23   that were designed to query the database, the news release

24   database, for news release data, copy that data from the

25   database onto the application server in a temp directory and

SN        OCR        RPR

PADRES – DIRECT – MS. NESTOR

1     then send the data to the attacker and then delete that data

2     from the application server.

3     Q     Was the data always deleted?

4     A     It was designed to be deleted.  There were some cases in

5     which the data still remained in the temp directory and in

6     looking at the logs of the script writing we can see that in

7     some cases the files that were being deleted were, like,

8     locked and couldn't be deleted.  So in 29 cases, there were 29

9     files still in that temp directly and those files were still

10    there.

11    Q     Were you able to determine how many press releases

12    approximately there were attempts to extricate?

13    A     Let me see here.

14    Q     Are still referring to 3500-BP-1?

15    A     Yes.  So, because I was able to find these scrips that

16    were designed to copy the data from the database, I also

17    retrieved logs that showed access to those scrips.  By looking

18    at those logs I found 43,527 times in which those scrips were

19    called to retrieve press release data from the database.

20    Q     During what period of time?

21    A     Between July of 2010 and January of 2011.

22    Q     Now, you referenced that there were 29 files that were

23    not deleted from the temp files; is that right?

24    A     There were 29 files still in the temp directory when we

25    created an image of that system, correct.

SN        OCR        RPR

PADRES – DIRECT – MS. NESTOR

1   Q      What were those files?

2   A      They were press release data.  So some of them looked to

3   be press releases.  Other files just related to press

4   releases.

5           MS. NESTOR:  I want to show the witness for

6   identification only and I can do this -- I was hoping I can do

7   this through the binder the witness has Government Exhibit 500

8   through 5026 and 5028 and 5029.

9   Q      Do you recognize all of these exhibits?

10  A      Yes.

11  Q      What do you recognize them to be?

12  A      These are the files that were in the temp directly on the

13  application server.

14  Q      Did you review them?

15  A      Yes.

16  Q      Are they in substantially the same condition as when you

17  provided them to the Government?

18  A      Yes.

19          MS. NESTOR:  Your Honor, at this time the Government

20  seeks to admit Government Exhibit 5001 through 5026 and 5028

21  and 5029.

22          THE COURT:  Any objection, folks.

23          MR. BRILL:  No objection, Your Honor.

24          THE COURT:   Received in evidence.

25          (Government Exhibits 5001 through 5026 and 5028 and

PADRES – DIRECT – MS. NESTOR

1   5029 received in evidence.)

2   Q    I'm going to publish 5002 to the jury.  Can you tell us

3   what this is that we're looking at?

4   A    This is a press release from ACTS Retirement and Life

5   Communities.

6   Q    This is one of the press releases that you recovered from

7   the server?

8   A    Correct.

9   Q    And what is this?

10  A    A general dynamics press release.  General dynamics is

11  awarded 19 million for Saudi Bank Corp.

12  Q    And that is Government's Exhibit 5002.  And there are --

13  as you testified, there are about 29 files.  Were all of them

14  press releases?

15  A    No.

16  Q    Were most of them press releases?

17  A    Correct, yes.

18  Q    Now, you previously testified that you were engaged by PR

19  Newswire in March.  Were you retained by PR Newswire at any

20  other point in time?

21  A    In February of 2013.

22  Q    Tell us why.

23  A    They had experienced some difficulty with their file

24  transfer server.  Their SFTP server had been crashing and they

25  were asking for help looking into the cause.

SN        OCR        RPR

PADRES – DIRECT – MS. NESTOR

1  Q    What is the SFTP server?

2  A    This is the server we were talking about earlier.  So

3  it's the file transfer, the secured file transfer server.

4  Q    Did you review the SFTP server as part of your work in

5  that case?

6  A    Yes.

7  Q    And what did you determine?

8  A    It looks as if somebody had gained access to that server

9  and was attempting to install a –– an exploit and it wasn't

10 working correctly and causing the server to crash.

11 Q    What did you observe about the intruder's activity on the

12 PR's server?

13 A    In addition to finding that somebody had gained access

14 and was trying to install this exploit kit to maintain access

15 to the server, we were trying to determine how they even got

16 onto this file transfer server to do that in the first place.

17 It was behind what's known as the VPN.  They would have had

18 reversed into the network and they would have done it through

19 a VPN connection.  A VPN connection is a way that they can

20 come from outside the network into the network and they were

21 using an employee's credentials to do this.

