```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        15-CR-381(RJD)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York
            -against-                   June 19, 2018
5                                       9:30 a.m.
     VITALY KORCHEVSKY and,
6    VLADISLAV KHALUPSKY

7            Defendants.
     ------------------------------x
8               TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                BEFORE THE HONORABLE RAYMOND J. DEARIE
9            UNITED STATES SENIOR DISTRICT JUDGE
                        BEFORE A JURY
10   APPEARANCES
     For the Government:        RICHARD P. DONOGHUE, ESQ.
11                              United States Attorney
                                Eastern District of New York
12                              271 Cadman Plaza East
                                Brooklyn, New York 11201
13                              BY:  RICHARD M. TUCKER, ESQ.
                                     JULIA NESTOR, ESQ.
14                                   DAVID GOPSTEIN, ESQ.
                                Assistant United States Attorneys
15
     For Defendant Korchevsky:SULLIVAN BRILL
16                              115 Broadway, 17th Floor
                                New York, NY 10006
17                              BY:  STEVEN G. BRILL, ESQ.
                                     JAMES L. HEALY, ESQ.
18
                                RACHEL BRILL, ESQ.
19                              263 Domenech Avenue
                                San Juan, P.R. 00918
20
     For Defendant Khalupsky:  FEDERAL DEFENDERS OF NEW YORK
21                              One Pierrepont Plaza
                                Brooklyn, NY 11201
22                              BY:  MILDRED WHALEN, ESQ.
                                     LaKEYTRIA W. FELDER, ESQ.
23
     Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
24                             718-613-2268 RivkaTeich@gmail.com
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

PROCEEDINGS

1    THE COURTROOM DEPUTY:  All Rise.

2    THE COURT:  Everybody present.

3    MS. WHALEN:  Your Honor, our client is still in the

4    line.  There is a long naturalization line this morning, our

5    investigator is down there to sort of jump him ahead of the

6    line.

7    THE COURT:  Okay.  I'll wait for him then.

8    Mr. Khalupsky has made it through the security

9    downstairs.  While we have a movement, I think our jury is

10   here, I just want to say very briefly that I took the occasion

11   last night and earlier this morning to reread Igor Dubovoy's

12   testimony just to make sure I wasn't missing something.  And

13   to reread and reconsider Ms. Whalen's letter of June 17.

14   I'm not going to characterize the testimony of that

15   witness or any other witness, at least certainly not at this

16   point in the proceedings; nor, is it my responsibility or my

17   jurisdiction generally to do that, perhaps another time.

18   But having read the testimony and considered rather

19   unusual application, I am not going to grant the reliefs

20   sought.  I'm not going to preclude the father from testifying.

21   I'm not going to strike the testimony of the son, which in

22   many respects was supportive of the offense, but neither here

23   nor there.  Nor am I going to instruct the jury as requested.

24   I will, of course, include in my formal instructions

25   a very strong admonition to the jury how they are to assess

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

1321

PROCEEDINGS

1   the testimony of anybody who has entered into a cooperation

2   agreement.  And for the moment I'm going to leave it at that.

3   Let me find out where my jury is.

4           MS. NESTOR:  Your Honor, one thing I'd like to put

5   on the record, a minor point.  I want to make sure it's on the

6   record and I made defense counsel aware of.  I'm going to put

7   Mr. Dubovoy on the stand.  I speak Russian, as does he.  It

8   will not interfere with anything.  I'm fluent in Russian -- I

9   speak Russian at a first-grader level.  And I just wanted to

10  put that on the record.

11          THE COURT:  We'll be relying on a certified

12  interpreter.

13          MS. NESTOR:  Of course, your Honor.

14          THE COURT:  We are missing one, same problem that

15  Mr. Khalupsky encountered.  I'm going to solve that problem.

16  We're going to fix this problem going forward for parties,

17  witnesses, most importantly for our jury.

18          Your first witness is Dave Haapaoja, might as well

19  bring him in.

20          (Witness takes the stand.)

21          THE COURT:  Good morning, sir, have a seat.

22          THE WITNESS:  Thank you.

23          MS. NESTOR:  With the Court's permission may I pass

24  up the book of Exhibits?

25          THE COURT:  Yes, of course.

PROCEEDINGS

1          MS. NESTOR:  Thank you, your Honor.

2          (Jury enters.)

3          THE COURT:  Good morning.  Please be seated

4    everyone.  I understand one or more of you had a little

5    problem downstairs in the lobby.  We're going to try to fix

6    that problem for you.  Going forward just identify yourselves

7    if you're confronted with a lengthy line.  If it's the

8    difference between being on time and not on time, just simply

9    identify yourself as a jury in a case on trial before Judge

10   Dearie.  I'm sure the CSOs will expedite your passage through

11   security.  All right, I apologize for that inconvenience this

12   morning.

13          We're ready with our next witness.

14          MS. NESTOR:  May I proceed, your Honor?

15          THE COURT:  Please.

16          MS. NESTOR:  The Government calls Dave Haapaoja.

17          COURTROOM DEPUTY:  Please stand and raise your right

18   hand.

19   DAVID HAAPAOJA, called as a witness, having been first duly

20   sworn/affirmed, was examined and testified as follows:

21          THE WITNESS:  I do.

22          COURTROOM DEPUTY:  State and spell your name for the

23   record.

24          THE WITNESS:  My name is, David Haapaoja,

25   H-A-A-P-A-O-J-A.

HAAPAOJA – DIRECT – MS. NESTOR

1    DIRECT EXAMINATION

2    BY MS. NESTOR:  :

3    Q    Where did you work from 2010 until May 2018?

4    A    PR Newswire.

5    Q    What is PR Newswire?

6    A    We take press releases from companies, organizations, and

7    distribute them publicly in a simultaneous way.

8    Q    What are press releases generally?

9    A    They are information that companies or organizations want

10   to make public to the investment community or customers or

11   just about anybody.

12   Q    What types of press releases does PR Newswire distribute?

13   A    All kinds.  Anywhere from financial press releases, like

14   quarterly earnings down to product releases, significant

15   personal announcements, just about anything a company wants to

16   make known to the marketplace.

17   Q    Do you still work at PR Newswire?

18   A    I do not.

19   Q    Why is that?

20   A    I retired six weeks ago.

21   Q    Congratulations.

22   A    Thank you.

23   Q    How long you were with PR Newswire?

24   A    Thirty years.

25   Q    What was your title right before you retired?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

HAAPAOJA – DIRECT – MS. NESTOR

1    A     Senior vie president of customer experience.

2    Q     How long were you in that position?

3    A     Two years.

4    Q     And before that, what was your title?

5    A     Senior vice president press of global operations.

6    Q     Roughly how long were you in that position?

7    A     Ten years.

8    Q     And focusing on your position as senior vice president of

9    global operations prior to the 2016 period, what did your

10   group do?

11   A     We have a group responsible to receive the press releases

12   from customers.  We confirm authenticity of both the company

13   and the sender.  We create an order in our system.  Then we

14   process the press release for distribution.  And then once it

15   is time for distribution, then we distribute it.

16   Q     How many people did you oversee in that role or in that

17   group?

18   A     About 300.

19   Q     What were your responsibilities specifically?

20   A     I was responsible for overall customer satisfaction and

21   meeting that.  As well as policies, procedures, how we do

22   things, that kind of thing.

23   Q     What policies and procedures?

24   A     What we do when a release comes in, how we do it,

25   confidentiality around press releases, working with customers

HAAPAOJA – DIRECT – MS. NESTOR

1    to make sure that we meet their needs, and they are happy with

2    what we do.

3    Q    Why are these policies and procedures important to PR

4    Newswire when it came handing press release information from

5    customers?

6    A    There is really two primary purposes.  One is the

7    confidentiality of the information, to make sure we do exactly

8    what customers want us to do.  The second is meeting the

9    customer's needs, making sure that they are happy with how we

10   do it.

11   Q    Does PR Newswire have competitors?

12   A    Yes.

13   Q    Who are they?

14   A    Business Wire, Marketwired.

15   Q    Why are they considered competitors.

16   A    We all go after the same customers, so we are all

17   competing against one another for all the customers that use

18   or we would like to have use our services.

19   Q    Now you described some of the services or some of the

20   types of press releases that PR Newswire distributes, does PR

21   Newswire specialize in any particular business sector?

22   A    No, we'll take business from pretty much anyone.

23   Q    As far as you know, does Business Wire specialize in any

24   particular sector?

25   A    No.

HAAPAOJA – DIRECT – MS. NESTOR

1    Q    How about Marketwired?

2    A    No, we all compete for the same group of customers.

3    Q    How do customers get press releases to PR Newswire?

4    A    Two ways.  First is they upload their documents through

5    our secure online portal or they can e-mail releases to us,

6    either way.

7    Q    Once a document or a press release is uploaded to the

8    online portal, is it in the PR Newswire system?

9    A    Yes, once they hit submit it comes through into a system

10   that we use to record the orders and process the releases.

11   Q    Fair to say once they are sent to you by e-mail, they are

12   also in the PR Newswire systems?

13   A    Yes, they come into the same queue.

14   Q    What happens to the press releases once they are uploaded

15   about by the customers at PR Newswire?

16   A    We call the customer back, as I said, to confirm

17   authenticity, to confirm timing, to make sure that we got it

18   right.  Then we move it over to the processing team who works

19   and we reformat the document from typically MS Office format

20   and we need to reformat that into HTML type of format in order

21   to distribute it to the many places that we send.

22   Q    So it goes from a Word document to an HTML document?

23   A    Yes.

24   Q    What else is done, if anything, to reformat or do to any

25   of these press releases?

HAAPAOJA – DIRECT – MS. NESTOR

1    A    We check through it for obvious errors.  We look at

2    headlines.  We look at the opening paragraph.  We look at

3    common names to make sure it's not multiple ways of spelling

4    them, we do that.  We also depending on the customer's

5    instructions, we either will set it up, format it, get it

6    done, and send it out immediately.  Or we can schedule it in

7    the system and send it at a time and date that the customer

8    has specified.  Or we can hold it for when they call us and

9    tell us to send it.

10    Q    Does this process take sometime?

11    A    Yes.  It can be fairly quick, 20 minutes; or it can take

12    hours.

13    Q    Is it important for PR Newswire to ensure that the press

14    releases are kept confidential between the time they are

15    uploaded to PR Newswire and the times they are released to the

16    public?

17    A    That's essential.

18    Q    Why?

19    A    Because depending on the content, the customer has

20    expectations around what happens then.

21          So in a case of financial documents there is a

22    market expectation of when that is going to come out.  Most

23    companies announce earnings releases or other things at a

24    particular time.  If those are not done on those times it

25    causes issues.

HAAPAOJA – DIRECT – MS. NESTOR

1    Additionally, these companies have a whole range of

2  things that they do around that. So it could be internal

3  announcements, internal changes, all kinds of things that they

4  do.

5    So there is a critically factor there for us to make

6  sure we follow the customer's instructions and we do exactly

7  what they say.

8  Q    How does PR Newswire go about keeping the customer

9  information confidential?

10 A    One way is only the people who are working on any of

11 these documents have access to those documents in the system.

12 So if in you're in the sales marketing or other parts of the

13 organization, you don't have access to the systems. We also

14 have key card access to the areas where the content is stored.

15 So unless you have key card for that particular area you can't

16 get in unless you have a card.

17   We confirm the authenticity of both the customer and

18 the company and the sender. So we have identified specific

19 individuals as customers who are authorized to send releases

20 on behalf of that organization. So if it's not someone who we

21 have in our system as someone who is authorized to do that, we

22 don't send it until we have confirmation from an authorized

23 sender. So those are three things that we do.

24 Q    You also talked about the three different ways in which

25 press releases might be distributed, in a sense, that they are

1329

HAAPAOJA – DIRECT – MS. NESTOR

1    immediate release, scheduled release, then a hold?

2    A    That's correct.

3    Q    Now is it important for you or PR Newswire to follow the

4    customer's instructions as to when to disseminate the press

5    releases?

6    A    Yes.  Like I said a minute ago, it's really important

7    that we get that right, so that's also a part of what we

8    confirm when the release comes in with the customers, to make

9    sure we both understand we have a timing and the timing

10   correct.

11   Q    Do customers tend to provide with you press releases a

12   certain amount of time in advance of distribution time and

13   date?

14   A    There is no set time, but certain types of releases have

15   a longer time than others.

16   Q    Is that because more has to be done with those releases?

17   A    Yes.  In the case of financial releases, they typically

18   have charts, graphs, things like that that during the

19   conversion from a Microsoft file to HTML file columns can get

20   misaligned or something like that, so it takes longer to do

21   that.  We need to make sure when we distribute it it is

22   actually legible, readable.

23   Q    Are changes made to press releases after they are

24   uploaded to PR Newswire?

25   A    Sometimes.  It's not uncommon to have things changed.

HAAPAOJA – DIRECT – MS. NESTOR

1    They are typically cosmetic changes, not fundamental to the

2    release.  Any number of changes what I consider to be

3    cosmetic.

4    Q    Can you explain a little more what you mean by cosmetic?

5    A    Sure.  During the conversion process, we have customers

6    who are very finicky, so in the financial columns they'll take

7    a ruler and they'll measure it.  They want things moved over

8    exactly in the same column, that kind of thing.  Punctuation

9    is another thing.  A misspelling found could be another.

10   Those kinds of things.

11   Q    Is there a record kept of when a customer provides a

12   press release to PR Newswire for upload?

13   A    Yes.

14   Q    Tell us about that.

15   A    As soon as a customer uploads a release, either by OCM or

16   e-mail, there is a date and time stamp that is entered into

17   our system automatically once the release has been submitted.

18   So that's kept in the normal course of business.

19   Q    Is it kept confidential, is the upload time kept

20   confidential?

21   A    Well, yes, everything about the release is confidential,

22   even whether we have it.

23   Q    When a press release is released to the public, what

24   happens?

25   A    Either, whether we actually physically submit the release

HAAPAOJA – DIRECT – MS. NESTOR

1    or the system does it for the scheduled release, it's sent out

2    at a specified time.  And it's immediately available to

3    financial news wires such as Dow Jones, Reuters, Bloomberg,

4    those types of things.  It's delivered to news media, print,

5    broadcast.  It's uploaded to websites like Yahoo finance,

6    other places like that.

7    Q    Is that done simultaneously?

8    A    Yes.

9    Q    As a point of PR Newswire?

10   A    Yes.

11   Q    What time of day are press releases distributed to the

12   market?

13   A    That depends.  Run of the mill press releases tend to go

14   all day long.  Financial press releases are done prior to

15   market opening or after market closing, almost always.  So in

16   the U.S. our financial markets open at 9:30 a.m. and close at

17   4:00 p.m.  So typically financial releases are sent out prior

18   to that or after that.

19   Q    When you say financial releases you're talking about

20   earnings, those types of releases?

21   A    That's correct.

22           THE COURT:  Meaning before opening or after closing.

23           THE WITNESS:  Correct.

24   Q    When press releases are made public you talked about a

25   number of the places they are generally published, are you

HAAPAOJA – DIRECT – MS. NESTOR

1    familiar with Factiva?

2    A    Yes.

3    Q    What is your understanding of what Factiva is?

4    A    Factiva is a service website that's an amalgamation of

5    various kinds of financial data, which PR Newswire is one.  So

6    if you're a subscriber to Factiva, you can go in there and

7    find all kinds of financial information, as well as the press

8    releases that are submitted by PR Newswire.

9    Q    Do you actually provide those press releases to Factiva,

10   does PR Newswire?

11   A    That's correct.  They are on distribution.

12   Q    I'm going to show you a CD that's been marked for

13   identification only as Government's Exhibit 803.

14        MS. NESTOR:  Just for the witness.

15   Q    Do you see that on your screen?

16   A    I do.

17   Q    Do you recognize Government's Exhibit 803?

18   A    I do.

19   Q    How do you recognize it?

20   A    It has my initials on it.

21   Q    Does it have a date?

22   A    It does.  6/11, June 11, 2018.

23   Q    Did you review the contents of Government's Exhibit 803

24   on June 11, 2018?

25   A    Yes, I did.

HAAPAOJA – DIRECT – MS. NESTOR

1    Q    You reviewed it for accuracy?

2    A    I did.

3    Q    What is it?

4    A    There is data on there from 2008, I believe December 2008

5    through middle of 2015.  And it's a summary of press releases

6    submitted by PR Newswire.  So specific data around those press

7    releases are on that CD.

8    Q    Is it upload and release times?

9    A    Yes, among other things.

10   Q    Is it specified by which companies are actually releasing

11   the press releases?

12   A    Yes.  So there is company names, headline, time in, time

13   out, some order numbers and other things that are on there

14   that are part of our system.

15             MS. NESTOR:  We move Government's Exhibit 803 into

16   evidence.

17             THE COURT:  You're not suggesting these are all the

18   releases that PR put out between 2018 and middle of 2015, are

19   you?

20             THE WITNESS:  They are not the releases themselves,

21   they are the time in and time out time.

22             THE COURT:  Of all the releases?

23             THE WITNESS:  Yes.

24             THE COURT:  Any objection?

25             MS. FELDER:  Yes, your Honor.  We object on the

                     HAAPAOJA – DIRECT – MS. NESTOR

1    basis of relevance to the documents that pertain to time

2    periods outside the scope of the alleged conspiracy,

3    particularly from 2008 to the 2009.  I believe that this

4    contains matters through 2016 as well.

5              THE COURT:  So you're objecting to the portion of

6    2008 and 2009.

7              MS. FELDER:  As well as any time period beyond the

8    time period of the alleged conspiracy, which I believe is

9    alleged to end August 2015.  There are documents in late 2015

10   as well as 2016.

11             THE COURT:  I note the objection.  The objection is

12   overruled.  I'll receive 803 in evidence.

13             (Government Exhibit 803, was received in evidence.)

14             MS. NESTOR:  Thank you.

15   BY MS. NESTOR:

16   Q    Explain once again what is on the CD in terms of the data

17   itself?

18   A    Yes.  So there is multiple rows and multiple columns.

19   Trying to do this from memory, hang on a second.

20             MS. NESTOR:  If we can publish this to the jury?

21             THE COURT:  Go ahead.  Is that what you want to

22   publish?

23             MS. NESTOR:  So they know what he's talking about.

24             THE COURT:  Go ahead.

25   A    The first column is the unique order ID, that's put in by

HAAPAOJA – DIRECT – MS. NESTOR

1   our system once the document is received.  The next number is

2   a number that's pulled from the OMC.  The third is the time

3   and date.

4   Q    Let me be clear, I don't need you to go through the

5   columns.  What is the general data?

6   A    Okay, sure.  It's the date and time in, the company name,

7   the date and time out, the headline of the release, I think

8   that's the important stuff.

9   Q    Was the upload data that you testified to on the CD, is

10  it voluminous?

11  A    Yes, there is a lot of content there.

12  Q    Was PR Newswire asked to provide certain press releases

13  to the Government pursuant to a subpoena?

14  A    Yes.

15  Q    What was PR Newswire asked to do?

16  A    We were asked to provide the uploaded copies, initial

17  uploaded copies of press releases for six companies.

18  Q    Did you actually review that process for pulling those

19  press releases?

20  A    I did.

21  Q    I want to show you actually it's in the binder in front

22  of you for identification only, Government's Exhibits 845,

23  846, 847, 848, 849, 850.  Do you recognize these documents?

24  A    Yes.

25  Q    What do you recognize them to be?

VOIR DIRE - HAAPAOJA - MR. HEALY

1    A    These are the original copies of the press releases that

2    were sent to PR Newswire on these dates.

3    Q    Are they as they are were uploaded to PR Newswire?

4    A    Yes.

5    Q    Are they fair and accurate representations of the

6    uploaded press releases that PR Newswire received and pulled?

7    A    Yes, they are the uploaded press releases.

8              MS. NESTOR:  Your Honor, at this time the Government

9    requests to move into evidence 845, 846, 847, 848, 849, 850.

10             THE COURT:  What is the earliest press release you

11   have in that set of press releases?

12             THE WITNESS:  This set or the ones on the CD?

13             THE COURT:  The ones you were just talking about,

14   845, six, seven so forth.

15             THE WITNESS:  The earliest date?

16             THE COURT:  Date, yes.

17             MS. NESTOR:  Sometime in 2011.

18             THE COURT:  2011.  Any objection to these tentative

19   releases?

20             MR. HEALY:  Super brief voir dire, your Honor?

21             THE COURT:  Go ahead.

22             THE WITNESS:  What year?

23             THE COURT:  That's all right, we had the answer.  Go

24   ahead, sir.

25   VOIR DIRE EXAMINATION

VOIR DIRE - HAAPAOJA - MR. HEALY

1    BY MR. HEALY:  :

2    Q    Did you pull these yourself or did someone else pull

3    these off the server?

4    A    Someone else pulled them.

5    Q    How did they come into your possession?

6    A    They were initially shown to me by the Government and

7    then I went back to the people who pulled them and got more

8    information as to how that was done and what they did and some

9    other things.

10   Q    Do you recall when that was?

11   A    Yes.  It was, well exactly, it was about two weeks ago.

12   Q    Fair to say that's after you retired from PR Newswire?

13   A    Yes.

14         MR. HEALY:  Your Honor, we would object.  The

15   witness cannot lay a specific foundation.  He was not an

16   employee of the company.  He didn't pull the records.  He has

17   no knowledge if anything changed in the months that he left,

18   how the records were stored and maintained.

19         THE COURT:  The word objection is enough.  If I

20   don't understand the nature of your objection I'll invite you

21   to sidebar.

22         MR. HEALY:  I apologize.

23         THE COURT:  Do you understand?

24         MR. HEALY:  Yes, your Honor.

25         THE COURT:  Overruled.  Go ahead.

VOIR DIRE - HAAPAOJA - MR. HEALY

1    (Government Exhibit 845, was received in evidence.)

2    MS. NESTOR:  I'm going to move these into evidence

3    and I'm going to show you Government's Exhibit 845.

4    COURTROOM DEPUTY:  Bear with me one second, we had a

5    glitch here.  I think the system automatically went off and

6    now it's powering on again.  Just bear with me one second.

7    MS. NESTOR:  I can move on briefly and then move on

8    to this so we don't waist time.

9    Approaching the witness, with the Court's

10   permission, to show 803-1?

11   COURTROOM DEPUTY:  Ms. Nestor, I believe the system

12   is back up.

13   MS. NESTOR:  Excellent.

14   THE COURT:  It is not in the binder?

15   MS. NESTOR:  It is not in the binder, your Honor.

16   BY MS. NESTOR:  :

17   Q    I'm going to show you what is already in evidence as

18   Government's Exhibit 845, and publish it to the jury.  Is this

19   one of the press releases that you pulled?

20   A    Yes.

21   Q    What company is it for?

22   A    Dendreon.

23   Q    An uploaded press release for Dendreon?

24   A    Yes.

25   Q    What is the ticker there?

VOIR DIRE - HAAPAOJA - MR. HEALY

1    A    DNDN.

2    Q    What is the date of the press release?

3    A    August 3rd, 2011.

4    Q    The second quarter 2011 financial results?

5    A    Yes.

6    Q    Showing you Government's Exhibit 846.  Is this a press

7    release for Metals USA?

8    A    Yes.

9    Q    On October 20, 2011?

10   A    Yes.

11   Q    Again, is this an uploaded press release?

12   A    Yes.

13   Q    Is the ticker MUSA?

14   A    Yes, it is.

15   Q    Were the other ones for Landstar in October 2011?

16   A    Yes.

17   Q    CA Technologies in 2012?

18   A    Yes.

19   Q    Caterpillar in 2012?

20   A    Yes.

21   Q    And Legg Mason in 2012 as well?

22   A    Yes.

23   Q    I'm showing you what is marked for identification only.

24        COURTROOM DEPUTY:  For identification only.

25   Q    It's also in front of you, Government's Exhibit 803-1?

VOIR DIRE – HAAPAOJA – MR. HEALY

1        COURTROOM DEPUTY:  803-1?

2        MS. NESTOR:  Yes.

3  Q    Do you recognize that?

4  A    Yes.

5  Q    What is it?

6  A    It's a synopsis of some of the data around the six

7  releases we just went through.  So it's what we talked about

8  before, order number, time in, company time out.

9  Q    Is it pulled directly from Government's Exhibit 803?

10 A    Yes.

11 Q    Just for the press releases that you pulled that you were

12 requested to do so by the Government; is that right?

13 A    That's correct.

14 Q    Did you review this spreadsheet for accuracy?

15 A    Yes.

16        MS. NESTOR:  At this time, your Honor, the

17 Government moved to admit into the evidence 803-1?

18        THE COURT:  It's already part of the 803.

19        MS. NESTOR:  That's correct.

20        THE COURT:  Any objection?

21        MR. HEALY:  No objection.

22        THE COURT:  Received.

23        (Government Exhibit 803-1, was received in

24 evidence.)

25        MS. NESTOR:  May I publish?

1341

VOIR DIRE - HAAPAOJA - MR. HEALY

1       THE COURT:  You may.

2   Q    Zooming in on the headers, what is order ID?

3   A    That's the unique order number that the system assigns to

4   a release when it first comes in.

5   Q    What is the external ID?

6   A    That's an order -- a number that comes off of the OMC,

7   our online customer portal.  So they upload releases that way.

8   Q    What is enquiry end date.

9   A    The time and date that PR Newswire received the release

10  from customer.

11  Q    Customer name is just the customer providing the press

12  release?

13  A    Yes.

14  Q    What is dissemination date?

15  A    The date we released it, distributing it to the market,

16  and our distribution network.

17  Q    Is that the time?

18  A    Yes.

19  Q    By the way, what is the, in this example, what is the

20  .080?

21  A    That gets to milliseconds of time.

22  Q    Is this the headline for the press release?

23  A    Yes.

24  Q    And what is the ticker indication there, let's keep it to

25  this Dendreon Corporation, what is the ticker indication

VOIR DIRE - HAAPAOJA - MR. HEALY

1    there?

2    A    You mean what is it?

3    Q    What does it mean?

4    A    It's the trading, the ticker symbol for that company on

5    the NASDAQ stock market exchange.

6    Q    So you know the ticker symbol so you know which exchange

7    that it is traded on?

8    A    Yes.

9    Q    What is the topic opted?

10   A    They are topics that we put in the metadata of the press

11   release to allow receiving systems to sort by things earnings

12   releases go here, conference calls go here, dividends go here,

13   that kind of thing.

14   Q    Did those cover all the press releases that you were

15   asked to look for that were uploaded to PR Newswire?

16   A    Yes.

17   Q    The six you referred to earlier?

18   A    Correct.

19   Q    Did there come a time you learned that PR Newswire

20   computer systems had been compromised?

21   A    Yes.

22   Q    When did you initially learn about the compromise?

23   A    2005.

24   Q    2005?

25   A    Not 2005, 2015.

VOIR DIRE - HAAPAOJA - MR. HEALY

1    Q    How did you come to learn that information?

2    A    Through internal discussions at the company.

3    Q    When you learned of the compromise, what was your

4    understanding regarding whether it was a past event or current

5    event?

6    A    Past event.

7    Q    Did you learn of the Indictment in this case at any

8    point?

9    A    Yes, when it was announced to the public, I think it was

10   by the U.S. Attorney General.

11   Q    Was that event significant to you in your role?

12   A    Extremely significant.

13   Q    Why?

14   A    Because customers started calling my team almost

15   immediately after that news conference asking what this was

16   about, how this happened, does this mean that the information

17   isn't secure, were their press releases compromised and a

18   whole host of other things.

19   Q    Was it significant to your company?

20   A    To PR Newswire, significant, yes.

21   Q    Can you briefly explain why that is?

22   A    It's like what I said before, it went to the heart of one

23   of the things that we do, which is to maintain confidentiality

24   around the content of press releases from our customers.  And

25   they were, our customers were extremely concerned that we had

1344

HAAPAOJA - CROSS - MR. HEALY

1    violated in that confidentiality.

2              MS. NESTOR:  Thank you.  No further questions.

3              THE COURT:  Cross-examine.

4              MR. HEALY:  Yes, your Honor.

5    CROSS-EXAMINATION

6    BY MR. HEALY:

7    Q    Good morning, Mr. Haapaoja.

8    A    Good morning.

9    Q    Retirement treating you well so far?

10   A    Not right now.

11   Q    I'll try not to make it worse.

12   A    Okay, I'm just kidding.

13   Q    I want to talk to you a little about the marketplace you

14   were discussing with the prosecution a few moments ago.  Is it

15   correct that in 2015 PR Newswire was acquired or sold to

16   Cision?

17   A    I think it was 2016.

18   Q    Okay, 2016.  Prior to that it was its own company,

19   correct?

20   A    Prior to that we were owned by UBM, a company based in

21   the UK.

22   Q    Is it fair to say that PR Newswire's primary source of

23   revenue is through the process you described issuing press

24   releases?

25   A    Yes.

HAAPAOJA - CROSS - MR. HEALY

1   Q    In 2013, in fact, gross revenues from that endeavor was

2   $310 million?

3   A    It could be, sure, I don't remember.

4   Q    Is it fair to say in that same year, 2013, PR Newswire

5   expressed that they had distributed in that year 350,000 press

6   releases?

7   A    That could be correct.

8   Q    You mentioned that there were, you mentioned three other

9   companies with which PR Newswire competed for business,

10  correct?

11  A    At least, sure.

12  Q    The competition was pretty fierce, would you agree with

13  that?

14  A    Yes.

15  Q    And you talked about the two things that -- by the way,

16  you are not a machine guy, you're not a technical guy, you

17  were a people guy, correct?

18  A    Yes.

19  Q    And when you would talk to customers you would represent

20  the understanding that PR Newswire was committed to two

21  things, keeping the information confidential and meeting their

22  particular needs; is that fair to say?

23  A    Yes

24  Q    That's why you were, or the sales force, was encouraging

25  them to use PR Newswire rather than one of those other

HAAPAOJA – CROSS – MR. HEALY

1   competitors?

2   A      Among other things, sure.

3   Q      In terms of keeping the information confidential, one of

4   the ways of course that would be accomplished was by

5   maintaining appropriate security for their data, correct?

6   A      You mean technical security?

7   Q      Sure.

8   A      Yes.

9   Q      That would mean that you were trusting, or you as a