22      We had suspected that what they might have done is

23 phished or spear phished that employee's credentials and that

24 they were using those credentials to get into the network and

25 then hop over to the FTP server.

SN        OCR        RPR

PADRES - DIRECT - MS. NESTOR

1       So we took possession of that employee's computer to

2   do analysis of whether or not there was a malware running on

3   that system or if we could find evidence that they were spear

4   phishing that computer's credentials.

5   Q    What is spear phishing?

6   A    So, phishing is when somebody sends you an e-mail to try

7   to get you to try to click on a link or run a program or trick

8   you into typing if your credentials so somebody can steal

9   those or use those credentials to gain access to the network.

10  Spear phishing is a modification of that which it's more

11  targeted rather than widespread to anybody.

12  Q    And you saw evidence of spear phishing during that time?

13  A    We did find evidence of spear phishing on that employee's

14  computer; correct.

15  Q    What happened after you were able to review that

16  employee's computer?

17  A    During that analysis we were told that they had changed

18  the credentials, the password, for that employee and then we

19  needed that.  The access continued, but just under a different

20  username.  So the attacker switched to a different user on the

21  VPN connection.  We then started to take steps to obtain

22  access to that user's laptop to perform analysis of that

23  system.  They changed those credentials.  The attacker

24  switched to another account and this continued which led us to

25  the conclusion that the attacker had access to a large cache

PADRES – DIRECT – MS. NESTOR

1    of credentials for the PR Newswire in this environment.

2    Q    Now, I just want to explain to the jury, what was -- back

3    in March of 2012 and in February of 2013, what was your role

4    in terms of what you were supposed to be doing at PR Newswire?

5    A    We were assisting the PR Newswire staff in investigating

6    this.

7    Q    What does that mean, you were assisting?

8    A    So it was really was their investigation and they would

9    ask us for assistance and look at a particular system or help

10   answer a specific question.  There are certain clients of ours

11   where they hand us the entire investigation.  They were

12   running it.  We were just assisting.

13   Q    Thank you.

14             MS. NESTOR:  No further questions, Your Honor.

15             THE COURT:  Okay.

16             Any questions?

17             MR. BRILL:  Yes.

18             (Continued on the following page.)

19

20

21

22

23

24

25

PADRES - CROSS - MR. HEALY

1    CROSS-EXAMINATION

2    BY MR. HEALY:

3    Q    Good afternoon, Mr. Padres.

4    A    Good afternoon.

5    Q    You told us in 2012 you were, working for Stroz

6    Friedberg, correct?

7    A    Correct.

8    Q    And there came a time when PR Newswire engaged that firm

9    to, I think the word you used was, assist their staff in an

10   investigation; is that fair to say.

11   A    Correct.

12   Q    Based on information that they obtained from the Secret

13   Service, correct?

14   A    I don't recall where they specifically.  I think they

15   were working with a couple different agencies, SECE, I think

16   the FBI.  I don't recall specifically the Secret Service at

17   that time, but maybe.

18   Q    Let me ask it a different way.  Did they engage Stroz

19   Friedberg because some investigative branch of the Government

20   had indicated to them that their servers had been compromised?

21   A    My understanding is they were given information from the

22   Government about a compromise that led them to start an

23   investigation, if that answers your question.

24   Q    Sounds like the answer was, yes.  Thank you.

25            You said that your job, was your team's job, was to

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

PADRES - CROSS - MR. HEALY

1    investigate whether or not there was access, correct?

2    A    Whether or not unauthorized access was gained, correct,

3    yes.

4    Q    And to determine if possible who was accessing the

5    system?

6    A    We were not engaged to determine who.

7    Q    What was your second goal?

8    A    Scope of compromise.

9    Q    Scope of compromise.  But you weren't engaged to try to

10   prevent future compromise; is that fair to say?

11   A    I'm sorry, your question?

12   Q    Sure.  Stroz Friedberg, for whom you were working, wasn't

13   engaged to try to prevent future compromise?

14   A    No, we were not engaged to.

15   Q    You and your company did not design that system, correct?

16   A    Correct.

17   Q    You didn't maintain that system, correct?

18   A    Correct.

19   Q    Would you agree with me that there are certain steps that

20   companies can take to secure their data?

21   A    Sure.

22   Q    Would you agree with me that one of the simplest ways

23   would be to make sure that all security updates and patches

24   are installed?