10  people, person were trusting the people on the mechanical or

11  the technical side to make sure that they were providing that

12  technical security?

13  A      Yes.

14  Q      That they were making sure the systems were up-to-date?

15  A      Yes.

16  Q      Doing appropriate routine monitoring of those systems?

17  A      Yes.

18  Q      And that's because that's what you were telling the

19  clients, correct, that we are keeping your information

20  confidential?

21  A      Well, that's what I was telling customers, yes.

22  Q      Now, you talked about the process, and if I misstate

23  something let me know, I think you said prior to being the

24  vice president of customer experience, I think that was your

25  final title?

HAAPAOJA – CROSS – MR. HEALY

1    A    Yes.

2    Q    You were head of a team that managed the press releases

3    from upload through distribution, is that a fair

4    characterization?

5    A    Yes.

6    Q    I think you said over 300 people on your team?

7    A    Yes.

8    Q    But those 300 people weren't the only team, correct?

9    A    No, they were not.

10   Q    There were 350,000-plus press releases, how many teams

11   were there let's say in 2012?

12   A    I'm not sure I understand the question.  How many teams

13   were there?

14   Q    How many teams were there doing what your team was doing?

15   A    Within PR Newswire?

16   Q    Yes, sir.

17   A    None.

18   Q    None?

19   A    My team was the team that processed press releases

20   globally for PR Newswire.

21   Q    So all the press releases that came into and then out of

22   PR Newswire was processed by your team of 300?

23   A    Yes, give or take, yes.

24   Q    Was it an around-the-clock process?

25   A    Yes.

HAAPAOJA - CROSS - MR. HEALY

1  Q    So if IBM uploaded a press release at two in the morning,

2  which would be after the close of business, correct, close of

3  trading?

4  A    Yes.

5  Q    Someone would be available to review that prior to its

6  distribution, if that distribution was to be 9:00 o'clock the

7  next morning?

8  A    Yes.

9  Q    You talked about the methods by which press releases

10 could be received, correct?

11 A    Yes.

12 Q    One of which you said was e-mail?

13 A    Correct.

14 Q    The other was the direct upload through the customer

15 portal?

16 A    Yes.

17 Q    Were businesses assigned a method, did they choose a

18 method, or something else, or could they do either?

19 A    They could do either, typically they use one or the

20 other.

21 Q    And you mentioned that when things were uploaded to the

22 portal they were given a time stamp; is that correct?

23 A    When things were uploaded either through e-mail or the

24 portal they were given a time stamp.

25         (Continued on next page.)

HAAPAOJA - CROSS - HEALY

1    MR. HEALY:

2    (Continuing.)

3    Q    I wrote down.  You said they would be in the queue.  What

4    did you mean by that?

5    A    Correct.  Whether it's through the portal or whether it's

6    through e-mail, once they're uploaded they come into this

7    system that we use for processing.  And in that system,

8    there's a queue that comes in where -- well, there's a queue

9    with incoming orders that is then -- it's monitored all the

10   time -- and so, that's where the press releases arrived.

11   Q    And they're stamped as they exit the queue?

12   A    No, they're stamped as they come in.

13   Q    As they come in.

14        While they're on the queue, are they on the server

15   to your knowledge?

16   A    Yes.

17   Q    Now, you talked about the availability of the press

18   releases to the clients once they're uploaded, and you said

19   that generally the clients do have access to those press

20   releases; is that correct?

21   A    No, I didn't say that.

22   Q    Let me rephrase it.  You said that they have access to

23   them for cosmetic changes?

24   A    No.

25   Q    Please explain.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1  A    No.  I said that, I believe, the question was more around

2  our changes made and I said, yes, they're typically cosmetic

3  changes.  But those are being made by team.

4  Q    So is it your testimony that once it comes into your

5  system, the client is unable to make any changes to those

6  press releases?

7  A    I'm hesitating because we have a press release review

8  function that is on the portal.  So my team can -- I want to

9  say republish, but that's the wrong word.  They can put the

10  document back on to the customer portal.  The customer can

11  then log in with their credentials and review the content on

12  the portal.

13       They cannot make changes to the document on that

14  portal.  They need to talk to us before we do that, before any

15  changes are made.  So there's not an edit function on that

16  portal.

17  Q    I understand.  I guess my question is a little more

18  general.

19       You said they would have to talk to you or someone

20  on the team before they could make changes.  That implies

21  they -- if it was necessary, changes could be made?

22  A    Correct.  By my team, yes.

23  Q    That would be after a phone call was made.  A personal

24  contact was made with someone from your team?

25  A    That's correct.

HAAPAOJA – CROSS – HEALY

1    Q    Is there a record kept of those phone calls?

2    A    Of the phone call itself or the interaction and what

3    happened?

4    Q    The phone call.

5    A    Well, if the customer called in to us then, yes.  If the

6    customer -- if we called the customer then, no.

7    Q    Now, you talked about the nature of press releases and

8    you talked a lot about financial press releases.  I think you

9    also indicated that of the 300,000-plus press releases in any

10   given year, there are all sorts of press releases; is that

11   correct?

12   A    Yes, that's correct.

13   Q    For example, "Omni Hotels and Resorts Named Top Luxury

14   Hotel Brand by Harris Poll."

15          That would be an example of a press release that

16   might be on your system?

17   A    Yes.

18   Q    "Rand Imperial Restaurant Launches Express Dim Sum

19   Lunch."

20          Could that be your system?

21   A    Yes.

22   Q    "Dumbest Insurance Fraud Case of All Time."

23          Would that be on your system?

24   A    Maybe.

25   Q    In fact, would it surprise you to know that every single

HAAPAOJA - CROSS - HEALY

1   one of those were distributed by PR Newswire in March of 2011?

2   A    No.

3   Q    Those press releases were given the same security and

4   same customer service as IBM making an earnings announcement;

5   correct?

6   A    Yes.

7   Q    Because that was paramount to what was being represented

8   to those clients?

9   A    Yes.

10  Q    Now, you mentioned that you became aware in 2015 that PR

11  Newswire had been compromised in the past?

12  A    Yes.

13  Q    Were you told that by the general counsel of PR Newswire?

14          MS. NESTOR:  Objection.

15          THE COURT:  Overruled.  Go ahead.

16  A    Yes.

17  Q    And when he told you that, are you aware -- and if you

18  are, you are.

19          Were you aware that was during the period of time

20  that sill doesn't was going to take over or acquire PR

21  Newswire?

22  A    That's a difficult question for me to answer.  My

23  conversation with her was I'm not sure where we were in the

24  process, but my best recollection is yes.

25  Q    And would you agree with me that that information would

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

HAAPAOJA - CROSS - HEALY

1   have been relevant to sill doesn't?

2   A    I suppose so.

3   Q    Now, when you spoke with the general counsel, were you

4   informed that, in fact, the intrusion had been discovered in

5   2012, three years earlier?

6              MS. NESTOR:  Objection, your Honor.

7              THE COURT:  Sustained.

8   Q    Did you come to learn when the intrusion into PR Newswire

9   first occurred?

10  A    I believe that the -- what you're asking me became clear

11  to me with the announcement with the attorney general.  I

12  think that was in August of 2015.

13  Q    So it's fair to say that in 2012 you were never told?

14  A    That's correct.

15  Q    You were also never told in 2012 that PR Newswire had

16  engaged a forensic investigation firm to look into this?

17  A    I wasn't, no.

18  Q    And you were never told that in 2012 members of that team

19  met with the Department of Justice that was conducting an

20  investigation?

21  A    I was not.

22  Q    Do you think that that information was something that

23  would have been of interest to the clients that you were

24  dealing with back in 2012?

25  A    I guess the short answer is yes, but -- yeah, sure.

HAAPAOJA – CROSS – HEALY

1    Q     Because that affected the confidentiality of their
2    information; correct?
3    A     I guess so, sure.
4    Q     And if they knew, they could take steps to protect their
5    information?
6    A     Yeah.  Yeah.
7    Q     They could change their upload times, for example?
8    A     Yeah, sure.
9    Q     They could choose a different firm?
10   A     They could.
11   Q     That wouldn't have been good for business, though?
12   A     I would suspect not if PR Newswire was the only one that
13   was saying that.
14   Q     And is it fair to say that also you were not told that an
15   intrusion happened again in 2013?
16   A     No.
17   Q     And would the same relevance to the clients have existed
18   in 2013?
19   A     I guess so, sure.
20   Q     They would have been just as interested at that point;
21   correct?
22   A     Yes.
23             MS. NESTOR:  Objection, your Honor.
24             THE COURT:  The line of questioning has been pursued
25   enough.

HAAPAOJA – CROSS – HEALY

1    MR. HEALY:  Sure, your Honor.

2  Q    I would like to talk to you a little bit about the press

3  releases that you discussed earlier that are in your binder.

4  A    Yes.

5  Q    Now, is it fair to say that each of the companies

6  represented in that binder were repeat clients of PR Newswire?

7  A    I'm not positive of that.

8  Q    Okay.  Let's take one in particular.  Let's talk about

9  CA Technologies.

10  A    Yes.

11  Q    Would you agree with me that CA Technologies is a

12  computer software firm?

13  A    Yes.

14  Q    And you know that because part of your job was to get to

15  know the clients; right?

16  A    Yes.

17  Q    And would you agree with me that in the time period we're

18  talking about, CA Technologies, the time period being 2011 to

19  2015, did CA Technologies issue many, many, many press

20  releases?

21  A    Yes.

22  Q    Now, could you tell us the date on that press release?

23  A    The one that -- yeah, it's October 21, 2011.

24  Q    And that is an earnings press release?

25  A    That's correct.

HAAPAOJA - CROSS - HEALY

1  Q     Now, I think you testified during voir dire that that

2  press release was given to you by the Government.  You didn't

3  pull that yourself first?

4  A     No.  No.

5  Q     No, you did not pull it?

6  A     Oh, yes.  The copy of the press release was given to me

7  by the Government for review, correct.

8              MR. HEALY:  Now, if we could pull up, Ms. Mulqueen,

9  I'm going to use the to HDMI at the podium and I'm going to be

10  putting up one of the spreadsheets that's already in evidence

11  which is 803 for the Government.  And for the record, it's

12  spreadsheet that is numbered 757.

13              COURTROOM DEPUTY:  Okay.

14  Q     Mr. Haapaoja, you said you reviewed these things and I

15  certainly don't presume that you memorized them.  There's

16  literally hundreds of thousands of entries here.

17              This is one of the spreadsheets that you

18  entered -- that you entered into evidence which concerns the

19  period of 2011 into '12, and what I'd like to do is this.

20              Let's just, if we could, we're going to filter for

21  CA Technologies.

22              And on this particular spreadsheet, which contains

23  over 200,000 entries, you'll see that we have, when you look

24  at the bottom corner, 57 different entries for

25  CA Technologies.

1357

HAAPAOJA – CROSS – HEALY

1       Now, if you look at the highlighted section, can you

2  see the dates in Column E?

3  A    Yes.

4  Q    And would you agree with me that those dates exclusive of

5  the, well, we'll do that.  Are including dates from

6  January 24th and January 30th of 2012?

7  A    Yes.

8  Q    And would you agree with me that in that short period of

9  time there are seven, I believe, seven different press

10 releases released by CA Technologies; is that correct?

11      THE COURT:  I think your count is wrong.

12      THE WITNESS:  Yeah.  1, 2, 3, 4, 5, 6, 7, 8, 9, 10.

13 Q    Now, again, I don't want to -- my mistake because I

14 wasn't going to include -- let's say ten, okay.

15      Would you also agree with me that there were two

16 that were issued on the same date, January 24, 2012?

17 A    Yes.

18 Q    One of which is contained in your binder; correct?

19 A    Yes.

20 Q    But you weren't given the other one?

21 A    No.

22 Q    And would you also agree with me that it actually wasn't

23 at all unusual, your time at CA Technologies, for companies to

24 issue more than one press release on any given day?

25 A    Yes.

1358

HAAPAOJA – CROSS – HEALY

1    Q    Now, let's talk briefly about Caterpillar.

2         Can you open up to Caterpillar?

3         And what I'd like to do is I'm going to refilter now

4    for Caterpillar and just visit a small quarter subsection.

5         Now, what is the date of the press release that you

6    were given by the Government?

7    A    January 25, 2012.

8    Q    And that would represent -- the date on that would

9    represent the date that it was uploaded; correct?

10   A    Correct.

11   Q    So the date that it was released, what does the

12   information indicate on the press release?

13   A    The following day, January 26, 2012.

14   Q    And if we look at this bottom line here on the line

15   that's included in Exhibit 803, that is the information

16   regarding that press release; correct?

17   A    That dissemination, right.  That's correct.

18   Q    Now, I'd like you to look at the top line, the top line

19   is highlighted.

20        What's the date on that?

21   A    For the dissemination is 1/12/2012.

22   Q    And would you agree with me that the headline is telling

23   the world, or as you said "everybody," when Caterpillar is

24   going to announce their earnings.

25        Is that fair to say?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

HAAPAOJA – CROSS – HEALY

1    A    Yes.

2    Q    So everybody who looked at the PR Newswire press release

3    that your company issued on January 12th could mark their

4    calendars and know that on January 26th Caterpillar was going

5    to announce their earnings.

6              Is that fair to say?

7    A    I don't know.  I didn't be review this one.

8    Q    Okay.  But based on your review of the headline, would

9    you agree with me?

10   A    I would suppose so.

11   Q    Okay.  Now, I want you to look at the middle highlighted

12   column that's not from Caterpillar.  That's from a company

13   called Zacks.

14             Are you familiar with Zacks?

15   A    Yes.

16   Q    Fair to say they were a client of PR Newswire?

17   A    Yes.

18   Q    Would it surprise you to know that in this particular

19   spreadsheet, which incorporates only one year, that PR

20   Newswire issued over 1,600 press releases for Zacks?

21   A    I don't know.

22   Q    Do you agree, though, that may be in keeping with what

23   you know about Zacks as a client?

24   A    Yes.

25   Q    Do you know what Zacks is?

HAAPAOJA – CROSS – HEALY

1    A    Yes.

2    Q    And is it fair to say that Zacks is a financial analysis

3    website?

4    A    Yes.

5    Q    They give detailed information about different stocks

6    that are publicly traded?

7    A    Yes.

8    Q    And can you tell me the date that Zacks made a press

9    release that I've highlighted on this?

10   A    The dissemination date was January 24, 2012.

11   Q    And January 24, 2012, is the day before the press release

12   was uploaded from PR Newswire to Caterpillar?

13   A    Two days before the 24th through the 26th.

14   Q    I think you read to me that the upload date was the 25th?

15   A    Sorry.  I'm looking at the dissemination date.

16   Q    Now, we don't have this press release.  But can you read

17   to the jury the headline?

18   A    "Zacks Bull and Bear of the Day highlights Caterpillar,

19   NII Holdings, Lowe's Companies, Home Depot, and St. Jude

20   Medical."

21   Q    So, again, anybody that was looking out for PR Newswire

22   releases would have known to go to Zacks or to read that press

23   release to get, among other things, information on

24   Caterpillar?

25   A    Yes.

HAAPAOJA – CROSS – MS. FELDER

1          MR. HEALY:  One moment, your Honor.  Pause.

2          (A brief pause in the proceedings was held.)

3          MR. HEALY:  No further questions.

4          THE COURT:  Ms. Felder.

5   CROSS-EXAMINATION

6   BY MS. FELDER:

7   Q    Good morning.

8   A    Hello.

9   Q    You testified that Factiva is a website that's an

10  amalgamation of various financial data; is that correct?

11  A    I believe so, yes.

12  Q    Have you ever worked at Factiva?

13  A    No.

14  Q    Did you review any of the press releases pulled from

15  Factiva?

16        Did the Government show you any press releases they

17  pulled from Factiva?

18  A    I'm not sure.

19  Q    But you don't have any personal knowledge about the

20  document retention process for Factiva, do you?

21  A    I have.  I understand how we deliver content to websites

22  and things, but exactly how that's done and what they do with

23  it, no, I do not.

24  Q    Okay.  So your role is providing the information to

25  Factiva?

HAAPAOJA – CROSS – MS. FELDER

1    A    Correct.

2    Q    Correct.  And once it's given to Factiva, you don't know

3    how it's stored; correct?

4    A    No.

5    Q    The Government showed you exhibits No. 845 through 850.

6         Those are press releases that were shown to you two

7    weeks ago; correct?

8    A    Correct.

9    Q    And you testified that you didn't pull them yourself but

10   other people did?

11   A    Correct.

12   Q    Did you review any drafts of those press releases?

13   A    I don't know what you mean by drafts.

14   Q    Drafts.  Any --

15        For example, you testified that customers would

16   upload documents to the portal and they would e-mail it;

17   correct?

18   A    Right.

19   Q    And there's an editorial process where changes can be

20   made to the documents?

21   A    Correct.

22   Q    And that your team would make those changes based on your

23   conversations with the customers?

24   A    Correct.

25   Q    Were the press releases that were admitted into evidence,

HAAPAOJA - REDIRECT - MS. NESTOR

1    did you review any drafts of those documents or only the final

2    documents shown by the Government?

3    A    Not the final document, it was the original document that

4    was sent in.

5    Q    Okay.  So that those documents they weren't edited, they

6    were uploaded and distributed as uploaded?

7              MS. NESTOR:  Objection, your Honor.

8              THE COURT:  I'm sorry.  Sustained as to form.  Break

9    it down, please.

10   Q    The documents you reviewed were the uploaded documents;

11   correct?

12   A    That's right.

13   Q    Are you aware of any other versions of those documents?

14   A    I'm not sure how to answer this, but I'll say yes.

15   Q    There are other versions of those press releases?

16   A    There are other versions of some of the press releases.

17             MS. FELDER:  No further questions.  Thank you.

18             THE COURT:  Anything else?

19             MS. NESTOR:  I want to clarify that last point.

20             THE COURT:  Just questions.

21   REDIRECT EXAMINATION

22   BY MS. NESTOR:

23   Q    You said that there were other versions of the press

24   releases after the uploaded press release that we reviewed in

25   court today?

1364

HAAPAOJA – RECROSS – MS. FELDER

1   A     That's correct.

2   Q     Can you explain what you meant?

3   A     Yes.  So for those six press releases, three of them had

4   no changes at all.  They were sent -- other than the

5   reformatting, they were sent exactly the same as they were

6   uploaded to us?

7   Q     What about the other three?

8   A     The other three.  One had an additional, one had a link

9   that was added to the press release.  One had a formatting

10  change to the column, as I said before, they get misaligned

11  some.  And then the other one had punctuation.  Not exactly

12  sure which was which.  But I testified before that we

13  primarily make cosmetic changes and that's three instances of

14  what I meant by that.

15            MS. NESTOR:  No further questions.

16            THE COURT:  Anything else.

17            MS. FELDER:  May I inquire your Honor?

18            THE COURT:  Yes, ma'am.

19  RECROSS-EXAMINATION

20  BY MS. FELDER:

21  Q     Is it your testimony that once a press release is

22  uploaded, the customers can review those press releases;

23  correct?

24  A     Yes.

25  Q     There may be changes in those press releases; correct?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

HAAPAOJA – RECROSS – MS. FELDER

1    A    Yes.

2    Q    Mainly cosmetic as you testified?

3    A    Correct.

4    Q    Have there been times when other things have been made?

5    A    Yes.

6         MS. FELDER:  Thank you.

7         THE COURT:  Anybody?  Anything else?  Going once.

8         Back to retirement, sir.  Thank you very much.

9         THE WITNESS:  Thank you.

10        (Witness leaves the witness stand.)

11        THE COURT:  Any witness, please.

12        MR. TUCKER:  Your Honor, the Government calls Robert

13   Soares.

14        (Witness takes the witness stand.)

15        COURTROOM DEPUTY:  Sir raise your right hand.

16        (Witness takes the witness stand.)

17   ROBERT DE MACEDO SOARES, called as a witness, having been

18   first duly sworn/affirmed, was examined and testified as

19   follows:

20        THE WITNESS:  I do.

21        COURTROOM DEPUTY:  Thank you.  Please have a seat.

22   State your full name for the record.

23        THE WITNESS:  Robert DeMacedo Soares.  R-o-b-e-r-t.

24   D-E M-A-C-E-D-O S-O-A-R-E-S.

25        MR. TUCKER:  May I inquire?

SOARES - DIRECT - MR. TUCKER

1            THE COURT:  Yes.

2    DIRECT EXAMINATION

3    BY MR. TUCKER:

4    Q     Good morning, sir, where do you work?

5    A     Business Wire.

6    Q     What is Business Wire?

7    A     A press release distributor.

8    Q     Where is Business Wire based?

9    A     San Francisco and New York are the two primary offices.

10   Q     Where do you work?

11   A     San Francisco.

12   Q     How long have you worked at Business Wire?

13   A     Since the end of 2011.

14   Q     What's your current title in Business Wire?

15   A     Chief technology officer.

16   Q     What are your responsibilities as chief technology

17   officer of Business Wire?

18   A     I'm responsible for our systems, networks, software

19   development, internal and external customer support.

20   Q     Do you have a staff that reports to you?

21   A     Yes, I do.

22   Q     Approximately how large is that staff?

23   A     Roughly 100.

24   Q     Does your portfolio of responsibilities include, among

25   other things, network and information security?

1367

SOARES - DIRECT - MR. TUCKER

1    A    Yes.

2    Q    Please tell the jury a little bit about your professional

3    background and how you became CTO of Business Wire?

4    A    Sure.  I started in the industry in 2007.  I joined

5    Business Wire in 2011 as a senior systems administrator.  I

6    became an applications security engineer.  Managed a systems

7    engineering team.  Became a vice president of systems

8    engineering and then a chief technology officer.

9    Q    How did Business Wire customers provide press releases to

10   Business Wire for distribution?

11   A    They log in through an online order entry system and

12   submit their press release along with any instructions for

13   distribution.

14   Q    When you say "log in," does that mean that the customers

15   have to provide a user name and a password?

16   A    Correct.

17   Q    And once they log in, what types of instructions about

18   distribution do Business Wire customers provide?

19   A    The time of release.  For example, you could also have a

20   geographic distribution, say, North America or an industry.

21   Q    So just focus in on the distribution instructions.

22        When you say, "A geographic distribution," can you

23   explain a little bit more what you mean by that?

24   A    Sure.  There are different media outlets across the

25   globe, and a customer can select what area they would like to

SOARES – DIRECT – MR. TUCKER

1   target.

2   Q     Like you said earlier, North America, for instance.

3   A     Correct.

4   Q     And could Business Wire customers also choose to have

5   their press releases distributed to particular types of media

6   publications and outlets?

7   A     Yes.

8   Q     So if it's a technology company, they could choose

9   technology media outlets?

10  A     Correct.

11  Q     And then you said that the press release itself is

12  uploaded?

13  A     Yes.

14  Q     Do Business Wire users have the ability to upload other

15  content beside the press release itself?

16  A     Maybe.

17  Q     Provide us with an example of other content.

18  A     Media such as images.

19  Q     Pictures?

20  A     Right.

21  Q     Once the media and associated press release are uploaded

22  by the Business Wire customer, where is that data stored?

23  A     In a database internally at Business Wire.

24  Q     Where is that database physically located?

25  A     Our primary data center is in Sacramento, California.

SOARES – DIRECT – MR. TUCKER

1    Q    After the press release and any associated media are

2    uploaded to Business Wire's database, what's the next step in

3    the process?

4    A    Our editorial staff will take that release and perform

5    their duties.

6    Q    What are their duties?  What does the editorial staff do?

7    A    For example, checking for grammar, formatting, and

8    preparing it for distribution.

9    Q    When the appointed time for distribution comes around,

10   what happens?  How are press releases distributed by

11   Business Wire?

12   A    Our primary distribution mechanism is a patented system

13   called NX whereby we send an encrypted press release shortly

14   before the release time and then send a decryption key to

15   decrypt that release at the appropriate time.

16   Q    So just to break that down a little bit.

17              You said it was a patented distribution system

18   called NX?

19   A    Correct.

20   Q    And the way that that works is an encrypted final press

21   release is distributed to those media publications?

22   A    Correct.

23   Q    Can you explain?

24              THE COURT:  Why don't you let me interrupt you for a

25   second.

SOARES - DIRECT - MR. TUCKER

1        Why don't you just tell us what you mean by the word

2   "encrypted" in this context.

3        THE WITNESS:  Sure.

4        It's essentially when you turn a file that would be

5   legible into something that's not computer or even readable.

6   Q    So how -- once the appointed time of distribution comes

7   around, what does Business Wire do to render those encrypted

8   files readable?

9   A    We send a decryption key which will unlock, so to speak,

10  that content.

11  Q    About how long before the distribution time is the

12  encrypted or locked file distributed by Business Wire?

13  A    Within a half an hour of time of release.

14  Q    And then the actual time of release that's when that

15  decryption key is sent out?

16  A    Correct.

17  Q    Is it important to Business Wire to keep its customers'

18  press releases confidential before their scheduled

19  distribution time?

20  A    Yes.

21  Q    Why?

22  A    Our clients are largely public companies which may send

23  market-moving information through it.

24  Q    When you say "market-moving information," what market are

25  you referring it?

1371

SOARES - DIRECT - MR. TUCKER

1    A    The stock market.

2    Q    What do you mean by "market moving"?

3    A    For example, financial information.

4    Q    And how would that move the markets?  What do you mean by

5    moving markets?

6    A    Unexpectedly poor or good financial performance, for

7    example.

8    Q    What affect might that have on, say, the stock price?

9    A    It could raise or lower.

10        MR. BRILL:  Objection, your Honor.

11        THE COURT:  Did I hear an objection.

12        MR. BRILL:  Yes.

13        THE COURT:  What effect would that have?

14        MR. BRILL:  To the foundation for this witness

15    answering the question, yes, your Honor.

16        THE COURT:  Overruled.

17    Q    The question again was, what affect might that have on

18    the stock price.

19        What do you mean by market-moving information?

20    A    It could move the stock price up or down, for example.

21    Q    Did there come a time in 2015 when you learned that

22    Business Wire's computer systems had been the target of

23    malicious cyber activity?

24    A    Yes.

25    Q    Please tell the jury what happened?

SOARES – DIRECT – MR. TUCKER

1  A    On May 19th, we became aware through an internal

2  cybersecurity employee that a piece of malware had been down

3  loaded to a Business Wire system.

4  Q    So a few questions.

5        That was May 19, 2015?

6  A    Correct.

7  Q    And you say that you to let this from an internal

8  cybersecurity employee at Business Wire?

9  A    Correct.

10  Q    What was your role at that time in May of 2015?

11  A    I was a manager of systems engineering.

12  Q    So you were working essentially in information technology

13  at Business Wire?

14  A    Yes.

15  Q    And you said that the internal cybersecurity employee had

16  become of aware of the malware on a Business Wire system?

17  A    Correct.

18  Q    What's malware just generally?

19  A    Generally, it's computer software intended to harm or

20  otherwise abuse the network you could say.

21  Q    I couldn't quite hear what you said.

22  A    Or abuse the network.  You know abuse privileges, that

23  sort of thing.

24  Q    What was the particular system that this malware was

25  found on at Business Wire?

SOARES – DIRECT – MR. TUCKER

1   A     A Business Wire employee.

2   Q     Was it a workstation, a desktop computer?

3   A     Correct.

4   Q     What was your role in the response to this discovery of

5   malware?

6   A     I worked with our internal team and also the

7   cybersecurity firm we brought in to assist.

8   Q     Did you have occasion to personally discuss and examine

9   the malware that was found on this employee's workstation?

10  A     I was involved in the investigation which included being

11  briefed on the malware found, yes.

12  Q     All right.  So focusing on the malware for a moment.

13        What was the malware?

14  A     This was Mimikatz.

15  Q     M-i-m-i-k-a-t-z.  Something like that?

16  A     That sounds correct.

17  Q     What is a Mimikatz?

18  A     It's a password retrieval tool.

19  Q     That doesn't necessarily sound bad.  How is a password

20  retrieval tool possibly malware?

21  A     For example, if an unintended recipient has that on your

22  system, they could retrieve a user's password information.

23  Q     So it would be a way to potentially steal log-in

24  credentials?

25  A     Correct.

SOARES - DIRECT - MR. TUCKER

1    Q      Besides the discovery of the Mimikatz malware on that

2    employee's computer, did you and the team discover any other

3    indications of malicious activity targeting Business Wire?

4    A      Yes.

5    Q      Please tell the jury.

6    A      We also saw what is known as collateral movement across

7    the network.  So the computers infecting other computers and

8    observe network traffic which will bolster that theory.

9    Q      Did you see something called "beaconing" to outside

10   systems?

11   A      Correct, yes.

12   Q      B-e-a-c-o-n-i-n-g.  What's beaconing?

13   A      That's when an infected system will try to communicate

14   with what are known as command and control systems.

15   Q      What's a command and control system?

16   A      It's a system where, essentially, you get instructions

17   from an outside party.

18   Q      And you were able to determine that those systems that

19   Business Wire computers were beaconing to were not authorized

20   external systems?

21   A      Correct.

22   Q      Those discoveries were made by you and the internal

23   Business Wire team; is that right?

24   A      That is my recollection, yes.

25   Q      What did Business Wire and the team do in response to

1375

SOARES – DIRECT – MR. TUCKER

1  these discoveries?

2  A    Immediately took remediation steps by pulling those

3  machines off of the network and then also engaged a leading

4  cybersecurity firm to assist in the investigation.

5  Q    So you had said remediation steps by taking those systems

6  off the network.  Can you explain to the jury why that's a

7  remediation step?

8  A    Sure.  As we were discussing, the lateral movement can

9  only happen if infected machinery remains on the network to

10 try to infect further machines.  So if you pull that machine

11 off the network, it can no longer infect the machine on the

12 network.

13 Q    You also said you also engaged a leading cybersecurity

14 firm?

15 A    Yes.

16 Q    That is Fidelis?

17 A    Yes.

18 Q    Did Fidelis comes and respond, an incident response to

19 Business Wire?

20 A    Yes.

21 Q    Did you participate in that response by Fidelis?