25   A    If you're asking me if all security patches are installed

PADRES – CROSS – MR. HEALY

1   would it prevent all security breaches, then I would disagree,

2   but certainly.

3   Q    That wasn't my question.  My question was, isn't that one

4   of the simplest ways to help prevent unauthorized access to a

5   system?

6   A    It is certainly something we recommend, yes.

7   Q    Sure.  Is it fair to say that that's relatively simple to

8   do?

9   A    No, but it is certainly something that we recommend.

10  Installing security patches can be fairly complicated, can

11  break things.  It's something that sometimes people can't

12  update their systems, so they have to do this process we call

13  putting in mitigating controls, but.

14  Q    Would you agree with me, sir, that if PR Newswire was

15  running an operating system that had been released in 2003 and

16  they had never installed a single patch or security update,

17  that would be evidence of perhaps a lack of diligence?

18  A    I don't know what other controls they would have put

19  around.  We didn't look at that.

20  Q    I didn't ask if you looked at it.  I asked if they failed

21  to did any security patches or updates from 2003 until you

22  walked through the door in 2012, would that indicate a lack of

23  diligence?

24  A    That alone wouldn't.

25  Q    So you think that would be okay?

PADRES – CROSS – MR. HEALY

1   A    That alone wouldn't be enough.

2   Q    My question wasn't whether that alone, just whether a

3   failure to do that, sir?

4           MS. NESTOR:  Objection, your Honor.

5           THE COURT:  In effect it is.  Next question.

6   Q    When you did your analysis and found that the system had

7   been compromised, I believe you said as early as 2010,

8   correct?

9   A    Correct, yes.

10  Q    And then I believe you said that through that time

11  through, January of 2011 there had been 43,000 requests for

12  press releases; is that correct?

13  A    Press release data exactly.

14  Q    But that doesn't mean that they accessed 43,000 press

15  releases, correct?

16  A    No.

17  Q    Would there -- in your review in your report were there

18  evidence of requests for press release data after January of

19  2011?

20  A    If I could review my -- the log data I had only went to

21  January 2011.

22  Q    So your review essentially says that after January 2011

23  you have no evidence of, because of the log data you had, any

24  evidence of press release requests after that date?

25  A    My review would not have that, correct.

PADRES – CROSS – MR. HEALY

1    Q      You said that Stroz Friedberg was called back again in

2    2013?

3    A      Correct.

4    Q      That was because the system was crashing?

5    A      Correct.

6    Q      I think you told the jury that the reason the system was

7    crashing is that people were making attempts to get in,

8    essentially in layman's terms?

9    A      They were already on the system, but they were trying to

10   elevate their privileges by installing this exploit kit that I

11   believe was causing instability and the crashing.

12   Q      Is it fair to say they were not able, since you use the

13   language that you did, that they were not able to install it?

14   A      Correct.

15   Q      Following the time that you finished, you and Stroz

16   Friedberg, finished your work in 2013, were you satisfied at

17   that point that your team had done what they could to assist

18   PR Newswire in making that system safe?

19   A      I don't think that was our role to assist PR Newswire in

20   making the system safe.

21   Q      Well, you said that you were there to assist them.  And

22   that your role -- is it your testimony that they weren't

23   interested in making their system safe?

24            MS. NESTOR:  Objection, your Honor.

25            THE COURT:  I don't think he testified to that.  I

PADRES - CROSS - MR. HEALY

1    think he testified what his role was.  Find the problem,

2    right.

3              THE WITNESS:  Investigate, correct.

4    Q    You made no recommendations how to solve that problem?

5    A    We were not tasked with coming up with remediation plans

6    for their network.

7    Q    That would be no then, no suggestions?

8    A    I think it would be untruthful for me to say never a time

9    that I ever gave them a suggestion.

10   Q    To your knowledge, well, strike that.

11             Were you or Stroz Friedberg ever called back again

12   to PR Newswire to assist their team?

13   A    After February 2013?

14   Q    That's correct.

15   A    There were probably times where we did interact with

16   them, I don't recall specific dates but I believe so.

17   Q    When you say interact, were you called back to assist

18   them in investigation?

19   A    So there was a time just prior to being hired by the

20   Government, where Stroz Friedberg was asked to assist the

21   Government prior to me being retained as a Crypsis Group

22   employee, so there is that time.