22 A    I did.

23 Q    What was your role?

24 A    I worked with them and provided, for example,

25 credentials, network access, and anything else that was needed

SOARES - DIRECT - MR. TUCKER

1    as well as the daily logs and assisting with the

2    investigation.

3    Q    So, again, focusing on that initial malware that was

4    discovered on the employee's computer, is that indicative of

5    any particular vector of attack or means by which the attacker

6    initially targeted Business Wire systems?

7    A    Generally speaking, when malware is discovered on a

8    user's machine it can be either through browser activity or

9    e-mail.

10   Q    So just so it's clear when you say, "Browser activity,"

11   what do you mean?

12   A    Visiting an infected website, for example.

13   Q    What about e-mail?  What do you mean by e-mail as a way

14   to get e-mail onto the system?

15   A    A phishing attack.

16   Q    So that's p-h-i-s-h-i-n-g?

17   A    Yes.

18   Q    What's phishing?

19   A    Phishing is when you send a targeted e-mail to a user

20   with the idea and intent of getting them to either provide

21   information back to you that you can use against, you know, in

22   furtherance of your goals, or alternatively, to actively

23   detonate a malicious payload.

24   Q    What is a malicious payload?

25   A    A virus.

SOARES – DIRECT – MR. TUCKER

1            THE COURT:  Can we find a logical point to take a

2     morning break?

3            MR. TUCKER:  We can do it right now.

4            THE COURT:  We can do that.

5            Don't discuss the case, folks.  We'll resume in

6     about 12 minutes.

7            COURTROOM DEPUTY:  All rise.

8            (Jury exits courtroom.)

9            THE COURT:  Somebody signaled to Ms. Mulqueen we

10    needed a break so I have a break.

11           MR. TUCKER:  Mr. Soares, you can use the bathroom if

12    you like.  Just stay very close.

13           (Witness leaves the witness stand.)

14           (A recess in the proceedings was taken.)

15           (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

SOARES – DIRECT – MR. TUCKER

1        THE COURTROOM DEPUTY:   All rise.

2        (Jury enters the courtroom.)

3        (Jury present.)

4        THE COURT:  All right.  Please be seated everyone.

5        MR. TUCKER:  May I proceed, Your Honor?

6        THE COURT:  Go ahead, Mr. Tucker.

7        MR. TUCKER:  Thank you, Your Honor.

8   DIRECT EXAMINATION (CONTINUED)

9   BY MR. TUCKER:

10  Q    Before we broke, Mr. Soares, you were talking about the

11  investigation at Business Wire by followed that discovery of

12  Malware on the employees' computer in May of 2015; is that

13  right?

14  A    Correct.

15  Q    Did the investigation reveal other indications of when

16  Business Wire systems had been the target of malicious cyber

17  activity?

18  A    Yes.

19  Q    What were those time periods?

20  A    There were five periods:  From September to October of

21  2014, November of 2014, January of 2015, April 2015, and

22  May 2015.

23  Q    Did you see indications that compromised user

24  credentials, specifically Business Wire user credentials, were

25  being used by the attackers?

David R. Roy, RPR – Official Court Reporter

SOARES - DIRECT - MR. TUCKER

1   A     Yes.

2   Q     What did you see?

3   A     We observed evidence of user activity either to systems

4   where the user did not normally have access or would not

5   normally have access in the course of daily work or at periods

6   of the day when they were not on shift or scheduled to be

7   working.

8   Q     So it's clear these were Business Wire employees' user

9   credentials?

10  A     Correct.

11  Q     Did the investigation yield any evidence about the origin

12  of the attack?

13  A     The attack appeared to originate from Eastern Europe.

14  Q     And what is that based on?

15  A     That was based on the domain that the systems were trying

16  to beacon out to.

17  Q     Just so it's clear, those are the external systems that

18  Business Wire's compromised computers were trying to

19  communicate with?

20  A     Correct.

21  Q     And those go back to Eastern Europe based on IT

22  addresses?

23  A     Most of them had a POB or, you know, like .com or dot --

24  you, know, any other country's POB, .us, for instance.  But in

25  this case it was largely Eastern Europe.

David R. Roy, RPR - Official Court Reporter

SOARES - DIRECT - MR. TUCKER

1    Q    So it's clear those suffixes for those domains that you

2    saw, some of them resolve back to European countries?

3    A    Most of them, as I recall.

4    Q    Now, at that time, did the investigation yield any

5    evidence that information had been successfully stolen from

6    Business Wire's system?

7    A    No.

8    Q    Please explain what you saw.

9    A    We saw that there had been, you know, malicious activity

10   on our systems but not directly observe any data leaving our

11   systems, like client confidential data, for example.

12   Q    Now, did there come a time when you were presented with

13   some evidence that data had been, in fact, stolen from

14   Business Wire's system?

15   A    Yes.

16   Q    Please tell the jury what happened.

17   A    The Department of Justice provided that data.

18   Q    What was that data, generally speaking?

19   A    Generally speaking, example of press releases in a

20   prefinished state.

21   Q    A prefinished state, is that what you said?

22   A    Correct.

23        MR. TUCKER:  I would like to show what is in

24   evidence as Government's Exhibit 3169-A1?

25        THE COURTROOM DEPUTY:   3961-A1.

David R. Roy, RPR - Official Court Reporter

SOARES - DIRECT - MR. TUCKER

1    MR. TUCKER:   31 -- I may have misspoken.   3169-A1.

2         THE COURTROOM DEPUTY:   Dash A1.   Okay.   And that's

3    in evidence.

4         MR. TUCKER:   Yes.   Thank you, Ms. Mulqueen.

5         THE COURTROOM DEPUTY:   Okay.

6         MR. TUCKER:   I'm not seeing it on my screen.   Are

7    you --

8         THE COURTROOM DEPUTY:   I'm sorry, Mr. Tucker.

9    You're using the docket camera.

10        MR. TUCKER:   For right now, yes.

11        THE COURTROOM DEPUTY:   Okay.

12        MR. TUCKER:   Sorry about that.

13        THE COURTROOM DEPUTY:   Okay.   We had our signals

14   crossed.

15   BY MR. TUCKER:

16   Q    All right.   So showing what is in evidence now as

17   3169-A1, is this one of those prefinished pre releases that

18   you just described?

19   A    Yes.

20   Q    Now, what is the significance of this information here at

21   the top making reference to, amongst other things,

22   newsml.businesswire.com?

23   A    So that is largely the title information and metadata.

24   Q    What's metadata?

25   A    Any sort of data that a company can file to give more

David R. Roy, RPR - Official Court Reporter

SOARES – DIRECT – MR. TUCKER

1    information about it.

2    Q    So this is metadata that is populated by Business Wire's

3    systems?

4    A    Correct.  It's metadata that is specified by our systems.

5    Q    And what's newsml specifically?

6    A    It's an industry-specific type of ML.

7    Q    Is that similar to HTML, the language you associated with

8    web pages?

9    A    It is similar, yes.

10   Q    Can you just explain a little bit about how it works and

11   how it's different from HTML?

12   A    Sure.  They're structured languages in a similar fashion,

13   but they have different tasks, basically different commands

14   within the document format.

15   Q    Is there anything distinctive about this header that

16   gives you some information about where in that editorial

17   process between the initial submission and distribution this

18   particular draft press release itself?

19   A    Yes.

20   Q    Please tell the jury.

21   A    In a finished press release that is ready for

22   transmission, the first line of that header has three IDs

23   appended to it, which are missing in this example.

24   Q    So those are numerical IDs?

25   A    That's correct.

David R. Roy, RPR – Official Court Reporter

SOARES – DIRECT – MR. TUCKER

1    Q    I'm going to show what's in evidence as 3080-A1.  I'm

2    going to show that simultaneously with 3169-A1.  This is

3    another press release.  The headline here is

4    Synnex Corporation Reports Record First Quarter Revenue and

5    Net Income for Fiscal 2015; is that right, Mr. Soares?

6    A    Yes, right.

7    Q    And do you see the numerical indicators in the header of

8    Government's Exhibit 3080-A1 that were not present in

9    Government's Exhibit 3169-A1?

10   A    I do.

11   Q    And these numbers here appearing at the top?

12   A    That is correct.

13   Q    So just so it's clear, the fact that these numbers are

14   present in the header, does that necessarily mean this

15   document is post-distribution?

16   A    Not necessarily.

17   Q    Please explain.

18   A    That indicates that the document is ready for

19   transmission but does not definitively determine whether it

20   been transmitted yet.

21   Q    All right.  Well, once again on this other information,

22   this would be metadata that you would associate with

23   Business Wire's system tracking this particular press release

24   and its formatted features?

25   A    And the cyber information for one of the distributions,

1384

SOARES – CROSS – MR. HEALY

1    yes.

2    Q      And so just directing your attention back to 3169 with

3    the headline, Veeva Announces Fiscal 2016 First Quarter

4    Results, those numbers are absent there; is that right,

5    Mr. Soares?

6    A      Correct.

7    Q      And what is the significance of that?

8    A      That indicates that this press release was not yet ready

9    for transmission.

10   Q      So this is earlier in the editorial process?

11   A      Correct.

12             MR. TUCKER:  One moment Your Honor.

13             THE COURT:  Yes, sir.

14             MR. TUCKER:  No further questions, Your Honor.

15             THE COURT:  All right.  Cross-examination?

16   CROSS-EXAMINATION

17   BY MR. HEALY:

18   Q    Good morning, Mr. Soares.

19   A    Good morning.

20   Q    Just a few questions.  In 2014 -- strike that.

21             In May of 2015, it was your internal team that had

22   discovered there had been, I believe you used, Malware

23   inserted onto one of the devices in your company?

24   A      Correct.

25   Q      Your team discovered that?

David R. Roy, RPR – Official Court Reporter

SOARES – CROSS – MR. HEALY

1   A     That was not my team at the time.

2   Q     All right.  Business Wire's internal people discovered

3   that?

4   A     Correct.

5   Q     No one had to call to you and tell you that your system

6   had been compromised?

7   A     Correct.

8   Q     That's because your team routinely searched for that sort

9   of thing, correct?

10  A     The information security employees, yes.

11  Q     And you are now head of that department, shall we say?

12  A     That department reports up to me, yes.

13  Q     So you are the head of that department.

14        Do you routinely still do that?

15  A     That is known -- yes.

16  Q     Do I have the day correct, your -- the Business Wire

17  internal people discovered that on May 19th of 2015?

18  A     Correct.

19  Q     And isn't it true that the next day on May 20th, Fidelis,

20  the security firm, was engaged?

21  A     Correct.

22  Q     Immediately?

23  A     Yes.

24  Q     You took immediate action?

25  A     Yes.

David R. Roy, RPR – Official Court Reporter

SOARES - CROSS - MR. HEALY

1   Q    And you told Mr. Tucker this was a well-respected firm,

2   Fidelis; is that true?

3   A    Correct.

4   Q    Did you have other firms that you could have chosen?

5   A    There are many firms in the cyber security sector.

6   Q    Was it Business Wire's opinion that this was among the

7   west?

8   A    Yes.

9   Q    Because it was important to maintain that security; is

10  that true?

11  A    Yes.

12  Q    And when Fidelis was retained, they were given

13  instructions to work with the Business Wire team to analyze

14  what had happened?

15  A    I did not provide them with their instructions, but that

16  is --

17  Q    Are you aware --

18  A    -- my understanding --

19  Q    -- if they were given instructions?

20  A    -- yes.

21  Q    I'm sorry to speak over you.

22  A    I said that is my understanding, yes.

23  Q    And was it your understanding that they were also given

24  instructions to work with the Business Wire people to contain

25  the situation?

David R. Roy, RPR - Official Court Reporter

SOARES - CROSS - MR. HEALY

1    A    Yes.

2    Q    And were they given instructions to monitor the

3    situation?

4    A    Yes.

5    Q    And, in fact, is that what occurred?

6    A    That is.

7    Q    And isn't it true that Fidelis continued to monitor the

8    situation after it had been contained?

9    A    Yes.

10   Q    And did, in fact, Fidelis produce an interim report in

11   June discussing what had been found?

12   A    That sounds correct, yes.

13   Q    Do you remember reviewing an interim report at some

14   point?

15   A    Yes.

16   Q    Do you recall if in that interim report they found that

17   there were at least two individuals acting as a team that were

18   trying to access the Business Wire service?

19   A    I do not recall that specifically.

20   Q    I'm going to show you what has been marked as

21   Government's Exhibit 3500 RS-1?

22        MR. HEALY:  May I approach, Your Honor?

23        THE COURT:  Yes, sir.

24   BY MR. HEALY:

25   Q    I'm going to ask you to review certain pages of that

SOARES – CROSS – MR. HEALY

1    document.

2    A      (Witness complies.)

3    Q      Let's come back to that particular question in a moment.

4           As part of their interim report, did Fidelis

5    determine at that time that there was no concrete evidence of

6    any attacker activity after May 20th?

7    A      My understanding of the report was that there was no

8    evidence of data exfiltration at that time.

9    Q      Well, I'm going to refer you just to Page 5 of 3500 RS1,

10   the third paragraph from the bottom.  Could you just look at

11   that and see if that refreshes your recollection?

12   A      Sure.  Yes.

13   Q      And having read that to refresh your recollection, do you

14   agree with me that there was no concrete evidence of attacker

15   activity according to the report after May 20th?

16   A      It does refer to two systems that were discovered after

17   that containment, that initial containment.

18   Q      Sure.  When you say, "discovered," they could have been

19   there already?

20   A      Correct.

21   Q      And is it also true to say that in that interim report

22   Fidelis could not conclude what, if any, data was taken by the

23   hackers?

24   A      Correct.

25   Q      And, in fact, didn't Business Wire's internal team and

1389

SOARES – CROSS – MR. HEALY

1    Fidelis continue to monitor their system after this?

2    A    Correct.

3    Q    And continued to try to make sure that the clients' data

4    was secure?

5    A    Correct.

6    Q    And, in fact, was a final report issued, to your

7    knowledge, by Fidelis in December of 2015?

8    A    The date skips me, but that is my understanding.

9    Q    And that report was focused mainly on the time between

10   the interim report in June and the time that they produced

11   their final report?

12   A    That sounds correct.

13   Q    And is it true that they discovered that there were no

14   new intrusions between June 18th and October 15th?

15   A    That is my recollection.

16   Q    So to be clear, Business Wire's internal security team

17   found no evidence of computer intrusions prior to May 19 of

18   2015 -- excuse me, prior to September of 2014?

19   A    That is what I am aware of.

20   Q    You told us earlier that there were four different

21   periods, and you listed them off.  I believe you earlier told

22   us September of 2014 that they discovered intrusions?

23   A    That was the earliest of the periods that I mentioned,

24   yes.

25   Q    Correct.

David R. Roy, RPR – Official Court Reporter

SOARES – CROSS – MR. HEALY

1          And in your role at Business Wire, do you feel that

2    Fidelis's report and findings are accurate?

3    A    I feel that Fidelis did a good job, analyzed –– you know,

4    did the work that they were hired to do.

5    Q    And Fidelis also felt there were no intrusions prior to

6    September of '14, correct?

7               MR. TUCKER:  Objection, Your Honor.

8               THE COURT:  Sustained.

9    BY MR. HEALY:

10   Q    Do you recall in reviewing their reports if they ever

11   indicated that there had been any intrusion on the

12   Business Wire systems prior to September of 2014?

13   A    I do not recall any intrusion prior to that.

14   Q    And the two press release documents that Mr. Tucker

15   showed you earlier, those two documents were brought to you

16   from the Government, correct?

17   A    Yes.

18   Q    As we sit here today, do you have any particular

19   knowledge, other than what the Government has brought to you,

20   particular documents, or more specifically, press releases

21   that were taken off of Business Wire's service?

22              MR. TUCKER:  Objection, Your Honor.

23              THE COURT:  No, I will permit it.

24   A    No.

25              MR. HEALY:  No further questions.

David R. Roy, RPR – Official Court Reporter

                        SOARES – CROSS – MS. FELDER

1           THE COURT:  Any questions?

2           MS. FELDER:   Yes, Your Honor.

3    CROSS-EXAMINATION

4    BY MS. FELDER:

5    Q    Hello.

6    A    Hello.

7    Q    Just briefly, the Government mentioned a tool to you,

8    Mimikatz, M-I-M-I-K-A-T-Z --

9    A    Correct.

10   Q    -- correct?

11   A    Yes.

12   Q    And you testified that in the past it's a retrieval tool?

13   A    That is my understanding.

14   Q    And it is a way to steal credentials from a system,

15   correct?

16   A    It can be used that way, yes.

17   Q    It can be used to steal credentials like a username?

18   A    Yes.

19   Q    A user password?

20   A    Correct.

21   Q    And that tool was being used without the employees'

22   knowledge at the time, correct?

23   A    Correct.

24   Q    Okay.  And you testified that that happened at

25   Business Wire?

                David R. Roy, RPR – Official Court Reporter

SOARES - CROSS - MS. FELDER

1   A     Yes.

2   Q     And the intruder, the computer intruder used those

3   credentials to access the network?

4   A     Other systems on the network, yes.

5   Q     Systems on the network.

6         And that, too, was done without Business Wire's

7   knowledge at the time.

8   A     We discovered it very quickly.

9   Q     How long did it take for you to discover it?

10  A     Mimikatz, I believe it was within the 24 hours of

11  downloads, if my recollection holds.

12  Q     And by that time, the user credentials were already

13  gathered?

14  A     Very likely.

15  Q     Thank you.

16        MS. FELDER:  No further questions.

17        THE COURT:  Anything else?

18        MR. TUCKER:  No, Your Honor.

19        THE COURT:  Thank you.

20        Sir, you may step down.

21        (The witness exits the witness stand.)

22        THE COURT:  Your next witness, please.

23        MR. TUCKER:  Thank you, Your Honor.  The Government

24  calls Marty Feil.

25        THE COURTROOM DEPUTY:  Sir, I'm going to ask you to

David R. Roy, RPR - Official Court Reporter

FEIL - DIRECT - MR. TUCKER

1    take the stand and raise your right hand.

2              (Witness takes the witness stand.)

3    MARTIN FEIL, called as a witness, having been first duly

4    sworn/affirmed, was examined and testified as follows:

5              THE COURTROOM DEPUTY:  Thank you.  Please have a

6    seat.

7              THE WITNESS:  (Complies.)

8              THE COURTROOM DEPUTY:  State and spell your name for

9    the record.

10             THE WITNESS:  Martin Feil, F-E-I-L.

11             MR. TUCKER:  May I inquire, Your Honor?

12             THE COURT:  Yes, sir.

13   DIRECT EXAMINATION

14   BY MR. TUCKER:

15   Q    Good morning, Mr. Feil.

16   A    Good morning.

17   Q    Where are you employed?

18   A    Business Wire, San Francisco.

19   Q    You work and live in San Francisco?

20   A    I work in San Francisco, live outside the city.

21   Q    How long have you worked for Business Wire?

22   A    About 20 years.

23   Q    What is your title at Business Wire now?

24   A    I'm the vice president of news technologies.

25   Q    What are your responsibilities in that role, just

                    FEIL – DIRECT – MR. TUCKER

1   generally?

2   A    I manage the software development for the work flow for

3   the news room.

4             MR. TUCKER:   Ms. Mulqueen, the document camera,

5   just for the witness.

6             THE COURT:   Just for the witness.

7   BY MR. TUCKER:

8   Q    Mr. Feil, I'm showing you what has been marked for

9   identification Government's Exhibit 801.

10            Do you recognize this CD?

11  A    I saw it last night.

12  Q    All right.  And what is it?

13  A    It's a listed of data extracted from our database

14  regarding the release dates.

15  Q    What kind of database?

16  A    This is release data.  The date the release was uploaded

17  to our system, the date the release was publicly disclosed,

18  ticket symbol, customer information.

19  Q    And how do you recognize this CD?

20  A    I do.

21  Q    How do you recognize it?

22  A    I initiated it and dated it last night.

23  Q    All right.  Now, just so it's clear for the record, had

24  you seen this data that was on the CD prior to reviewing this

25  particular CD last night?

              David R. Roy, RPR – Official Court Reporter

FEIL - DIRECT - MR. TUCKER

1    A    Yes.  Yes, I'd seen it.

2    Q    How did you come to see it?

3    A    Well, I produced the data based on requests from our

4    company.

5    Q    All right.  And this data, does it pertain to

6    distribution times and dates, upload times and dates of press

7    releases for Business Wire's systems?

8    A    Yes.

9    Q    And does Business Wire retain that data in the ordinary

10   course of business?

11   A    Yes, we do.

12   Q    Very generally, how does Business Wire use these uploads

13   and distribution data?

14   A    It's the basis of data on which we run our business.

15   Q    Is it, among other things, an archive?

16   A    Archival data of full history of the release.

17   Q    Is this archive populated at or close to the time in the

18   events described, namely the upload and distribution of press

19   releases?

20   A    Yeah.  We have automated processes that upload and record

21   that data.

22   Q    And so it's clear, you reviewed this content.  Is it an

23   accurate copy of that data as you extracted it from

24   Business Wire's systems?

25   A    It is.

1396

FEIL – DIRECT – MR. TUCKER

1     MR. TUCKER:  Your Honor, the Government moves to

2  admit Government's Exhibit 801 into objection.

3     THE COURT:  Any objection?

4     MR. HEALY:  No objection.

5     MS. FELDER:   Your Honor, objection based on

6  relevance, based on the dates.

7     THE COURT:  Based on the dates?

8     What are the dates that are covered in this data on

9  801?

10     THE WITNESS:  I think 2011 through 2015.

11     THE COURT:  Overruled.  801 is in evidence.

12     (Government Exhibit 801, was received in evidence.)

13     MR. TUCKER:  Thank you, Your Honor.

14     May we publish just for a moment so the jury can

15  see?

16     THE COURT:  Go ahead.

17  BY MR. TUCKER:

18  Q    Is that the CD you were just testifying about with that

19  upload and distribution data?  Now that the jury can see; is

20  that right, Mr. Feil?

21  A    Correct, yes.

22  Q    All right.

23     MR. TUCKER:  Ms. Mulqueen --

24     THE WITNESS:  Yes, sir.

25     THE COURT:  -- would you mind switching over to the

FEIL – DIRECT – MR. TUCKER

1    podium laptop.

2                THE COURTROOM DEPUTY:  That's fine.

3                MR. TUCKER:  And for the record, I'm going to show

4    the witness what is in evidence, which is one of the

5    constituent files that was saved on 801.  This file is called

6    BW_ENY_000001, and this is Tab 2, just for illustrative

7    purposes.

8    BY MR. TUCKER:

9    Q    Can you see that, Mr. Feil?

10   A    I can.

11   Q    Can you just explain to the jury what is the significance

12   of this column, Date Time Uploaded Eastern?

13   A    That is the date the order was received into our newsroom

14   at Eastern time.

15   Q    So that's when the initial draft press release is

16   uploaded in the Business Wire's system?

17   A    That's correct.

18   Q    What about Customer Name?

19   A    The name of the customer who the release is regarding.

20               THE COURT:  Did I hear you say, in Eastern time?

21               THE WITNESS:  That is correct.

22               THE COURT:  Eastern, that's Standard Eastern U.S.

23   time.

24               THE WITNESS:  Eastern U.S. time, yes.

25               MR. TUCKER:  Thanks for clarifying, Judge.

David R. Roy, RPR – Official Court Reporter

FEIL – DIRECT – MR. TUCKER

1  BY MR. TUCKER:

2  Q    And that's actually reflected in the heading; is that

3  right, Mr. Feil?

4  A    Yes.

5  Q    And then there's an entry for Tickers.  What is that?

6  A    That's the stock -- stock symbol or ticker of the

7  company.  It was a publicly traded company.

8  Q    And Release Time Off Eastern, what is that?

9  A    That's the time the release was publicly disclosed.

10  Q    So it's clear, is that the time when the decryption key

11  is distributed?

12  A    That's correct.

13  Q    And finally, Main Headline, what is that?

14  A    The headline of that particular press release.

15  Q    All right.  So just turning your attention specifically

16  to this entry here, which is for the record, Row 30701.  This

17  is for the press release headline, Veeva Announces Fiscal 2016

18  First Quarter Results.

19          Did I read that right?

20  A    Yes.

21  Q    I'm now showing --

22          MR. TUCKER:  If we could switch back to the document

23  camera for a moment?

24          THE COURTROOM DEPUTY:  Back to the document.  Okay.

25  Just one second.

FEIL - DIRECT - MR. TUCKER

1    BY MR. TUCKER:

2    Q     Showing what's in evidence, 3169-A1.  That is the

3    corresponded press release, Veeva Announces Fiscal 2016 First

4    Quarter Results?

5    A     Yes.

6          MR. TUCKER:  And one more time, Ms. Mulqueen, back

7    to the laptop.

8          THE COURTROOM DEPUTY:  The laptop.  Okay.

9          MR. TUCKER:  Thank you so much.

10   BY MR. TUCKER:

11   Q     Just so it's clear, this first entry, that press release

12   was uploaded on May 27th of 2015, at 9:47 p.m.; is that right?

13   A     That's correct.

14   Q     And its distribution time and date was May 28th, 2015 at

15   4:03:00 p.m.; is that right --

16   A     That's correct.

17   Q     -- according to this data.

18   A     Yes.

19         MR. TUCKER:  One moment, Your Honor.

20         THE COURT:  Yes, sir.

21         MR. TUCKER:  No further questions, Your Honor.

22         THE COURT:  Thank you.

23         Cross?

24         MR. HEALY:  No question, Your Honor.

25         THE COURT:  Thank you.

David R. Roy, RPR - Official Court Reporter

1400

CUNNINGHAM – DIRECT – MR. GOPSTEIN

1     Ms. Felder?

2          MS. FELDER:   No questions, Your Honor.

3          THE COURT:   Thank you, Mr. Feil.  Step down, if you

4    will.

5          (The witness exits the witness stand.)

6          THE COURT:  Next witness?

7          MR. GOPSTEIN:  The Government calls Kelly

8    Cunningham.

9          THE COURTROOM DEPUTY:   Good morning,

10   Ms. Cunningham.  I'm going to ask you to take the stand and

11   raise your right hand.

12          (Witness takes the witness stand.)

13   KELLY CUNNINGHAM, called as a witness, having been first duly

14   sworn/affirmed, was examined and testified as follows:

15          THE COURTROOM DEPUTY:  Please have a seat.

16          State and spell your name for the record.

17          THE WITNESS:  Kelly Cunningham, K-E-L-L-Y,

18   C-U-N-N-I-N-G-H-A-M.

19          THE COURTROOM DEPUTY:   Thank you.

20          MR. GOPSTEIN:  May I inquire?

21          THE COURT:  Go ahead, Mr. Gopstein.

22          MR. GOPSTEIN:  Thank you, Your Honor.

23   DIRECT EXAMINATION

24   BY MR. GOPSTEIN:

25   Q    Good morning.

David R. Roy, RPR – Official Court Reporter

                    CUNNINGHAM – DIRECT – MR. GOPSTEIN

1    A    Good morning.

2    Q    Where do you work?

3    A    I work at the FBI.

4    Q    What is your title at the FBI?

5    A    My title is special agent.

6    Q    All right.  Are you assigned to a particular unit at the

7    FBI?

8    A    Yes.  I'm assigned to a cyber squad in the New York

9    office.

10   Q    For about how long have you been assigned to a cyber

11   squad?

12   A    Approximately two year.

13   Q    Generally speaking, what are your responsibilities on

14   that squad?

15   A    My responsibilities include investigating cyber-related

16   crimes.

17   Q    Now, before becoming a special agent on the cyber squad,

18   what did you do?

19   A    I was a digital forensic examiner for the FBI.

20   Q    Okay.  And for about how long did you have that position?

21   A    For two years.

22   Q    And as part of your role as a forensic examiner, did you

23   examine electronic devices?

24   A    Yes, I did.

25   Q    Just very generally speaking, what did that process

                  David R. Roy, RPR – Official Court Reporter

CUNNINGHAM – DIRECT – MR. GOPSTEIN

1    entail?

2    A    It entailed obtaining and processing digital evidence, to

3    include hard drives, computers, mobile devices.

4    Q    About how many mobile devices a year did you examine?

5    A    About over a hundred a year.

6    Q    And did you keep records of your examinations?

7    A    Yes, I did.

8    Q    Now, prior to testifying here today, did you review a

9    report of any examination that you conducted on or about

10   October 2nd of 2015?

11   A    Yes, I did.

12   Q    Now, I'm showing you --

13        MR. GOPSTEIN:  -- and I will publish for the jury

14   what is already in evidence as Government's Exhibit 487-P.

15   Thank you.

16        THE COURTROOM DEPUTY:   I'm sorry 4, 8, 7 dash P?

17        MR. GOPSTEIN:  487-P.  Thank you.

18        THE COURTROOM DEPUTY:   Thank you.

19   BY MR. GOPSTEIN:

20   Q    Now, Agent Cunningham, do you recognize this photograph?

21   A    Yes, I do.

22   Q    What is it?

23   A    It is the iPad that was used from the address on the

24   label above.

25   Q    Just so that we are clear for the record, are you

David R. Roy, RPR – Official Court Reporter

1403

CUNNINGHAM – DIRECT – MR. GOPSTEIN

1   pointing to the label up at the top of the photo that says the

2   date 8/11/15 and then starting with 1709 the row?

3   A    Yes.

4   Q    And turning your attention down on the iPad, are these

5   your initials here, KC?

6   A    Yes.

7        MR. GOPSTEIN:  If I could show just for the witness?

8        THE COURTROOM DEPUTY:   Just bear with me one

9   second.

10       (Pause in proceedings.)

11       THE COURTROOM DEPUTY:  Okay.  Just for the witness.

12       (Pause in proceedings.)

13   BY MR. GOPSTEIN:

14   Q    Okay.  Showing you what's been marked for identification

15   as Government's Exhibit 423.  Do you recognize this?

16   A    Yes.

17   Q    What is it?

18   A    It is a report of the previously shown iPad.

19   Q    Is this a true and accurate -- is this a report to be

20   forensic examination conducted of the iPad?

21   A    Yes.

22   Q    And that's the iPad that's depicted in 487-P?

23   A    Yes.

24   Q    And is this a true and accurate copy of the report?

25   A    It is.

David R. Roy, RPR – Official Court Reporter

1404

CUNNINGHAM – DIRECT – MR. GOPSTEIN

1      MR. GOPSTEIN:  The Government moves to admit

2  government 423 into evidence.

3      THE COURT:  Any objection?

4      MS. BRILL:  No, Your Honor.

5      THE COURT:  423 in evidence.

6      (Government Exhibit 423, was received in evidence.)

7      MR. GOPSTEIN:  Permission to publish, Your Honor.

8      THE COURT:  Go ahead.

9  BY MR. GOPSTEIN:

10 Q    We're now on the cover page of Government's Exhibit 423.

11 And is this your name over here next to examiner name?

12 A    Yes.

13 Q    And working down to Row 15, do you see something

14 resembling a serial number?

15 A    Yes.

16 Q    And the numbers next to it, is that the serial number of

17 the iPad that you searched?

18 A    Yes.

19 Q    Now, directing your attention to Page 3 of the report,

20 the section titled Contact.  Now, the first contact, will you

21 just read for the jury what it says here next to Name?

22 A    Echo Sound Test Service.

23 Q    And the second contact?

24 A    Igor Dubovoy.

25 Q    Now, there's a third contact here.  I assume you can't

David R. Roy, RPR – Official Court Reporter

CUNNINGHAM - DIRECT - MR. GOPSTEIN

1    read that, correct?

2    A     Correct.

3    Q     Okay.

4          Directing your attention to the right where it says

5    Value.  Can you just read that for the jury?

6    A     Dubovoy, P.

7    Q     Now, are these the three contacts that were contained in

8    your report of the extraction of the iPad?

9    A     Yes.

10   Q     Now, directing your attention to Page 36 of the report,

11   where it says emails 8, what does that mean?

12   A     Those were emails that were found on iPad.

13   Q     Are those all the emails that were found and included in

14   your report?

15   A     Yes.

16   Q     Now turning to the following day.  If I could direct your

17   attention to the entry over here that begins with 2012-07-30.

18   What is this?

19   A     That is the subject of the email.

20   Q     And who was that email from?

21   A     It was from stargate11@email.ua.

22   Q     Who was the email to?

23   A     stargate11@email.ua.

24   Q     And when was it sent?