23   Q    I'm confused for a moment.  Stroz Friedberg was asked by

24   the Government to assist or asked by PR Newswire to assist?

25   A    You're right, asked by PR Newswire to assist.

PADRES - CROSS - MR. HEALY

1    Q    That was prior to 2017, do I have that correct?

2    A    That would have been in 2017, correct.

3    Q    Do you have any knowledge of that investigation?

4    A    It wasn't an investigation.

5    Q    Help me out, what were they asked to do?

6    A    I believe it was to, certainly to produce data to the

7    Government, that was one thing.

8    Q    That's the data you reviewed?

9    A    It includes the data I reviewed, correct.

10   Q    Was there other data you didn't review that was produced

11   to the Government?

12   A    I don't know.

13   Q    Why would you -- strike that.

14             Let's talk about a little about those press releases

15   that you found in 2013.  Do I have that correct, the 28 in the

16   temporary folder?

17   A    I'm sorry?  You kind of mixed two things together.

18   Q    Sure.  Did you find when you came back in 2013, press

19   releases in a folder that you referred to as a temporary

20   folder?

21   A    I didn't find that in 2013.

22   Q    You found that in 2012?

23   A    Correct.

24   Q    You can refer to your binder.  This is marked 5001?

25             THE COURT:  In evidence, yes.

PADRES - CROSS - MR. HEALY

1   Q    Can you look at the title of that press release, can you

2   read that to the jury?

3   A    New website offers up to $100 discount on Apple iPads.

4   Q    I'm going to show you in your binder also in evidence

5   number 5023, can you read that headline?

6   A    National eagles and angles association will host national

7   launch on 2011 -- January 11, 2011 in New York City.

8   Q    I'd like you to refer to what is in evidence as

9   Exhibit 5026.  Can you read that to the jury?

10  A    United States Mint to launch the 2011 Native American $1

11  coin in Plymouth, Massachusetts.

12  Q    Finally, can you turn to what in evidence as 5017, do you

13  see -- I'm not going to ask you to read the headline because

14  I'm not sure there is a headline.  That is what you recovered

15  from the temporary folder?

16  A    It is.

17  Q    Would you agree with me none of these four documents have

18  anything to do with earnings?

19  A    It certainly looks like 5017, it would be hard for me to

20  imagine it has nothing to do with earnings on the face of it.

21  The others --

22  Q    United States Mint to launch the 2011 Native American

23  coin?

24  A    Certainly based off of the headlines I just read.  I

25  would have to read the rest of them to give you an answer

PROCEEDINGS

1    about the contents.

2    Q     Finally, would you agree with me, as you told us earlier,

3    since there is no evidence that was obtained in 2011 because

4    of the logs you were provided, that there was any requests for

5    press releases after January 11, 2011, that the date of all 28

6    of those documents are January 11, 2011 or prior?

7    A     Can you repeat the question?

8    Q     Sure.  You told us earlier that there is no evidence that

9    you uncovered in 2012 with Stroz Friedberg that there were any

10   requests for press releases after January of 2011.  These

11   press releases that were found in the temporary folder, you

12   can certainly look through them all if you'd like, these press

13   releases are all dated prior to January 11, 2011?

14   A     That's my recollection, correct.

15              MR. HEALY:  No further questions.

16              THE COURT:  Ms. Felder.

17              MS. FELDER:  No questions.

18              THE COURT:  Any further questions of the witness?

19              MS. NESTOR:  No, your Honor.  Thank you.

20              THE COURT:  All right, sir.  Thank you very much.

21   You may step down.

22              (Whereupon, the witness was excused.)

23              THE COURT:  We'll call it a day, folks.  We will

24   resume at 9:30 a.m. tomorrow morning.

25              Let me repeat my usual admonitions with a little

PROCEEDINGS

1    emphasis, don't discuss this case, folks.  When I say don't

2    discuss the case, I don't only mean don't discuss the case and

3    the testimony, I don't want you talking about anything about

4    the case.  In other words, when you walk out this door the

5    case doesn't exist.  All right.  The time of day other than

6    what day you start tomorrow.  Please, folks.  Because you

7    know, an innocent little comment about something is liable to

8    trigger something else.  And like a house of cards, it's big

9    trouble.  So please no discussion, whatsoever.

10           Again, you'll pardon my tone, but we're all vested

11   in this case, a lot of time has been spent, a lot of effort,

12   we don't want to jeopardize that.  Have a pleasant evening.