25   A     It was sent July 30th, 2012.

David R. Roy, RPR - Official Court Reporter

CUNNINGHAM – DIRECT – MR. GOPSTEIN

1    Q    And what was the subject of the email?

2    A    The subject was 2012-07-30_14-36.

3    Q    What was the text of the email?

4    A    The text of the email was Update.

5    Q    And was there an attachment to this email?

6    A    Yes, there was.

7    Q    Now, when you created your forensic report of this iPad,

8    did you create a version of a report that contains a live

9    link?

10   A    Yes, sir.

11   Q    And did you try to open the attachment to the email that

12   we're looking at right now?

13   A    I did.

14   Q    And were you able to?

15   A    No.

16   Q    What happened?

17   A    Well, our software wasn't able to extract the attachment.

18   Q    Working our way down staying on the same page the next

19   entry, is this another email from stargate11@email.ua?

20   A    Yes.

21   Q    And who received this email?

22   A    stargate11@email.ua.

23   Q    And when was this one sent?

24   A    This was sent July 30, 2012.

25   Q    And what was the subject?

1407

CUNNINGHAM - DIRECT - MR. GOPSTEIN

1   A    The subject was 2012-07-30_13-34.

2   Q    And what was the text of the email?

3   A    The text was Update.

4   Q    And did this email have an attachment as well?

5   A    Yes.

6   Q    Did you try to open this attachment as well?

7   A    Yes, I did.

8   Q    Were your able to?

9   A    No.

10  Q    For the same reason as the previous email?

11  A    Yes.

12  Q    How many additional emails did you find from

13  stargate11@email.ua to stargate11@email.ua in the iPad that

14  was recovered on August 11, 2015?

15  A    I believe one more, but I would have to look at the

16  report to refresh my memory.

17  Q    Let's turn to Page 38 of the report.  Is this another

18  entry?

19  A    Yes.

20  Q    And is this another entry?

21  A    Yes.

22  Q    So were there four?

23  A    Correct.

24  Q    All sent from stargate to stargate?

25  A    Yes.

CUNNINGHAM - CROSS - MS. BRILL

1  Q    And did you try to access the attachments for all four of

2  these emails?

3  A    I did.

4  Q    And were not able to do so for all four?

5  A    Correct.

6         MR. GOPSTEIN:   One second.

7         (Pause in proceedings.)

8         MR. GOPSTEIN:  Thank you.  No further questions.

9         THE COURT:  Yes, sir.

10        Any cross, folks?

11        MS. BRILL:  Yes, Your Honor.  Can I also ask

12  Mr. Healy to use his technological prowess and put that

13  exhibit up on the laptop?

14        MR. HEALY:  We're putting Exhibit 423 in evidence.

15  We're at the middle table.

16        THE COURTROOM DEPUTY:   Okay.  Thank you.

17        THE COURT:  Is this what you're looking for?

18        MS. BRILL:  Yes, Your Honor, the first page of it.

19        THE COURT:  Okay.

20  CROSS-EXAMINATION

21  BY MS. BRILL:

22  Q    Agent Cunningham, that is the report that you've been

23  testified about when you answered questions for the

24  prosecutor, right?

25  A    Yes.

David R. Roy, RPR - Official Court Reporter

CUNNINGHAM - CROSS - MS. BRILL

1  Q    And it's a report about an iPad that was seized on

2  August 11, 2015, right?

3  A    Yes.

4  Q    And surely somebody was in possession of that iPad on

5  August 11, 2015, right?

6  A    Yes.

7  Q    But you don't know when that person came into possession

8  of the iPad, correct?

9  A    We maintain a chain of custody when we seize evidence at

10  a location, so I assigned a chain of custody when I receive

11  the evidence.

12  Q    So you're talking about what happens after this tool is

13  in possession, right?

14  A    Yes.

15  Q    Agent took possession on August 11, right?

16  A    Correct.

17  Q    And then you examined it beginning on October 2nd, 2015,

18  right?

19  A    Yes.

20  Q    And you keep track of that and that's those stickers that

21  we saw on the back of the iPad, right?

22  A    Yes.

23  Q    And I'm talking about who was in possession before

24  August 11th, 2015.  You don't know who was in possession

25  before that time, correct?

David R. Roy, RPR - Official Court Reporter

CUNNINGHAM - CROSS - MS. BRILL

1    A    Correct.

2    Q    Okay.  And you don't know when anyone prior to

3    August 11th came into possession of that iPad, correct?

4    A    Correct.

5    Q    You don't know who purchased the iPad, right?

6    A    Correct.

7    Q    And you don't know who actually used it after it was

8    purchased, correct?

9    A    Correct.

10   Q    That's not what you were examining, right?

11   A    Right.

12   Q    But you do know that you can examine the iPad and you can

13   extract information, right?

14   A    Yes.

15   Q    And that's the report that we're looking at, Exhibit 423,

16   right?

17   A    Yes.

18           (Continued on the next page.)

19

20

21

22

23

24

25

CUNNINGHAM – CROSS – MS. BRILL

1    BY MS. BRILL:

2    Q    On the first page, let me ask a couple of questions about

3    the first page and about the extraction in general.  That

4    extraction gives some indications, something like what we're

5    looking at here, 221 pages of indications, of what has

6    happened on that iPad, right?

7    A    Yes.

8    Q    And you can see the applications or the apps on the iPad

9    from what you did, right?

10   A    Yes.

11   Q    You could see information about e-mailing and texting and

12   Skyping from what you did, right?

13   A    Yes.

14   Q    But we don't know who was in possession when those things

15   happened, correct?

16   A    Correct.

17   Q    We don't know who installed the applications?

18   A    Correct.

19   Q    We don't know who sent or received the e-mails, right?

20   A    Correct.

21   Q    We don't know who did any of the texting, right?

22   A    Correct.

23   Q    And we don't know who did any of the Skyping, right?

24   A    Right.

25   Q    There is some, there is another indication on the first

CUNNINGHAM - CROSS - MS. BRILL

1    page -- maybe, is the jury seeing what I'm seeing, which is

2    small picture or seeing the words that I can't read up there?

3    Can everybody see -- keep up going up a little bit, halfway

4    down on that page, there is a device name, right, Mark's iPad?

5    A    Yes.

6    Q    That's a name that was given to the device.

7    A    Correct.

8    Q    By somebody who was in possession of it at some point,

9    right?

10   A    Correct.

11   Q    Do you know who Mark is?

12   A    No.

13   Q    Do you know the name Mark Dubovoy?

14   A    Yes.

15   Q    You do know the name Mark Dubovoy?

16   A    Yes.

17   Q    That has some relationship to this investigation, right?

18   A    Correct.

19   Q    I want to ask Mr. Healy to do what he does best and do a

20   search.  And let's search the first thing that we can search

21   for on Exhibit 423 is Igor, I-G-O-R.

22         The first time we see a hit on the name Igor is in a

23   call log, but that's actually Skype calls if you look to the

24   right side, it's a series of Skype calls, right?

25   A    Yes.

CUNNINGHAM – CROSS – MS. BRILL

1  Q    That series of Skype calls took place on December 19,

2  2012, right?

3  A    Yes.

4  Q    So that's about five months after the series of e-mails

5  that you talked about earlier that took place on July 2012,

6  right?

7  A    Yes.

8  Q    So it looks like there is a Skype call in December of

9  2012.  And can you read the participants the ones can you read

10 in those Skype calls?

11 A    Yes.  Igor Dubovoy, Vishevsky.Roman, DubovoyP.

12 Q    And something in Russian underneath that, right?

13 A    Yes.

14 Q    There is a first call with three of those people; a

15 second call with three or four people; a second call possibly

16 with two of those people; a third call two or three of those

17 people; a fourth call with one or two of those people, right?

18 A    Yes.

19 Q    That's what we can read from your extraction, right?

20 A    Yes.

21 Q    If we keep on searching for the word Igor we come to

22 another indication, I think that's part of the Skype situation

23 on December 19, 2012, right?

24 A    Yes.

25 Q    Keep ongoing.  You see what you pointed out that one of

CUNNINGHAM - CROSS - MS. BRILL

1   the contacts in the iPad is Igor Dubovoy, right?

2   A    Yes.

3   Q    With an address of Atlanta U.S., right?

4   A    Yes.

5   Q    Keep ongoing.  We can see that there is a couple of

6   messages from and call log messages from Igor Dubovoy right on

7   this page, which is page 41 or 42 of the report.

8   A    Yes.

9   Q    Keep ongoing.  Search the word Igor.  Again we see a

10  couple of calls involving Igor Dubovoy and somebody else,

11  right?

12  A    Yes.

13  Q    And additional information involving Igor Dubovoy.  Now

14  we finally get to a section, what is this section, what is

15  this section that enables you to extract web history?

16  A    I believe this is part of the timeline report.  I can't

17  see the title of the section of the report, but it includes,

18  as you can see, IP connections, web history, a timeline of

19  events that occurred on the iPad.

20  Q    If we go down to the one that indicates Igor Dubovoy, it

21  looks like Igor Dubovoy something corporate about Igor Dubovoy

22  and something called OptionsHouse, right?

23  A    Yes.

24  Q    It seems like the name Igor Dubovoy is associated with

25  OptionsHouse, right, at least in that entry of web history

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CUNNINGHAM – CROSS – MS. BRILL

1    which takes place all the way in 2014, right?

2    A    Yes.

3    Q    Another indication of Igor Dubovoy's corporate account

4    and OptionsHouse, right?

5    A    Yes.

6    Q    Another one, right?

7    A    Yes.

8    Q    Another indication of Igor Dubovoy's account with

9    OptionsHouse?

10   A    Yes.

11   Q    Yet another one?

12   A    Yes.

13   Q    Now we have a contact of Igor1964, somehow associated

14   with Interactive brokers; is that correct?

15   A    Correct.

16   Q    And what is -- seeing what you see right here, can you

17   tell us what section of your extraction that is?

18   A    I'm not sure what section it is.

19   Q    Maybe we can scroll up, while keeping the search the

20   same.  That's the configuration section?

21   A    Yes.

22   Q    We were talking about Igor1964 and Interactive brokers,

23   some configuration was made for that?

24   A    It appears there is some sort of data file.  Could we go

25   back?  Yes, the Igor name is appears to be part of, related

CUNNINGHAM - CROSS - MS. BRILL

1    to, that Interactive brokers.

2    Q    Keep ongoing.  We have another entry for Igor Dubovoy

3    talking about how many events involve him, right, phone

4    events, other events.

5    A    I'm not sure what section this is, if can you scroll up.

6    Q    Activity analytics.  Go back to the entry for Igor.

7    There is several, there is a total of three events, correct,

8    involving the name Igor Dubovoy, right?

9    A    For that specific Igor.Dubovoy account, yes.

10   Q    Keep ongoing.  Is that the beginning again?  It's the

11   end, so --

12              THE COURT:  I didn't hear you.

13              MR. GOPSTEIN:  Never mind.

14   Q    -- that's the last entry of Igor at this point.  Two more

15   involving Skype, correct?

16   A    Yes.

17   Q    Below that -- by the way, you see DD export, entry three

18   under Skype, do you see that?

19   A    Yes.

20   Q    That's also something that you extracted, right?

21   A    Correct.

22   Q    I'm going to ask you to do another report, Mr. Healy --

23   another search, sorry, for Dawson D-A-W-S-O-N.

24              We see DD export and Dawson and the Skype service

25   have also been associated with this iPad, right?

CUNNINGHAM - CROSS - MS. BRILL

1   A    Yes.

2   Q    Based on your extraction, right?

3   A    Correct.

4   Q    You see an e-mail address there Dubovoy1@gmail.com,

5   right?

6   A    Yes.

7   Q    Can we look for APD?  We see there an entry for

8   APDCapital1964@gmail.com, right, on that iPad?

9   A    Yes.

10  Q    Finally can we do a search for K-O-R-C-H.  There is an

11  entry there SKorchevsky@hotmail.com?

12  A    Yes.

13  Q    And that's an entry in what?  Mr. Healy, if we scroll up

14  a little bit.  In the user accounts, so

15  SKorchevsky@hotmail.com seems to have a user account on the

16  iPad?

17  A    Yes.

18  Q    Do you know, is the initial S followed by Korchevsky

19  something familiar to, you associated with this case?

20  A    No.

21  Q    Can we scroll down for more K-O-R-C-Hs?  We see a search

22  for Korchevsky maybe one time, is that what that indicates to

23  you?

24  A    I can't see what section.  It's in this the user

25  dictionary section, maybe a common word that's been used on

CUNNINGHAM – REDIRECT – MR. GOPSTEIN

1   this iPad.

2   Q     The frequency being one, what does that mean to you?

3   A     It's recorded as being used once.  But I'm not sure if

4   it's used anymore than that.

5   Q     Okay.  Keep on searching for K-O-R-C-H.  Again, we have

6   an entry for that SKorchevsky@hotmail.com e-mail address,

7   right?

8   A     Yes.

9   Q     Are there any more K-O-R-C-Hs on this iPad?  If we're

10  back to the user accounts, does that mean there are no more

11  K-O-R-C-H entries in the extraction that you made of this

12  iPad?

13  A     Yes.

14               MS. BRILL:  Nothing further at this time.

15               THE COURT:  Anything further, Ms. Felder?

16               MS. FELDER:  No, your Honor.

17               THE COURT:  Anything from the Government?

18               MR. GOPSTEIN:  Very briefly, your Honor.

19  REDIRECT EXAMINATION

20  BY MR. GOPSTEIN:

21  Q     You were shown a number of entries in your extract report

22  with the name Igor Dubovoy, do you recall that?

23  A     Yes.

24  Q     You were asked to read a number of those entries into the

25  record.

CUNNINGHAM – RECROSS – MS. BRILL

1    A    Yes.

2    Q    I'd like to direct your attention to page 41 of the

3    report, right here, do you see an entry that it says from

4    Igor.Dubovoy?

5         COURTROOM DEPUTY:  Excuse me for a second, are you

6    using the document camera?

7         MR. GOPSTEIN:  The Elmo.

8         COURTROOM DEPUTY:  Okay.  Thank you.

9    Q    I'd like to direct your attention to an entry you were

10   not asked to read.  This is, just starting with the time

11   stamp, what is the entry here?

12   A    December 19, 2012, 8:14:35 p.m.

13   Q    And the party?

14   A    Igor.Dubovoy.

15   Q    What does "from" mean?

16   A    The sender of the message.

17   Q    Then if can you read the content of the message?

18   A    Please add me as a contact.

19        MR. GOPSTEIN:  Thank you.  No further questions.

20        MS. BRILL:  I do have short recross based on that

21   redirect, your Honor.

22        THE COURT:  Go ahead.

23   RECROSS-EXAMINATION

24   BY MS. BRILL:

25   Q    I'm going to put page 41 back on there.  It looks to me

CUNNINGHAM - RECROSS - MS. BRILL

1    like this is a section where you were able to extract instant

2    messages, right?

3             MR. GOPSTEIN:  Objection.

4             THE COURT:  Ask the witness.  Let's scroll up or

5    down.

6    Q    I'm looking at the, it comes right after the number 29.

7    A    I believe it is from a Skype message.  Are there

8    additional columns to the right?

9    Q    There is the column to the right, it doesn't have a

10   heading, that's the whole column to the right.  I'll take off

11   this yellow sticky.

12            I can put page 39 on top of it which is the first

13   page of this section -- actually not, I'm sorry.  It's part of

14   the timeline that could be found on page 40, it begins with

15   number one on page 40.

16   A    Yes.

17   Q    And then this is entry number 29 on the timeline, the one

18   that you were just speaking to the prosecutor about?

19   A    Yes.

20   Q    So that's an instant message on Skype?

21   A    I believe it's from Skype, it may be in the Skype message

22   section as well.

23   Q    So it looks like Igor Dubovoy wanted to be added as a

24   contact on Skype, right?

25   A    Yes.

CUNNINGHAM - RECROSS - MS. BRILL

1    Q    And that happened on December 19, 2012, right?

2    A    Yes.

3    Q    Happened on the same day as the Skype call that we spoke

4    about earlier when I was questioning you earlier, right?

5    A    I don't recall the date.

6    Q    The Skype call was on page two of the report, a series of

7    Skype calls.  That series of Skype calls took place on

8    December 19, 2012, right?

9              THE COURT:  It's out of focus.

10             MS. BRILL:  Mr. Healy, could you pull up page two?

11   Q    So the Skype calls, the series of Skype calls that we

12   spoke about earlier was that same date December 19, 2012?

13   A    Yes.

14   Q    Those Skype calls did involve Igor Dubovoy, Roman

15   Vishevsky, and someone named DubovoyP, correct?

16   A    Yes.

17   Q    Those were the people involved in those Skype calls?

18   A    Yes.

19   Q    Then December 19 once again, which is about five months

20   after the date of the e-mails that you were talking being

21   which was July 30, 2012, right?

22   A    Yes.

23             MS. BRILL:  Nothing further, your Honor.

24             THE COURT:  Anything else?

25             MR. GOPSTEIN:  Nothing further.  Thank you, your

CAROCCI - DIRECT - MR. GOPSTEIN

1    Honor.

2                THE COURT:  You may step down.  Next witness please.

3                (Whereupon, the witness was excused.)

4                MR. GOPSTEIN:  Government called Thomas Carocci.

5                COURTROOM DEPUTY:  Please raise your right hand.

6                (Witness takes the witness stand.)

7    THOMAS CAROCCI, called as a witness, having been first duly

8    sworn/affirmed, was examined and testified as follows:

9                THE WITNESS:  I do.

10               COURTROOM DEPUTY:  State and spell your full name.

11               THE WITNESS:  Thomas, Carocci, C-A-R-O-C-C-I.

12               MR. GOPSTEIN:  May I inquire?

13               THE COURT:  Yes.

14   DIRECT EXAMINATION

15   BY MR. GOPSTEIN:

16   Q    Good afternoon.

17   A    Good afternoon.

18   Q    Where do you work?

19   A    I work for FINRA.  FINRA stands for the Financial

20   Industry Regulatory Authority.

21   Q    What does FINRA do?

22   A    We regulate individuals and firms that sell securities

23   such as stocks and bonds to the investing public.

24   Q    Is FINRA a private organization or part of the

25   Government?

CAROCCI - DIRECT - MR. GOPSTEIN

1    A    We're a private, self-regulatory organization.

2    Q    Who are FINRA's members?

3    A    Our members would be brokerage firms.  You may have heard

4    some of these like E-Trade, TD Ameritrade, Goldman Sachs,

5    firms of that nature that deal with the public regarding

6    securities.

7    Q    Are brokerage firms employees members of FINRA as well?

8    A    They are required to be registered with FINRA as well,

9    both the firms and the employees that buy and sell securities

10   on behalf of the investing public.

11   Q    Those are often referred to as broker/dealer?

12   A    Yes.

13   Q    What do a broker/dealer do?

14   A    A broker/dealer would be a firm made up of individuals,

15   obviously, that can buy or sell securities stocks, bonds, on

16   behalf of the investing public, individual investors who are

17   entities, pension funds, hedge funds, mutual funds.  And they

18   can do it on behalf of others or on their own accounts.

19   Q    How does FINRA regulate broker/dealers?

20   A    We have a rule book.  And the member firms and the

21   individuals registered with FINRA agree to abide by that rule

22   book in the conduct of their business.

23         And then we have an enforcement department that

24   would investigate any rules violations and bring actions.  We

25   can bar, suspend individuals and firms from the industry.  We

CAROCCI - DIRECT - MR. GOPSTEIN

1    can also fine them an amount of money.

2            We also conduct examinations of these member firms,

3    so FINRA employees.  We go out and examine their books and

4    records, the processes and procedures to try to ensure they

5    are following the FINRA rules as well as federal securities

6    laws.

7    Q    Who oversees FINRA?

8    A    We're over seen by the Securities & Exchange Commission,

9    the SEC.

10   Q    What is the SEC?

11   A    That is a federal Government entity agency.  That

12   regulates the securities industry, both anybody who buys or

13   sells stocks, as well as the publicly-traded companies so the

14   companies that are trading on an exchange.

15   Q    Mr. Carocci, how long have you worked at FINRA?

16   A    For approximately 18 years.

17   Q    What is your current position?

18   A    I'm assistant general counsel for the criminal

19   prosecution assistance group.

20   Q    About how long have you been in that group?

21   A    Approximately 14 years, 13, 14 years.

22   Q    Generally speaking, what does your group do?

23   A    We assist federal, state, local investigators and

24   prosecutors with their white-collar criminal investigations

25   and trials.

CAROCCI – DIRECT – MR. GOPSTEIN

1    Q    What kind of assistance do you provide?

2    A    So if we're getting on the investigative stage, we might

3    do analysis of trading, books and records or other documents.

4    And then we would testify to that analysis at trial.

5    Q    What did do you for your first few years at FINRA prior

6    to joining your current group?

7    A    I worked for the FINRA corporate finance department.

8    That department oversees initial public offering of stocks

9    when the stock is initially sold, and the underwriting so the

10   firms that take companies public.  We regulate that

11   relationship.

12         I also later worked for the member regulation

13   department.  And that was the department that I kind of

14   referred to earlier, that goes out and conducts examinations

15   of member firms.

16   Q    Member brokerage firms?

17   A    Yes.

18   Q    During your time at FINRA have you conducted trainings

19   for law enforcement agencies?

20   A    Yes.  We conduct usually two trainings for the Federal

21   Bureau of Investigation every year, I've done that multiple

22   times.  I've also trained IRS criminal investigations, Postal

23   Inspection inspectors, as well as United States Attorney's

24   Offices.

25   Q    In addition to your experience at FINRA, do you have any

                      CAROCCI - DIRECT - MR. GOPSTEIN

1    experience in the private sector?

2    A     Yes.  I worked for Goldman Sachs for approximately a year

3    in their regulatory compliance department.

4    Q     Generally, what were your responsibilities there?

5    A     To respond to requests from the SEC or regulators, such

6    as FINRA, when they wanted information regarding trades or

7    something that happened at the firm.

8    Q     What is your educational background?

9    A     I have a law degree from Duquesne University in

10   Pittsburgh, Pennsylvania.  My undergraduate degrees are in

11   finance economics.

12   Q     Do you have any certifications?

13   A     Yes.  I'm a certified regulatory compliance professional.

14   This is a certification that was a partnership between FINRA

15   and the University of Pennsylvania Awards School of Business.

16   It is offered to both to regulators, such as myself, and also

17   industry professionals in the compliance realm, so people who

18   work for brokerage firms in compliance.  And you go for a

19   couple of weeks over a year-and-a-half period and you get your

20   certification.

21   Q     Do you have any other certifications?

22   A     I completed what is called FINRA exam university.  That's

23   an internal FINRA certification where you develop expertise in

24   the books and records that brokerage firms are required to

25   keep under FINRA rules and federal securities laws, as well as

                    CAROCCI - DIRECT - MR. GOPSTEIN

1    their practices and procedures.

2    Q    During your time at FINRA and in the private sector, have

3    you become familiar with the securities industry and the

4    operation of public securities exchanges?

5    A    Yes.

6    Q    Have you examined the movement of stock prices of

7    publicly-traded companies?

8    A    Yes.

9    Q    Have you become familiar with SEC filings and

10   regulations?

11   A    Yes.

12   Q    With FINRA regulations?

13   A    Yes.

14   Q    Have you provided expert testimony on these topics

15   before?

16   A    Yes, I have.

17   Q    Approximately how many times?

18   A    Approximately a dozen times.

19           MR. GOPSTEIN:  At this time the Government moves to

20   qualify Thomas Carocci to offer both explanatory and opinion

21   testimony regarding the securities industry, SEC disclosure

22   requirements and regulations and FINRA regulations.

23           THE COURT:  Any objection?

24           MS. BRILL:  No objection.

25           MS. WHALEN:  No objection.

CAROCCI – DIRECT – MR. GOPSTEIN

1          THE COURT:  Thank you.  You may proceed.

2          Bear in mind what I said yesterday about opinion

3    witnesses.  Go ahead.

4    BY MR. GOPSTEIN:

5    Q    Mr. Carocci, you testified that in some of your cases,

6    you provide assistance in the investigation, did have you any

7    involvement in the investigation of this case?

8    A    No.

9    Q    Mr. Carocci, what is a stock?

10   A    A stock is a security.  It represents an ownership

11   interest in a company.  It's measured by what are called

12   shares, shares of stock.  It represents an ownership interest

13   in a company.

14   Q    What is a security?

15   A    A security would be, at a very high level, an investment

16   of money, expecting a rate of return, expecting some type of

17   profit on your money, largely through the efforts of a company

18   or other third-party.

19          So an example of securities would be stock.  You

20   invest your money expecting a rate of return from investments

21   of the company.  There is bonds, also considered securities,

22   which is a loan to a company.  You would expect an interest

23   payment on that loan, for the loan, that you continue to be

24   repaid eventually.  Those are the two most common securities.

25   Q    What is a publically-traded company?

1429

CAROCCI - DIRECT - MR. GOPSTEIN

1    A    A publically-traded company is a company who's stock,

2    shares of stock, trade so that the investing public can by and

3    sell stock in these companies on an exchange or market.

4    Q    Who owns a publically-traded company?

5    A    The shareholders.

6    Q    You testified that publically-traded companies trade on

7    markets or exchanges what is a market or exchange?

8    A    That would be a companies like the NASDAQ, or the New

9    York Stock Exchange, the two largest in the United States,

10   where they provide a market for a publically-traded company

11   stock to trade on.

12   Q    Are there certain requirements in order for a

13   publically-traded company to be listed on either the New York

14   Stock Exchange or the NASDAQ?

15   A    Yes.  They both have what is called listing requirements.

16   So generally the company has to be a certain size, a fairly

17   large company usually.  As far as what is called market

18   capacity decision, which is just their number of outstanding

19   shares, so the number of shares issued to the public, issued

20   to investors times the stock price.

21          Another big listing requirement for the New York

22   Stock Exchange and NASDAQ is the publically-traded company has

23   to be what is called current in their Securities & Exchange

24   Commission filings.

25   Q    About how many companies trade on the New York Stock

CAROCCI - DIRECT - MR. GOPSTEIN

1    Exchange?

2    A    Approximately 2800 companies.

3    Q    About how many companies trade on the NASDAQ?

4    A    Approximately 3300 companies.

5    Q    Are you familiar with something called the S&P 500?

6    A    Yes.

7    Q    What is it?

8    A    The Standard & Poor's 500, the 500 largest

9    publically-traded companies.  And it's, they have an S&P 500

10   Index, which kind of measures the how well those companies are

11   doing over periods of time.

12   Q    Can an investor invest in the S&P 500?

13   A    Yes.  You can usually do it through a mutual fund.  There

14   are mutual funds that invest in the 500 Index exclusively.

15   You can also do it through options or exchange trader funds.

16   Q    What is a rate of return?

17   A    A rate of return would be the return on your invested

18   money.  So the gain or the loss on your invested money

19   generally presented as a percentage of the amount you invest

20   in.

21   Q    What was the rate of return on the S&P 500 in the year

22   2011?

23   A    2011 it was 2.11 percent.

24   Q    So if you invested $100 in the S&P 500 on January 1st,

25   2011, about how much money would you have made by the end of

CAROCCI - DIRECT - MR. GOPSTEIN

1    that year?

2    A    $2.11.

3    Q    You testified earlier about brokerage firms and the

4    members of FINRA, do most brokerage firms have things called

5    trading authorization forms?

6    A    Yes.  Whenever an individual opens an account they have

7    to fill out a new account form.  And they have to, there has

8    to be a signer who is an authorized person who is authorized

9    to trade in that account.  In that way it's not much different

10   than a bank account that anybody would have set up.  The bank

11   wants to know who has proper authorization to execute a

12   transaction in the bank account, very similar to a brokerage

13   account.

14   Q    Are there any FINRA rules or regulations that govern

15   brokerage firms books and records?

16   A    Yes, we have many rules and regulations that require

17   brokerage firms to maintain certain books and records.  They

18   need to be accurate books and records.

19   Q    Trading authorization forms is one form is used to

20   maintain accurate books and records?

21   A    Yes.  Firms are required to know their customers, so know

22   who is trading in the account and who has permission to trade

23   in the account.

24   Q    What is a clearing firm?

25   A    A clearing firm is a type of FINRA member firm that

CAROCCI - DIRECT - MR. GOPSTEIN

1    actually can hold securities, stocks and bonds for the

2    investors as well as their money that they would use to buy

3    stocks and bonds or that they would hold in their brokerage

4    account.  They get more scrutiny because they actually hold

5    assets of investors.

6    Q    What is settlement?

7    A    Settlement is kind of the end of a trade.  So it would be

8    when the stock that was traded, for example, switched from the

9    seller's account to the buyer's account and the money to pay

10   for that stock purchase would be transferred basically from

11   the buyer's account to the seller's account.

12   Q    Now that you defined all these terms, could you walk

13   through for the jury a typical stock transaction from

14   beginning to end, where an individual goes into their

15   brokerage firms then what happens next?

16   A    So for example, if an individual wanted to buy shares of

17   Apple stock, they notify the brokerage firm, either online by

18   filling out an order form to buy the stock or calling your

19   broker if you have one.  And that broker would then send the

20   buy order to the market, would post what the individual is

21   wanting to buy the stock at and how many shares they want to

22   buy.  If that is matched up with someone who is willing to

23   sell Apple stock basically at that price and for that those

24   number of shares, a transaction occurs, a trade occurs.  I

25   should say it's agreed upon.

CAROCCI – DIRECT – MR. GOPSTEIN

1          And then it has basically two business days to sell,

2     for the money to go from the buyer to the seller, and from the

3     stock to go from the seller's brokerage account to the buyer's

4     brokerage account.

5     Q    What happens after that?

6     A    Then, well, the transaction would be complete.

7          At settlement there is a clearing firm.  There is

8     also clearing corporations, which is Depository Trust

9     Corporation, which they kind of trade on behalf of the

10    clearing brokers.

11         For example, if in Apple, an E-Trade might have an

12    account with DTC, so the buyer of the Apple E-Trade would have

13    shares deposited into their account at the clearing

14    corporation level.  And then E-Trade it would show up in that

15    individual's account that he bought Apple shares.

16    Q    I'd like to ask you about a few different kinds of

17    investments.

18         Generally speaking, if you think that a company's

19    stock price is going to go up in the future, it's going to

20    increase, what kinds of investments would you make?

21    A    You would want to be what is called a long, a long

22    position, bullish position.  You're positive about the stock

23    price increasing.

24    Q    What does a long position mean?

25    A    It means, for example, you could hold the stock, you

CAROCCI - DIRECT - MR. GOPSTEIN

1    could buy the stock and hold it, and hopefully wait for it to

2    appreciate in value.

3    Q    Are you familiar with something called a call option?

4    A    Yes.

5    Q    A call what is that?

6    A    A call option is a contract basically where you can call

7    in shares or buy shares at a certain price, a specified price

8    at a date in the future.  So it's called an options contract.

9    Q    A call option, if you think that a company stock price is

10   going to increase in the future, would you enter, would you

11   buy a call option?

12   A    Yes.  So for example, if a company is trading $5 a share

13   and you think it's going to go up in value.  And you're buying

14   a call option, let's say approximately $5 a share, and if the