13   Get some rest.  We'll see you at 9:30 in the morning.

14           COURTROOM DEPUTY:  All rise.

15           (Jury exits the courtroom.)

16           THE COURT:  Have a seat folks.  Counsel come up to

17   the bench.

18           A couple of things, I haven't really had much of an

19   opportunity trying to pay attention to what is going on to

20   review this testimony from last week, but I will do so over

21   the evening break.  I didn't get Mr. Brill, who did stand this

22   morning, an opportunity to speak, nor did I give the

23   Government a chance to.

24           MR. BRILL:  I'll defer to Ms. Brill to give our

25   position.

1312

PROCEEDINGS

1    MS. BRILL:  Our position at this time is the same as

2    the position of the federal public defender.  We are at this

3    time requesting at a minimum the strong curative instruction

4    that Ms. Whalen has put forth.  But that is our position now.

5    We certainly understand that the Court hasn't completed its

6    review.  We've only begun to also absorb the contents of the

7    Government's disclosures.

8         And so, but you asked for the position.  That was

9    going to be the position.  That's the position we put in the

10   morning.  This is a fluid situation.  We may have more to say

11   once the Court makes a ruling.

12        THE COURT:  You want to add anything?

13        MR. TUCKER:  No, your Honor.  Simply to say that the

14   reason that Igor Dubovoy was brought back in was specifically

15   was to ascertain the scope of the conduct.  The Government has

16   reviewed his testimony.  It's the Government's view that in

17   his testimony he admitted to the conduct that defense counsel

18   elicited.  The Government standing here today has no reason to

19   believe that Igor Dubovoy perjured himself during the

20   testimony.  That's the whole reason we brought him back.

21        Finally, we disclosed what we learned as soon as we

22   learned it.

23        THE COURT:  Let me review the testimony.  Look,

24   obviously this technical aspect of this case we heard all

25   about all day long, I know their arguments are going to be

PROCEEDINGS

1   made, perhaps there should be some dents in the Government's

2   presentation that the defense can exploit, that's your job.

3   But ultimately I think it's critical, it's the testimony of

4   two or three individuals which is very important.  So I take

5   this very seriously, very seriously, which is why I want to

6   read specifically the testimony.  I do recall Igor admitting

7   preparation of two or three documents.

8           I'm not as concerned about the points.  Stressed

9   somewhat a letter, it's going be apparent a disagreement

10  between father and son as to whether or not the preparation of

11  those documents was ordered as opposed to just done by the son

12  who informed his father.  There is a lot of room for

13  misinterpretation and so forth.  It doesn't seem to be as

14  black and white as it's been portrayed.  It's a serious

15  matter.

16          That said, I don't see any authority, nor so for

17  frankly Ms. Whalen, despite the passionate plea, do I see

18  justification or authority for the relief you seek, either the

19  instruction to the jury or for that matter the striking not

20  only of the witness who we heard from, the witness we haven't

21  heard from.  That's not a final ruling.

22          I just wanted to say one other thing.  I know this

23  is a complicated case from everybody's perspective.  I'm

24  absorbing all this information.  I don't envy the charge of

25  the responsibility of the getting the situation to the

PROCEEDINGS

1    defense, the defense digesting it all.  I seem to detect a

2    level of rancor and it's distressing me.  When you're under

3    pressure and you don't get things when you want to get them, I

4    fully understand the human reaction to that.  But I hope we

5    can turn the page here.

6         But in the process, I call upon the Government.

7    You've got to be Cesar's wife here.  The folks here are under

8    enormous pressure dealing with voluminous information.

9         One area specifically of inquiry, then I'll let you

10   go, the Latvia situation troubles me.  We had motion in limine

11   to preclude any examination.  Ms. Whalen in her letter asked

12   the question what was done here.  If it's simply a question of

13   asking the witness is there an investigation going, did you do

14   it, yes.  There is an investigation, no, I didn't do it,

15   leaving it at that.  Or did the Government take the

16   initiative, as I think you would, to get the bottom of it and

17   explore what sources of information are available to you.  So

18   we know what exactly is going on.  We know the level of

19   falsity, if any, in the witness's claims of not being

20   criminally culpable.