15   stock went up to $10 a share, you would have the right to

16   purchase that stock at only $5 a share.  You would have

17   profited $5 a share for however many options contracts you

18   bought.

19   Q    If you think that the price of a stock is going to

20   decrease in the future, what would kind of investments would

21   you make if you wanted to make money?

22   A    You would want to be what is called short that stock, you

23   want to be bearish or short that stock.

24   Q    What does shorting a stock mean?

25   A    Shorting a stock means you can sell a stock, you borrow

CAROCCI - DIRECT - MR. GOPSTEIN

1   the stock generally from a brokerage firm.  So you, for
2   example, Apple, you would borrow let's say 100 shares from the
3   brokerage firm.  Would you sell those shares, and if the stock
4   dropped you have to eventually go and buy those shares back to
5   repay those shares to the firm you borrowed them from,
6   wherever you borrowed them from.  So you would sell actually
7   before you buy, but when you buy back you're buying at a lower
8   price than what you sold for; so therefore, you can profit
9   from a decrease in the stock price.
10  Q    Is a put option another way to profit from a decrease in
11  stock price?
12  A    Yes.  Because that can allow you to put or give shares to
13  somebody, again at a predetermined price at a predetermined
14  date in the future.
15  Q    Can you explain what a put option is, for the jury?
16  A    Right.  So let's say you had a stock at $10 per share.
17  You thought it was going to decline in price, let's say to $5
18  a share, you could enter into a contract roughly that gives
19  you the right to sell the shares sometime in the future at $10
20  per share.  If the stock does go down the $5 per share, you
21  have the contract that allows you to sell for $10 per share
22  the stock that you own.
23  Q    So to recap, if you think the price so going to go up
24  long position or call option?
25  A    Yes.

CAROCCI - DIRECT - MR. GOPSTEIN

1    Q    Down, short position or put option, generally speaking?

2    A    Generally speaking, yes.

3    Q    In all of these kinds of transactions that you've been

4    talking about so far, is there always somebody on the other

5    end of the transaction?

6    A    Stock sales and options contracts are in that way not any

7    different than selling a house or a car.  There are buyers and

8    there are sellers.  And for a transaction to occur someone has

9    to buy the options, contact the other side, and someone has to

10   buy the Apple stock or sell the Apple stock for a transaction

11   to occur.

12              (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CAROCCI - DIRECT - MR. GOPSTEIN

1    BY MR. GOPSTEIN:

2    Q     What are security filings?

3    A     Securities filings are filings that publically traded

4    companies, such as Apple would make with the Security Exchange

5    Commission, and there's a few different types.  There's --

6    there's financial statements they are required to be made,

7    such as what are call 10Q's, which are quarterly -- a publicly

8    traded company's quarterly financial results, so how much

9    money they made for a particular quarter.  They're required to

10   filed three of them per year.  And then an annual report

11   called a 10K, which would be their annual financial statement.

12   They're also required to file what is called 8K's, and 8K's

13   are a way of letting investors know if anything really

14   materially important is going on in the company that should be

15   disclosed to investors.  They are required to file them with

16   the Securities Exchange Commission and it's also a listing

17   requirement for NASDAQ and New York Stock Exchange, to be

18   traded on those exchanges.

19   Q     And what is Regulation FD?

20   A     Regulation FD is regulation fair disclosure.  That's what

21   the FD starts for.  And that's basically an SEC regulation

22   which prohibits selective disclosure of material information.

23   So if a company has material information that should be

24   disclosed to the investing public, they have to make a wide

25   distribution of that information through 8K filings or press

David R. Roy, RPR - Official Court Reporter

CAROCCI – DIRECT – MR. GOPSTEIN

1    releases.  They can't just pick and choose which investors or

2    individuals or entities to disclosure it to.  They have to

3    disclosure it to all and be transparent to all.

4    Q    And approximately when was Regulation FD issued?

5    A    In the year 2000.

6    Q    If a company violates Regulation FD, what, if anything,

7    must they do?

8    A    Well, they're required to rectify the situation

9    immediately, meaning if something was selectively disclosed,

10   they're required to then widely disseminate the information,

11   widely disclose the information to correct the situation.

12   Q    Can you just provide some examples of the kind of

13   material that is subject to Regulation FD?

14   A    Right.  I would say, you know, earnings, mergers,

15   acquisitions, leadership changes in –– in –– in a corporation

16   at a high level.  It's –– it's material information, so

17   material information is generally defined as anything that an

18   investor would find important or substantial in making an

19   investment decision, whether to buy or sell a stock, something

20   material.

21   Q    Are you familiar with something called guidance?

22   A    Yes.

23   Q    What does that mean?

24   A    Those are numbers, financial numbers that companies put

25   out such as earnings per share, you know, net income, maybe

CAROCCI – DIRECT – MR. GOPSTEIN

1   revenue to –– and it's kind of their expectations, their ––

2   what's called future statements.  So it's their expectation of

3   let's say the next quarter, how well they believe it is go to

4   go financially or not well financially, but their expectations

5   financially for the next quarter.  And publicly traded

6   companies generally put that information out, make that

7   information public.

8   Q    Fair to say that earnings and guidance are two of the

9   kinds of materials that are suggest to Regulation FD?

10  A    Yes.

11  Q    Mr. Carocci, are there analysts and companies that

12  analyze and predict what publicly traded companies' earnings

13  will be?

14  A    Yes.  There are, you know, financial analysts that follow

15  publicly traded companies and try and predict their earnings

16  or, you know, their financial condition in the future to

17  advise investors as to –– as to whether to basically buy,

18  sell, or hold the security.

19  Q    And generally speaking, if a company beats the analyst

20  predictions for its earnings, that's good news for the company

21  stock, right?

22  A    Generally that's considered positive because what they're

23  saying is that financially they have done better than was

24  expected with the guidance, so it's generally seen as a

25  positive.

CAROCCI – DIRECT – MR. GOPSTEIN

1    Q    And conversely if a company didn't meet analysts'

2    predicted earnings, how would you expect the company's -- that

3    is bad news for the company?

4    A    That would be considered bad news because they didn't do

5    financially as well as they thought they were going to do, and

6    so that's usually a negative and would generally put down the

7    pressure on stock purchases, generally.

8    Q    Now, if a company beats the analysts' earnings

9    predictions, does its stock price always go up?

10   A    No.

11   Q    Can you explain why not?

12   A    Well, you know, there's hundreds of thousands of reasons

13   to go -- what investors think of the stock price, and the

14   stock price is really set by the market.  What one individual

15   is willing to sell a stock is worth more than another

16   individual -- or entity or pension fund is willing to -- to

17   sell the security for and what one is willing to buy the

18   security for.  So earnings is certainly one component, and I

19   would argue a fairly important component, but, you know, there

20   could be things, you know, where, you know, a company is --

21   they think they're going to be subject to some type of

22   litigation or product recall in the future or some type of

23   geopolitical situation with overseas operations or factories,

24   tax rates, overseas foreign currency rates overseas than the

25   United States.  So there's -- earnings is not the only

David R. Roy, RPR – Official Court Reporter

CAROCCI – DIRECT – MR. GOPSTEIN

1    reason –– or the only thing that puts pressure on the stock

2    price.

3    Q    Now, some of these factors that you just listed that can

4    affect a company's stock price, are some of these factors

5    sometimes included in the text of earnings press release

6    itself?

7    A    Yes.  Sometimes an earnings press release announcement

8    would have the earnings per share and net income and other

9    figures like that, but also can sometimes get into discussions

10   of some of the things I previously mentioned.

11   Q    And sometimes are these factors included in other press

12   releases that are separate from the earnings press releases?

13   A    Yes, yes.

14   Q    And sometimes other factors that affect stock price are

15   not in the press release, just public factors?

16   A    Yes.

17   Q    So if an individual has a company press release prior to

18   its public distribution, does that mean that the individual

19   knows how the company's stock price will react?

20   A    No, not necessarily.

21   Q    What does it mean?

22   A    Well, it means that individual would have an

23   informational advantage.  You know, it means no similar –– you

24   know, if you were a batter in baseball and you kind of knew

25   what pitch the pitcher was going to through, whether it's

David R. Roy, RPR – Official Court Reporter

CAROCCI - DIRECT - MR. GOPSTEIN

1    going to be a fastball or a curve ball, if you know what's

2    coming, you have an informational advantage in the situation.

3    But you know, you still have to swing the bat.  You have to

4    make contact.  You have to hit it where nobody's going to

5    catch it, or hit it over the fence.  So again, there's in

6    guarantee.  But there is an informational advantage.

7    Q    And when you say it's "an informational advantage," it's

8    an informational advantage over whom?

9    A    Over basically the rest of the market, other investors

10   who don't have that, they would be at an informational

11   disadvantage.  And it's really -- the reason for Regulation FD

12   that I discussed earlier about why I would be disseminating

13   this information to all of the investors at once, is so that

14   it's a level playing field.  There is transparency in the

15   market for all investors.

16              FINRA, where I work, our mission is investor

17   protection and market integrity -- stock market integrity.

18   And that's what that goes to, stock market integrity.

19   Q    Turning back to FINRA, does FINRA have certain rules that

20   govern the behavior of professionals who work in the security

21   industry?

22   A    Yes.

23   Q    And are you familiar with FINRA Conduct Rule 208N?

24   A    Yes.

25   Q    And what is that?

David R. Roy, RPR - Official Court Reporter

CAROCCI – DIRECT – MR. GOPSTEIN

1   A      That means that the individuals have high standards of

2   commercial honor and just and equitable principles of trade.

3   It basically is our rule, our FINRA rule that says if you're

4   in this industry and registered, you have to have fair

5   dealings with customers and everybody else that you're dealing

6   with.

7   Q      Is FINRA licensed professionals who are associated with

8   Wall Street firms?

9   A      Yes, we're register.  We call them registered, because we

10  are not the Government.  We don't call it licensed.  We call

11  it registration.

12  Q      Okay.  And are you familiar with the registration

13  process?

14  A      Yes.

15  Q      What does somebody have to go in order to become

16  registered with FINRA?

17  A      They have to be employed with a FINRA member firm, and

18  then they have to take examinations that would test their

19  knowledge of profits such as stocks and bonds, as well as the

20  rules, regulations, and federal securities laws regarding the

21  sell and the trading of those proofs.

22  Q      Does FINRA maintain records of the individuals who are

23  registered with it?

24  A      Yes.

25  Q      What are these records called?

David R. Roy, RPR – Official Court Reporter

CAROCCI - DIRECT - MR. GOPSTEIN

1    A    It's call our Central Registration Depository or CRD

2    reports.  There's a CRD for each individual in the industry,

3    registered in the industry, as well as the firms.

4    Q    And are any CRD reports maintained by FINRA in the

5    ordinary course of its business?

6    A    Yes.

7              MR. GOPSTEIN:  If I could just show for the

8    witness --

9              THE COURTROOM DEPUTY:   Just bear with me one

10   second.

11             MR. GOPSTEIN:  This will be

12   Government's Exhibit 814, if you want to look for it.

13             THE COURT:   Did you say 814?

14             MR. GOPSTEIN:   814.

15             THE COURT:  All right.

16             MR. GOPSTEIN:  Thank you, Your Honor.

17   BY MR. GOPSTEIN:

18   Q    Now I'm showing you what has been marked for

19   identification as Government's Exhibit 814.  Do you recognize

20   this document?

21   A    Yes.

22   Q    What is it?

23   A    It's a FINRA CRD report.

24   Q    Is this FINRA CRD report for what individual?

25   A    Vladislav Khalupsky.

David R. Roy, RPR - Official Court Reporter

CAROCCI – DIRECT – MR. GOPSTEIN

1  Q    And is that a true and accurate copy of Khalupsky's CRD

2  report?

3  A    Yes.

4        MR. GOPSTEIN:  The Government offers

5  Government Exhibit 814 into evidence.

6        THE COURT:  Any objection?

7        MS. WHALEN:  No objection.

8        MR. GOPSTEIN:  If I may publish?

9        THE COURT:  Received.

10       (Government Exhibit 814, was received in evidence.)

11       MR. GOPSTEIN:  Thank you, Your Honor.

12  BY MR. GOPSTEIN:

13  Q    We now have Government's Exhibit 814 in evidence up on

14  display.  I am going to turn to Page 3.  Do you see here -- up

15  here?  Who is that for?

16  A    Vladislav Khalupsky.

17  Q    Do you see where it says, State of Resident?

18  A    New York.

19  Q    Turning our attention down on the page to the section

20  that is called Registration With Previous Employer.  If you

21  could just read into the record the top entry here?

22  A    Right.  So from July 28th, 2010 until June 15th of 2011,

23  Mr. Khalupsky worked for WTS Proprietary Trading Group, LLC.

24  Q    And prior to that, the entry right underneath it?

25  A    From May 6th of 2003 to October 25th of 2005,

David R. Roy, RPR – Official Court Reporter

CAROCCI - DIRECT - MR. GOPSTEIN

1   Mr. Khalupsky worked for Hold Brother On-Line Investments --

2   or I'm sorry.  I went three down.  I'm sorry.  Let me start

3   over.

4            From September 13th, 2003 to August 1st of 2008

5   Mr. Khalupsky --

6   Q    Do you mean September 13th, 2007?

7   A    Correct.  I'm sorry.  So September 13, 2007 to August 1st

8   of 2008, Mr. Khalupsky worked for Dimension Brokerage, LLC.

9   Q    And then before that, from May 2003 to October 2005 for a

10  company called Hold Brothers On-Line Investment Services, LLC?

11  A    Yes.

12  Q    And this category called Registration With Previous

13  Employers, what does it mean to be registered?

14  A    Well, they're registered with FINRA.  So they're allowed

15  to basically conduct any type of activity that their -- that

16  the exams that they passed would allow them to conduct, most

17  commonly, you know, assisting the public with the purchase and

18  sale of securities.

19  Q    And can an individual be registered with FINRA without

20  being employed by a firm?

21  A    No.

22  Q    Now, turning to Page 5, there is a category called

23  Employment History right here.  Who provides the information

24  that's included in this section?

25  A    Well, it generally comes from -- really most of the

David R. Roy, RPR - Official Court Reporter

CAROCCI – DIRECT – MR. GOPSTEIN

1   information in this report comes from what is called -- or the

2   individual in the firm that they're working for, they file

3   what's called a Form U4 which would provide all of this

4   information.

5   Q    And does the employment history for this report cover two

6   pages and go all the way back to 1990?

7   A    Yes.

8   Q    And just generally speaking, where are the locations of

9   the prior employment listed here for Mr. Khalupsky?

10  A    It looks like New York; Brooklyn, New York; New York,

11  New York; and Brooklyn, New York.

12  Q    Now, turning to Page 8 of the report.  You have a section

13  called Exam History.  What are we looking at here?

14  A    So these would be the exams that Mr. Khalupsky took and

15  passed, that FINRA administered exams that he took and passed

16  that would, you know, demonstrate knowledge of the products,

17  securities, the buying and selling, as well as FINRA rules,

18  regulations of the Federal Securities laws.

19  Q    Starting here where it says under Exam S7.  What is the

20  S7?

21  A    That's stands for the Series 7 Examination.  It's kind of

22  the -- it's the -- you know, it's really our -- the exam that

23  would test, again, your -- it would allow me to buy and sell

24  securities on behalf of clients and to be a registered rep

25  with a firm.  It's called the General Securities Registered

CAROCCI - DIRECT - MR. GOPSTEIN

1   Representative.

2   Q     And did he take this exam?

3   A     Yes.  He took it on June 1st of 2000 and passed it and

4   scored 81.

5   Q     Working our way down, what is the S55?

6   A     That's the equity trader exam.  So that's kind of an

7   advanced exam.  So, for example, this Series 7 is a

8   pre-requisite for taking the Series 55.  It really focuses on

9   trading and trade reporting, as well as the rules,

10  regulations, Federal Securities Laws regarding that.

11  Q     And did he take and pass this exam as well?

12  A     Yes.  Mr. Khalupsky passed the exam on June 16th of 2000

13  with a score of 71.

14  Q     And finally, we have the S63.  What is that?

15  A     That's what's called the State Law Exam.  So instead of

16  individuals having to take 50 different exams to sell in all

17  50 states, the states created an exam, and FINRA administers

18  the exam.  It basically really focuses on Federal Securities

19  Laws and Security Regulations.  You know, that's most of the

20  exam.

21  Q     Thank you.

22             MR. GOPSTEIN:   And if I could show one more

23  document?

24             THE COURTROOM DEPUTY:   Just a moment.

25             MR. GOPSTEIN.   Thank you.

CAROCCI - DIRECT - MR. GOPSTEIN

1          THE WITNESS:  Just the witness.

2          MR. GOPSTEIN:  Thank you.

3    BY MR. GOPSTEIN:

4    Q    Now, showing what has been marked for identification as

5    Government's Exhibit 815, what is this document?

6    A    This is the CRD, the FINRA CRD report for Vitaly

7    Korchevsky.

8    Q    Is this a true and accurate copy of Korchevsky's CRD

9    report?

10   A    Yes, it is.

11         MR. GOPSTEIN:  The Government offers

12   Government's Exhibit 815 into evidence.

13         THE COURT:  815?

14         MR. GOPSTEIN:  815.

15         THE COURT:  Any objection?

16         MR. BRILL:  We have no objection.

17         THE COURT:  Admitted.

18         (Government Exhibit 815, was received in evidence.)

19         MR. GOPSTEIN:  Permission to publish?

20         THE COURT:  Go ahead.

21         MR. GOPSTEIN:  Thank you.

22   BY MR. GOPSTEIN:

23   Q    Turning to Page 3 of Government's Exhibit 815, that is

24   the whole legal name of Korchevsky there?

25   A    Yes.

David R. Roy, RPR - Official Court Reporter

CAROCCI - DIRECT - MR. GOPSTEIN

1    Q    And it says CFA after that.  What is that?

2    A    So it designates Chartered Financial Analyst.  So it's

3    a -- it's a certification.  It's not a FINRA certification.

4    It's the CFA certification.

5    Q    Now moving down like we did before to Registration with

6    Previous Employers.  Please read the top entry there for the

7    jury.

8    A    Okay.  From October 4th to 2005 to October 6th of 2008,

9    Mr. Korchevsky worked for Investment Counselors of Maryland.

10   Q    And what was the reason for his termination?

11   A    It says Discharged:  Position Eliminated.

12   Q    And continued to work our way down, the next entry for

13   the record?

14   A    From January 3rd of 2000 to September 21st of 2001,

15   Mr. Korchevsky worked for Morgan Stanley Distribution.

16   Q    And the reason for termination there?

17   A    It says, Voluntary.

18   Q    Now, according to this report was October 2008 the last

19   time Mr. Korchevsky was employed with a FINRA-related firm?

20   A    Yes.

21   Q    And just like you looked at before, is this the

22   employment history that was provided for Korchevsky?

23   A    Yes, it is.

24   Q    So that top entry that we just looked at, Investment

25   Counselors of Maryland?

David R. Roy, RPR - Official Court Reporter

CAROCCI – DIRECT – MR. GOPSTEIN

1   A    Yes.

2   Q    And beneath that is there an entry from 2001 to 2005 for

3   an entity called Vitcus Capital?

4   A    Yes.

5   Q    And the remaining entries on Pages -- I apologize, Pages

6   4 and 5, that completes the employment history that was

7   provided by Korchevsky?

8   A    Yes, it is.

9   Q    All right.

10           Turning to Page 6 of the report, again, we have an

11  Exam History.  What is being shown here?

12  A    Okay.  These are Mr. Korchevsky's FINRA exams that he

13  passed.

14  Q    Okay.  So I think we had a new exam down here that wasn't

15  on our last report.  It's S6.  What is S6?

16  A    That's the Series 6 Exam.  It's the investment company

17  variable contracts exam.  So the examined individual would

18  have to pass to sell mutual funds or variable annuity

19  products.  So different types of products for the stocks and

20  bond that I've been talking about, but still securities.

21  Q    And did Mr. Korchevsky pass the S6?

22  A    Yes.  He passed it on April 9 of 2001 with a score of 90.

23  Q    Now, turning down, looking down on the page we have the

24  S63 again.  Is that the same S63 that you just testified about

25  with regard to Mr. Khalupsky's --

David R. Roy, RPR – Official Court Reporter

CAROCCI – DIRECT – MR. GOPSTEIN

1    A    Yes.

2    Q    -- CRD report?

3    A    Yes, it is.

4    Q    And did Mr. Korchevsky pass the S63?

5    A    Yes, March 28th of 2001.  He passed it with a score of

6    82.

7    Q    Now, we just looked at a number of different exams that

8    FINRA conducts.  Does FINRA publish outlines on topics that

9    are covered on these exams?

10   A    Yes.  They're study guides that individuals can use to

11   review the topics that are covered on the exam in preparation

12   for taking it.

13   Q    And starting with the Series 63, which I believe is the

14   exam you testified that both Korchevsky and Khalupsky passed.

15   Does that exam cover fraudulent and prohibitive practices?

16   A    Yes.  So that's about 45 percent of the exam questions

17   are on fraudulent and other prohibitive practices.

18   Q    And one of prohibitive practices that the exam covers is

19   trading on material nonpublic information?

20   A    Yes, that's one of the topic.

21   Q    And does the study guide that FINRA provides for the

22   exams address this?

23   A    Yes.  It's a section that says that that -- you know,

24   that that will be the subject on the exam.

25   Q    In total how many FINRA exams did the Defendant Vitaly

David R. Roy, RPR – Official Court Reporter

1453

CAROCCI – DIRECT – MR. GOPSTEIN

1    Korchevsky pass?

2    A    Korchevsky passed two exams, the Series 6 and a

3    Series 63.

4    Q    How many did Defendant Khalupsky pass?

5    A    Three exams.

6    Q    And did each of the exam that the defendants passed,

7    cover securities regulations?

8    A    Yes.

9    Q    Did FINRA study manuals on these exams address the

10   prohibition of fraudulent practices?

11   A    Yes, it does.

12   Q    Thank you.

13             MR. GOPSTEIN:  One second.

14             (Pause in proceedings.)

15             MR. GOPSTEIN:  No further questions.

16             Thank you, Mr. Carocci.

17             THE COURT:  Well, this strikes me as a logical time,

18   so we will break to take our luncheon break and resume at

19   2:05.  Enjoy your lunch, and please don't discuss the case,

20   folks.

21             THE COURTROOM DEPUTY:   All rise.

22             (Jury exits the courtroom.)

23             (The following matters occurred outside the presence

24   of the jury.)

25             THE COURT:  Enjoy your lunch.  Be back at 2:05.

David R. Roy, RPR – Official Court Reporter

CAROCCI – CROSS – MR. BRILL

1           (AFTERNOON SESSION)

2           THE COURTROOM DEPUTY:  All Rise

3           THE COURT:  Please be seated, folks.  Mr. Brill,

4    whenever you're ready.

5           MR. BRILL:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. BRILL:

8    Q     Good afternoon, Mr. Carocci.

9    A     Good afternoon.

10   Q     How are you?

11   A     Good.  How are you?

12   Q     You told us today on your direct testimony that there is

13   approximately almost 3,000 stocks that are traded on the New

14   York Stock Exchange, 2800?

15   A     Yes.

16   Q     And even more than 3,000 on the NASDAQ?

17   A     That's correct.

18   Q     These are all public companies?

19   A     Yes, publically-traded companies.

20   Q     One requirement you mentioned with respect to

21   publically-traded companies are that they have to fill out and

22   submit a 10Q form, 10Q submissions?

23   A     With the SEC, yes.

24   Q     And that's done three times a year?

25   A     Three fiscal quarters, yes.

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CAROCCI – CROSS – MR. BRILL

1    Q    Also an annual submission which is called a 10K also with

2    the SEC, yes?

3    A    Yes.

4    Q    And these essentially, with respect to the 10Q forms, are

5    essentially informing the world, so to speak, that public

6    company's numbers or earnings, yes?

7    A    Yes.

8    Q    And also with respect to the 10K, similarly, but that's

9    their annual earnings, their annual numbers, how they did that

10   year?

11   A    Yes.

12   Q    And so would you also agree with me, Mr. Carocci, that

13   publically-traded companies also inform us as to when they are

14   going to announce their earnings?

15   A    Yes, that's public knowledge, when you go on a financial

16   website and find out the next time they are going to release

17   earnings.

18   Q    My question though is, is it common practice for each

19   public company to announce publicly as to when they are

20   actually going to announce their earnings each quarter?

21   A    Yes.

22   Q    Would you agree with me, Mr. Carocci, that there are

23   traders, stock traders, that will essentially make trades with

24   respect to those earnings announcements?

25   A    You just mean the event?

CAROCCI - CROSS - MR. BRILL

1    Q    Yes.

2    A    Earnings announcement event, the public announcement by

3    the company?

4    Q    Yes.

5    A    Yes.

6    Q    Would you agree with me that the traders that do that,

7    they are traders that essentially will make their stock trades

8    on the day that the company announces their earnings or

9    announces their numbers, would you agree with me with that?

10   A    Yes.  We're talking about -- you're talking about before

11   they announce their numbers on that day?

12   Q    Yes.

13   A    So speculative before the earnings they are making a

14   trade?

15   Q    Correct.

16   A    Yes.

17   Q    Would you agree that for some traders that's a stock

18   trading strategy?

19   A    Yes.

20   Q    Which means that for particular stock traders they will

21   research a certain stock, yes?

22   A    Yes.

23   Q    They will read what an analyst has to say about that

24   particular stock or that particular company?

25   A    They could, yes.

CAROCCI - CROSS - MR. BRILL

1    Q    And with respect to the actual trade, the execution of

2    their trade, they will do it very close in time to when the

3    company announces their earnings?

4    A    Close in time, you mean -- I mean, they can do it the day

5    before the, day of, five hours before.  Close in time, I'm

6    not --

7               THE COURT:  You mean before the earnings are

8    announced?

9    Q    Before the earnings are announced.

10   A    Close in time before the earnings are announced, yes.

11   Q    Would you agree it's also common practice amongst these

12   types of traders they will do it very close in time to be when

13   the earnings are announced.

14             For example, if a company is going to announce after

15   market, which is after 4:00 p.m., that the stock trader that

16   is trading based on what they anticipate earnings to be that

17   trade would be placed as close to four as they can get it?

18   A    I wouldn't know about that.  Every trader would have

19   their own strategy.  I would imagine if they thought that the

20   stock was trading at a level they liked in the morning or the

21   day before, they would execute it then.

22             But as far as what I think what you're trying to

23   say, the market is open for trading in that stock up until

24   it's not.  So they can do it as close to the close of trading

25   as possible.  But I don't know when you're saying that's a

                        CAROCCI - CROSS - MR. BRILL

1    strategy or a factor, I don't know that.  That's an individual

2    trader.

3    Q     But would you agree, if you know based on your knowledge,

4    that that would be a trading strategy for some stock traders

5    who are trading with respect to the earnings announcement?

6    A     I imagine, but I have no personal knowledge of that

7    trading strategy.

8    Q     Would you agree, Mr. Carocci, that on the day a company

9    announces earnings, that the closer that you get to that time

10   that they announce earnings, all of the news that's out with

11   respect to that company is already out.  In other words, by

12   the time you place that trade you can place that trade not

13   worrying about what else is coming from the news before the

14   earnings.  I could rephrase that if you would like.

15                MR. GOPSTEIN:  Objection to form.

16                THE COURT:  Yes, please.

17   Q     If you place a trade closer to 4:00 o'clock, if a company

18   is announcing earnings after 4:00 o'clock, then at that point

19   the only news left for that company is the earnings, would you

20   agree with that statement?

21   A     I mean I would -- I guess I would agree that there is

22   news and information out there about the company all day long?

23   Q     Yes.

24   A     Then there is the earnings announcement.  So yes, I

25   guess.

                        Rivka Teich CSR, RPR, RMR FCRR
                          Official Court Reporter

CAROCCI - CROSS - MR. BRILL

1    Q    If some stock trader was placing their trade based on

2    what they anticipated the earnings to be and they were solely

3    interested only in what those earnings were, the closer you

4    got to the earnings announcement that is the optimal time for

5    that trader to place that trade, would you agree with me?

6    A    I don't necessarily know that whatsoever.  A lot of

7    factors would come into play.  That may not be the optimal

8    time, the stock could have been trading a lower price.

9         Let's say you want to buy the stock, it could have

10   been at lower price the day before, a lower price the morning

11   of.  So that if you're looking to buy because you think a

12   stock is going to go up, buy low, sell high.  You think it's

13   going to up, you're saying optimal, the optimal could have

14   been a day before, two days before, the morning.  If you're

15   talking about a low price to buy low, sell high.  The opposite

16   for short a price decrease.

17        I can't agree that optimal time would be then.  I

18   don't think, I don't think you can say that as a blanket

19   statement whatsoever.

20   Q    If you are, Mr. Carocci, an earnings trader basing your

21   trade solely on what that company will announce as its

22   earnings, do you not agree that the best time to place that

23   trade is right before the earnings are announced, that's the

24   question?

25   A    I guess I don't.  Because the way I understand the

CAROCCI - CROSS - MR. BRILL

1    question is, I mean, this person trading on earnings has to

2    have something if their mind whether they feel the stock is

3    going to be, the earnings announcement is going to be

4    beneficial to the stock price or detrimental to the stock

5    price.  They have to some type in their mind when they are

6    making a trade to execute some type of strategy.  I don't know

7    how this is related to this optimal time to a few minutes

8    before.  I just don't get that.

9              Because if, like I said, if you wanted to buy the

10   stock, you want to buy as low as possible, that stock price

11   could be low, lower the day before, could be lower five hours

12   before, surely one hour before.

13   Q    How about ten minutes before?

14   A    Anything is possible.  But to say ten minutes is always

15   the optimal time for it, I don't think you can say that.  I

16   don't know how can you say that.

17             THE COURT:  Excuse me, whether it's optimal or not,

18   as you're describing that, if you trade close to the point at

19   which the earnings are announced you are less vulnerable to

20   other outside forces news and so forth effecting the price of

21   the stock, fair enough?

22             THE WITNESS:  That's correct, your Honor.