21        I read the Latvian document.  It was difficult to

22   read, but one thing is clear, very specific term, a wholesale

23   fraud.  The fact that they lost $100,000 in it doesn't tell me

24   anything.  If the fraud was going to net them 5 million, what

25   does the down payment of $100,000 mean?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

PROCEEDINGS

1          I just I want to know that you've done your homework

2    on this Latvia thing that you shared it with counsel.  This

3    goes right to the heart of this case.  Is the jury going to

4    believe these people?  I assume you're going to do everything

5    you can to pull all this technical stuff together, that's your

6    job.  I don't want loose ends when it comes to credibility, or

7    short cuts.  I don't care whether the witness has already

8    testified, if something was said that relates to the issue of

9    credibility, you walk a higher rope, or least you should be.

10   I trust you're making your efforts to the do that.

11         That's what bothers me more than anything else, what

12   is between the lines here.  I know most of you, certainly I

13   know Milly Whalen longer than she would like to admit.  I

14   don't want to see the woman as upset as she was.  I thought

15   I'd share that with you.

16         I'll review the testimony and have some rulings, if

17   you will.

18         One other thing, if I turn you down on these

19   requests to strike or to instruct the jury on so-called

20   curative instruction, if you want this fellow back, or maybe

21   if you're undecided whether you want him back, tell them now

22   and we can get him back here forthwith.  Same thing with

23   Ms. Pierce, although I think that is obviously less of a

24   concern.

25         MS. WHALEN:  With respect to Mr. Dubovoy, our

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

```
 1   position is not to call him back.  I don't trust him.

 2              MS. BRILL:  With respect to Mr. Korchevsky, we are

 3   undecided.  Awaiting the Court's --

 4              THE COURT:  I don't want to delay.

 5              MS. BRILL:  The undecided, your Honor, and I don't

 6   mean to sound like you gave a technical way out and I took it.

 7   We are planning to going back and come to a final conclusion

 8   about that.  I can't say if we are in agreement or not with

 9   that.

10              THE COURT:  I just don't want a delay here.

11              MS. BRILL:  That is why if the Court is asking for

12   that reason, then in abundance of caution, the Court should

13   read between the lines.  The Government should read between

14   the lines.

15              THE COURT:  I want this done right.  If you're going

16   to convict these people, you're going to do it right.

17              MR. TUCKER:  The Government would make arrangements

18   to bring Igor Dubovoy back in the city to be called quickly.

19   The Government's understands the Court's admonition.

20              THE COURT:  Have a good night.

21              (Proceedings adjourned to resume on June 19, 2019 at

22   9:30 a.m.)

23

24

25                            I N D E X
```

```
1    WITNESS                                  PAGE

2    SAMAD SHAHRANI

3    DIRECT EXAMINATION      BY MR. TUCKER    1091
     CROSS-EXAMINATION       BY MR. HEALY     1152
4    CROSS-EXAMINATION       BY MS. WHALEN    1171

5    LOUIS DIPIETRO

6    DIRECT EXAMINATION      BY MS. NESTOR    1182
     CROSS-EXAMINATION       BY MR. BRILL     1189
7    CROSS-EXAMINATION       BY MS. FELDER    1191

8    ALISTAIR CLARK FERGUSON

9    DIRECT EXAMINATION      BY MR. TUCKER    1200
     CROSS-EXAMINATION       BY MS. BRILL     1230
10   CROSS-EXAMINATION       BY MS. FELDER    1233

11   JAMES GIMBI

12   DIRECT EXAMINATION      BY MR. TUCKER    1236
     CROSS-EXAMINATION       BY MR. HEALY     1274
13   CROSS-EXAMINATION       BY MS. FELDER    1281

14   BRET PADRES

15   DIRECT EXAMINATION      BY MS. NESTOR    1286
     CROSS-EXAMINATION       BY MR. HEALY     1305
16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2                          EXHIBITS

3   GOVERNMENT                    PAGE
    408 & 409                     1099
4   411 & 444                     1102
    413                           1106
5   407T                          1108
    4541-4544, 4511, 4554
6   4592, 4594, 4620, 4225,
    4574, & 4575                  1215
7   802                           1221
    802-2                         1222
8   4627                          1225
    711                           1252
9   712                           1267
    710                           1250
10  DEFENDANT                     PAGE
    427                           1117
11  405                           1119
    406T                          1122
12  431, 432, 433, 434, and 435  1126
    424                           1139
13  418T and 426T                 1141
    826                           1149
14  710                           1250

15

16

17

18

19

20

21

22

23

24

25

            Rivka Teich CSR, RPR, RMR FCRR
                Official Court Reporter