23   Q    Would it be fair to say if you are a trader that is

24   solely interested or solely anticipating what those earnings

25   will be, then you want to be in a position where you are less

CAROCCI - CROSS - MR. BRILL

1    vulnerable to any other news outside of that earnings?

2    A    Okay, that would make sense, yes.

3    Q    Mr. Carocci, in terms of activity or volume in a

4    particular stock, would you agree with me that on the day a

5    stock is to announce its earnings, that there is an increase

6    in stock trading activity for that company?

7    A    I would say it's been my experience that that's usually

8    the case; but I wouldn't say it's always the case.  In my 18

9    years of experience, that is usually the case.

10   Q    And by us saying increase activity, would it be fair to

11   say there is an increase in volume, which means the number of

12   shares trading and bought and sold on that day?

13   A    That's what I thought you meant by the previous question.

14   Q    Yes, I wanted to make it crystal clear for everyone.

15   A    Yes.

16   Q    Would you agree, Mr. Carocci, based on what you said

17   which is based on your knowledge, that is it a fair assumption

18   that the reason for that is because those traders are

19   essentially anticipating the earnings in someway?

20   A    I think it would be a fair assumption that at least part

21   of that increased trading volume you're discussing would be

22   related to earnings announcement in anticipation.

23   Q    Thank you.  In other words, it's not a coincidence there

24   is increased activity or increased volume of trading the day a

25   company is announcing earnings, right?

CAROCCI - CROSS - MR. BRILL

1    A    Correct.

2    Q    Now, we touched upon this, Mr. Carocci, but in terms

3    of -- we talked briefly about research.  I think you were

4    asked a question about research, do you remember that?

5    A    Vaguely, I don't remember the specific question.

6    Q    It may have been one question.  My question is, would you

7    agree with me that there are several research tools for a

8    stock trader to use out there?

9    A    Yes.

10   Q    And for example one of them is Zacks.com?

11   A    I've heard of it.  I've never gotten on it.

12   Q    I never asked if you had gotten on it, but you've heard

13   of Zacks.com?

14   A    I've heard of it, yes.

15   Q    Would you agree it's a popular research tool amongst

16   stock traders?

17   A    I wouldn't know that.

18   Q    It has, Zacks.com has what is called rating system for

19   how the analysts who work for Zacks anticipate or predict

20   earnings for a company, are you familiar?

21   A    I use Bloomberg.  I don't use Zacks.  I'm not familiar

22   with Zacks.

23   Q    I'm not talking what you use -- let me finish the

24   question.  As someone who is has been declared an opinion

25   witness here, who worked for FINRA for 18 years, that's who

CAROCCI - CROSS - MR. BRILL

1   I'm asking, do you have knowledge of Zacks based on your 18

2   years experience?

3   A    I'm telling you I have knowledge that it exists, but

4   other than that I do not use it.  I use other financial

5   websites.  I use Bloomberg mainly, almost exclusively.

6   Sometimes I'll use Reuters Thompson, even Yahoo Finance if I'm

7   looking for certain things.  That's just not what I use.  I'm

8   not familiar at all with its layout or anything like that or

9   content, quite frankly.

10  Q    Okay, but given that you don't use it, are you able to

11  testify that it's a popular tool that other traders use?

12  A    I wouldn't know what other traders use.  As a regulator I

13  use Bloomberg.  I know other traders use Bloomberg.

14  Q    Same question, Mr. Carocci, with respect to Briefing.com

15  as a research tool?

16  A    I have not.

17  Q    How about Yahoo Finance?

18  A    Yes, I've heard of that.

19  Q    And would you -- is it fair to say that Yahoo Finance is

20  a popular research tool among individuals who trade stocks?

21  A    I don't have anything to base -- I use Yahoo, I don't

22  have anything to base -- you're asking popular, how many

23  people log on and use it?  I have no idea of that number

24  whatsoever.

25  Q    I'm not asking numbers.  Just in general, being in the

CAROCCI - CROSS - MR. BRILL

1    field how long you have been, would you consider the use of

2    Yahoo Finance for stock traders as something that is commonly

3    done, that's popular?

4    A    Yes, it's common I would say.

5    Q    Mr. Carocci, are you familiar with what an earnings

6    surprise is?

7    A    As I would define it, it's something that is basically

8    not in line with the guidance, what the company put out as

9    guidance, or what the consensus of the analysts was.  So it

10   could be positive or negative surprise, positive you think a

11   surprise positive it's not in line with the guidance is how I

12   would understand it.

13   Q    In other words, that there is public knowledge as to what

14   a stock is supposed, or what a company, is supposed to

15   announce or what their earnings are supposed to be and the

16   actual announcement comes out the opposite way, or is a

17   surprise based on what was predicated; is that fair?

18   A    Yes.

19   Q    Would you agree with me that if someone possessed that

20   information ahead of time, before the public, that their

21   trades would be consistent with that surprise?

22          THE COURT:  What is that information?

23   Q    The information that there is an earnings surprise, the

24   earnings are different from how it was predicated.

25   A    Can you repeat the question?  I'm sorry.

CAROCCI - CROSS - MR. BRILL

1    Q    Sure.  Would you agree if someone had that information,

2    the fact there was a surprise in earnings before the public,

3    that they essentially, if they wanted to place a trade, would

4    place a trade based on that earnings surprise having the

5    non-public information ahead of time?

6    A    Just that it was a surprise or, I mean, to execute a

7    strategy you probably want to know if it's a positive or

8    negative surprise, right.  But as far as like what you're

9    saying, yes, if they knew about that prior, yes, there would

10   be a type of strategy that they might try to execute.

11   Q    To be more clear, their trade would be consistent with

12   what that earnings surprise was, negative or positive?

13   A    Right, that's correct.

14   Q    Mr. Carocci, you had told us on your direct testimony

15   when you were asked by the Government about the return the S&P

16   500 return in 2011, do you remember that question?

17   A    Yes.

18   Q    You told all of us that essentially the rate of return

19   for the for all 500 stocks on average in the S&P was

20   2.1 percent in 2011, is that your testimony?

21   A    That was the Index return.  I did the Index when I looked

22   it up.

23   Q    Were you asked just to do 2011?

24   A    Yes.

25   Q    Well, are you aware that in 2012 it was 16 percent?

CAROCCI - CROSS - MR. BRILL

1    A    No.  For my preparation for my testimony today I just

2    looked at 2011.

3    Q    Okay.  That's because the Government told you to look at

4    2011 only?

5    A    They asked me if I could get that information.

6    Q    Okay.  How about -- so I guess they didn't ask you to

7    look at 2013, which was a 32 percent return?

8    A    I wasn't asked to get that information.

9    Q    How about 2014, which is a 16 percent return.  You

10   weren't asked to do that?

11   A    Correct.

12            THE COURT:  Do you know that to be the case?

13            THE WITNESS:  Those numbers sound accurate to me.

14   But again, I didn't specifically look that number up before I

15   came here today.  I have no reason to doubt.

16   Q    You weren't asked to do that?

17   A    Correct.

18   Q    Mr. Carocci, back to the 2011, which you did testify

19   about which was 2.1 percent, would you agree with me that

20   there are let's say mutual funds in 2011 that beat that

21   number, that beat the S&P 500 Index?

22   A    Yes.

23   Q    Mutual funds?

24   A    Yes.

25   Q    Hedge funds, same thing, there are hedge funds that after

CAROCCI – CROSS – MR. BRILL

1  the year was up their rate of return was higher than

2  2.1 percent than the S&P 500 Index?

3  A    Some hedge funds would be, some would not, same as mutual

4  funds depending on investment strategy, depending how

5  successful it was for 2011.

6  Q    My question is, there were some that would beat it?

7  A    Yes.

8  Q    And would it be fair to say there were some that would

9  beat it by a lot?

10  A    Off the top of my head I don't know that, but it's

11  possible.

12  Q    Would the same apply, Mr. Carocci, to an individual

13  trader that's trading throughout the year then takes a final

14  tally at the end of the year?  Would you agree with me that an

15  individual stock trader could very well beat the S&P 500 Index

16  at the end of 2011?

17  A    Yes.

18  Q    Would you agree that that particular individual trader

19  could beat the S&P 500 Index by a lot?

20  A    It's certainly possible.

21  Q    That's just one index, you've testified just to a rate of

22  return on one particular index in 2011, yes?

23  A    On direct, yes.

24  Q    The question, Mr. Carocci, I think you did mention on

25  direct about brokerage companies.  I'm sorry, we heard a lot

CAROCCI - CROSS - MR. BRILL

1   of things, I don't know if you mentioned E-Trade or brokerage

2   companies where you can conduct trades like E-Trade or Schwab

3   or TD Ameritrade?

4   A    FINRA member firms, we call them brokerage firms.

5   Q    Would you agree with me that each time if you're a

6   customer of those companies, that each time you conduct a

7   trade with those companies, there would be a record of it?

8   A    Correct.

9   Q    So if I'm a Schwab customer and I want to place a trade

10  on Apple, and I can do it online, I place a trade with Apple,

11  that transaction the details of that will be recorded by

12  Schwab?

13  A    Yes.

14  Q    Now, would you agree with me, Mr. Carocci, that if I did

15  that exact same thing but I was in Switzerland when I logged

16  into my Schwab account and placed that exact same trade in

17  Apple with Schwab, wouldn't you agree that Schwab would also

18  have a record of that trade?

19  A    If it was executed through Schwab, Schwab should have a

20  record of trade.

21  Q    No matter where I am, if I'm in Brooklyn?

22  A    Yes.

23  Q    Or Switzerland?

24  A    Yes.

25  Q    Or Canada, as long as I execute within those companies

CAROCCI - CROSS - MR. BRILL

1   they are going to have a record of those trades, wouldn't you

2   agree?

3   A    They should have the record of those trades.

4   Q    You were asked on direct testimony, Mr. Carocci, about

5   Government's Exhibit 815.  You were asked questions about 815

6   this morning, which was Mr. Korchevsky's CRD report do you

7   remember those questions?

8   A    Yes.

9   Q    You saw in there Mr. Korchevsky's employment history,

10  yes?

11  A    Yes.

12  Q    Now, question for you Mr. Carocci, in reviewing this CRD

13  report basically up to 2008, there was no FINRA suspensions

14  that you saw in the CRD, right?

15  A    Reviewing the CRD up until 2008?

16  Q    Yes.

17  A    Yes, correct.

18  Q    There are no -- you mentioned barring, Mr. Korchevsky

19  wasn't barred from trading, nothing reflected in this report,

20  right?

21  A    Correct.

22  Q    If one trades on their own, Mr. Carocci, meaning if

23  someone essentially is not employed by anyone and for

24  themselves wants to trade, do they need to register through

25  FINRA?

CAROCCI – CROSS – MS. WHALEN

1  A    Not if they are trading for their own account, their own

2  money, no.  The registration only applies if you're doing it

3  for others, for compensation, that's where the registration

4  applies.  No, any individual can set up an E-Trade or TD

5  Ameritrade account on their own.  You don't need to be

6  registered to trade your own money in your own brokerage

7  account.

8            MR. BRILL:  Your Honor, may I have one moment?

9            THE COURT:  Yes, sure.

10            MR. BRILL:  Nothing further.

11            THE COURT:  Thank you.  Ms. Whalen?

12            MS. WHALEN:  Yes, your Honor.

13  CROSS-EXAMINATION

14  BY MS. WHALEN:  :

15  Q    Good afternoon, Mr. Carocci.

16  A    Good afternoon.

17  Q    We are heading into new waters.

18  A    Okay.

19  Q    On your direct testimony you talked about trading

20  authorization forms?

21  A    Correct, yes.

22  Q    And the brokerage firms keep the trading authorization

23  forms as a record of who is signing up for the account, who

24  the account belongs to, that kind of information, correct?

25  A    Who has trading authorization in the account, it's really

CAROCCI - CROSS - MS. WHALEN

1    not dissimilar to a bank account.  You set up a bank account,

2    you need to know who can make withdrawals from the account.

3    MS. WHALEN:

4                 MS. WHALEN:  Ms. Mulqueen, the witness only.

5                 COURTROOM DEPUTY:  Witness only, okay.

6    Q    I'm showing you what is marked for identification as

7    Government's Exhibit 1008-2, do you recognize what this

8    document is?

9    A    First time I've seen it.  Looks like TD Ameritrade

10   business account application.

11   Q    I'm not suggesting that you have any experience with this

12   document, but this is the kind of document that you would

13   recognize as a trading authorization form?

14   A    It's an account opening document.  That's where I would

15   recognize it as.

16   Q    Would there be a separate trading authorization document?

17   A    I mean, it should be, it could be separate but it should

18   be related to this form, or on this form there should be a

19   section that gives the trading authorization.

20                 MS. WHALEN:  Your Honor, I'd like to move this

21   document into evidence as part of a stipulation that will be

22   introduced later.  And I would just publish it subject to

23   connection later on.

24                 MR. GOPSTEIN:  No objection.

25                 THE COURT:  1008-2 received subject to connection.

CAROCCI - CROSS - MS. WHALEN

1          (Government Exhibit 1008-2, was received in

2     evidence.)

3     Q     I'm going to turn to page three of the document.  I'm

4     going to show you section nine, you see margin account is

5     checked?

6     A     Yes.

7     Q     And then I would ask you to look at the provision

8     underneath, it's the financial information, subsection ten?

9     A     Yes.

10    Q     I'm showing you the last sentence in this which reads,

11    Selling short can expose you to potentially unlimited risk.

12    To learn more about the potential benefits of margin borrowing

13    and the associated risks involved, read the margin account

14    handbook.

15          Mr. Carocci, what is a margin account?

16    A     An account that allows the account holder to effectively

17    borrow money from the brokerage firm to make investments,

18    investments in stocks options, allows to you borrow money.

19    Not every brokerage accounts are like that, some are margin

20    accounts.

21    Q     That means if you only have $100 deposited but you have a

22    margin account, you can borrow and trade with more than $100,

23    correct?

24    A     Correct, you can borrow, they can lend you money to make

25    trades, then whatever you buy will be collateral for the

CAROCCI - CROSS - MS. WHALEN

1    money.

2    Q    This is a warning because that can be risky in some

3    circumstances, correct?

4    A    Yes, because you're trading with borrowed money.

5    Q    Right.  And so if you make a mistake in your borrowing,

6    you could lose a lot of money and in this case owe Ameritrade

7    a lot of money?

8    A    Right.  Technically they would have the stock as

9    collateral; but yes, you could lose money and a lot of money,

10   yes.

11   Q    They actually give you a warning as part of this

12   financial information, correct?

13   A    I call that a warning, yes.

14   Q    Going to page four, this is going to be, this is the

15   account agreement, paragraph 13.  As part of paragraph 13 I'm

16   going to zoom down, there is a section that says, When you

17   open an account we will ask you your name, address, date of

18   birth, and other information.  We may also use third-party

19   information verification and ask you for a copy of your

20   driver's license and other identifying documents.  Correct?

21   A    Yes.

22   Q    That means that they could ask for, as they say, your

23   driver's license just to confirm identity, correct?

24   A    Yes.

25   Q    Now, I think Mr. Brill just talked to you about, there

CAROCCI - CROSS - MS. WHALEN

1  are different ways to trade on the stock market.  You can use

2  a brokerage firm or you could trade on your own, correct?

3  A     You have to, you have to have a brokerage account, not a

4  brokerage firm.  You could do it yourself as far as make your

5  own decisions, but you could also use a broker to make

6  recommendations or help you through the process or walk you

7  through things.  So but you need a brokerage account.

8  Q     Right, I'm sorry, you need something like a TD Ameritrade

9  to physically make the trades, correct?

10  A     Correct.

11  Q     Some people do it on their own and some people under the

12  advice of a broker?

13  A     Yes.

14  Q     Brokers are paid for their work; isn't that correct?

15  A     Yes.

16  Q     They can be paid per activity, like they could be paid

17  for every purchase and they could be paid for every sale of

18  stock, correct?

19  A     They can.

20  Q     They can also receive a commission on the purchase and

21  sale of stock, correct?

22  A     Yes.

23  Q     And that commission could be a percentage of the profits,

24  if there were profits on that sale, correct, or purchase?

25  A     Right, yes.

CAROCCI - CROSS - MS. WHALEN

1   Q     The percentage, if someone was acting on that kind of a

2   commission basis earning, getting paid for profits, the

3   percentage of the profit could vary, correct?

4   A     I'm confused now.

5   Q     I didn't mean to confuse you.

6   A     You're talking about commissions for executing a trade;

7   some are flat fees, some are percentage of the trade.

8   Q     Okay.  And if someone was operating on a percentage

9   basis, the percentage could vary; isn't that correct?

10  A     It can vary.  But under FINRA rules it has to be

11  reasonable for the stock.  Basically reasonableness is

12  determined how liquid the stock is and that type of stuff.

13  Q     Okay.  There are brokerage firms that have -- let's use

14  Merrill Lynch for example.  Merrill Lynch has an online

15  platform where can you trade on your own, correct?

16  A     Yes.

17  Q     And they also have traders who work for them for Merrill

18  Lynch, correct?

19  A     Yes.

20  Q     The fee relationship between the traders and Merrill

21  Lynch would be established by that company, correct?

22  A     Correct.

23  Q     Maybe they have a sort of a base salary, then sort of

24  commission rate on top of that, correct?

25  A     Correct.  I'm not familiar what Merrill Lynch does, but

CAROCCI – CROSS – MS. WHALEN

1    something to that effect.

2    Q     I'm using Merrill Lynch as an example in name.  I saw it

3    on an advertisement, not using them for a particular example.

4              Then you were asked on your direct testimony about

5    the settlement of securities transactions, do you remember

6    that?

7    A     Yes.

8    Q     Settlement is the last step in the securities

9    transaction, correct?

10   A     Yes.

11   Q     The first step is the execution of the trade, correct?

12   A     An order to buy or sell then the execution, then

13   settlement.

14   Q     So first I would place my order, correct, then if I'm

15   using Merrill Lynch they would execute that order, correct?

16   A     Correct.

17   Q     Then the next step would be clearing, correct?

18   A     Yes.

19   Q     What is clearing?

20   A     Well, it's basically making sure that the stock that's

21   let's say sold, gets to the right account, and that the money

22   to pay for that stock or the proceeds from a stock sale get to

23   the right accounts.

24   Q     I think you mentioned on your direct testimony that the

25   DTCC --

1477

CAROCCI - CROSS - MS. WHALEN

1    A    Yes.

2    Q    -- that's the depository trust company?

3    A    Clearing Corporation.

4    Q    Clearing Corporation, okay.  A subsidiary of the DTCC is

5    the National Securities Clearing Corporation, correct?

6    A    Yes.

7    Q    And if I can just call it the NECC for short.  The NECC

8    provides clearing and settlement of securities transactions,

9    correct?

10   A    Yes.

11   Q    That's actually located in Manhattan, correct?  I could

12   show you something to refresh your recollection.

13   A    Off the top of my head I can't recall where they are

14   located, I'm sorry.

15        This looks like from their website, National

16   Security Clearing Corporation.  They have a contact address of

17   55 Water Street, New York, New York.  I don't know if that's

18   their headquarters.

19   Q    So you don't know.

20   A    That's an address on a website.

21   Q    So you have no personal knowledge as to where the NECC

22   clears trades, correct?

23   A    I don't know their physical location.

24             (Continued on next page.)

25

CAROCCI - CROSS - MS. WHALEN

1    Q    So then I'm going to show you --

2              MS. WHALEN:  And this is for everyone, Ms. Mulqueen.

3    Q    I'm going to show you what's been previously marked as

4    Government's Exhibit 814.  And this is the CRD report from --

5    for -- this is the CRD report, correct?

6    A    Yes.

7    Q    Okay.  And Government Exhibit 814 is actually for -- I'm

8    turning to page 3 -- it's actually for Mr. Khalupsky, correct?

9    A    Yes.

10   Q    FINRA registration, you are registered if you are

11   employed by a Wall Street firm?

12   A    Yes.

13   Q    And you requested this report on April 18th of 2018?

14   A    Yes.

15   Q    Okay.  And it lists, Mr. Khalupsky's state of residence

16   as New York; is that correct?

17   A    Yes.

18   Q    Now, that state of residence, is that the state of

19   residence at the time of the filing of the report -- the

20   individual who is filing their forms with FINRA?

21   A    Right.  So it would have been what's called a Form U4,

22   which would have been filed by Mr. Khalupsky and the firm he

23   was currently with, notifying us that that was his state of

24   residence at that time, and if that changes from the time

25   someone becomes registered or the time if they file that Form

14/9

CAROCCI - CROSS - MS. WHALEN

1    U4, they are required to amend the Form U4 to let us know that

2    it had changes and then it would show up in this -- the

3    amendment would show up in this -- in this report.

4    Q    Okay.  So at this point, just going further down on

5    page 3, so it says, "There are no registrations with the

6    current employer found for this individual," correct?

7    A    Yes.

8    Q    Okay.  And that means -- that could mean many things;

9    isn't that correct?

10   A    No.  I mean, I think, you know, if -- it basically means

11   that the current person is not currently registered.

12   Q    Okay.  So he's no longer registered with FINRA; is that

13   correct?

14   A    Correct.

15   Q    Okay.  And that could be -- maybe I should rephrase it.

16         That could be the result of a number of things,

17   correct?  He could no longer be working in the securities

18   industry, correct?

19   A    Correct.

20   Q    Or he could have left the United States and no longer be

21   working in the United States, correct?

22   A    Correct.

23   Q    And no longer be working with a Wall Street firm,

24   correct?

25   A    Correct, yeah.

CAROCCI – CROSS – MS. WHALEN

1  Q    Okay.  I'd like to draw your attention, then, to the

2  registrations with previous employers.

3         So it indicates that he was registered from July 28,

4  2010, to June 15, 2011, with WTS Proprietary Trading

5  Corporation, correct?

6  A    Yes.

7  Q    And before that, I think you mentioned he was with

8  Dimension Brokerage from September 13th, 2007, to August 1st,

9  2008?

10  A    Yes.

11  Q    I would like to draw your attention to, then, page 5,

12  because just looking at page 5, that top line of employment

13  history --

14  A    Right.

15  Q    -- it says from September 2007 to the present at

16  Dimension Brokerage.

17  A    Right.

18  Q    But previously on the other page, it showed him working

19  for Dimension Brokerage until 2008.

20  A    Well -- right.  So you have -- what that section is, in

21  the database, is the history.  So it stops, you know, before

22  its last -- the last employer.

23  Q    Okay.

24  A    You see what I'm saying?  So -- so that's, kind of,

25  history.  The section you read from before was registration

CAROCCI – CROSS – MS. WHALEN

1    with previous employers.  This section is employment history,

2    and so it's just the way the database is.  That employment

3    history cuts off there, and the last one that they're with is

4    in the front.  It gives the dates.

5    Q    Okay.

6    A    And that's why it just says "present," because it's just

7    the way the database is set up.

8    Q    Okay.  But so it doesn't mean that he's still working

9    there, correct?

10   A    No.  It's a history.  It's the historical part of the

11   database.  It's not the -- if he was still employed, it would

12   have been the current.  If he was still employed, it would

13   have been the current part of the database, which is that

14   first page you read, page 3.

15   Q    Okay.

16        And then I'd like to show you page 6, and looking

17   down at -- it says, "Office of employment history, July 2010

18   to June 2011."  It gives WTS Proprietary Trading Group.  And

19   then it says, "type of office," and it says, "supervised

20   from."

21        What does that mean?

22   A    Well, this is the office that he should have been

23   supervised from.

24   Q    Okay.  And just looking below --

25   A    And this information would have been, again, provided by

Denise Parisi, RPR, CRR
Official Court Reporter

CAROCCI - CROSS - MS. WHALEN

1   Mr. Khalupsky and the firm to FINRA.

2   Q    Okay.  Great.

3        And then just looking below at the type of office,

4   because in his employment with -- from 2000 -- July 2010 to

5   August 2010, they're saying "located at."

6        Is that just a --

7   A    Your question?

8   Q    Yeah.  I guess, what's the difference between the one

9   that says "supervised from" and the other one that says

10  "located at"?

11  A    Well, the "located at" should have been his office of

12  employment where he shows up most of the time.  You know, not

13  necessarily every day, but his main office.

14       I think the "supervised from," that's the office he

15  supervised from.

16  Q    Okay.

17       And this is not the -- it says at the top of this

18  section, it says, "office of employment history," and

19  that's -- that's not the history of the office, because I

20  think the office address changes between -- as of June -- as

21  of the July 2010, it says 17 State Street, 39th floor, but

22  previously, the same employer from August 2010 to August 2010

23  is at 11 Broadway, Suite -- 11 Broadway, Suite 1515.

24       So, I guess, is this where Mr. Khalupsky should be

25  reporting, or is this just a history of where the offices are

CAROCCI - CROSS - MS. WHALEN

1   located?

2   A    It should be where -- he's located at the 11 Broadway,

3   that should be his office, and then -- but it's saying,

4   "supervised -- supervised from 17 State Street."

5           So, you know, this is his office of employment

6   history.  Again, this would have been provided by the firm.

7   You're saying he's at this office and he's supervised from

8   this office.

9   Q    Okay.

10  A    Now, if you're asking did WTS Proprietary Trading change

11  offices in that time, I would have to look at the -- at their

12  CRD to see if they had office changes.

13  Q    Okay.

14  A    But I don't have to do that.  I don't have that

15  information.

16  Q    Okay.  But this says "supervised from," so you have no

17  information as to whether he was at the 17 State Street office

18  or whether he was working remotely or how he was reporting to

19  the office; is that correct?

20  A    Well, it says, "private residence, no" -- yeah, that's

21  correct.  That's correct.

22  Q    So he could be reporting to the office or he could be

23  reporting in remotely, correct?

24  A    Correct.

25  Q    And then one more.  I'm just taking you to page 9 of the

CAROCCI - CROSS - MS. WHALEN

1    report.  The top line -- not the very top line, but the top of

2    the previous CE requirement status, he's listed -- just to

3    back up, CE stands for continuing education?

4    A    Yes.

5    Q    Continuing education inactive as -- it appears to be as

6    of September 30th, 2008, correct?

7    A    Yes.

8    Q    That would be an indication that he was no longer an

9    active registered broker, correct?

10   A    That's correct.  I think it ended a month earlier in

11   August.

12   Q    Okay.

13            MS. WHALEN:  Just a moment.

14            (Short pause.)

15   Q    Sorry, I think I -- I obviously misstated something.

16            The state of residence, just again, that was at the

17   time of his registration, you have no information as to

18   whether or not that's currently his residence, correct?

19   A    I have no -- no knowledge of his current residence.  That

20   is as of the last time he notified FINRA.

21   Q    Okay.

22            And that appears -- the last registration probably

23   would have been in July of 2010?

24   A    Let me see here.  It should be -- let me see in the back.

25   There might be something that tells us.

Denise Parisi, RPR, CRR
Official Court Reporter

CAROCCI – REDIRECT – MR. GOPSTEIN

1          (Short pause.)

2    A     Yeah, it looks like -- if you go to page 9, there's a

3    filing history, and if you look -- it looks like on

4    August 16th of 2010, there was a Form U4 filed for WTS

5    Proprietary Trading Group, so that -- it would have been on

6    that form, because there's no -- I don't see an amended form

7    after that --

8    Q     Okay.

9    A     -- amended Form 4 after that, so that should have been on

10   that form, and that's how that information would have gotten

11   into our database and you would see it where it's located.

12          MS. WHALEN:  I think that's it.  Thank you.  No

13   further questions.

14          THE WITNESS:  Thank you.

15          THE COURT:  Anything further?

16          MR. GOPSTEIN:  Just briefly, Your Honor.

17   REDIRECT EXAMINATION

18   BY MR. GOPSTEIN:

19   Q     Good afternoon again.

20   A     Good afternoon.

21   Q     You were asked a number of questions on cross-examination

22   about earnings surprises.

23          Do you recall that?

24   A     Yes.

25   Q     You were asked about how you might consider an earnings

CAROCCI – REDIRECT – MR. GOPSTEIN

1    surprise if you were in possession of a earnings press release

2    before it was published.

3             Do you recall that?

4    A    Yes.

5    Q    And would you agree, Mr. Carocci, that there are

6    different kinds of earnings surprises?

7    A    Yes.

8    Q    So if you have a positive earnings surprise, it's meeting

9    the estimate, and if you have a negative surprise, it's not

10   meeting the estimate?

11   A    Yes.

12   Q    And you can have a really big earnings surprise of

13   beating the estimate by $10, and you can probably have a

14   smaller surprise of beating the earnings by a cent; is that

15   fair?

16   A    Yes.

17   Q    And if you were in possession of a press release, is one

18   of the things you would consider the size of the earnings

19   surprise?

20   A    Yes.  If you were in possession of a press release.

21   Q    If you were in possession of an earnings press release,

22   would you also consider the information in addition to the

23   earnings numbers that are contained in that earnings press

24   release when deciding how to trade?

25   A    Yes.  I imagine you can read the whole press release and

CAROCCI - REDIRECT - MR. GOPSTEIN

1   see what other information is in there.

2   Q    So if you had an earnings press release that showed an

3   earnings surprise that a company, for example, beat earnings

4   predictions by one cent, but also in that press release it

5   announced it was firing its CEO and discontinuing its product,

6   would you consider that information when deciding how to

7   trade?

8   A    Sure.  I mean, there's -- earnings, again, is just one --

9   one component.  I mean, you know, Ford could have an earnings

10  surprise, but they could also disclose that they have to

11  recall a million vehicles.  That's a problem, okay, because

12  one is saying for the past quarter, we beat expectations,

13  let's say, for example, we made more money than we thought,

14  but, you know, the government just told us we had to recall a

15  bunch of cars.  There's going to be a cost to that in fixing

16  them, so, you know, what's more important?  That's up to the

17  individual trader to evaluate and decide.  I couldn't tell

18  you, I'm not an expert of Ford, but that's something that an

19  individual trader would have to decide.  What's more

20  important, that they beat earnings expectations or they have

21  to recall five million vehicles?

22  Q    And having all of that information before it's public,

23  that's the informational advantage you testified to on direct?

24  A    Correct.  That's the informational advantage that

25  regulation FD is supposed to prevent from happening.

CAROCCI - REDIRECT - MR. GOPSTEIN

```
 1            MR. GOPSTEIN:  No further questions.

 2            THE COURT:  Anything else?

 3            MR. BRILL:  No.  No questions.

 4            THE COURT:  Thank you, sir.  You may step down.

 5            THE WITNESS:  Thank you, Your Honor.

 6            (Witness steps down.)

 7            THE COURT:  Next witness, please.

 8            MS. NESTOR:  The government calls Arkadiy Dubovoy.

 9            THE COURTROOM DEPUTY:  Good afternoon, sir.  I'm

10   going to ask you to, please, take the stand.

11            THE COURT:  The witness will be testifying with the

12   assistance of a Russian interpreter.

13            Ms. Mulqueen, please swear the interpreter.

14            THE COURTROOM DEPUTY:  Sir, I'm going to ask you to

15   raise your right hand.

16            (Interpreter sworn.)

17            THE INTERPRETER:  Yes.

18            THE COURTROOM DEPUTY:  Thank you.

19            May we have your name for the record, please.

20            THE INTERPRETER:  Andrew Harkuscha,

21   H-A-R-K-U-S-C-H-A.

22            THE COURTROOM DEPUTY:  Thank you.

23            Sir, I'm going to ask you to stand and raise your

24   right hand.

25            (Witness takes the witness stand.)
```

1489

DUBOVOY – DIRECT – MS. NESTOR

1   ARKADIY DUBOVOY, called as a witness, having been first duly

2   sworn/affirmed, was examined and testified as follows:

3              follows:

4              THE WITNESS:  Yes, so help me God.

5              THE COURTROOM DEPUTY:  Thank you.  Please have a

6   seat.

7              State and spell your name for the record.

8              THE WITNESS:   Arkadiy Dubovoy, A-R-K-A-D-I-Y

9   D-U-B-O-V-O-Y.

10             MS. NESTOR:  Will the interpreter need a microphone?

11  It's just a suggestion.  If it's not necessary for the

12  Court --

13             THE COURTROOM DEPUTY:  Sure.  We have a lapel -- we

14  can use this.

15             (Short pause.)

16             THE COURTROOM DEPUTY:  Okay.  If this isn't working,

17  I'm just going to ask you --

18             THE COURT:  Just speak up.  The witness is fine.

19  We're talking about the interpreter.

20             THE INTERPRETER:  Yes, I have a loud voice.

21             THE COURT:   Good.  We need a few loud voices around

22  here.

23             Go ahead.

24  DIRECT EXAMINATION

25  BY MS. NESTOR:

Denise Parisi, RPR, CRR
Official Court Reporter

1490

DUBOVOY - DIRECT - MS. NESTOR

1    Q    How old are you?

2    A    Fifty-three.

3    Q    Where were you born?

4    A    Ukraine de Odessa Oblast region, Shevchenko.

5    Q    Where did you grow up?

6    A    In the Ukraine in the village of Shevchenko.

7    Q    How far did you go in school?

8    A    Technical school.

9    Q    What technical education did you receive?

10   A    Electrical.

11   Q    Where do you live currently?

12   A    Atlanta, Georgia.

13   Q    And I should have asked, when you said you got an

14   electrical education, does that mean you learned how to be an

15   electrician?

16   A    Yes.

17   Q    So you currently live in Atlanta, Georgia.

18   A    Yes.

19   Q    When did you come to the United States?

20   A    Twenty-five years ago.

21   Q    Why did you move?

22   A    I came here as a refugee.

23   Q    A refugee from what?

24   A    By way of a -- because I was a Christian.

25   Q    What do you mean?

DUBOVOY – DIRECT – MS. NESTOR

1    A    Back -- back then, in our -- in our territories, there

2    was suppression of religious believers.

3    Q    Are you a citizen of the United States?

4    A    No.

5    Q    Why not?

6    A    I -- I attempted to become one twice, but I was not able

7    to handle the language part of the exam.

8    Q    What language do you speak?

9    A    Russian and Ukrainian.

10   Q    Do you speak English?

11   A    No.  A little.

12   Q    What have you been doing for a living in the last

13   25 years?

14   A    I am a businessman.

15   Q    Have you run your own businesses?

16   A    Yes.

17   Q    Tell us about those businesses.

18   A    I have a construction business.

19   Q    What's that called?

20   A    APD Custom Homes.

21   Q    What else?

22   A    I also have a ice cream factory.

23   Q    You have them currently?

24   A    Now, no.

25   Q    You had it at one point?

1492

DUBOVOY – DIRECT – MS. NESTOR

1    A    Yes.

2    Q    Where was the ice cream factory?

3    A    In the Ukraine.

4    Q    What else did you do for business?

5    A    I also had a company back in the Ukraine that collected

6    garbage.

7    Q    What else?

8    A    I sold clothes.

9    Q    Where was that?

10   A    In the Ukraine.

11   Q    What else did you do in the United States?

12   A    I had apartments.

13   Q    What does that mean?

14   A    I would rent out apartments.

15   Q    Did you have any other construction businesses in the

16   Ukraine?

17   A    Yes.  I had a business with partners.

18   Q    What was that called?

19   A    Atlanta Invest.

20   Q    Currently, what are you doing?

21   A    I just work.

22   Q    Where do you work?

23   A    Mission Cargo.

24   Q    What does that do?

25   A    It's a transportation company.

DUBOVOY – DIRECT – MS. NESTOR

1    Q    What do you do for them?

2    A    I am a worker there.  I repair trucks.

3    Q    I should have asked.  When you first came to the United

4    States, did you start out owning your own business?

5              THE INTERPRETER:  I'm sorry, could you repeat it?

6    Q    I should have asked.  When you first came to the United

7    States, did you start out owning your own business?

8    A    No.  I initially worked.

9    Q    What did you do?

10   A    I worked in –– at a glass factory.

11   Q    Why are you here today?

12   A    Because I broke the law.

13   Q    Tell us what you did.

14   A    Our group, we purchased –– we purchased information ––

15   information that we were able to receive before other people

16   were able to receive that information, and then we purchased

17   stocks on the market.

18   Q    Based on that information?

19   A    Yes.

20   Q    Did you plead guilty to any crimes?

21   A    Yes.

22   Q    To what?

23   A    That –– to what I did –– to which I did.

24   Q    What was the crime you pled guilty to?

25   A    That –– that we agreed to –– that we were involved in

DUBOVOY – DIRECT – MS. NESTOR

1  wire fraud.

2  Q     A conspiracy to commit wire fraud?

3  A     Yes.

4  Q     Are you testifying here today as part of an agreement

5  with the government?

6  A     Yes.

7  Q     Have you been sentenced yet?

8  A     No.

9  Q     Did you commit this crime with others?

10  A     Yes.

11  Q     Do you recognize anyone in the courtroom today who you

12  committed these crimes with?

13  A     Yes.

14  Q     Can you please describe them by an article of clothing

15  and a name?  Well, who was it?  We'll start there.  Who was

16  it?

17  A     Khalupsky Vladimir and Vitaly Korchevsky.

18  Q     Can you please identify Mr. Khalupsky?

19  A     He's there at the edge of the table.

20         MS. NESTOR:  Your Honor, the government asks that

21  the record reflect that the witness has identified the

22  defendant, Mr. Khalupsky.

23         THE COURT:  Could you be more specific, sir?

24         THE WITNESS:  He is there at the end of the table;

25  white shirt, black suit.

DUBOVOY – DIRECT – MS. NESTOR

1    THE COURT:  Okay.  Indicating the defendant.

2    Q    And how about Mr. Korchevsky?  Could you please identify

3    him?

4    A    In the middle of the table, white shirt, black suit, gray

5    tie.

6    THE COURT:  Indicating Mr. Korchevsky.

7    MS. NESTOR:  Thank you, Your Honor.

8    Q    Can you briefly tell the jury what Mr. Korchevsky's role

9    was in this crime?

10   A    Korchevsky is a trader, and he traded on my accounts.

11   Q    Based on what?

12   A    Based on me giving him a code where he was able to access

13   information with which he was able to buy stocks before anyone

14   else was able to get that information.

15   Q    What about Mr. Khalupsky?  What was his role?

16   A    Khalupsky did the same thing.

17   Q    He was also trading in your accounts?

18   A    Yes.

19   Q    And based on the stolen information as well?

20   A    Yes.

21   Q    When was the last time you spoke to Korchevsky?

22   A    Prior to my arrest -- three years ago.

23   Q    What about Khalupsky?

24   A    Same thing.

25   Q    Can you tell us when you first met Vitaly Korchevsky?

Denise Parisi, RPR, CRR
Official Court Reporter

DUBOVOY - DIRECT - MS. NESTOR

1   A    That was in '99.  '99, 2000 -- somewhere in '99.

2   Q    How did you meet him?

3   A    A friend called me that we have a pastor in our church

4   and let me introduce you to him.  You're a businessman, he

5   works in a bank, and you may be of use to each other.

6   Q    So you learned Mr. Korchevsky worked at a bank.

7   A    That's how I recall it.  It was a long time ago.

8   Q    Did you meet Mr. Korchevsky?

9   A    Yes.

10  Q    What happened after you met him?

11  A    We met up, we spoke to each other, we shared what each of

12  us is involved in, what we do.

13  Q    What happened next?

14  A    He explained to me what the stock market was.  I didn't

15  know what it was.

16  Q    What happened next?

17  A    I opened an account, I deposit money to that account, and

18  I let him trade on it.

19  Q    I want to unpack that for a minute.

20        Whose idea was it for you to open up a brokerage

21  account?

22  A    Well, Vitaly described to me that -- what seemed to be a

23  good opportunity and I opened an account.

24  Q    What was the good opportunity?

25  A    Buying stock.

DUBOVOY – DIRECT – MS. NESTOR

1    Q    Had you invested in the stock market before?

2    A    No.

3    Q    Just to be clear, what were you doing at that time for

4    work?

5    A    Back then, I had a business.

6    Q    What type of business?

7    A    I built homes; I was involved with stucco plastering.

8    Q    Why did you decide to let Korchevsky trade for you in

9    your account?

10   A    I -- I trusted him.  He -- he's an honest person, a

11   pastor.

12   Q    How did the trading work?

13   A    Vitaly traded, then -- then the crash occurred and I lost

14   money and that's it.

15   Q    To be clear, he wasn't trading on stolen information at

16   this time?

17   A    No.

18   Q    Did you pay Mr. Korchevsky at this time?

19   A    Yes.

20   Q    Tell us what you paid.

21   A    I don't remember now.  This was a short period of time.

22   Q    Was there an agreement that you recall?

23   A    No.  There was nothing.

24   Q    What happened next?

25   A    Well, since I -- well, since I lost money, I got somewhat

DUBOVOY – DIRECT – MS. NESTOR

1    upset at Korchevsky.

2    Q    Let me ask you, during this time, did anyone else review

3    Korchevsky's trades in your accounts?

4    A    Near the -- in the last months, my accountant, Leonid

5    Momotok, looked at it.

6    Q    Leonid Momotok?

7    A    Yes.

8    Q    Who was Leonid Momotok?

9    A    We attend the same church together.

10   Q    I'm showing you what's already in evidence as

11   Government's Exhibit 3.

12           Do you recognize who that is?

13   A    Yes.

14   Q    Who is that?

15   A    Leonid Momotok.

16   Q    So please explain to us why you let Mr. Momotok review

17   your accounts during this time.

18   A    Well, back then, he traded using his own money.  That was

19   for some period of time.

20   Q    And why did you let him look at your accounts?

21   A    I don't exactly -- I don't exactly recall anymore.

22   Either we -- we spoke and -- and I gave him an opportunity to

23   look at the accounts.  I don't recall exactly.

24   Q    Did you tell Mr. Korchevsky that he was reviewing your

25   accounts?

                    DUBOVOY - DIRECT - MS. NESTOR

1    A    That Leonid looked at them?

2    Q    Yes.

3    A    No.

4    Q    Just to be clear, what was he doing after looking at the

5    accounts?

6    A    I don't know.  He just looked at them.  Maybe he did some

7    analysis for himself.  I don't know.

8    Q    Did he pay you money as a result of looking at the

9    accounts?

10   A    No, of course not.

11   Q    Why didn't you tell Mr. Korchevsky that Momotok was doing

12   this?

13   A    There was no need to tell him.

14   Q    After Mr. Korchevsky stopped trading in your accounts,

15   what was your relationship like with him?

16   A    For a certain period of time, there was no relationship

17   at all.

18   Q    Was there a time when you started dealing with

19   Mr. Korchevsky again?

20   A    Yes.

21   Q    When was that?

22   A    That was in the year 2010 -- 2010.

23   Q    Tell us what happened.  And start from the beginning,

24   please.

25   A    My brother called me and said there's a program that we

DUBOVOY - DIRECT - MS. NESTOR

1  can work on the stock market with.

2  Q    What did you do?

3  A    I said, well, then, send it over to me -- to Garkusha

4  or -- I don't know exactly who I mentioned.

5  Q    What's your brother's name?

6  A    Pavel.

7  Q    Showing you what's already in evidence is Government

8  Exhibit 4.

9        Who is that?

10  A    That's Pavel.

11  Q    Where did Pavel live at this time?

12  A    In the Ukraine.

13  Q    When Pavel first told you about the idea of something

14  having to do with the stock market or stocks, what did you

15  think about it?

16  A    I thought it was nothing.  I thought that nothing would

17  come of this.

18  Q    Why?

19  A    Because Pavel had a lot of ideas that -- that came my

20  way, but none of the ideas worked.

21  Q    You said that you asked Pavel to send it to you or -- to

22  send the information to you or Garkusha.  Who is Garkusha?

23  A    Garkusha is my partner in the construction company APD.

24  Q    Showing you what's already in evidence as Government

25  Exhibit 1.

DUBOVOY - DIRECT - MS. NESTOR

1          Who is that?

2     A     That's Garkusha.

3     Q     So what happened?

4     A     Garkusha reviewed what was sent to Pavel or that which

5     was sent to me -- I don't recall now to who it was sent to --

6     and he stated, "I don't know what this is.  I don't understand

7     this.  I can't -- I can't make sense of this."

8     Q     Let me ask you:  Why did you ask Garkusha to look at the

9     information?  Why couldn't you do it?

10    A     Because I don't have a command of computers, and I don't

11    have a command of the English language.

12    Q     Explain what you mean by you don't have a command of

13    computers.

14    A     I just -- I don't have a command of them.  The most I can

15    do is perhaps access them to maybe read some news.

16    Q     Are you able to send e-mails?

17    A     I don't send them.  I'm able to receive them and -- and

18    read them.

19    Q     Who sends e-mails for you in your business?

20    A     I had a secretary.  Garkusha took care of a lot of this,

21    and my son Igor assisted me.

22    Q     I'm showing you a photo that's already in evidence as

23    Government Exhibit 8.

24          Who is this?

25    A     That's Igor.

DUBOVOY - DIRECT - MS. NESTOR

1    Q    He's your son?

2    A    Yes.

3    Q    What happened after you asked Garkusha to look at the

4    information that Pavel, your brother, sent?

5    A    Garkusha said that he doesn't know what this is.

6    Q    What happened next?

7    A    So I called Pavel and said that this is all non-workable.

8    Q    What happened next?

9    A    Pavel calls me back and says, "Try it again."  He says,

10   "You have a friend Vitaly Korchevsky.  Show it to him."

11   Q    Did Pavel know Mr. Korchevsky?

12   A    He -- he wasn't -- he didn't personally know him, but he

13   heard of Korchevsky.

14   Q    Tell us why.

15             THE INTERPRETER:   I'm sorry?

16   Q    Tell us why.

17   A    Vitaly Korchevsky, everyone knows him.  He preaches

18   everywhere, he travels, and -- and he's known to many.

19   Q    Did you contact Mr. Korchevsky?

20   A    Yes, I got in contact with Korchevsky.

21   Q    At the time you contacted Korchevsky, what was your

22   understanding of this information that you were getting?

23   A    Back at that time, I didn't understand anything.

24   Q    What happened?

25   A    And we agreed to meet with Korchevsky at the airport in

Denise Parisi, RPR, CRR
Official Court Reporter

DUBOVOY - DIRECT - MS. NESTOR

1    Atlanta.  He was transiting the airport.

2    Q    What do you mean "transiting the airport"?

3    A    He was traveling -- he was traveling somewhere further,

4    but he had two or three hours to meet with us.

5    Q    Who is the "us"?

6    A    Garkusha was with me also.

7    Q    Where did Mr. Korchevsky live?

8    A    In Pennsylvania.

9    Q    And why couldn't you do this over the phone or by e-mail?

10   A    We decided to meet.  We hadn't seen each other for a long

11   period of time and we decided to meet.

12   Q    What happened when you met?

13   A    We came -- we traveled there with Garkusha.  We met with

14   Korchevsky, Garkusha opened the folder, he showed him the

15   paperwork.

16              (Continued on the following page.)

17

18

19

20

21

22

23

24

25

DUBOVOY – DIRECT – MS. NESTOR

1   EXAMINATION BY

2   MS. NESTOR:

3   (Continuing.)

4   Q    So approximately when was this?

5   A    I don't recall exactly, but the year '10, '11.  Don't

6   remember exactly.

7   Q    Where were you meeting?

8   A    In the airport on the second floor in the restaurant.

9   Q    There's a restaurant on the second floor?

10  A    There was one then, yes.

11  Q    And you said that Garkusha brought some papers with him?

12  A    Yes.

13  Q    What papers?

14  A    That which Pasha gave him access to.  He had printed it

15  out and he brought them to show it Vitaly.

16  Q    Did you ever see what Pavel gave access to?  That site

17  that Pavel gave access to.

18  A    I didn't see it.

19  Q    Did you review the papers that Garkusha brought for

20  Korchevsky?

21  A    No.

22  Q    Why not?

23  A    Because I don't read English and I'm not in that

24  business.

25  Q    What business are you referring to?

DUBOVOY – DIRECT – MS. NESTOR

1  A    I'm not in the financial business.  I was in the

2  construction business.

3  Q    What happened when you met with Korchevsky in the airport

4  when you met with Garkusha?

5  A    Korchevsky looked at it and he said, "This is all

6  non-workable and we can just access a computer and it would be

7  all be there."

8  Q    But tell us what the conversation was.  Why were you

9  talking about public versus nonpublic?

10            MR. BRILL:  Objection.

11            THE COURT:  I heard the word objection.

12            MR. BRILL:  Yes, your Honor.

13            THE COURT:  I'll overrule the objection.  Go ahead.

14  Q    What was the conversation about at the airport?  What

15  were you actually discussing?

16  A    This was so long ago, I don't recall everything exactly.

17  But we spoke that Pasha gave some type of program.  I don't

18  recall that well.

19  Q    Did you communicate to Mr. Korchevsky at the time that

20  this information was nonpublic?

21            MS. WHALEN:  Objection.

22            THE COURT:  Sustained as to form.  I would like to

23  hear from the witness.  Ask if there was any discussion about

24  the public nature of the information, something along those

25  lines.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DUBOVOY - DIRECT - MS. NESTOR

1    EXAMINATION BY

2    MS. NESTOR:

3    (Continuing.)

4    Q    Was there any discussion during this meeting about

5    whether this information was public or nonpublic?

6    A    When Vitaly looked at it, he said that all this exists,

7    it's accessible to everyone as of today.

8    Q    What happened next?

9    A    We left with Garkusha and Korchevsky flew on.

10   Q    What was Garkusha's reaction to this meeting?

11   A    Garkusha asked me, "So are you going to get involved in

12   this?"  And I said, "No, I'm not going to be involved in

13   this."  This is all nonsense.  This is just another one of

14   Pasha's bad ideas."

15   Q    Is Pasha the same person as Pavel?

16   A    Yes.

17   Q    What happened next?

18   A    We got back to the office and I tell Pavel that this is

19   non-workable.

20   Q    And what happened next?

21   A    A couple of days go by.  Pavel calls me again.  He says,

22   "Let's give it another look."

23   Q    What happens?

24   A    He sends these codes to us again and I call Vitaly

25   Korchevsky.  He comes to our office.

DUBOVOY - DIRECT - MS. NESTOR

1   Q    He comes from Pennsylvania to Atlanta?

2   A    Yes.

3   Q    And what happened?

4   A    I meet him at the airport and we go to the office.

5   Q    And what happened?

6   A    We go into Garkusha's office.  Garkusha, he accesses the

7   computer.  I think he printed out some papers.  He shows

8   what's on the computer to Vitaly and it ends with Vitaly

9   saying that all this information is publicly accessible.  It's

10  of no interest to us.

11  Q    Did Mr. Korchevsky ever express any concern about the

12  fact that you were trying to show him non-public information?

13          MR. BRILL:  Objection.

14          MS. WHALEN:  Objection.

15          THE COURT:  There's a delayed reaction here.  Can I

16  hear the question back?

17          MS. NESTOR:  I ask whether Mr. Korchevsky ever

18  expressed any concern that Mr. Dubovoy was trying to show

19  non-public information.

20          THE COURT:  I will overrule the objection, but I

21  want to hear from this witness.  We'll take this answer and

22  then we'll take our break.

23          THE INTERPRETER:  Could you repeat that.

24  Q    Did Mr. Korchevsky ever express any concern about the

25  fact that you were trying to show him non-public information?

1508

SIDEBAR CONFERENCE

```
1   A     No.

2              THE COURT:  All right.  I'm sorry.  Did I cut you

3   off?

4              THE INTERPRETER:  No.

5              THE COURT:  Let's take our afternoon break.

6              Don't discuss the case, ladies and gentlemen.

7              (Jury exits courtroom.)

8              THE COURT:  While the jury is filling out, can I see

9   counsel briefly at the sidebar.

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  Look, I know this is a little difficult

5    given the passage of time, given the language and everything

6    else, but we really do have to hear from this witness, all

7    right?  So keep the leading to an absolute minimum.

8          MS. NESTOR:  Absolutely, your Honor.

9          THE COURT:  On the other hand, I'd like to give the

10   jury for the first time some indication as to our pace of how

11   are we doing.

12         MR. TUCKER:  I think that much will depend on the

13   cross-examination here and the next witness.

14         THE COURT:  Not unreasonable.

15         MR. TUCKER:  When we sketch it out, we're thinking

16   we're likely to rest the middle of next so we're on track,

17   your Honor.

18         MS. WHALEN:  Judge, if I could complete my

19   objection.

20         Twice Ms. Nestor has assumed facts not in evidence.

21   Twice Ms. Nestor, when she asked him was there any are

22   indication that Mr. Korchevsky was upset about non-public

23   information.  Everything the witness on his own has said is

24   that Mr. Korchevsky kept saying it was public information.

25         THE COURT:  I didn't apprehend your objection.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

PROCEEDINGS

1              MS. WHALEN:  I'm sorry.

2              THE COURT:  Not your sorry, my sorry.  I didn't

3    realize what I, on balance, as this gets through all

4    evaporates.  I understand your concern.

5              Anybody else tell me I was wrong again?  All right.

6              MS. WHALEN:  Judge, can we move to strike that last

7    bit of testimony then?

8              MS. FELDER:  Or correct the record.

9              THE COURT:  In light of the last answer, do you want

10   to do that?

11             MS. FELDER:  Yes.  It's misleading.  It's

12   mischaracterizing what he testified to.

13             THE COURT:  Questions I will tell the jury when we

14   come out.  Questions are not evidence.

15             MS. WHALEN:  All right.

16             THE COURT:  Fair enough?

17             MS. WHALEN:  Okay.

18             THE COURT:  Ten minutes.

19             (Sidebar discussion concludes.)

20             (Continued on the next page.)

21

22

23

24

25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1511

PROCEEDINGS

1          (In open court.)

2          (Witness leaves the witness stand.)

3          MR. BRILL:  Your Honor, in the meantime may we

4    quickly approach?

5          THE COURT:  Come on.

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

1              (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4              THE COURT:  Yes.

5              MR. BRILL:  Thank you, your Honor.

6              So this has to do with the translation on the last

7     question which was from Ms. Nestor, "Was Mr. Korchevsky

8     concerned," and our information from people that also speak

9     the language is that it was translated as "Was Mr. Korchevsky

10    aware," which is different.

11             THE COURT:  Wait a minute.  We have certified

12    interpreters.  You can't pick it apart like this.  I can't

13    conduct the trial.

14             Does anybody have any problems with the

15    certification.

16             MR. BRILL:  We don't, and that's why I'm approaching

17    at this point to inform the Court that this is what we were

18    told and I guess what I would like to do --

19             THE COURT:  By who?

20             MR. BRILL:  By someone in Mr. Korchevsky's family.

21             THE COURT:  Why are you going to do this to me?

22    What expect me to?

23             MR. BRILL:  I want to bring this to the Court's

24    attention, and if it happens again -- I wouldn't bring it to

25    the Court's attention --

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SIDEBAR

1          THE COURT:  Ms. Mulqueen, this interpreter that just

2     was working.  Was he one of ours?

3          COURTROOM DEPUTY:  He's from the U.S. Attorney's

4     Office.

5          MS. NESTOR:  We provided the interpreter, your

6     Honor.

7          THE COURT:  Is he a certified court interpreter?

8          MS. NESTOR:  Yes.

9          COURTROOM DEPUTY:  Certified.

10          MR. BRILL:  I don't dispute that.  I just wanted to

11     make the record on that.  I'm not asking the Court to do

12     anything at this point.

13          THE COURT:  Let's keep Mr. Korchevsky -- all of a

14     sudden Mr. Korchevsky's camp and Mr. Khalupsky's camp or the

15     Government's camp has a different translation.  We can't go

16     that way.  We deal with certified interpreters perhaps this

17     lady who is about to come on --

18          MS. FELDER:  Is she with the U.S. Attorney's Office

19     or is she from the Court?

20          MS. NESTOR:  These interpreters are with the U.S.

21     Attorney's Office.  They are court certified interpreters the

22     U.S. Attorney's Office has obtained as a result of the Court's

23     request to obtain court certified interpreter because the

24     Court was not providing an interpreter.

25          THE COURT:  The Court itself doesn't have

SIDEBAR

1    interpreters.  We have an interpreters office, okay?  We have

2    a couple of staff interpreters as you should probably know.

3    But when we need other languages such as Russian, our court

4    staff goes out and finds certified Russian or whatever,

5    Ukrainian, interpreters which is who these people are, I

6    assume.  If there are any continuing difficulties, you'll

7    bring it to my attention and we'll deal with it.  Okay?

8              MR. BRILL:  Thank you.

9              (Sidebar discussion concludes.)

10              (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DUBOVOY – DIRECT – MS. NESTOR

1          (In open court.)

2          THE COURT:  Swear the interpreter.

3          COURTROOM DEPUTY:  Raise your right hand.

4    GALINA ANDRACCHIO, having been first duly sworn by the Clerk

5    of the court to interpret the proceedings from English to

6    Russian and from Russian to English as follows:

7          THE INTERPRETER:  I do.

8          COURTROOM DEPUTY:  State your name for the record.

9          THE WITNESS:  Galina Andracchio.

10          COURTROOM DEPUTY:  Spell it for the record.

11          THE INTERPRETER:  G-a-l-i-n-a, A-n-d-r-a-c-c-h-i-o.

12          THE COURT:  Okay.  Ladies and gentlemen, before we

13    resume the testimony of the witness, let me make a point

14    that's important for you to realize and indeed I'll include it

15    in any final instructions.

16          The questions put to a witness by any lawyer, the

17    questions themselves are not evidence, all right?  Isn't a

18    fact that the earth is square isn't evidence that the earth is

19    square, okay?  The questions, the substance of the questions,

20    only become evidence when the witness adopts the substance of

21    the question by the answer.  The questions themselves are not

22    evidence.  Bear that in mind.

23          Go ahead.

24    EXAMINATION BY

25    MS. NESTOR:
     (Continuing.)

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1516

DUBOVOY - DIRECT - MS. NESTOR

```
 1   Q     Thank you, your Honor.

 2           Before the break we were talking about what happened

 3   during the meeting in Mr. Garkusha's office between you,

 4   Mr. Garkusha, and Mr. Korchevsky.

 5           Do you remember that?

 6   A     Yes.

 7   Q     What happened at the end of that meeting?

 8   A     Vitaly looked at this information and concluded that's

 9   public information it's non-workable.

10   Q     What was he looking at in Garkusha's office?

11   A     I don't recall exactly, but we were looking at some

12   information in the computer and Garkusha printed out some

13   paperwork.

14   Q     Now, you previously testified that Pavel sent you codes.

15   Do you recall that?

16   A     Yes, I do recall.

17   Q     I'd like to show the witness, your Honor,

18   Government Exhibit 214 and 214-T which are not yet in

19   evidence.

20           MS. NESTOR:  Your Honor, before we proceed, I would

21   like to make a point.  The jurors all have binders on their

22   chairs.  Because the witness only reads in Russian, we're

23   going to have -- the juror binders have both the original and

24   the translation.  I will keep the original Russian e-mail on

25   the Elmo.
```

DUBOVOY – DIRECT – MS. NESTOR

1           THE COURT:  All right.  But direct your attention

2    only to the exhibit that we are using at this particular time

3    these have not yet been introduced into evidence so hold your

4    attention.

5           MS. NESTOR:  Thank you, your Honor.

6    Q    Exhibit 214 on the screen for the witness only.

7           Who is this e-mail from?

8    A    Pavel Dubovoy to me.

9    Q    Do you recall this e-mail?

10   A    Yes.

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DUBOVOY - DIRECT - MS. NESTOR

1   BY MS. NESTOR:

2   Q    And it was an email that was sent from Pavel Dubovoy to

3   you; is that correct?

4             THE INTERPRETER:  Can you repeat?

5   Q    It was an email that was sent from Pavel Dubovoy to you?

6   A    Yes.

7             MS. NESTOR:  Now at this time, the Government moves

8   to admit Government Exhibit 214 and 214-C, which is the

9   translation.

10            THE COURT:  Any objections.

11            MR. BRILL:  No objection.

12            THE COURT:  Received.

13            (Government Exhibit 214 & 214C, was received in

14  evidence.)

15            MS. NESTOR:  And the jury could just turn to --

16  could you turn to Tab 214?  All the binders are marked with

17  exhibit numbers.  The first email in the binder 214 is in

18  Russian, and the one after is the translation.  The jurors

19  should refer to 214-C, translation.  The witness will keep

20  referring to 214 for the record testify.

21  BY MS. NESTOR:

22  Q    Can you please tell us what this email is?

23  A    It's an email from Russia with a code that you have to

24  use to get into the system and look at it.  That's what he

25  sends to me.

DUBOVOY - DIRECT - MS. NESTOR

1    Q    When you say "the system," what are you talking about.

2    A    You have to go -- you have to access the computer fr the

3    info.

4    Q    And when you say "look at it," I believe is what the

5    witness said, what do you mean?

6    A    As I understand -- as I understood when you access --

7    when you access that information from there, so by accessing

8    that -- by answering that -- that field, you are accessing the

9    information that you are able to obtain earlier than the rest

10   of the people.

11   Q    What happened next after this meeting in Garkusha's

12   office?

13   A    Vitaly left, and I don't recall if -- what at that

14   specific time or later on, we passed him the code.  I don't

15   recall how that -- how that occurred.

16   Q    What happened next?

17   A    And then some period of time passed.  Vitaly give me a

18   ring and indicate that this was working information.

19   Q    What does that mean?

20   A    That we are able to work on the stock market with that.

21   Q    What happened next?

22   A    And he asked me if I have some sum of money.  I looked in

23   the account and put that sum on the account, provided access

24   to my account, and I should purchase a computer and send it to

25   him.

David R. Roy, RPR - Official Court Reporter

DUBOVOY - DIRECT - MS. NESTOR

1  Q    At this point in time, did you understand where this

2  information was coming from?

3  A    Back then I didn't understand.  I understood later on.

4  Q    Tell us what you understood later on.

5  A    When I went to Ukraine, I was able to discover that

6  information is coming from hackers.

7  Q    Tell us how you were about to discover that.

8         THE COURT:   I didn't hear what you said.  Able to

9  discover that this information...

10         THE INTERPRETER:    Hackers.

11         THE COURT:  Would you hold that microphone up?

12         THE INTERPRETER:  Hacker.

13         THE COURT:   Okay.

14         I'm sorry.  Go ahead.

15         MS. NESTOR:  I'm sorry.

16  BY MS. NESTOR:

17  Q    All right.  So tell us what happened when you went to the

18  Ukraine.

19  A    I went to Ukraine and Pavel introduced me to a person

20  named Roman.  Based on his conversation, I concluded that he

21  had some guy for doing it.

22  Q    When you say, "based on his conversation," the

23  conversation with whom?

24  A    With me, when we talked with Roman.

25  Q    When was that?

David R. Roy, RPR - Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1   A    It was in 2011.  I don't recall.

2   Q    Did you ever have a conversation with Mr. Korchevsky

3   about your conversation with Roman?

4   A    No.

5   Q    What did you discuss with Mr. Korchevsky about where the

6   information was coming from?

7          MR. BRILL:  Objection.

8          THE COURT:  Overruled.

9   A    I told him that the information is coming from the guy,

10  but we talked about it later.  Yes, but later on, we did kind

11  of discuss that.

12  Q    When you say, "the guy," what do you mean?

13  A    Hackers.

14  Q    Why do you call him "the guy"?

15  A    That's what we called them.

16  Q    But there Russian words for the guy that you used?

17  A    Simply guys.

18  Q    Did you ever use the word "Patsani"?

19  A    Yes, but I mean, we used.

20  Q    Can you spell it for the court reporter?

21  A    P-A -- I can spell, yes.

22  Q    That's fine.

23          (Pause in proceedings.)

24  BY MS. NESTOR:

25  Q    Well, let me ask you:  What happened after you met with

David R. Roy, RPR – Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1    Roman?

2    A    When we met, Roman informed us that we have to pay the

3    guy, the "Patsani," for his kind service.

4    Q    Now, you testified that you had opened up a brokerage

5    account for Mr. Korchevsky to trade in; is that correct?

6    A    Yes.

7    Q    You also testified that he asked for a laptop; is that

8    correct?

9    A    Yes.

10   Q    Why do you need a laptop?

11   A    Simply to work.  I don't know.

12   Q    Why couldn't you use a phone?

13            MR. BRILL:  Objection.

14            THE COURT:  Sustained.  Next question.

15   BY MS. NESTOR:

16   Q    Did you ask for anything else?

17   A    He asked for iPad and a phone number -- and a -- and a

18   phone to write.

19   Q    Did you purchase those items?

20   A    Yes.

21   Q    Did you personally purchase them?

22   A    No.

23   Q    Who bought them?

24   A    The computer was purchased by my son, Igor.  And iPad was

25   purchased by a worked from my office Sergei Nerchin

David R. Roy, RPR – Official Court Reporter

DUBOVOY - DIRECT - MS. NESTOR

1   [phonetic].  And the phone, I don't recall who did.  I think

2   maybe Igor or Sergei.

3   Q    Do you know where Korchevsky traded from?

4              MR. BRILL:  Objection.

5              THE COURT:  To the question?

6              MR. BRILL:  Yes.

7              THE COURT:  No, I will permit it.

8   A    Once again with the question, please?

9   Q    Do you know where Korchevsky traded from?

10  A    What I know, he was doing trading from Ukraine.

11  Q    Tell us about that.

12  A    I was renting a hotel for him for trading.  I was

13  providing an apartment for trading for him.

14  Q    Tell us how that all came about.

15  A    He was the -- going there, was doing trading within two,

16  three weeks, then he was coming back.

17  Q    Are you aware one way or the other whether that was the

18  only place he was trading?

19  A    No, I don't know.

20  Q    The trading in the Ukraine, why would you provide the

21  apartment or the hotel?

22  A    Because he was trading my money.

23  Q    Did you come to understand what the information, the

24  stolen information was that you were trading on?

25  A    Yes, of course, I understood.

David R. Roy, RPR - Official Court Reporter

                        DUBOVOY – DIRECT – MS. NESTOR

1   Q    How did you learn that?

2   A    I understood we obtained this information early, and a

3   certain period of time, then it's accessible by public.

4   Q    What is "this information" that you are talking about?

5   A    Quarter report.

6   Q    Of what?

7   A    A company.

8   Q    Did you and Mr. Korchevsky ever have conversations about

9   this?

10  A    We didn't discuss it thoroughly but, like, briefly.

11  Q    Tell us about that.

12  A    That really give this information earlier than the rest

13  of the people.  That it's a good deal for work.

14  Q    Did Mr. Korchevsky ever call you and complain or ask any

15  questions about the information?

16  A    Yes.  Sometimes that information wasn't working, and he

17  would call and ask why it was not working.

18  Q    What would you do?

19  A    I called Pavel.

20  Q    Why?

21  A    So Pavel can ask Roman why it's not working.

22  Q    And what would happen?

23  A    And then information was currently working and sometimes

24  it wasn't again.

25  Q    So it's fair to say that there were times when it was

                David R. Roy, RPR – Official Court Reporter

DUBOVOY - DIRECT - MS. NESTOR

1   working and times when it wasn't?

2   A    Yes.

3   Q    Tell us about Mr. Khalupsky, how did he get involved in

4   this?

5   A    When I started cooperating with Korchevsky I went to

6   Ukraine and Pavel sold his trading company here.  Let's try to

7   work with Vladislav Khalupsky.

8   Q    At the time that Pavel suggested that you do that, did

9   you know who Mr. Khalupsky?

10  A    No, I don't know.

11  Q    So Pavel introduced you?

12  A    Yes, Pavel introduced us.

13  Q    Where did Mr. Khalupsky live at that time?

14  A    In the Ukraine.

15  Q    Do you know what he did for a living?

16  A    He was -- he owns his own trading company.

17  Q    Do you remember what it was called?

18  A    Dolphin.

19  Q    Do you know what Mr. Khalupsky's background was?

20       THE INTERPRETER:  Background?

21  Q    Do you know what Mr. Khalupsky's background was?

22  A    I knew that he lived in the United States and he's a

23  broker himself.

24  Q    And just to be clear:  At what point did he live in the

25  United States?

David R. Roy, RPR - Official Court Reporter

1526

DUBOVOY – DIRECT – MS. NESTOR

1    A    I can't answer that.

2    Q    At the time you met him, where was he living?

3    A    In Odessa, Ukraine.

4    Q    On that trip to Ukraine, did you meet Mr. Khalupsky?

5    A    Yes, we did.  When we met at his office, Pavel introduced

6    us.

7    Q    Tell us about the meeting.

8    A    Well, we basically told him that we have this type of

9    program and we can work together.

10   Q    Be more specific, if there is anything else.  What else

11   was the conversation about?

12   A    We explained to him since we knew this arrangement, it

13   was quarter reports accessible by us earlier than by public.

14   Q    When you said you met at his company, which company was

15   that?

16   A    Dolphin.

17   Q    What happened?

18   A    And Roman decided to -- to work together.

19   Q    What was the discussion; what was the agreement?

20   A    That I provide my account, my -- my account for trading.

21   We will give access to the account and Pavel provide him with

22   a code.

23   Q    Now, did Mr. Khalupsky trade in the same account as

24   Mr. Korchevsky?

25   A    (No audible response.)

David R. Roy, RPR – Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1    Q    Did Mr. Khalupsky trade in the same account as

2    Mr. Korchevsky?

3    A    No.

4    Q    Where was he trading?

5    A    Different account.

6    Q    Did you open up another account?

7    A    Yes.

8    Q    Did you ever have a discussion with Mr. Khalupsky about

9    who was trading in the account that you had opened for him?

10   A    I did not understand the question.

11   Q    I'll re-ask it.

12        Did you and Mr. Khalupsky ever discuss who would be

13   trading in the account that you opened up?

14   A    That he will be using it for trading, all his people.

15   Q    What do you mean, "his people"?

16   A    He had a company and many people worked for him at that

17   period of time.

18   Q    Did you ever meet any of his employees?

19   A    When we were there, one guy walked in, and we showed this

20   to him.

21   Q    Be specific, what did you show him?

22   A    I don't recall now, but I -- I think we saw the code that

23   he can use to access information.

24   Q    At the time that Mr. Korchevsky and Mr. Khalupsky were

25   trading your account, did you have a number of accounts?

David R. Roy, RPR – Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1    A    What accounts do you mean, trading accounts?

2    Q    Yes.

3    A    Only accounts that they used for trading.

4    Q    I'm asking, was that more than two?

5    A    More than two.

6    Q    Do you remember all of them sitting here today?

7    A    (No audible response.)

8    Q    Do you remember all of them sitting here today?

9    A    No, I don't recall.

10   Q    Were there some accounts that were in your name?

11   A    Yes.

12   Q    Where there some that were in the name of your

13   businesses?

14   A    Yes.

15   Q    At the time that Mr. Khalupsky and Mr. Korchevsky were

16   trading your accounts, which businesses did you own?

17   A    I had the real estate business.

18   Q    What was the name of that business?

19   A    APD Custom Homes.

20   Q    Did you ever own a company named Boni?

21   A    Yes, Boni.

22   Q    What is Boni?

23   A    That's the company Boni that's -- that was ice cream

24   company.

25   Q    Was Boni in operation at that time?

David R. Roy, RPR – Official Court Reporter

1529

DUBOVOY - DIRECT - MS. NESTOR

1   A     Yes.

2   Q     Now, did you and Mr. Khalupsky -- going back to

3   Mr. Khalupsky.  Did you and Mr. Khalupsky discuss how the

4   agreement would work?

5   A     Yes.  I asked him to provide special paperwork, because

6   when you do trading from the Ukraine, they block the account.

7   Q     Explain.  What do you mean?

8   A     When Mr. Khalupsky was purchasing stock from Ukraine,

9   they would see coming from Ukraine and was blocked, the

10  account.

11  Q     You said you asked him to do what?

12  A     I asked Mr. Khalupsky to provide special paper that he

13  invest, it belong -- I can show the document to the bank and

14  say that Mr. Khalupsky and I, we have good relationship, trust

15  in relationship.

16  Q     I want to show you what's been marked for identification

17  only as Government Exhibit 805?

18             MS. NESTOR:  This is not in the jury binders,

19  Your Honor.

20  BY MS. NESTOR:

21  Q     Do you recognize Exhibit 805?

22  A     Yes, it's my signature.

23  Q     What do you recognize it to be?

24  A     I don't receive this, but I understand that the

25  document --

David R. Roy, RPR - Official Court Reporter

DUBOVOY - DIRECT - MS. NESTOR

1      MS. WHALEN:   Objection.

2      THE COURT:   I'm sorry?

3      MS. WHALEN:   Objection.

4      THE COURT:  Yes, sustained.

5      Do we have the Russian translation here.

6      MS. NESTOR:   Your Honor, could we have a sidebar?

7      THE COURT:   Sure.

8      (Continued on the next page.)

9      (Sidebar conference.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1           (The following occurred at sidebar.)

2           MS. NESTOR:  I think I understand.

3           THE COURT:  Come over here.

4           MS. NESTOR:  I'm sorry, Your Honor.

5           THE COURT:  Everyone has to get in the conversation.

6           MS. NESTOR:  I think I understand Ms. Whalen's

7  objection.  This witness has identified this document as one

8  he recognizes with his signature on it.  He's unable to read

9  it, but he can testify that Mr. Khalupsky previously

10 translated the document for him, and --

11          MS. WHALEN:   He recognizes his signature.  If he

12 doesn't read English, Mr. Khalupsky could have translated a

13 thousand documents for him.  He has no way of knowing if this

14 is the specific one.

15          MS. NESTOR:  I disagree, Your Honor.

16          THE COURT:  If he says he recognizes this document,

17 ask --

18          MS. NESTOR:  That's correct.

19          MS. WHALEN:   He said he recognizes the signature.

20          THE COURT:  I thought I heard you say he knows his

21 signature so he can testify to that.  I heard you just say he

22 recognizes this document.

23          MS. NESTOR:  Your Honor, this document has been

24 shown to him before in preparation for trial.  This document

25 has been shown to him before in preparation.  It has been

David R. Roy, RPR - Official Court Reporter

SIDEBAR CONFERENCE

1    translated for him.

2              THE COURT:  Where is this going?

3              MS. NESTOR:  He understands what the document is.

4    We just stated that he does not read English, meaning he

5    cannot read the document into the record.

6              MS. WHALEN:   But then I think the document should

7    be prohibited, because if he doesn't know that this is the

8    document --

9              THE COURT:  Well, but if it's been translated to him

10   and he recalls signing the document, he can testify to it.  I

11   think this establishes a -- let's set a foundation for it

12   before we admit it.

13             MS. NESTOR:   Sure, Your Honor.

14             (End of sidebar conference.)

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

DUBOVOY - DIRECT - MS. NESTOR

1        (In open court.)

2    BY MS. NESTOR:

3    Q    Mr. Dubovoy, have you recently seen this document?

4    A    Before when?  What?

5    Q    Did you previously see this document at the time that

6    Mr. Khalupsky presented it to you?

7    A    No, Khalupsky provided me with it and that's it.

8    Q    Is this the document Mr. Khalupsky provided you?

9    A    Yes.

10        MS. NESTOR:  At this time the Government seeks to

11   admit Government's Exhibit 805 into evidence.

12        THE COURT:  Not speaking English or reading English,

13   looking at that document, how do you know it's the document

14   that Mr. Khalupsky showed to you?

15        THE WITNESS:  My signature is there.

16        THE COURT:  Your signature I assume, sir, is on a

17   lot of documents.  How do you know this particular document is

18   a document shown to you by Mr. Khalupsky?

19        THE WITNESS:  I see my name there, Arkadiy Dubovoy.

20   It's written here, Arkadiy Dubovoy.

21        THE COURT:  I'm not questioning your signature or

22   the fact that your name is typed there, I'm asking you a

23   different question.

24        When you look at the text of the document, you can't

25   read what that says, correct?

DUBOVOY – DIRECT – MS. NESTOR

1          THE WITNESS:  I've been living in the states for 20

2     years, I understand a little bit.

3          THE COURT:  What do you understand about this

4     document?

5          THE WITNESS:  When Khalupsky translated this for me,

6     it says that I authorized him to manage my account.  And that

7     he can execute purchases.  And that he has full access and

8     permission to access my account.

9          MS. NESTOR:  Your Honor, may I turn the page?

10          THE WITNESS:  And the reason I specifically recall

11     this is because this document, this document was always on my

12     desk in my office.

13          THE COURT:  You want to turn the page?

14          MS. NESTOR:  Sure, your Honor.

15     BY MS. NESTOR:

16     Q    Mr. Dubovoy, do you remember the second page of this

17     document?

18     A    Yes.

19     Q    Did Mr. Khalupsky provide you with this as well?

20     A    Yes.

21          MS. NESTOR:  At this time we seek to admit

22     Government's Exhibit 805.

23          MS. WHALEN:  Your Honor, I still object.  I don't

24     think proper foundation has been laid.

25          THE COURT:  I understand.

DUBOVOY - DIRECT - MS. NESTOR

1        When was the last time it was translated for you?

2        THE WITNESS:  Well, specifically a week ago.

3        THE COURT:  Uh-huh.

4        THE WITNESS:  Ms. Julia's office.

5        THE COURT:  This particular document was translated

6   for you?

7        THE WITNESS:  Yes.

8        THE COURT:  I'll receive it.

9        MS. NESTOR:  Thank you, your Honor.

10       THE COURT:  805 now in evidence.

11       (Government Exhibit 805, was received in evidence.)

12       THE COURT:  I want to remind the jury that the fact

13  that I engaged the witness, there is nothing about this

14  document, the significance of it, the evidentiary worth of it.

15  I'm just dealing with some legal issues related to the

16  admissibility of it in light of counsel's objection.  All

17  right.  Don't read anything into that.  Go ahead.

18       MS. NESTOR:  Thank you, your Honor.

19  BY MS. NESTOR:

20  Q    Mr. Dubovoy, who's signature is that at the bottom of the

21  document?

22  A    Mine.

23  Q    What is the date on this document, if you know?

24  A    The first of August, 2011.

25  Q    How do you know it's the first of August?

DUBOVOY - DIRECT - MS. NESTOR

1    A    Because it's the eighth month and in the Ukraine they

2    write the month and the date.

3    Q    Mr. Dubovoy, is this a trading agreement that you were

4    testifying about before with Mr. Khalupsky?

5    A    Yes.

6         MS. NESTOR:  Your Honor, with your permission I'd

7    like to read it into evidence and have it translated.

8         THE COURT:  Go ahead.

9         MS. NESTOR:  "I Arkadiy P. Dubovoy the undersigned

10   here by authorize Vladyslav Khalups'kyy full discretionary

11   accounts.  To buy, sell, including short sales, and trade in

12   stocks, bonds, put and call options, and other securities on

13   American Trade.  I agree to indemnify and hold Vladyslav

14   Khalups'kyy harmless of any losses.  And any and all acts

15   carried out by Vladyslav Khalups'kyy on my behalf shall have

16   the same effect as acts of my own."

17   BY MS. NESTOR:

18   Q    I'm going to show you the next page, briefly who is that?

19   A    Khalupsky Vladyslav.

20   Q    Tell us, I'm going to ask you what stocks bonds, puts and

21   call options are?

22   A    No, I don't know.

23   Q    What happened when you signed this document?

24   A    Khalupsky traded using my account.

25   Q    I'm sorry, my question was different.  What happened

DUBOVOY – DIRECT – MS. NESTOR

1    during signing this document?  What was the conversation?

2    A    That he will be trading using my accounts based on the

3    information that he was, that he was given by Pavel.

4    Q    When was this document signed, before or after

5    Mr. Khalupsky started trading in your accounts?

6    A    After.

7    Q    Who drafted this document?

8    A    Khalupsky gave it to me to sign.

9    Q    And where were you when Khalupsky gave it to you to sign?

10   A    In Khalupsky's office.

11   Q    Just to be clear, are you were you able to read this

12   document?

13   A    No, I was not.  Khalupsky translated it for me.

14   Q    When Mr. Khalupsky started trading in your accounts, was

15   Mr. Korchevsky still trading on the stolen information in your

16   accounts?

17   A    Yes.

18   Q    As far as you know, did Korchevsky know about Khalupsky?

19   A    I didn't say anything, I don't know.

20   Q    As far as you know, did Mr. Khalupsky know about

21   Mr. Korchevsky?

22   A    No.

23   Q    You were intentionally trying to keep them away from each

24   other?

25   A    Yes.

DUBOVOY – DIRECT – MS. NESTOR

1  Q   Explain that?

2  A   We wanted to see who was better at trading.  And to

3  introduce Khalupsky to Korchevsky, they are different people,

4  they have different interests.

5  Q   So I'm sorry, let me unpack that.  You eventually asked

6  Mr. Khalupsky to do this, why?

7  A   Could you ask the question again?

8  Q   Sure.  At the time you asked Mr. Khalupsky to trade in

9  your accounts, why were you asking him to do it when you

10 already had Mr. Korchevsky?

11 A   I wanted to see who does it better.

12 Q   Then you also testified that they were different people

13 so you didn't want to introduce them, what did you mean by

14 that?

15 A   Khalupsky is interested in tennis, sport.  Korchevsky is

16 a paster, a preacher.  And I don't know, it didn't workout to

17 introduce them to each other.

18 Q   I want to talk to you about the hackers for a minute.

19 Were the hackers being paid?

20 A   Yes.

21 Q   How?

22 A   I had an account where there was 700,000, and they asked

23 that they receive 50 percent of what was earned in that

24 account.

25 Q   Did they have access to the account?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1   A    Pavel had access.  Whether they had access, I don't know.

2   Q    Pavel, your brother?

3   A    Yes.

4   Q    You said they were asking for a percentage of what?

5   A    From the earnings, from the profit.

6   Q    When you say account, do you mean a brokerage account?

7   A    Yes.

8   Q    So they were asking, the hackers were being paid a

9   percentage of the brokerage account; is that right?

10  A    That which the 700,000 will earn, 50 percent of that.

11  Q    Do you mean earn on trading?

12  A    Yes.

13  Q    How were the hackers actually paid?

14  A    They were paid weekly.

15  Q    Who paid them?

16  A    I paid, I paid, I paid my brother and he paid.

17  Q    He paid the hackers?

18  A    There was a middle-man between the hackers and Pavel.

19  Q    Who was that?

20  A    Roma.

21  Q    Is that the Roma you said you met in Ukraine?

22  A    Yes.

23  Q    Explain what Roma's role was?

24  A    Roma was the middle-man between the hackers and Pavel.

25  Q    What do you mean by middle-man?

1540

DUBOVOY - DIRECT - MS. NESTOR

1    A    Only he had dealings with the hackers, and Pavel did

2    everything through Roma.

3    Q    How would you get money to Pavel?

4    A    It varied.  I wired money.  It varied, whatever way it

5    would work out.

6    Q    What other ways are there?

7    A    Cash, transfers.

8    Q    How would you get cash to Pavel?

9    A    We have a company in the Ukraine and I would take it and

10   it would be given to him.

11   Q    Did you use any particular companies from which you wired

12   the money to Pavel?

13   A    From what I recall it seems we wired money from Boni.

14   Q    Who would actually do the wires?

15   A    I would delegate it to my son, Igor.  And also Larissa

16   from the office would do some of the transfers.

17   Q    Did you or Mr. Korchevsky ever discuss how much money the

18   hackers were asking for?

19   A    I told him 700,000 that I paid 50 percent of the profit.

20   Q    You told him about the account was 700,000?

21   A    Yes.

22   Q    Why were you discussing this with Korchevsky?

23   A    Because I wasn't earning anything on this account.

24   Q    What was Mr. Korchevsky's reaction to what you told him?

25   A    Nothing, but, that we need to work with the guys.

DUBOVOY – DIRECT – MS. NESTOR

```
 1   Q    Did you discuss paying the hackers with Mr. Khalupsky?

 2   A    I don't remember.

 3   Q    Now you testified the hackers had access to one of your

 4   brokerage accounts, did they have access to all of your

 5   accounts?

 6   A    I don't know whether they had access or whether they

 7   didn't have access.  I know that Pavel had access.

 8   Q    My question -- I'm sorry.  My question is, whether you

 9   paid them from just one account or all the accounts you were

10   trading in?

11   A    No, only from one.

12   Q    I want to show you what is marked for identification only

13   Government's Exhibit 244.  Can you see that?

14   A    Yes.

15   Q    Do you recognize this e-mail?

16   A    Yes.

17   Q    Who is it from?

18   A    That's Pavel sending it to me.

19   Q    Is that on February 3rd, 2012?

20   A    Yes.

21        MS. NESTOR:  Your Honor, at this time the Government

22   moves to admit Government's Exhibit 244 and Government's

23   Exhibit 244T.

24        THE COURT:  Any objection?  Received 244 and 244T.

25        (Government Exhibit 244 & 244T, was received in
```

DUBOVOY – DIRECT – MS. NESTOR

1    evidence.)

2            MS. NESTOR:  The jury could flip in their binder,

3    there is a 244 tab.

4    Q    I'd like to direct your attention to -- what is the

5    subject?

6    A    This is an accounting.

7    Q    And I want to direct your attention to this line that

8    says Carese Trade and Invest.  Is this a payment on March 2,

9    2012?

10   A    Yes.

11   Q    Is it for 160,000?

12   A    Yes.

13   Q    Is it to Carese Trade and Invest?

14   A    Yes.

15   Q    And who is name is in parenthesis there?

16   A    That's Vlad in Russian.

17   Q    Who is Vlad?

18   A    Vlad Khalupsky.

19   Q    This is a payment of $160,000 to Mr. Khalupsky?

20   A    Yes.

21   Q    Can you tell me sitting here today what this payment is

22   for?

23   A    I don't remember specifically, it was 2012.  But I paid

24   Khalupsky for his trading, work for his trading, I paid him

25   his percentage.

DUBOVOY – DIRECT – MS. NESTOR

1    Q    And directing you to this line right here, a payment on

2    March 2, 2012, for $95,000, to Trudo Solution LLP, who is this

3    payment to?

4    A    That's to Patsani, Roma, that's the hackers.

5    Q    Again, you use that term that you used before, Patsani,

6    what does that mean?

7    A    That's what we called Roma.

8    Q    That's what you called Roma, the intermediary between the

9    hackers and you?

10   A    Yes.

11          MS. NESTOR:  Your Honor, I'm about to go to a

12   lengthy your document.

13          THE COURT:  We'll break for the day.  I told you

14   during jury selection that I would give you from time to time

15   how we were progressing.  This is very preliminary, but we're

16   doing quite well.  I'll have a more specific report for you

17   later in the week before we break for the weekend, but rest

18   assured we are on or ahead of schedule, with the cooperation

19   of all the attorneys.

20          Finally, once again, I renew any admonition not to

21   discuss the case with anyone.  Please be careful.  And have a

22   good night and get some rest.  See you 9:30 in the morning.

23          COURTROOM DEPUTY:  All rise.

24          (Jury exits.)

25          THE COURT:  All have a seat for just a moment.  The

1544

PROCEEDINGS

1     witness is excused for the time being.  9:00 o'clock tomorrow

2     morning, please.

3                  (Whereupon, the witness steps down.)

4                  THE COURT:  What do we anticipate tomorrow, assuming

5     we finish with this witness?

6                  MS. NESTOR:  One moment, your Honor.  Your Honor, I

7     submit I probably have with the translation I'm guessing

8     another two hours at least tomorrow.  I anticipate cross will

9     take sometime, but that's up to defense counsel.

10                  After that we will be calling Brian Hayes from CBP

11     to discuss travel records, your Honor, and Eugene Canjels is

12     the expert.  I do not believe we'll get past that, your Honor.

13                  THE COURT:  Okay.  Then have a pleasant evening.

14                  MR. TUCKER:  I apologize, can I make a very brief

15     record on very brief point?

16                  THE COURT:  Sure.

17                  MR. TUCKER:  So the Government received in the

18     middle of Mr. Dubovoy's testimony some additional documents

19     pertaining to what we've been calling the Latvian matter.

20     They are older than the documents we've already disclosed,

21     they date back to 2015, the fall of 2015.

22                  I have read them quickly in Court.  They are

23     certainly not 3500 material as best I can tell.  They are not,

24     they don't undermine anything that Igor Dubovoy said, frankly

25     quite the contrary.  But given where we are, I have copies

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

PROCEEDINGS

1   printed.  I'm going to provide them to defense counsel now.

2            Just one request, given that these pertain to MLAT

3   from the Latvian Government, the DOJ of International Affairs

4   is puzzling over whether they were provided to the U.S.

5   Government with some kind of confidentiality request.  They

6   bear no confidentiality request on them.  Certainly the fact

7   of this investigation is now known both to Igor Dubovoy and to

8   the public more broadly.  I request that we make these

9   disclosures subject to the Court's protective order that is

10  already in place, which would preclude the parties from

11  disseminating them publicly, things of that nature.

12           THE COURT:  I assume there is no objection to that

13  pending further discussion.

14           MS. WHALEN:  Not pending further discussion, your

15  Honor.

16           MR. BRILL:  No objection.

17           THE COURT:  All right.  Yes, so provide them with

18  that.  Anything else?

19           MR. TUCKER:  That's it for the Government, your

20  Honor.  I have a copy for the Court as well.

21           THE COURT:  See you in the morning.

22           (Proceedings to resume on June 20, 2018 at 9:30

23  a.m.)

24

25

```
 1                    I N D E X

 2    WITNESS                              PAGE

 3

      DAVID HAAPAOJA
 4
      DIRECT EXAMINATION     BY MS. NESTOR    1326
 5    CROSS-EXAMINATION      BY MR. HEALY     1347
      CROSS-EXAMINATION      BY MS. FELDER    1364
 6    REDIRECT EXAMINATION   BY MS. NESTOR    1366
      RECROSS-EXAMINATION    BY MS. FELDER    1367
 7

 8    ROBERT DE MACEDO SOARES

 9    DIRECT EXAMINATION     BY MR. TUCKER    1369
      CROSS-EXAMINATION      BY MR. HEALY     1387
10    CROSS-EXAMINATION      BY MS. FELDER    1394

11

      MARTIN FEIL
12
      DIRECT EXAMINATION     BY MR. TUCKER    1396
13

14    KELLY CUNNINGHAM

15    DIRECT EXAMINATION     BY MR. GOPSTEIN  1403
      CROSS-EXAMINATION      BY MS. BRILL     1411
16    REDIRECT EXAMINATION   BY MR. GOPSTEIN  1421
      RECROSS-EXAMINATION    BY MS. BRILL     1422
17

18    THOMAS CAROCCI

19    DIRECT EXAMINATION     BY MR. GOPSTEIN  1425
      CROSS-EXAMINATION      BY MR. BRILL     1457
20    CROSS-EXAMINATION      BY MS. WHALEN    1473
      REDIRECT EXAMINATION   BY MR. GOPSTEIN  1488
21

22    ARKADIY DUBOVOY

23    DIRECT EXAMINATION     BY MS. NESTOR    1492

24

25
```

1                          I N D E X

2                          EXHIBITS

3     GOVERNMENT                    PAGE
      803                           1337
4     845                           1341
      803-1                         1343
5     801                           1399
      423                           1407
6     814                           1448
      815                           1452
7     1008-2                        1475
      214 & 214C                    1521
8     805                           1538
      244 & 244T                    1544

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                 Rivka Teich CSR, RPR, RMR FCRR
                    Official Court Reporter