```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------x
                                        15-CR-381(RJD)
 3   UNITED STATES OF AMERICA,

 4                                       United States Courthouse
                                         Brooklyn, New York
          -against-                      June 20, 2018
 5                                       9:30 a.m.

     VITALY KORCHEVSKY and,
 6   VLADISLAV KHALUPSKY

 7           Defendants.
     -------------------------------x
 8               TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                 BEFORE THE HONORABLE RAYMOND J. DEARIE
 9             UNITED STATES SENIOR DISTRICT JUDGE
                          BEFORE A JURY
10   APPEARANCES
     For the Government:      RICHARD P. DONOGHUE, ESQ.
11                            United States Attorney
                              Eastern District of New York
12                            271 Cadman Plaza East
                              Brooklyn, New York 11201
13                            BY:  RICHARD M. TUCKER, ESQ.
                                   JULIA NESTOR, ESQ.
14                                 DAVID GOPSTEIN, ESQ.
                              Assistant United States Attorneys
15
     For Defendant Korchevsky:SULLIVAN BRILL
16                            115 Broadway, 17th Floor
                              New York, NY 10006
17                            BY:  STEVEN G. BRILL, ESQ.
                                   JAMES L. HEALY, ESQ.
18
                              RACHEL BRILL, ESQ.
19                            263 Domenech Avenue
                              San Juan, P.R. 00918
20
     For Defendant Khalupsky: FEDERAL DEFENDERS OF NEW YORK
21                            One Pierrepont Plaza
                              Brooklyn, NY 11201
22                            BY:  MILDRED WHALEN, ESQ.
                                   LaKEYTRIA W. FELDER, ESQ.
23
     Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
24                            718-613-2268 RivkaTeich@gmail.com
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

SIDEBAR CONFERENCE

1          (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.

3          THE COURT:  Good morning.  Can I see counsel at

4    sidebar, please?

5          (Sidebar conference.)

6          THE COURT:  I'm told somebody wants to say something

7    at sidebar.

8          MS. NESTOR:  Sure, your Honor.  So yesterday's

9    outburst court concerned the Government.

10         THE COURT:  Outburst?

11         MS. NESTOR:  The laughing concerned the Government.

12   The bigger concern, your Honor, was our agent reported that he

13   saw faces being made at the witness from the gallery.  We're

14   just putting this on the record.  We've asked Mr. Brill, the

15   defense team, to please ask the people who are here to respect

16   the courtroom.  We ask the Judge, to the extent it becomes

17   necessary, to say something similar on the record.

18         THE COURT:  If I see it, that's a different matter.

19   I'll deal with it.  In the meantime just caution them.

20         MR. BRILL:  Of course.

21         THE COURT:  Everybody reacts to what they hear.

22         I have something I have to share with you.  Really

23   it comes of somewhat of an education after all these years.  I

24   misinformed you yesterday.  This by the way has nothing to do

25   with the incident with the word interpretation.

1550

SIDEBAR CONFERENCE

1           The federal Government does not certify Russian

2   interpreters.  The only interpreters the federal Government

3   certifies, I've come to know, is Spanish, Navajo, that might

4   surprise you here in New York, and I forget the third language

5   but it's similarly obscure.

6           From what I understand, these interpreters were

7   hired through an agency that the Government approached and our

8   office uses.  And they are apparently represented by these

9   agencies to be, quote, "certified," and I assume that means

10  some state certification.

11          MS. NESTOR:  That's correct, your Honor.

12          THE COURT:  You verified that?

13          MS. NESTOR:  I have asked the agencies.  I have

14  asked the agencies, all these agencies.  I was aware that the

15  federal Government does not certify the Russian interpreter.

16  I didn't understand the Court to be saying federally

17  certified.

18          THE COURT:  I wasn't saying federally.  But the

19  implication was saying certified, bluntly, candidly, I thought

20  they were.

21          MS. NESTOR:  They are certainly certified, not

22  federally certified.

23          THE COURT:  I wanted to make sure.

24          MS. NESTOR:  To be clear, I did not ask for

25  verification.  I confirmed with the language service that we

SIDEBAR CONFERENCE

1  wanted court-certified interpreters.

2         MS. FELDER:  Your Honor, there is one other matter.

3  Yesterday we ended with Mr. Tucker disclosing additional

4  documents relating to the Latvia matter.  A few hours later

5  there are additional documents as well.  I believe this

6  disclosure is in reference to your Honor's inquiry as to what

7  investigation had been done after they learned of it.

8         The documents that we received were dated from

9  August 2015 and April 2016 and then 2017 as well.  Included in

10  those documents were references to interviews that, we just

11  received a copy of the interview this morning, an interview of

12  Igor Dubovoy relating to the Latvian matter.

13         THE COURT:  By whom?

14         MS. FELDER:  Who was the interview by, by the United

15  States Attorney's Office in the Northern District of Georgia.

16  So this has been an ongoing matter since 2015 at least, where

17  Igor Dubovoy was interviewed in the Northern District of

18  Georgia in 2015, the date of the interview was July 15, 2015.

19         These documents I believe were readily available, no

20  inquires was made for them.  That's disturbing to the defense.

21  I don't know if there are other documents, other materials

22  that are relevant or available.

23         But we do believe that this is not just about

24  Latvia, it's really about credibility and the defense having

25  an opportunity to cross-examine witnesses effectively.  We use

1552

SIDEBAR CONFERENCE

1  what we have, but this could have been helpful.

2           THE COURT:  I understand.

3           MS. FELDER:  My concern is what other documents are

4  out there, not just about Latvia, but other conduct by these

5  witnesses that the Government are putting forward.

6           MR. TUCKER:  So, your Honor, just a couple of points

7  of clarification.  The additional documents we provided last

8  evening were largely duplicative of the materials produced.

9  They were just older.  They were documents provided by the

10 Latvian government in furtherance of the MLAT request.

11          The interview to which Ms. Felder refers to, which

12 we disclosed, Mr. Dubovoy made no statements.  He was in the

13 presence of counsel and exercised his right to answer no

14 questions.  There was no actual witness statement in what we

15 disclosed.

16          What the Government has done since, over the last

17 couple of days, we've had the Office of International Affairs

18 scrub their entire file relating to this Latvia request and we

19 provided that to the defense.  OIA provided that they don't

20 actually keep copies of the materials that they provide to

21 foreign Governments in response to MLAT requests.  So in order

22 to get the additional documents, including the transcript to

23 which Ms. Felder refeed to, we reached out to the Northern

24 District of Georgia, the United States Attorney's Office that

25 conducted that attempted interview.  That's how we got the

SIDEBAR CONFERENCE

1    transcript, three-page transcript, where Mr. Dubovoy did not

2    make any statements.

3              THE COURT:  You say three page?

4              MR. TUCKER:  It's like three pages.  They go in --

5              MS. FELDER:  He invoked the Fifth.

6              MR. TUCKER:  In addition, your Honor, the Government

7    has asked our FBI agent to conduct another query, the

8    Sentinel, which is the FBI database, for any names pertaining

9    to this matter, to make sure there are no other reports or

10   statements.  He did that prior to Mr. Dubovoy's testimony, we

11   are confirmed there are no other statements.

12             Again, your Honor, I understand the Court's ruling.

13   We've gone above and beyond here.  Nothing here is 3500 or

14   Giglio.  Nothing further impugns the witness's credibility.

15   We've gone past the extra mile to make sure we've given

16   everything we've got.  We've done that.

17             MS. WHALEN:  Your Honor, within the documents that

18   we got from the Northern District of Georgia were the actual

19   forged documents that had been submitted to the bank.  They

20   were notarized by the office secretary in Arkadiy and Igor's

21   office.

22             I guess the Government is not hearing our concern.

23   Our concern is that they learned, this office, learned about

24   the Latvian complaint in January of 2018.  They filed a motion

25   in May, at the end of May of 2018, trying to preclude us from

SIDEBAR CONFERENCE

1    cross-examining on this issue claiming that any prosecution

2    would simply be harassment of their witnesses.

3              It's clear that they didn't do an investigation to

4    see what this would be.  That's what we're upset about.

5              And our concern is we've got another allegation

6    about involvement in drug activity.  Again the Court received

7    a letter saying here's the details, but it's just harassment,

8    our clients deny it.  And those are the two incidents we know

9    about.  I don't know what databases are open, but I would

10   think there must be some sort of a database within the

11   Department of Justice or within the Department of State or

12   within the FBI that would indicate an ongoing investigation

13   into individuals that could have been accessed when they

14   learned about this, that could have been inquired into when

15   they learned about this.

16             And what we're saying is, we don't have confidence

17   that we've been given all of the materials that are relevant

18   to cross-examination.  Whether we were able to able

19   effectively cross-examine Mr. Dubovoy on this issue is not

20   what we're upset about.  I just think that the record should

21   be clear.

22             All of this investigation could have been done in

23   January 2018 when it was first brought to their attention.

24             MR. TUCKER:  Respectfully, your Honor, may I be

25   heard briefly?  I want to clarify, materials that were

SIDEBAR CONFERENCE

1   provided, the documents to which Ms. Whalen referred, those

2   aren't the altered documents.  Those replicate the wire

3   transfers that were shown in the Boni bank records which

4   Ms. Whalen and Ms. Felder referred to, actual wire transfers

5   that took place.

6          MS. FELDER:  The issue is you represented to the

7   Court that the claims were unsubstantiated claims related to

8   Latvia.  What was provided in 2015 was a documentation of the

9   transfers of $6.5 million at that time.  You represented that

10  those claims are unsubstantiated and Mr. Dubovoy denied

11  everything, that they weren't involved, am I correct?

12         MS. NESTOR:  I don't think we understand what you're

13  saying.

14         MS. FELDER:  What I'm saying is that investigation

15  should have been done.

16         THE COURT:  Hold on a second.  I do not bear witness

17  to conversations between the two of you.  I encourage those

18  conversations, because I too am very, very concerned.  I only

19  want to try this case once.

20         MS. WHALEN:  Our concern is the documents last night

21  showed the fraudulent transfers.  The issue was the bank

22  records that we had showed the money going back.

23         And the problem is that because we were not focused

24  on this being an issue until the 29th, we were going through

25  the bank records looking for the transfers that dealt with our

SIDEBAR CONFERENCE

1    clients.  It wasn't until we put it together when I wrote that

2    response to your Honor back on June, that we needed to go back

3    through all of these records again and look for DBM

4    Engineering.  That's how we found it.

5              But to say that this is exactly what they gave us,

6    is not what they gave us.

7              And again, not that it's water under the bridge.

8    But the real issue is we can have no confidence that the

9    Government has provided all of the Giglio or or the Brady or

10   has done the due diligence that is expected of them to find

11   these items.

12             THE COURT:  I understand your reaction.  I

13   understand your reaction.

14             MR. HEALY:  I think that was very well said.  One

15   thing, your Honor read the Latvian accusatory for want of a

16   better word.  One of the things that I think is implied in

17   some 3500 material, is that those individuals identified as

18   S1, S2, S3 through S7, may very well be some the other

19   cooperating witnesses that are going to testify.  Again, I

20   think that at least if that's the case the Government did have

21   the ability to determine if indeed those people identified

22   there are the other cooperating witnesses.

23             THE COURT:  I don't know if the Government has that

24   ability, dealing with a foreign Government.  But it's

25   certainly a fair question to put to them.

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

SIDEBAR CONFERENCE

1          Look, you heard the complaints.  I think you

2     understand them.  I think you can be sensitive from the

3     defense perspective as to their level of upset.  You will deal

4     with the consequences of your actions or inactions.

5          And there's not much more I can say other than I

6     fully understand the concerns expressed.  Just get whatever

7     there exists in the universe that you can access regarding

8     Latvia or drug allegations.  Get it out there.  And then we

9     can argue about whether or not they can use this or that or

10    how far we will let them go and so far.  But the information

11    has got to be in their hands.

12         MS. NESTOR:  To be clear on the drug records, we

13    provided all of the records that we received from the DEA on

14    the drug records.

15         THE COURT:  From who?

16         MS. NESTOR:  From the Drug Enforcement

17    Administration, we provided that to defense counsel.  The

18    question becomes for the Government what more are we required

19    to do?

20         THE COURT:  I don't know.  I'm dealing with I don't

21    know.  The question is the level of investigation and search.

22    So I can't answer the question.  Neither can they.  But their

23    vote of no confidence, for lack of a better word, is

24    understandable given the lack of information.

25         Don't shake your head.  I respect you.  And I don't

SIDEBAR CONFERENCE

1    make gestures.  And I don't like it.  You can call me a fool,

2    but do it in private.  All right.  I'm trying to handle a

3    delicate situation.  They have reason to complain.

4              Let's go.

5              MS. WHALEN:  Just one more thing to put on the

6    record, yesterday our client went to the restroom on the tenth

7    floor and ran into the witness, Mr. Dubovoy, who is on the

8    stand.  He turned around.  He did not use the restroom.  And

9    today, just so everybody knows so there is no further issue,

10   we're sending him to the eighth floor.

11             THE COURT:  As we excused the jury last night, juror

12   number one gestured to Ellie.  And Ellie lent an ear, thinking

13   she that she wasn't feeling well.  The juror said -- well,

14   Ellie, as best you recall, what did the juror say?

15             COURTROOM DEPUTY:  She asked for a clarification of

16   the meaning of a word.  And I put my hand up and said, You're

17   not allowed to ask me any questions.  That was it.

18             THE COURT:  You don't know what the word was .

19             COURTROOM DEPUTY:  She did not say the word.  I

20   stopped her.

21             THE COURT:  The only reason I tell you because I

22   don't want to know something that you don't know.

23             (End of sidebar conference.)

24             (Continued on the next page.)

25

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1          (In open court.)

2          (Whereupon, the witness resumes the stand.)

3          (Jury enters the courtroom.)

4          THE COURTROOM DEPUTY:  All Rise.

5          THE COURT:  Please be seated everyone.  Good

6   morning.  We are about to resume the direct testimony of the

7   witness.

8          I remind the witness, having been sworn, sir, you

9   remain under oath.  Do you understand?

10          THE WITNESS:  Yes.

11          THE COURT:  Please proceed.

12          MS. NESTOR:  Thank you, your Honor.

13          Ms. Mulqueen, may I have the Elmo and publish to the

14   jury.  This is already in evidence.

15          COURTROOM DEPUTY:  The marking please?

16          MS. NESTOR:  Government's Exhibit 244 already in

17   evidence, and in the jurors binders tab 244 behind the sheet.

18   DIRECT EXAMINATION

19   BY MS. NESTOR:  :

20   Q    Mr. Dubovoy, when we ended yesterday we were speaking

21   about this document.  You had testified I believe that on

22   February 3rd, 2012, there was a payment for $160,000 to Carese

23   Trade and Invest, and that payment was to Mr. Khalupsky?

24   A    Yes.

25   Q    Sitting here today do you know what that payment was for?

DUBOVOY – DIRECT – MS. NESTOR

1   A     I don't remember exactly, but I think it was probably for

2   his work.

3   Q     His work doing what?

4   A     That, for that, for his trading.  And for, and for, and

5   for the commission that he received.

6   Q     That's trading on the illegal information?

7   A     Yes.

8   Q     To be clear, did you have legitimate dealings with

9   Mr. Khalupsky as well?

10  A     Yes.

11  Q     I'll get into those in a moment.  There is also an entry

12  for February 3rd, 2012, for, as you've testified earlier,

13  Patsani, can you explain what that means?

14  A     That payment was for Roma.  And that's for settling up

15  with the hackers.

16  Q     How do you know it's for settling up with the hackers?

17  A     We called those guys Patsani.

18  Q     Sitting here today -- and for the Court reporter Patsani

19  is P-A-T-S-A-N-I -- sitting here today, do you know whether

20  these are, this is one payment or a number of payments grouped

21  together?

22  A     I think that was a number of payments.

23  Q     For a period of time?

24  A     Yes, for some period of time.

25          MS. NESTOR:  With the Court's permission I'd like to

DUBOVOY - DIRECT - MS. NESTOR

1  show the witness marked for identification only Government's

2  Exhibit 828, and 828T is the translation.

3          COURTROOM DEPUTY:  And witness only?

4          MS. NESTOR:  Yes, thank you.

5  BY MS. NESTOR:  :

6  Q    Showing you Government's Exhibit 828.  Mr. Dubovoy, do

7  you recognize Government's Exhibit 828?

8  A    Yes.

9  Q    What do you recognize it to be?

10 A    I was crunching my numbers, doing my numbers for a

11 period, over a period of time.

12 Q    Is this document a number of pages?

13 A    Yes.

14 Q    Were you previously shown this document by the Government

15 when you met with the Government?

16         THE COURT:  Have you seen this before?

17         THE WITNESS:  Yes.

18         THE COURT:  Did the Government show it to you when

19 you met with them?

20         THE WITNESS:  Yes.

21         MS. NESTOR:  Thank you, your Honor.

22 Q    How do you recognize these as your notes?

23 A    I wrote this; it's my handwriting.

24 Q    Do you know what period of time these expenses are for?

25 A    I don't remember, but it was for, over a lengthy period.

DUBOVOY – DIRECT – MS. NESTOR

1    Q    Was it during the time that both defendants were trading

2    in your account?

3    A    Yes.

4    Q    Was it during the time you were paying the hackers?

5    A    Yes.

6            MS. NESTOR:  Your Honor, at this time the Government

7    moves to admit 828 and 828T.

8            THE COURT:  Any objection?

9            MS. WHALEN:  No objection.

10           MR. BRILL:  No action.

11           THE COURT:  828, 828T received.

12           (Government Exhibit 828 & 828T, was received in

13   evidence.)

14           MS. NESTOR:  May I publish it?

15           THE COURT:  Yes.

16   BY MS. NESTOR:

17   Q    Mr. Dubovoy, I'd like to go through the highlighted

18   portions of this document.  Tell us what the first line is

19   about?

20   A    That has nothing to do with anything.  That's, I was just

21   settling an account for someone's bank card.

22   Q    To be clear, these aren't just payments for the illegal

23   scheme; is that right?

24   A    Yes.  These were all my expenses for that period of time.

25   I just put them all together just to see where I stand.

DUBOVOY – DIRECT – MS. NESTOR

1  Q    For the jury, the translation for this is behind tap 828

2  behind the blue sheet.

3            I'd like to direct your attention to the second line

4  that's highlighted.  Do you know who this payment is to?

5  A    That's Pavel, what Pavel gave to the Patsani, the guys.

6  Q    How do you know that it's to the guys?

7  A    Because we spoke about that, that the Patsani are

8  hackers.

9  Q    Does it say it somewhere on here?

10  A    It says Patsani.

11  Q    What does Oleshka next to Patsani indicate?

12  A    I don't recall exactly, or I borrowed money from him, I

13  don't recall exactly.

14  Q    Who is he?

15  A    He is a friend of Pavel.

16  Q    Where does he live?

17  A    In Kiev.

18  Q    Did you ever borrow money from him to pay the hackers?

19  A    I don't recall presently.  I think I lent him money.

20  Q    You lent him money or you borrowed money?

21            MS. WHALEN:  Objection.

22            THE COURT:  Overruled.

23  A    He lent it to me.

24  Q    I want to focus you on the next highlighted line, four

25  lines down, who is this payment to?

DUBOVOY – DIRECT – MS. NESTOR

1    A    That's to Vadim Khalupsky.

2    Q    How do you know that?

3    A    I drew up this list, I remember that's him.

4    Q    What would that payment be for?

5    A    This was for a certain period of time.  It was a number

6    of payments, it wasn't just one.  To the extent that I recall,

7    it was for his work.

8    Q    Underneath is another payment to the guys, is that right,

9    for 118,000?

10   A    Yes.

11   Q    Again, that's the hackers?

12   A    Yes.

13   Q    And below that's $80,000 payment to the guys as well?

14   A    Yes.

15   Q    If you go towards the bottom of the page there is a

16   $25,000 payment, is that to the guys also?

17            MR. BRILL:  Objection.

18            THE COURT:  What objection?

19            MR. BRILL:  Leading.

20            THE COURT:  Can I see the bottom of it?

21            MS. NESTOR:  Sorry, your Honor.

22            THE COURT:  Which one?

23            MS. NESTOR:  The one I am pointing to.

24            THE COURT:  Overruled.

25   BY MS. NESTOR:  :

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1  Q    Who is the payment to below that one for 30,000?

2  A    That's Vadim Khalupsky.

3  Q    Who is the payment to below that?

4  A    That's to Korchevsky, Vitaly.

5  Q    That's for $180,000?

6  A    Yes.

7  Q    Do you recall what that payment was for?

8  A    It's for a period of time.  I think it was also for his

9  work, a percentage.

10 Q    When you say a percentage for his work, what do you mean?

11 A    We had an agreement that for managing the money I was

12 supposed to pay a percentage.

13 Q    Turning to the next page.  Can you tell us what these

14 first three entries are in order?

15 A    That's also Vadim Khalupsky.

16 Q    What about this one?

17 A    That also.

18 Q    What about the $95,000?

19 A    That's the same thing, the Patsani the guys.

20 Q    When you say that, you mean the hackers?

21 A    Yes.

22 Q    What about the 42,000?

23 A    Same thing.

24 Q    To the guys?

25 A    Yes.

DUBOVOY – DIRECT – MS. NESTOR

1   Q    How about the 30,000?

2   A    Yes, that also.

3   Q    I'm jumping all the way to the bottom of the page, who is

4   this payment to for 20,000?

5   A    That's to Vadim Khalupsky.

6   Q    Turning the page, who is the second payment on the page

7   to?

8   A    Also to Vadim Khalupsky.

9   Q    That's for 40,000?

10  A    Yes.

11  Q    Going all the way to the bottom of the page to the

12  right-hand corner, do you know what this payment for $200,000

13  is?

14  A    I think I noted that, I had, I had agreed with Vadim

15  Khalupsky that I would purchase 50 percent of his company.

16  And that was my sort of deposit for that.

17  Q    What do you mean sort of deposit.

18  A    It was a deposit to purchase 50 percent of the company.

19           THE COURT:  What company was it referring to?

20           THE WITNESS:  Dolphin.

21  Q    So explain to the jury what you mean?

22  A    Vadim offered to for me to buy 50 percent of the company

23  for a sum of $2 million, and the 50 percent of the company

24  cost $1 million.  I needed to pay 200,000 and the balance as

25  work goes on he'll deduct from my part of working.  But we had

DUBOVOY - DIRECT - MS. NESTOR

1    an agreement when I check the numbers, do the accounting, if,

2    if I don't like the numbers, he'll return the money to me.

3    Q    Thank you.  I want to take some time to talk to you in

4    more detail how the scheme worked both with Mr. Korchevsky and

5    Mr. Khalupsky.  How did you discuss this scheme with

6    Mr. Korchevsky?

7    A    During the meeting we spoke about it.

8    Q    During a meeting?

9    A    We had a number of meetings.

10   Q    Did you have phone conversations about this, or no?

11   A    By telephone, there were no conversations.

12   Q    Can you explain why?

13   A    We understood what we were doing, that we were doing

14   illegal things.

15   Q    We may have talked about this yesterday but were there

16   times where Mr. Korchevsky would tell you things about the

17   website he was accessing?

18            MR. BRILL:  Objection, your Honor.

19            THE COURT:  Overruled.

20   A    No, there wasn't.

21   Q    You never talked about it over-the-phone?

22   A    No, didn't discuss it.

23   Q    I believe in yesterday's testimony was there were times

24   that he would ask you questions or complain to you about the

25   website, do you remember that?

1568

DUBOVOY - DIRECT - MS. NESTOR

| | | |
|---|---|---|
| 1 | A | He would call me and say it's not working, nothing else. |
| 2 | Q | What does that mean to you? |
| 3 | A | That it's not functioning, there is no access. |
| 4 | Q | Is that when you would call Pavel, your brother, as you |
| 5 | | testified to yesterday? |
| 6 | A | Yes. |
| 7 | Q | When that happened, would that happen every -- once in a |
| 8 | | while? |
| 9 | A | It happened often, many times. |
| 10 | Q | Did login credentials ever change? |
| 11 | A | I don't remember, but I think they changed. |
| 12 | Q | Now, did your brother ever ask, Pavel, did he ever ask |
| 13 | | Mr. Korchevsky to provide the hackers with any information? |
| 14 | | MR. BRILL:  Objection, your Honor. |
| 15 | | THE COURT:  Overruled. |
| 16 | | Can I see counsel at sidebar. |
| 17 | | (Continued on the next page.) |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

SIDEBAR CONFERENCE

1          THE COURT:  I take you're objecting as leading.

2          MR. BRILL:  I am.

3          THE COURT:  There has to be some structure to this.

4    It's got to be some structure to it, otherwise we'll be here

5    forever.

6          You object when you think you should.  But I'm just

7    giving you my reactions as to why I just don't, most times,

8    sometimes I do agree, most times I just don't see a leading

9    question.  You've got to have a structured examination.

10         MS. NESTOR:  I'll try my best to ask open-ended

11   questions.

12         MR. BRILL:  That's all I'm asking, for the questions

13   to be open ended.

14         THE COURT:  Mr. Dubovoy to tell us everything you

15   ever said to anyone you ever said it to, I don't think you'd

16   like that.  I don't think you'd like that question either.  I

17   just wanted to share that.

18         MS. NESTOR:  Your Honor,I want to apologize to the

19   Court.  When I shook my head, it was not at all reaction to

20   what the Court said.  It was never my intention to be rude to

21   the Court or anybody here.

22         THE COURT:  I'll defer the spanking.

23         (End of sidebar conference.)

24         (Continued on the next page.)

25

DUBOVOY – DIRECT – MS. NESTOR

 1          (In open court.)

 2   BY MS. NESTOR:  :

 3   Q     Did your brother Pavel ever ask Mr. Korchevsky to provide

 4   any information to the hackers, as far as you know?

 5   A     He would tell you what is required when you called him.

 6   Q     What do you mean what is required?

 7   A     Which companies are of greater interest.

 8   Q     Would you ask Mr. Korchevsky to do anything in response

 9   to Pavel's questions?

10   A     I think I did ask him one or two times.

11   Q     What did you ask him?

12   A     Which companies are of interest.

13   Q     Did he provide you anything in response?

14   A     I think he sent me the names of some companies.  I don't

15   remember exactly right now.

16   Q     Did you remember ever sending them on to Pavel?

17   A     I don't remember.

18   Q     Did you discuss the consequences of trading on stolen

19   information with Mr. Korchevsky?

20   A     Yes, there was a moment we spoke about it.

21   Q     Tell us about that.

22   A     I asked Vitaly to what extent is this punishable.

23   Q     What did he say?

24   A     He said, well, the most that could happen is I could lose

25   the license.

DUBOVOY – DIRECT – MS. NESTOR

1    Q      You alluded to this earlier, but you were paying

2    Mr. Korchevsky, is that right, for his trading in your

3    accounts?

4    A      Yes.

5    Q      Tell us about how that worked?

6    A      I paid 12 percent of everything that would be earned on

7    the account.

8    Q      How would you pay Mr. Korchevsky?

9    A      It varied.

10   Q      Explain?

11   A      Cash, transfers.

12   Q      Was that regular, was the payment regular?

13   A      No.

14   Q      Why?

15   A      Vitaly never asked me for money.

16   Q      He never asked to be paid for the trading?

17   A      He would request after some period of time, the numbers

18   were done after a year or so.

19   Q      Who would do the money transfers, when there were

20   transfers?

21   A      My son Igor, and in the office Larissa.

22   Q      Why wouldn't you handle the money transfers?

23   A      My English is bad, and I didn't go to the banks.

24   Q      During this time did you know whether Mr. Korchevsky was

25   trading in his own accounts on the stolen information?

DUBOVOY – DIRECT – MS. NESTOR

1    A    No, I didn't know.

2    Q    Did there come a time that you did find out he might have

3    traded in his own accounts?

4    A    He asked me once.  He told me that he had a small account

5    had around 70,000 on it or so.  He asked me, can I?  And I

6    said yes.

7    Q    Was there a time where you discussed with Mr. Korchevsky

8    whether he should be trading in his own accounts aside from

9    the 70,000?

10   A    Later on, we combined the amounts of money and then we

11   were together.

12   Q    I'll get to that in a moment, I'm asking about earlier

13   on.

14          Did you ever have a conversation with Mr. Korchevsky

15   that he shouldn't be trading in his own accounts?

16   A    Yes.

17   Q    Tell us about that?

18   A    I told him that since I'm the one who is paying the

19   hackers, I was opposed to him trading using his own money.

20   Q    Explain why?

21   A    Because I was paying the hackers.

22   Q    I want to show you what is already in evidence as

23   Government's Exhibit 268, which does have a translation in the

24   jury binders, 268T.  There is also a tab 268A-1, which is the

25   attachment already in evidence.

DUBOVOY - DIRECT - MS. NESTOR

1              Showing 268, first, do you recognize this e-mail?

2    A    Yes.

3    Q    Showing you the attachment.  Do you recognize the

4    attachment, 268A-1?

5    A    Yes.

6    Q    Let's start with the e-mail, tell us what this is about?

7    A    I'm passing this along to Larissa in order that Larissa

8    transfer a million dollars to Korchevsky's account.

9    Q    Showing you the attachment.  First of all who is Larissa?

10   A    She is my accountant in my office.

11   Q    One more question, who is sending you the wire

12   instructions in the attachment, who is that coming from?

13   A    Igor Dubovoy, my son.

14   Q    Showing you the attachment.  It says, I, Arkadiy Dubovoy

15   account number 35Z-19078 would like to wire $1 million to the

16   following account number.

17              And who's account is that?

18   A    Vitaly Korchevsky.

19   Q    Who's phone number is this?

20   A    Igor, my son.

21   Q    Did you write this e-mail?

22   A    No.

23   Q    Who wrote it?

24   A    Igor sent it to me.

25   Q    That's Igor's number on the bottom, the contact

DUBOVOY – DIRECT – MS. NESTOR

1   information?

2   A     Yes.

3   Q     Tell us why you were transferring $1 million to

4   Mr. Korchevsky?

5   A     We came to an agreement that it would be my million and

6   his million that we would trade, because Korchevsky had an

7   opportunity where the margin would be one to ten.

8   Q     So explain what you mean Korchevsky had the opportunity

9   of a one to ten margin?

10  A     He's a professional, the bank made it available to him.

11  I don't know.

12  Q     Explain to us what you understood the one to ten margin

13  to mean?

14  A     The way I understood, if we had a million dollars we

15  could, we could purchase stock up to $10 million.

16  Q     Did you have a margin in your brokerage accounts?

17  A     Yes, I had one to one, maybe one to two.

18  Q     So he had a larger margin?

19  A     Yes.

20  Q     Did this $1 million, did Mr. Korchevsky trade on this

21  $1 million as far as you know?

22  A     It didn't work out.

23  Q     Why?

24  A     We didn't have information back then.  It was just laying

25  there for a certain period of time and nothing came of it.

DUBOVOY – DIRECT – MS. NESTOR

1   Q    I'd like to show the witness what is marked for

2   identification as Government's Exhibit 270, there is no

3   translation so it's not in the jury binders, just on the

4   screen after it's published.  Do you recognize this e-mail?

5   A    Yes.

6   Q    Who is it from?

7   A    From me to Vitaly.

8   Q    Is it a fair and accurate representation of the e-mail

9   that you sent to Mr. Korchevsky on December 12, 2012?

10  A    Yes.

11          MS. NESTOR:  Your Honor, at this time the Government

12  moves to admit 270.

13          THE COURT:  Any objection.

14          MR. BRILL:  No objection.

15          THE COURT:  Received in evidence.

16          (Government Exhibit 270, was received in evidence.)

17          MS. NESTOR:  Publish to the jury?

18  BY MS. NESTOR:

19  Q    This e-mail says, Vitaly can you transfer the 1 million

20  to the Merrill Edge account below since it is not being used.

21          First I want to ask you, did you write this e-mail?

22  A    No, it was not me.

23  Q    How do you know that?

24  A    Because I don't write English.

25  Q    Do you remember sitting here today who did?

DUBOVOY – DIRECT – MS. NESTOR

1    A      Igor might have written this.  It could have been

2    Larissa.

3    Q      Who's brokerage account is this?

4    A      Mine.

5    Q      Why tell us why you're asking for the $1 million to be

6    returned to your Merrill Edge account?

7    A      Because it wasn't working and it was just dormant.

8    Q      I'd like to show you for identification only Government's

9    Exhibit 334, again this is an English-only document.  Do you

10   recognize this e-mail?

11   A      Yes.

12   Q      Who is it from?

13   A      Vitaly Korchevsky.

14   Q      Who is it to?

15   A      To me.

16   Q      And is the dated February 7, 2014?

17   A      Yes.

18          MS. NESTOR:  Your Honor, at this time the Government

19   moves to admit Government's Exhibit 334.

20          THE COURT:  Any objection?

21          MR. BRILL:  No objection.

22          THE COURT:  Received.

23          (Government Exhibit 334, was received in evidence.)

24          MS. NESTOR:  May we publish to the jury?

25          THE COURT:  Go ahead.

DUBOVOY – DIRECT – MS. NESTOR

1   BY MS. NESTOR:

2   Q      Looking at Government's Exhibit 334, can you explain to

3   us what this first line of this e-mail is about?

4                THE COURT:  First line?

5                MS. NESTOR:  First line, yes, your Honor.

6                THE COURT:  The subject line or the first line?

7                MS. NESTOR:  First line right there, your Honor.

8   A      That's as we discussed with Vitaly since, he didn't have

9   the money we needed to borrow it.  And the 80,000 is the

10  interest.

11  Q      Explain to us what you mean he didn't have the

12  $1 million, $1 million for what?

13  A      In light of the fact that I deposited a million, and that

14  he was supposed to deposit a million.  He said he could lend

15  it at an interest rate.  I don't remember what it was, six or

16  8 percent, I don't recall exactly.

17  Q      So at some point it's your testimony that Mr. Korchevsky

18  was going to give you a million dollars?

19  A      He was borrowing it for himself, but the interest we

20  paid, each of us paid half of the interest.

21  Q      Just explain to us why, where this million dollars came

22  from and for what, clarify it for us?

23  A      I deposited a million dollars, and Korchevsky borrowed a

24  million dollars, and deposited it in order to trade.

25  Q      Trade on what?

DUBOVOY – DIRECT – MS. NESTOR

1    A    On the stock market.

2    Q    Based on what?

3    A    Based on the information that we were receiving.

4    Q    What does it mean expense on one mil for Chris.  Who is

5    Chris?

6    A    I don't know.

7    Q    Do you have an understanding of what this means?

8    A    I don't know.

9    Q    You don't know who Chris is, correct?

10   A    I don't know who Chris is.

11   Q    Did have you an understanding as you previously testified

12   Mr. Korchevsky borrowed the money from someone?

13   A    Well, yes.

14              (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

DUBOVOY – DIRECT – NESTOR

1    DIRECT EXAMINATION

2    BY MS. NESTOR::

3    Q    And that's what he told you?

4    A    Yes.

5    Q    And the $80,000, as you testified, was supposed to be

6    split, a split payment between you and Mr. Korchevsky?

7    A    Yes.  The interest.

8    Q    And that's why he's telling you about it here?

9    A    Yes.

10   Q    The rest of these payments, do they have anything to do

11   with the illegal trading?

12   A    No.

13   Q    Tell us about the first three payments here, what are

14   they for?

15   A    Trips to Ukraine.

16   Q    For what?

17   A    Together with Korchevsky, we decided to open a company

18   that filters water and we traveled there for negotiations.

19   Q    Why is he sending you the expenses for those trips?

20   A    In order for me to pay them.

21   Q    Why were you paying for the expenses?

22   A    It was my idea and I invited Korchevsky into this

23   business.

24   Q    Why did you invite Mr. Korchevsky into the business?

25   A    Since we were working in one business, I wanted him to

1580

DUBOVOY - DIRECT - NESTOR

1  participate in this one also.  I wanted to bring this business

2  over to the united -- to America.

3  Q    Is the business name AWD Technology?

4  A    Yes.

5  Q    Whatever happened to AWD Technology?

6  A    We opened the company and we were, up until the arrest,

7  we tried to bring this technology in.

8  Q    Whose arrest?

9  A    My -- mine.

10 Q    What about the two lines at the bottom, what's that for?

11 A    We had a meeting in the institute in Kiev and this is

12 regarding medical technologies.  We also wanted to bring this

13 over here to America and try to sell it here.  And Vitaly

14 reviewed this subject matter and said it's very difficult here

15 and that we won't be able to do it.

16 Q    So this never went anywhere?

17 A    So this didn't go anywhere.

18 Q    Did you have any other businesses with Mr. Korchevsky

19 other than the illegal trading and the AWD?

20 A    We also opened a fund together.

21 Q    Tell us about that.

22 A    We opened the fund, we just had the papers we didn't even

23 have an account in the bank.

24 Q    What do you mean by a fund?

25 A    To collect investments and then invest them.

DUBOVOY – DIRECT – NESTOR

1   Q    Whose idea was the fund?

2   A    The ideas -- the idea was Vitaly's but we came up with it

3   together.

4   Q    What was your role going to be?

5   A    I was supposed to gather the first finances.

6   Q    And what was Mr. Korchevsky's role going to be?

7   A    He managed the fund.  He knows about -- he knows a lot

8   about that, he's a specialist in that field.

9   Q    And what was the fund going to invest in?

10  A    Real estate, hotels, construction.

11  Q    How about the market?

12  A    The market.

13  Q    I'd like to show you what's been marked for

14  identification only, it's Government Exhibit 305 an email.

15  I'm also showing the witness 305-a1 and 305-a2.

16       Did you have a chance to look at those, Mr. Dubovoy?

17  A    Well, yes.

18  Q    Do you know what these are?

19  A    These are documents regarding the fund --

20  Q    What do you mean --

21  A    - the package.

22  Q    -- documents regarding the fund?

23  A    Well, like a package.  What the fund -- what fund's

24  activities are, what the fund does.

25  Q    And the cover email, who is it from?  Looking at the

DUBOVOY – DIRECT – NESTOR

1    bottom portion.

2    A    From Vitaly Korchevsky and sending it to me.

3    Q    And who do you forward it to?

4    A    To Vladimir Khalupsky.

5    Q    Was this on June 8th, 2013?

6    A    Yes.

7            MS. NESTOR:  Your Honor, at this time the government

8    moves to admit into evidence Government Exhibits 305, 305-a1

9    and 305-a2.

10           THE COURT:  Any objection?

11           MR. BRILL:  We have no objection.

12           MS. WHALEN:  No objection.

13           THE COURT:  Received in evidence.

14           (Government Exhibit 305, 305-a1 and 305-a2, were

15   received in evidence.)

16           MS. NESTOR:  I'll publish the cover email to the

17   jury.

18           Can you tell us why you're sending these documents

19   to Mr. Khalupsky?

20   A    My goal is to find money for the fund.  I sent this not

21   only to Khalupsky but to other people in order to find some

22   money.  And why to Khalupsky, because Khalupsky had friends

23   who worked in banks, they were bankers.

24   Q    And just to show the jury the actual documents that are

25   already in evidence 305-a1 and 305-a2, Mr. Dubovoy, tell us

DUBOVOY - DIRECT - NESTOR

1   again what these are?

2   A     These are documents concerning the fund.

3   Q     And here's a2.  Is the fund name SNT Capital Fund?

4   A     Yes.

5   Q     Did you travel with Mr. Korchevsky for any of the

6   business ventures you talked about?

7   A     Yes.

8   Q     Where did you travel?

9   A     We traveled to the Ukraine, to Russia, traveled to Spain.

10  We traveled to the Cayman Islands.

11  Q     Why did you go to the Cayman Islands?

12  A     We opened the fund there.

13  Q     So the fund was opened in the Cayman Islands?

14  A     Yes.

15  Q     You also said you traveled to Spain, do you remember why

16  you traveled to Spain?

17  A     We traveled, the three of us traveled, Garkusha found a

18  package of documents regarding real estate.

19  Q     Why was Mr. Korchevsky going with you?

20  A     We thought that maybe he could look at that package,

21  review that package and get some investments.

22        MS. NESTOR:  Can I publish just for the witness, and

23  I'm sorry, Ms. Mulqueen I'm going to make you do a little

24  work, it's going to come from the computer.  The image is

25  going to come from the computer.

DUBOVOY - DIRECT - NESTOR

1    THE COURTROOM DEPUTY:  From the computer.  Just one

2  second.

3    MS. NESTOR:  Just for the witness.

4    THE COURTROOM DEPUTY:  Just for witness.

5    MS. NESTOR:  Thank you.

6  Q    Do you recognize -- Government Exhibit 9 for

7  identification, do you recognize Government Exhibit 9?

8  A    Yes.

9  Q    What is this a photo of?

10 A    That's the three of us in Spain.

11 Q    Is it a fair and accurate photograph of the three of you

12 in Spain?

13 A    Yes.

14    MS. NESTOR:  Your Honor, the government moves to

15 admit Government Exhibit 9.

16    THE COURT:  Government Exhibit 9.  Any objection?

17    MR. BRILL:  No objection.

18    THE COURT:  Received.

19    (Government Exhibit 9, was received in evidence.)

20    MS. NESTOR:  Can we publish to the jury please.

21 Thank you.

22    (Exhibit published.)

23 BY MS. NESTOR::

24 Q    Can you tell us who we're looking at?  Who is this a

25 photograph of?  Sorry.

DUBOVOY - DIRECT - NESTOR

1   A     As I look at the computer, on the left is Garkusha, in

2   the middle that's me, and to the right is Vitaly Korchevsky.

3   Q     And, again, this is the trip to Spain?

4   A     Yes.

5   Q     Thank you.

6         By the way, what was your main business throughout

7   this time that you're trading with illegal hackers and you're

8   doing all these other ventures?

9   A     Construction.

10  Q     And did Mr. -- what company?

11  A     APD Custom Homes.

12  Q     Did Mr. Korchevsky ever work at APD Custom Homes?

13  A     No.

14  Q     And I wanted to ask you one other question about

15  Exhibit 9.  We heard about Mr. Garkusha yesterday but can you

16  remind us who that is?

17  A     That's my partner in APD.

18  Q     Did you testify yesterday that he went to the airport

19  with you to meet Mr. Korchevsky the first time you met about

20  the press releases?

21  A     Yes.

22  Q     Now, I want to turn and talk to you a little bit more

23  about Mr. Khalupsky.

24        Ms. Mulqueen, if you have an opportunity to just

25  take this down.

DUBOVOY – DIRECT – NESTOR

1          THE COURTROOM DEPUTY:  Just bear with me,

2    Ms. Nestor.

3          THE COURT:  I'm aware there's some problems with

4    some monitors, sorry about that.  We have the technical people

5    on the way.

6          MS. NESTOR:  Thank you.

7    Q    So I want to take some time to talk about Mr. Khalupsky

8    in some detail as well.

9          How did you communicate with Mr. Khalupsky about the

10   scheme?

11   A    We would meet, but also by phone.

12   Q    How would you meet?

13   A    I would travel to the Ukraine and meet him.

14   Q    How many times do you think you met with Mr. Khalupsky in

15   the Ukraine?

16   A    I don't remember, but it was a lot of times.

17   Q    Did you meet him anywhere else other than the Ukraine?

18   A    Yes, I met him in Vienna, New York.

19   Q    I want show you what's already in evidence as Government

20   Exhibit 480.  I'm sorry.

21         Do you recognize Government Exhibit 480?  This is

22   already in evidence.

23         THE COURTROOM DEPUTY:  I'm sorry, Ms. Nestor, are

24   you on back the document camera.

25         MS. NESTOR:  I'm back on the document camera.  I

DUBOVOY - DIRECT - NESTOR

1   won't veer way from it again.

2              THE COURTROOM DEPUTY:  Okay.  And this is in

3   evidence?

4              MS. NESTOR:  It is in evidence.

5              THE COURTROOM DEPUTY:  What number is it.

6              MS. NESTOR:  Government Exhibit 480.

7   Q    Do you recognize Government Exhibit 480?

8              I'm happy to bring it up to you, Mr. Dubovoy.

9   A    It's my telephone.

10  Q    Was that telephone seized from you when you were

11  arrested?

12  A    Yes.

13  Q    Do you remember the phone number for that phone?

14  A    Yes.

15  Q    What is it?

16  A    (404)247-6088.

17  Q    I'm showing you what's already in evidence as Government

18  Exhibit 403B for that phone.  I'd like to direct your

19  attention to page 505.

20             THE COURTROOM DEPUTY:  Ms. Nestor, excuse me for one

21  second, may we have the marking of that exhibit again, please.

22             MS. NESTOR:  Sure, 403B.

23             THE COURTROOM DEPUTY:  403B.

24             MS. NESTOR:  And I'm showing the witness page 505 of

25  that exhibit.

                    DUBOVOY – DIRECT – NESTOR

1           THE COURTROOM DEPUTY:  Thank you.

2    Q    I want to go through the contacts of your phone for a

3    moment.

4           Starting with this contact, who is this?

5    A    That's Pacha, my brother.

6    Q    Does this number end in 4444?

7    A    Yes.

8    Q    What does the 380 indicate?

9    A    That's the Ukraine, the code.

10   Q    I'm showing you page 514 of 403B.  Who is this contact

11   for?

12   A    That's Vadim Khalupsky.

13   Q    Is he a contact in your phone?

14   A    Yes.

15   Q    Do you know what Viber refers to?

16   A    That's Internet communication.

17   Q    Did you use that to speak to Mr. Khalupsky?

18   A    Yes.

19   Q    And, again, what does the 380 indicate here?

20   A    That's the Ukrainian code.

21   Q    And showing you last, same Exhibit 403B page 516.  Who is

22   this a contact for?

23   A    Where?

24   Q    The highlighted?

25   A    That's Vitaly Korchevsky.

DUBOVOY – DIRECT – NESTOR

1   Q    And, again, he was a contact in your phone as well?

2   A    Yes.

3   Q    What's the number for Mr. Korchevsky here?

4   A    (917)701-1041.

5   Q    Now you testified that Mr. Khalupsky was paid for trading

6   in your accounts; is that right?

7   A    Yes.

8   Q    Can you tell us how that worked?

9   A    Khalupsky would issue me an invoice on a monthly basis

10  and I would transfer him the money.

11  Q    How much was he paid?

12  A    I don't remember.

13  Q    You don't remember the amount or you don't remember how

14  it worked?

15  A    I don't remember the amount, but it worked, he sent me --

16  he sent me something and I sent him the money.

17  Q    You testified you paid Mr. Korchevsky a percentage of the

18  profits.  How did it work with Mr. Khalupsky?

19  A    Same thing.

20  Q    Do you remember how much you paid?

21  A    I remember it was 10, 12 percent.

22  Q    Was that consistent across the time, or were there other

23  payments as well?

24          THE INTERPRETER:  I'm sorry.

25  Q    Was that consistent across time, or were there other

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

DUBOVOY – DIRECT – NESTOR

1  payments as well?

2  A    That was -- in the very beginning it was just one or two

3  weeks it was 50 percent.  That was just in the beginning.  It

4  was something like that.  It was 50 percent for whatever

5  reason in the beginning.

6  Q    When you say the beginning, for how long?

7  A    Maybe a week, two, I don't remember.

8  Q    Now you testified that Mr. Khalupsky would send you

9  invoices to be paid; is that right?

10  A    Yes.

11  Q    Who would actually carry out the payment?

12  A    Well, Igor.

13  Q    I'd like to show the witness for identification only

14  Government Exhibit 230.

15         THE COURTROOM DEPUTY:  Just one second, Ms. Nestor.

16         MS. NESTOR:  Sure.  230 and 230-a1.  This does have

17  a translation associated with it 230T.  So does the

18  attachment, 230-a1T.  Showing 230 first.

19         Mr. Dubovoy, do you recognize this email?

20  A    Yes.

21  Q    Who is it from?

22  A    From Vladimir Khalupsky to me.

23  Q    Is it dated December 2nd, 2011?

24  A    Yes.

25         MS. NESTOR:  Your Honor, at this time -- one moment

DUBOVOY - DIRECT - NESTOR

1    actually.

2    Q    I'm going to show you 230-a1, the attachment.  Have you

3    seen this before?  Have you seen this before?

4    A    Yes.

5    Q    And what is it?

6    A    This is the banking details.

7    Q    Does it attach the email we just looked at?

8    A    Yes.

9              MS. NESTOR:  Your Honor, at this time the government

10   seeks to admit Government Exhibit 230, 230T, 230-a1 and

11   230-a1T.

12             MS. WHALEN:  No objection.

13             THE COURT:  Thank you.  Received.

14             (Government Exhibit 230, 230T, 230A-1 & 230A-1T, was

15   received in evidence.)

16             MS. NESTOR:  These exhibits are similarly in the

17   jury's binder.  Behind 230 is the translation 230T.  Behind

18   230-a1 is the translation 230-a1T.

19             I'd like to publish the cover email first.

20             (Exhibit published.)

21   Q    You testified this is an email from Mr. Khalupsky to you?

22   A    To me.

23   Q    What is the subject of the email?

24   A    From the first of November to the 30th of November we

25   earned 418,200 of which 10 percent is 41,820.

DUBOVOY - DIRECT - NESTOR

1   Q    Can you explain to us what that means?

2   A    Well 10 percent, that's Vadim's earnings.

3   Q    What does it say after that?

4   A    For the past period you gave a hundred thousand dollars

5   and 87,321 that's what you were supposed to pay and there's a

6   remaining balance of 12,679.

7        MS. NESTOR:  Can you slow down, please.

8   A    The earnings based on 10 percent was 41,820 minus 12,679,

9   that's money that I overpaid from the previous months and the

10  owed balance -- the owed remaining balance is $28,601.  And

11  that's up until the first of December.

12  Q    What does this say?

13  A    Waiting for the transfer, thank you.

14  Q    What is this payment for, if you know?

15  A    This is payment for his trading, for what he traded.

16  Q    And does this email indicate that you had -- that you

17  paid more money in the last round?

18  A    Yes.

19  Q    Just to be clear, the amount that you owed Mr. Khalupsky

20  is the 41,820 for the month of November, 2011; is that

21  correct?

22  A    Yes.

23  Q    Showing you the attachment, 230-a1 and 230-a1T, the

24  translation.  Is the name of the account here Carese Trade and

25  Invest Limited?

DUBOVOY – DIRECT – NESTOR

1   A     Yes.

2   Q     Can you tell us what this is?

3   A     Khalupsky provided this account information for

4   transferring the money.

5   Q     I'd like to show just to the witness Government

6   Exhibit 241.

7            Do you recognize Government Exhibit 241?

8   A     Yes.

9   Q     Who is it an email from and to?

10  A     From Vladimir Khalupsky to me.

11  Q     Is it dated February 1st, 2012?

12  A     Yes.

13  Q     Is that a few months later from the last email we looked

14  at?

15  A     Yes.

16           MS. NESTOR:  I'd like to move this into evidence as

17  well, Your Honor, 241 and 241T.

18           THE COURT:  Any objection?

19           MS. WHALEN:  No objection.

20           THE COURT:  241.  And I assume 241T?

21           MS. NESTOR:  Yes, Your Honor, 241T.  It's in the

22  jury's binders.

23           THE COURT:  Received.

24           (Government Exhibit 241 and 241T, were received in

25  evidence.)

                    DUBOVOY – DIRECT – NESTOR

1              MS. NESTOR:  Can we publish it to the jury?

2              THE COURT:  Go ahead.

3              (Exhibit published.)

4    BY MS. NESTOR::

5    Q    Can you please explain to us what we're looking at here.

6    A    Hello Arkadiy, how are things?  I'm sending you the

7    numbers for January 2012 from the first to the 31st of

8    January --

9    Q    Let me ask you, that 1 million-dollar number here,

10   1.5 million, what does that represent?

11   A    That's the earnings.

12   Q    And then what else does this email say?

13   A    Minus 180,000 for December from the first to the 31st

14   equals 1,341,790, which is 12 percent.  That comes to 161,014

15   minus 1,399, that comes to 159,615.

16   Q    What does that number represent?

17   A    The way I see it, that's Khalupsky's money, the money

18   that I'm supposed to pay him.

19   Q    And what else does the email say?

20   A    Since the last time you sent -- in light of the fact that

21   the last time you sent 30,000 instead of 28,601 and leaving

22   1,399.  If there's any questions call.

23   Q    Just explain to us what this, generally, is about.

24              THE INTERPRETER:  I'm sorry?

25   Q    Explain to us what this, generally, is about?

DUBOVOY – DIRECT – NESTOR

1    A    This is our –– this shows our payment relationship.

2    Sometimes I paid him earlier, sometimes later.

3    Q    Do you mean sometimes you overpaid?

4    A    Yes, sometimes I paid forward.

5    Q    And here it's 12 percent, what does that 12 percent

6    represent?

7    A    12 percent is Khalupsky's earnings.

8         MS. NESTOR:  I'd like to publish 257 marked for

9    identification only.

10   Q    Do you recognize this email?

11   A    Yes.

12   Q    What do you –– who is it from?

13   A    From Vladimir Khalupsky to me.

14   Q    Is it dated May 31, 2012?

15   A    Yes.

16   Q    Is it a few months after the last email we looked at?

17   A    Yes.

18   Q    What is this email generally?

19   A    Bank details.

20        MS. NESTOR:  Your Honor, at this time the government

21   moves to admit Government Exhibit 257 and 257T.

22        MS. WHALEN:  No objection.

23        THE COURT:  Exhibit 257 and 257T received in

24   evidence.

25        (Government Exhibit 257 and 257T, were received in

DUBOVOY – DIRECT – NESTOR

1    evidence.)

2           MS. NESTOR:  I'd like to publish it to the jury, Ms.

3    Mulqueen.

4           (Exhibit published.)

5    Q    Can you please, directing your attention to -- well, let

6    me ask you, what's this part up here?

7    A    These are the bank details, bank details for the company.

8    Q    Carese Trade and Invest Limited?

9    A    Yes.

10   Q    What is this line here?

11   A    That's also -- that's also accounting in order to send

12   money.

13   Q    Money for what?

14   A    From the two account that I need to pay Khalupsky the

15   12 percent.

16   Q    What is the reference to the large account and the small

17   account?

18   A    I don't remember.  We just named it -- we just named it

19   like that.  The big account, the smaller account.

20   Q    Is this referring to two different brokerage accounts?

21   A    Yes.

22   Q    And, again, the 12 percent?

23   A    Yes.

24   Q    What is that for?

25   A    For the work.

DUBOVOY – DIRECT – NESTOR

1    Q     Showing the witness a document marked for identification

2    as Government Exhibit 262 and 262T.

3          Mr. Dubovoy, who is this email from and to?

4    A     From Vladimir Khalupsky to me.

5    Q     Was it dated July 2nd, 2012?

6    A     Yes.

7    Q     And again, is it just a few months after the last

8    statement?

9    A     Yes.

10   Q     And what is it generally?

11   A     Same thing.

12   Q     The same thing we just saw on Government's Exhibit 257

13   and 257T?

14   A     Yes.

15   Q     To be clear, is this a similar statement to the one we

16   just saw in Government Exhibits 257 and 257T?

17   A     Yes.

18         MS. NESTOR:  Now I'd like to publish it to the jury,

19   if it's okay with counsel.  I'd like to move the exhibit into

20   evidence as Government Exhibit 262 and publish it to the jury.

21         MS. WHALEN:  No objection.

22         THE COURT:  Received.

23         MS. NESTOR:  And, again, 262T.

24         THE COURT:  Received.

25         MS. NESTOR:  For the jury in their binders.

DUBOVOY – DIRECT – NESTOR

1    THE COURT:  Go right ahead.

2    MS. NESTOR:  Thank you, Your Honor.

3    (Government Exhibit 262 and 262T, were received in

4    evidence.)

5    BY MS. NESTOR::

6    Q    Again, is this a similar thing -- information that we saw

7    in the last exhibit?

8    A    Yes.

9    Q    Is it for Carese Trade and Invest Limited?

10   A    Yes.

11   Q    What about this first line?

12   A    This is an accounting.

13   Q    An accounting of what?

14   A    From the broker's account, the earnings.

15   Q    And what does the 12 percent represent again?

16   A    The 12 percent is Khalupsky's earnings.

17   Q    Thank you.

18        Now you have previously spoken about purchasing

19   Dolphin, can you explain more about that?

20   A    Well, Vladimir made me an offer, he called me and said do

21   you want to buy 50 percent of the company?  And I replied, I'm

22   not opposed, we need to meet and talk about it.  And we met up

23   with him in Austria and we spoke and we came -- we came to an

24   agreement that he needed money urgently and we came to an

25   agreement that I'll be -- that I'll give him 200,000 and when

DUBOVOY – DIRECT – NESTOR

1    I traveled to the Ukraine I'll determine whether everything

2    works for me.  If not, he'll return the money to me.

3               (Continued on the next page.)

DUBOVOY – DIRECT – MS. NESTOR

1    BY MS. NESTOR:

2    Q    And what happened?

3    A    I returned to America and transferred the money to him.

4    Q    What happened next?

5    A    When I came to the Ukraine, and over some period of time,

6    began to study this company.  I didn't like what I found.

7    Q    What do you mean?

8    A    It wasn't what I expected.

9    Q    In what way?

10   A    It wasn't as successful as I thought it to be.  It had a

11   lot of debt.

12   Q    And what happened?

13   A    And I told him that this doesn't work for me, and you

14   need to give me my money back.

15   Q    What happened?

16   A    He said, Well, okay.  And, No problem.  But I don't

17   presently have the money.  Give me some account.  I'll earn

18   some money and I'll -- and then I'll pay you back.

19   Q    What account is that from?

20   A    A trading account.

21   Q    Do you remember whether this happened before or after

22   Mr. Khalupsky was already trading your account?

23   A    This is after he was already trading.

24   Q    So what happened?

25   A    He was trading, and then all the information was lost and

DUBOVOY – DIRECT – MS. NESTOR

1    then he stopped trading.

2    Q    All right.  I want to talk about that a little.  He was

3    trading your account before you lost the information?

4    A    Before?  He was trading when the information was

5    accessible.  Once the information was not accessible, he

6    wasn't trading.  Then he offered me to get into this company.

7    I paid this $200,000 sum in order to get into this company.

8    Then the company doesn't work for me, so I asked him to give

9    my money back.  He said, I don't have any money.  Give me an

10   account, I'll trade and then I'll pay you back.  I said, How

11   are you going to trade?  You don't have any information.

12   Well, he said, Well, I have some.

13   Q    Explain that.

14   A    He said that he had some -- these guys in Leningrad, that

15   they have something similar.  He brought a guy over to my

16   apartment to show me.

17   Q    Do you mean for you to meet him?

18   A    Yes.  In order for me to get a look at him.

19   Q    Just so I understand, this happened after you lost access

20   to stolen information for a period of time; is that right?

21   A    Yes, yes.

22            THE COURT:  I think we will take a break now, if

23   that is all right?

24            MS. NESTOR:  Thank you, Your Honor.

25            THE COURT:  Do not discuss the case, ladies and

                      DUBOVOY – DIRECT – MS. NESTOR

1   gentlemen.  Let's take a short break.

2                THE COURTROOM DEPUTY:   All rise.

3                (Jury exits the courtroom.)

4                (The following matters occurred outside the presence

5   of the jury.)

6                THE COURT:  Okay.  Ten minutes, folks.

7                (Recess taken.)

8                (In open court; outside the presence of the jury.)

9                MS. NESTOR:  Your Honor, would you like the witness

10  back on the stand?

11               THE COURT:  Yes, please.

12               (The witness takes the witness stand.)

13               THE COURTROOM DEPUTY:   All rise.

14               (Jury enters the jury room.)

15               THE COURT:  All right.  Please be seated.

16               Ms. Nestor, go right ahead.

17               MS. NESTOR:  Thank you, Your Honor.

18               Ms. Mulqueen, I would like to publish for the

19  witness only Government Exhibits 303 and 303T for

20  identification.

21               THE COURTROOM DEPUTY:   I'm sorry.  Say it again, 3,

22  0?

23               MS. NESTOR:  303 and 303T, which is the translation.

24               THE COURTROOM DEPUTY:   Okay.  Thank you.  Witness

25  only.

                David R. Roy, RPR – Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1    BY MS. NESTOR:

2    Q     Do you recognize this document?

3    A     Yes.

4    Q     What is this?

5    A     This is what Vladimir Khalupsky send me –– send it to me.

6    Q     Is he sending you an email?

7    A     Yes.

8    Q     And is it dated May 29, 2013?

9    A     Yes.

10          MS. NESTOR:  The Government moves to admit

11   Exhibit 303.

12          MS. WHALEN:   No objection.

13          THE COURT:  Admitted.

14          (Government Exhibit 303, was received in evidence.)

15          MS. NESTOR:  Can we publish?

16          (Exhibit published to the jury.)

17   BY MS. NESTOR:

18   Q     What is the subject line I'm underlining here?

19          MS. NESTOR:  And the jury –– I'm sorry.  The jurors

20   have a copy of the translation, the last tab in their binder.

21   A     An accounting.

22   Q     And can you tell us what the first entry is for

23   November 19, 2012?

24   A     I give the hundred thousand for the business –– to

25   purchase the business.

David R. Roy, RPR – Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1    Q    You're talking about Dolphin?

2    A    Yes.

3    Q    What is this entry for (indicating)?

4    A    This -- this 15 -- or the 165,000, I transferred for -- I

5    remember that I transferred that to -- to the account,

6    Vladimir Khalupsky's account, to the extent that I can

7    remember.

8    Q    Do you remember why you were transferring it?

9    A    I remember that there was supposed to be money on some

10   account, not on my account, in order that he was able to show

11   these guys that I spoke about.

12   Q    The guys, which guys?

13   A    The guys that seem to have some kind of information.

14   What information, I don't know.

15   Q    You're referring back to what you told us before the

16   break?

17   A    Yes.

18   Q    And so this money was transferred to Mr. Khalupsky's

19   account?

20   A    Possibly.  I don't remember exactly.  Possibly.

21   Q    And what about this next entry (indicating) -- let me ask

22   you first:  What does it say?

23   A    This is -- this says settling of accounts with the guys.

24   Q    And what does this say (indicating)?

25   A    Cash.

David R. Roy, RPR – Official Court Reporter

1605

DUBOVOY – DIRECT – MS. NESTOR

1    Q    And does that mean it was done in cash?

2    A    Yes.

3    Q    And do you know what this entry is for exactly

4    (indicating)?

5    A    What?

6    Q    This entry, what is it for, the one in brackets?

7    A    The settling of accounts?

8    Q    Yes.

9    A    I don't remember any longer what this was the settling of

10   accounts for.

11   Q    And how about the last line here, do you remember what

12   this is about?

13   A    I recall that with these guys, the ones from Leningrad,

14   Vladimir agreed to pay them 60 percent.  The way I understand

15   it, he's showing me here what the 60 percent profit was that

16   he's paying to them.

17   Q    Do you mean what 60 percent of the profit was?

18   A    Yes.

19   Q    And who was making the payments to the guys?

20   A    Khalupsky.

21   Q    Did you provide him the money for the payment?

22   A    They took it directly from that account, that 165,000

23   one.

24   Q    Now, you talked about the fact that Mr. Khalupsky took

25   $200,000 from you for the business, right?

David R. Roy, RPR – Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1  A    Yes.

2  Q    Okay.  Did he pay you back all that amount at the time

3  you were arrested?

4  A    No.

5  Q    Now, I want to switch topics for a minute.  You

6  previously testified that your son, Igor, would help you send

7  wires and write some emails; is that right?

8  A    Yes.

9  Q    Did he help you out in your businesses, generally?

10  A    Yes.

11  Q    Did there come a time when you and Igor were looking to

12  buy a hotel in Latvia?

13  A    Yes.

14  Q    Tell us about that, how it came about.

15  A    Pavel called and said that there's a good opportunity to

16  buy a hotel in Latvia.  But Pavel called once.  He called

17  twice, that he called and said that -- that an amount greater

18  than $100,000 needs to be transferred to a legal entity, a

19  legal company.

20  Q    At the time that he asked you to transfer over the

21  $100,000 amount, did you decide to buy the hotel at that

22  point?

23  A    At that time, not immediately.  But he just told me that

24  it's available.  That it's for sale.

25  Q    So what were you transferring the hundred-plus-thousand

David R. Roy, RPR – Official Court Reporter

DUBOVOY – DIRECT – MS. NESTOR

1    dollars for?

2    A    I didn't transfer it.  I sent Igor over there in order

3    for him to study everything.

4    Q    What happened?

5    A    Igor went and he said, Yes, this person is selling the

6    hotel.  He's got power of attorney.  All the legal

7    documentation is in order.

8    Q    What happened next?

9    A    And then I transferred the money.

10   Q    What happened next?

11   A    And then the way it came -- the way it worked is that

12   Igor signed the -- and notarized all the documents.  The

13   remaining documents needed to be worked on at a later date.

14   Q    And what happened?

15   A    Then some time passed, a bit of time went by.  There were

16   questions that required Igor to fly over there.  Igor was

17   having -- there was a child being born in his family, so he

18   couldn't go.  So he drew up a power of attorney for Leona

19   Momotok.  Leona flies over there.  He spent two days there,

20   and then he calls us and says that you've been conned.

21   Q    What does that mean?

22   A    That that is -- that we've been -- a fraud has taken

23   place.  There are owners of the hotel and there is a director

24   of the hotel, a part of management.  The owners gave power of

25   attorney to the director to -- to sell the hotel, to do

DUBOVOY - DIRECT - MS. NESTOR

1   everything connected to the hotel.  And this director, not

2   getting consent from the owners, is selling the hotel.

3   Q     What happened next?

4   A     Well, that's it.  Leona departed.  So the owners

5   turned -- turned the deal back, and then an investigation was

6   launched at the prosecutor's office.

7   Q     And then what happened?

8   A     And Igor was summoned as a witness.  And we -- we were --

9   well, we hadn't been addressing this for three years after our

10  arrest.  I don't know what went on there, but all I know is

11  that Igor was there as a witness.

12  Q     Can I ask you a question?  You were referring to Leona

13  Momotok.  Is that the same person as Leona Momotok.

14  A     Yes.

15  Q     And that's the person we spoke about yesterday?

16  A     Yes.

17  Q     You were in business with him?

18  A     Yes.

19  Q     What ended up happening with the Latvian hotel; did you

20  ever end up getting the money back?

21  A     No, it wasn't returned.

22  Q     Did you ever go to Latvia?

23  A     Yes, I traveled there.

24  Q     Tell us why.

25  A     I wanted to clear things up there.  I went to this legal

DUBOVOY – DIRECT – MS. NESTOR

1    entity, this legal office.  No one was –– no one would talk to

2    me about anything.  They're just fraudsters.

3    Q    Do you mean the legal attorneys who had represented the

4    deal?

5    A    Yes.

6    Q    What else did you do?

7    A    I attempted to go to the prosecutor's office, but our

8    meeting didn't occur.

9    Q    Were you ever charged in connection with the Latvia

10   matter in any way?

11   A    No.

12   Q    Sitting here today, do you know whether Igor was?

13   A    I just know one thing, that he was there as a witness.

14   What was done up until today over the course of the three

15   years, I don't know.

16   Q    Were there times that you were aware where your son

17   altered documents as part of your real estate business?

18   A    Yes, there were.

19   Q    Tell us about that.  Why did he do it?

20   A    When we bought real estate there, when banks were selling

21   real estate there, when some building would make it to the

22   market, we needed to make a quick offer and show that we had

23   money on our bank account.

24   Q    Can I ask a question?  Do you deal with auctions; when

25   houses went on the auction?

DUBOVOY - DIRECT - MS. NESTOR

1  A    Also auctions, but there's -- some of them were just

2  being sold.  It varied.

3  Q    I'm sorry.  I interrupted you.  Go ahead.

4  A    And we had to make an offer, and with this offer we had

5  to attach something that showed we had money on account.

6  We -- we had -- we had accounts with various companies where

7  we did have money, but -- so we showed that we had money on

8  accounts where there was no money in order to make offers.  If

9  the offer was accepted, we would transfer money to that

10 account and use it to purchase the real estate.  Back then, I

11 didn't know that this was illegal.  Now I know that it's

12 wrong.  I admit and want -- and understand that this was done

13 wrongly.

14 Q    Let me ask you a question:  You talked about altering

15 documents for purposes of real estate ventures.  Do you know

16 whether Igor altered documents for purposes of Latvia?

17 A    I know when the -- when the offer was accepted, that

18 he -- he entered into some agreement, and he wanted to see

19 that we had the 6 million in order that we make payments to

20 him.  He wanted this to be -- he wanted it to be part of an --

21 the American infrastructure so that in case we don't pay him,

22 that he's able to -- to go to -- to file an action in an

23 American suit -- an American court.

24 Q    Who is the "he" we're talking about?

25 A    This person that was selling the hotel, together with

DUBOVOY - DIRECT - MS. NESTOR

1    that -- that legal company, Natasha -- there was a Natasha

2    there.  They called her Natasha.

3    Q    Just so I'm clear, the owner of the hotel who was selling

4    it to you, he wanted the money to be paid to him in the

5    United States; is that right?

6    A    Yes.

7    Q    So that he could sue you if you didn't pay in U.S.

8    courts?

9    A    Yes.

10   Q    Do you have any sense as to why he would care about being

11   in a Latvian court as compared to a U.S. court?

12           MS. WHALEN:   Objection.

13           THE COURT:  Sustained.

14           MS. NESTOR:  I'll move on.

15           THE COURT:  Thank you.

16   BY MS. NESTOR:

17   Q    Did you disclose to the Government -- withdrawn.

18           Did you disclose to the Government the altering of

19   documents for purposes of your real estate venture -- real

20   estate ventures?

21           THE INTERPRETER:  I'm sorry?

22   Q    Sure.

23           Did you disclose to the Government the altering of

24   documents in connection with your real estate ventures?

25   A    Just a week ago, because we didn't even think that there

David R. Roy, RPR - Official Court Reporter

                    DUBOVOY – DIRECT – MS. NESTOR

1    was anything about that.

2    Q    Tell us under what circumstances that happened.

3    A    When Igor was here, he told my wife and my wife told me.

4    That's the situation.

5    Q    So you were aware that Mr. -- that your son was

6    confronted with this while in court here?

7    A    My wife told me about it.  She's -- she's worried

8    about -- she's worried about her son --

9              MS. WHALEN:   Objection.

10             MR. BRILL:  Objection, Your Honor.

11             THE COURT:  Move on.

12   BY MS. NESTOR:

13   Q    As a result of not disclosing this to the Government,

14   what is your understanding about where your cooperation

15   agreement stands now?

16   A    It's in question.

17   Q    Does that mean you could lose your cooperation agreement?

18   A    Yes.

19   Q    I want to talk to you very briefly about your son's role

20   in this scheme, the trading scheme.  Was your son trading on

21   the stolen information in 2015?

22   A    No.

23             (Continued on the next page.)

24

25

1    BY MS. NESTOR:

2    Q    What do you mean he wasn't trading on the stolen

3    information?

4    A    He would just copy Vitaly's account.

5    Q    So he was trading on the stolen?

6    A    Yes, yes, in that case, yes, he was since he was copying

7    it.

8    Q    Did there come a time where he took a more active role?

9    A    That was already later on.

10   Q    I'll get to that.

11   A    In the year '15.

12   Q    Did anyone else copy Korchevsky's trades during this time

13   period, earlier on, that you're talking about?

14   A    Yes.

15   Q    Who?

16   A    Leonid Momotok.

17   Q    This is the same Leonid Momotok we've been talking about?

18   A    Yes.

19   Q    Was he also the person that he gave access to

20   Korchevsky's account -- to Korchevsky's trading back in 2000?

21   A    Yes.

22   Q    Tell us how Leonid Momotok would copy the accounts of

23   Korchevsky's trading?

24   A    He had access to my account, he would access my account,

25   he would see what Vitaly was purchasing and he would make

1    those purchases.

2    Q    Other than trading on the stolen information, did you do

3    anything else that is illegal with Leonid Momotok?

4    A    I have, jointly have a construction company with him, a

5    company that does renovations.  There were instances where we

6    would pad the invoices to show that the cost was more than it

7    actually was.

8    Q    Why?

9    A    This was my company where, this is a company where I had

10   to set aside money for renovations.  And it was, these monies

11   were only released for renovations.  This was our money.  We

12   would do renovations for 5,000, but we would write-up 10,000.

13   And we would split these monies, me Garkusha and Leonid.

14   Q    Leonid Momotok?

15   A    Yes.

16   Q    And Garkusha, again, who is that?

17   A    The partner.

18   Q    In APD?

19   A    Yes.

20   Q    Do you know Valeri Pychnenko?

21   A    Yes.

22   Q    Who is he?

23   A    This is a countryman of mine.  His wife is my cousin.

24   Q    Showing you what is admitted into evidence as

25   Government's Exhibit 5, who is that?

1   A    Valeri Pychnenko.

2   Q    Did Pychnenko have any role in the scheme in the early

3   phases?

4   A    Yes.

5   Q    When I say scheme, I mean the trading scheme?

6   A    Yes.

7   Q    Can you tell us what that role was?

8   A    He gave me money, he collected money.  And I traded using

9   his money, not me, but Vitaly and Vadim Khalupsky.

10  Q    You put that money into your brokerage accounts?

11  A    Yes.

12  Q    Did you pay Pychnenko anything?

13  A    Well, yes.

14  Q    Was Pychnenko ever convicted of a crime apart from this?

15  A    Yes, he has a record.

16  Q    What is it?

17  A    To the extent that I know, it was narcotics, purchasing

18  narcotics.

19  Q    Did you have any involvement in the drug trafficking,

20  purchasing of narcotics, with Pychnenko?

21  A    No.

22  Q    Did you pay for his lawyer in connection with the drug

23  trafficking case?

24  A    No, I didn't pay.

25  Q    Did you provide any money in advance of, for purposes of

```
 1    paying his lawyer?

 2    A     I once transferred $3,000 to his wife.

 3    Q     For what?

 4    A     She was crying and saying that she has nothing to pay the

 5    bills with.

 6    Q     And this is your cousin?

 7    A     Yes, cousin.

 8    Q     Going back to the stolen information, you testified that

 9    there were times you would lose access to the stolen

10    information.

11    A     Yes.

12    Q     Would there still be trading going on when that happened

13    by Korchevsky and Khalupsky?

14    A     No.

15    Q     They wouldn't be trading at all?

16    A     I can't say, I don't remember, maybe.

17    Q     Did there ever come that you lost access to the stolen

18    information for a longer period of time?

19    A     Yes.

20    Q     When was that?

21    A     I can't recall that.

22    Q     Was it at some point before 2015?

23    A     Before, before.

24    Q     Why did you lose access?

25    A     Well, Roma stopped giving us access.
```

```
1    Q    Why?

2    A    Because they found out that we were trading not only

3    using the account that we agreed to use, but we were also

4    trading on other accounts.

5    Q    What did you do in response?

6    A    We attempted to come to some type of agreement with them.

7    Q    Did have you any conversations with Mr. Korchevsky about

8    this?

9    A    No.

10   Q    Tell us why not?

11   A    I didn't want to bring him into this, I didn't want to

12   tell him about it, that was my job.

13   Q    Explain?

14   A    Korchevsky was trading.  I did everything for him to have

15   the information.  If it's non-existent, that would be my

16   problem.

17   Q    How about Mr. Khalupsky, did you have any conversations

18   with him?

19   A    No, on that subject there weren't any.  I don't recall

20   any longer.  But no, no there wasn't any.

21   Q    I want to show you -- withdrawn.

22        I'm going to show you 403A, which is already in

23   evidence.  I want to focus on this first part right here.  Are

24   these conversations text messages from your phone?

25   A    It looks like.
```

1618

```
1   Q    Have you reviewed this document before?

2   A    Yes, in your office.

3   Q    Can you tell us what the first set of text messages are?

4   A    It says here Pasha, hello, you didn't forget the server

5   report.

6        MS. NESTOR:  Your Honor, with the Court's permission

7   can I pass up a copy to the translator so he can look at it as

8   well?

9        THE COURT:  Sure.

10  Q    What is the server you're referencing in this first one?

11  A    I think that's the server connected to the work the guys

12  were doing.

13  Q    You mean the hackers?

14  A    Yes.

15  Q    Pavel responds, no will have everything for tomorrow.

16       This is November 25, 2014; is that right?

17  A    Yes.

18  Q    There is another incoming text message from Pavel to you,

19  let Vitaly tell us what he's interested in, maybe he wants to

20  see something that is very important.

21       Do you have an understanding of what this is about?

22  A    When nothing was working for us, the information wasn't

23  working, Vitaly was asking when, when, when?  And I would say

24  that to Pasha all the time.  And Pasha replied with this SMS

25  message.
```

```
1    Q    Do you have an understanding what Pavel is asking for --

2    who is Vitaly?

3    A    Korchevsky.

4    Q    Do you have an understanding of what Pavel is asking for

5    from Korchevsky?

6    A    What Pasha is asking?

7    Q    I'm sorry, what Pavel is asking from Korchevsky?

8    A    The way I understand it, is what does he need, what

9    companies are of interest to him.

10   Q    Thank you.  Did there ever come a time -- let me back up.

11   Did you ever meet anyone in person about losing access to the

12   stolen information, the stolen press releases?

13   A    Well, I met with Roma.

14   Q    Tell us about that?

15   A    I met up with him.  And he said that we, we no longer can

16   give you information because you were operating using other

17   accounts.

18   Q    Later on, did you meet with anybody else?

19   A    Well, only later, later.

20   Q    Tell us about that.

21   A    That was already in '15, the year 2015.  Roma called me

22   and states, this is already later on.

23   Q    Go ahead.

24   A    Roma called and says, this was before Christmas.

25   Q    Just before Christmas 2014 or 2015?
```

```
 1   A    I think it was 2014.

 2   Q    Go ahead.

 3   A    And he said, let's work.  That I'll introduce you to the

 4   main person.

 5   Q    Go ahead.

 6   A    And I said okay.  Let's do it.  I'll travel to the

 7   Ukraine after the holidays.

 8            And I flew into Kiev and he brought me to a guy, his

 9   name was Valera.  And he was the main guy in their scheme.

10   Q    Just to be clear the Valera you are talking about now is

11   not Valera Pychnenko, your friend?

12   A    No.

13   Q    Go ahead.

14   A    And we met with him.  I, Roma, and Valera.  And he made

15   an offer to work.

16   Q    What was the offer?

17   A    And he would make available to us the code to access this

18   information, like we had before.

19   Q    Go ahead, what happened?

20   A    And he said to me that this would cost 50,000 a day.

21   Q    And what happened?

22   A    And I didn't agree to that and I left.

23   Q    What happened next?

24   A    When we got in the car, Roma, stated to me that you put

25   me in on the spot.  I just introduced you to such an
```

1    individual, I showed him your face -- I showed you his face,

2    and your actions were improper.

3    Q    What does he mean, your actions were improper?

4    A    That I turned him down.

5    Q    What happened next?

6    A    He convinced me to acquire this information for one day.

7    Q    What happened?

8    A    And I agreed to that.

9    Q    What happened?

10   A    He gave me the codes.  And I gave them to Vitaly

11   Korchevsky.  And, well, Vitaly attempted to get access, we

12   were on the telephone with Roma, but it wasn't working,

13   something wasn't working.  But towards the end something began

14   to work.  I turned this offer down.  This was one day, and I

15   turned the offer down in the end.

16   Q    I'm going to show you 304A, again, already in evidence.

17   Directing your attention to January 27, 2015, at the bottom?

18   A    That's Roma.

19   Q    Were there two contacts for Roma in your phone?

20   A    Yes.

21   Q    On January 27, page two, there are a number of contacts

22   with Roma; is that correct?

23   A    Yes.

24   Q    These are all phone calls, right?

25   A    Yes.

```
1    Q    Then you call Mr. Korchevsky, is that right?  You

2    previously testified that's Vitaly Korchevsky from your phone?

3    A    Yes.

4    Q    That's about a minute after you got off the phone, you --

5    I'm sorry, that's about eight minutes after you -- that's

6    about eight minutes after you spoke to Roma; is that right?

7    A    Yes.

8    Q    You also got a text message in the middle of this

9    VMarken@bk.ru from your son, Igor; is that right?

10   A    Yes.

11   Q    Do you know what VMarken is?

12   A    No, I don't remember what that is.

13   Q    Fair to say that later on January 27 you have a bunch of

14   contacts with Roma10 and Korchevsky?

15   A    Yes.

16   Q    Turning to page three, are these more contacts with

17   Korchevsky and Roma10, top?

18   A    Yes.

19   Q    Then there is a Viber chat from Roma Kiev.  Do you know

20   who that is?  It says Viber chat on the left side?

21   A    That's Roma, that same Roma.

22   Q    Can you tell us what this chat is about?

23   A    I think it has to do with did we get access or not, were

24   we able to get in or not.  It says, call back.

25   Q    I want to ask a more broad question, is it your
```

1    recollection that these chats have to do with that one day of

2    access?

3    A    Yes, to the extent I recall that has to do with that one

4    day.

5    Q    So there is an entry incoming from Roma Kiev at 707 UTC

6    time approximately.  It's a Viber chat, incoming, from Roma

7    Kiev on January 27, 2015?

8    A    Yes.

9    Q    What does that say?

10   A    Are you in.

11   Q    What is your text back?

12   A    Can't get in.

13   Q    What does he ask you to do?

14   A    Dial me, call me.

15   Q    Did you make a phone call to him after that?

16   A    I don't remember, probably, I don't remember.

17   Q    I'm pointing you to the records, is there an outgoing

18   call from your phone to Roma10 there?

19   A    Well, probably.

20   Q    You're not able to tell from the record?

21   A    Yes, I recognize it.  I made the call.

22   Q    There is another incoming text from Roma Kiev saying got

23   in; is that right?

24   A    We got in.

25   Q    You remember getting in?

1    A    Yes, I recall for a short period of time.

2    Q    I'm just talking about the text now.  The text says, "got

3    in??".  Then the question mark sent from him and question mark

4    sent from him again?  Then he calls you; is that right?

5    A    Yes.

6    Q    Turning to the next page.  He again texts, "you got in,

7    got in or not??"

8    A    Yes.

9    Q    Then moving to the middle of the page, he writes, I

10   understand everything is okay?

11   A    Yes.

12   Q    Then there is a phone call, an outgoing phone call, from

13   you to Mr. Korchevsky.  There is no time there, it might have

14   never connected.

15   A    Yes.

16   Q    Then there is another incoming text from Roma, after the

17   letter SH instead of N.

18        What do you understand that to be?

19   A    I don't recall everything, but I think he was adding

20   these symbols to the code with which, to the code which we

21   were not able to get access.

22   Q    There is a call from Mr. Korchevsky to you and a call

23   from you to Roma10; is that right?

24   A    Yes.

25   Q    On the bottom here is another call from you to Roma10; is

1    that right?

2    A    Yes.

3    Q    Sitting here today you don't remember exactly what was

4    said on these calls; is that accurate?

5    A    I don't remember.

6    Q    Could you explain to us what this Viber chat on the top

7    is, same day January 27, 2015, between you and Roma Kiev?

8    A    That I'm already getting calls about money, about the

9    money.  Roma, please understand, one company is operating we

10   talked about 15.  I gave one.

11            MS. NESTOR:  If the translator needs the witness to

12   repeat, please go ahead.

13   A    Understand that one company is working.  We spoke about

14   15.  I bought one for preserving the friendship, but this

15   isn't how things work.

16   Q    What is your understanding what that is about?

17   A    It's about that he wants 50,000 a day, but it's not

18   working properly, it's not working.

19   Q    We're talking about the stolen information, access to the

20   stolen information; is that right?

21   A    Yes.

22   Q    I want to ask one more thing about this document, turning

23   back to page one, I bracketed the section, do you understand

24   what this is about?  First, who is this conversation with?

25   A    With Vitaly Korchevsky.

1626

```
1   Q    You write, Delta Airlines, 786 arrival, terminal D

2   8:07 a.m. tomorrow?

3   A    Yes.

4   Q    By the way, did you write that?  I understand the text is

5   from you, did you actually write the English words?

6   A    No.

7   Q    Mr. Korchevsky responds, to J.F.K.

8   A    Yes.

9   Q    And you respond, LaGuardia?

10  A    Yes.

11  Q    This is January 2, 2015; is that right?

12  A    Yes.

13  Q    Just to clarify, sitting here today do you know who wrote

14  that text message on your behalf?

15  A    I don't remember now.

16  Q    But why do you say you didn't write it?

17  A    Because I don't write English.

18  Q    Do you recall what this trip was about, why were you

19  flying to LaGuardia in January 2015?

20  A    We were meeting with Vitaly Korchevsky.  We met at the

21  airport, had some coffee, spoke.

22  Q    At the airport or somewhere else?

23  A    I think we met up in a coffee shop in Brooklyn, I don't

24  remember exactly, but I think it was a coffee shop in

25  Brooklyn.
```

```
 1   Q    Go ahead.

 2   A    We spoke.

 3   Q    Spoke about what?

 4   A    We talked about our water company, I don't recall any

 5   longer.

 6   Q    Did you meet with anybody else that day?

 7   A    Valeri departed.  And then I met up with Vladimir

 8   Khalupsky, he was in New York.

 9   Q    Who is Valeri?

10   A    Vadim Khalupsky.

11   Q    You first met with Mr. Korchevsky, then you met

12   Mr. Khalupsky?

13   A    Yes.

14   Q    Do you remember what you talked to Mr. Khalupsky about

15   that day?

16   A    Just spoke about the family, that his son was traveling,

17   had traveled somewhere, it was just about things.

18   Q    Let me ask you, I thought Mr. Khalupsky lived in Odessa,

19   Ukraine.  What was he doing in Brooklyn, New York?

20   A    Back at that time, he traveled here to see his father, as

21   I understand it.

22   Q    Did you ever get access to the stolen information again?

23   A    Yes.

24   Q    Tell us when and how?

25   A    When it didn't work out with this Roma, that Valeri
```

```
1    Pychnenko told me that he knows this boss.

2    Q    Who is the boss we're talking about?

3    A    The one who is doing this, the one Valeri, the guy that I

4    met with.

5    Q    The one you met in the Ukraine?

6    A    Yes.

7    Q    I'm sorry, I don't know that I asked you this, do you

8    remember where you met with him in the Ukraine, what city?

9    A    Kiev.

10   Q    Do you remember where?

11   A    In a store, in a mall, a cafe, a coffee shop in a mall.

12   Q    I'm sorry, Valeri Pychnenko your friend?

13   A    Yes.

14   Q    Provides you with some access to the information, tell us

15   more?

16   A    Valeri said that he has, he knows this Valeri who has got

17   the information.  And Valeri Pychnenko offered this to me.

18   Q    What were the terms that you agreed to with Pychnenko?

19   A    Well, on the condition, to give up 50 percent to that

20   Valeri.

21   Q    Let's call him Ukraine Valeri and Pychnenko to make it

22   simple.

23   A    So Valeri Pychnenko agreed to give Valeri Ukraine

24   50 percent.

25   Q    What did you decide to do?
```

```
 1   A     I said, let's give it a try.

 2   Q     How did it work?

 3   A     So this Valeri sent something over to this Valeri

 4   Pychnenko.  Valeri sent it over to Igor.  Igor sent it over to

 5   Vitaly Korchevsky.

 6   Q     The something we're talking about, what are we talking

 7   about?

 8   A     I didn't see what this was, but it was information.

 9   Q     What information?  I'm just asking for your

10   understanding?

11   A     That to which we agreed, the way it was in the past.

12   Q     You're talking about the stolen press releases?

13   A     Yes.

14   Q     Did the Valeri in the Ukraine know that Pychnenko was

15   giving you this information?

16   A     No.

17   Q     Why not?

18   A     Because otherwise he wouldn't give it to me.

19   Q     Was Khalupsky still trading on the stolen information at

20   this time -- let me take a step back.  Do you remember when

21   this happened, what year?

22   A     It was in 2015.

23   Q     Was Mr. Khalupsky still trading on the stolen information

24   in 2015 as far as you remember?

25   A     I don't remember.
```

1    Q    Were Khalupsky and Pychnenko friends?

2    A    Yes, they were.

3    Q    Do you know how they met each other?

4    A    To the extent that I know, Pavel introduced them.

5    Q    Did you ever learn that Pychnenko and Khalupsky had any

6    falling out?

7    A    In 2015 Valeri told me that their relationship had gone

8    bad.

9    Q    Valeri Pychnenko that is?

10   A    Yes.

11   Q    Did you have an understanding about what happened?

12   A    No, I didn't have any.

13   Q    Now, Pychnenko was providing the information to Igor,

14   your son; is that right?

15   A    Yes.

16   Q    And Igor provided information to Mr. Korchevsky, is that

17   your testimony?

18   A    Yes.

19   Q    Did you have an understanding of how that all worked?

20   A    From what I understand, Vitaly told Igor what needs to be

21   purchased.

22   Q    Did you personally do any purchasing of securities or

23   stock.

24   A    I myself, no.

25   Q    Was anyone else involved in the illegal trading at this

1631

```
 1    point in time in 2015?

 2    A    Yes.

 3    Q    Who?

 4    A    Leonid Momotok.  And Alexander Garkusha.

 5    Q    How did Garkusha get involved?

 6    A    Igor sent him companies that needed to be purchased and

 7    he executed the purchases.

 8    Q    In his own accounts?

 9    A    Yes.

10    Q    He was basing that on information who was providing?

11    A    Korchevsky would send Igor what needs to be purchased.

12    And Igor passed the information along to Garkusha.

13    Q    How did it work with Momotok?

14    A    And Igor also would send it over to Momotok.

15    Q    Why were Garkusha and Momotok involved at this point?

16    A    They got involved, finances were bad, and they decided to

17    earn something.

18    Q    Did you offer the opportunity to Garkusha?

19    A    Well, yes.

20    Q    Did you take money from them because they were trading on

21    the information?

22    A    From Garkusha, no; but from Leonid, yes.

23    Q    Did you have any conversations with Mr. Korchevsky about

24    the trading during this time in 2015?

25    A    Yes, there were some.
```

```
 1    Q    Do you remember anything about them?

 2    A    I don't remember.

 3    Q    At this time, did you know whether Mr. Korchevsky was

 4    using the stolen information to trade in his own accounts?

 5    A    I didn't know.

 6    Q    Was the scheme profitable for you during this period of

 7    time in 2015, were you making money?

 8    A    No.

 9    Q    To be clear, were you making any money?

10    A    It was more problems than earnings.

11    Q    Tell us about that.

12    A    I didn't want to be involved with this any longer.  There

13    was a lot of problems with these guys.

14    Q    Go ahead.

15    A    Vitaly wanted us to continue doing this.

16    Q    Why?

17    A    He saw that this is, that this is workable.

18    Q    What happened?

19    A    I said, I don't have the money to be involved with this

20    any longer.  I just don't have the money.  And that he lend me

21    some money.

22    Q    How much?

23    A    Vitaly found some, and lent me 500,000.  He said that

24    he's borrowing from some person.

25    Q    What was the $500,000 going to be used for?
```

1   A    In order to continue further trading.

2   Q    I want to show you Government's Exhibit 403A already in

3   evidence, page five at six, are these text messages with

4   Mr. Korchevsky?

5   A    Yes.

6   Q    On July 15, 2015, there is an incoming text from

7   Mr. Korchevsky saying, "today????"; is that right?

8   A    Yes.

9   Q    On July 15, 2015, you respond, no, it will be later I'll

10  call back.

11        July 20, 2015, how is everything going from

12  Korchevsky to you.

13        Is that right?

14  A    Yes.

15  Q    And then there is an outgoing text message from you to

16  Mr. Korchevsky a few minutes later on the same day, not today

17  tomorrow I think.

18        And then there is the last text message incoming

19  July 21, 2015, with the lot of question marks.  Do you see

20  that?

21  A    Yes.

22  Q    Turning the page.  On that same day, you respond, for now

23  waiting.  At the top.

24        And then the next -- later on that day you respond,

25  today a small breakdown, won't happen, it will be tomorrow.

1          Do you see that?

2    A    Yes.

3    Q    And then there is an incoming text message the next day

4    on 7/22/2015 from Mr. Korchevsky with question marks?

5    A    Yes.

6    Q    And then there are a number of other question marks, some

7    short time later on the same day July 22, 2015.  You respond

8    later that day, for now waiting.

9          And then later you say, won't happen.

10         The next day question marks from Mr. Korchevsky

11   again.

12         Is that right?

13   A    Yes.

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

DUBOVOY – DIRECT – NESTOR

1    DIRECT EXAMINATION

2    BY MS. NESTOR::

3    Q    And you respond again, won't happen.

4    A    Yes.

5    Q    Do you have any recollection what this is about?

6    A    When things were not happening with this information to

7    the extent that I can recall.

8    Q    So he would send you these type of text messages or?

9         THE INTERPRETER:  I'm sorry?

10   Q    Would he send you these type of text messages?

11   A    Yes.

12   Q    Would he also call you?

13   A    I don't remember specifically, but possibly.

14   Q    Eventually you testified that you were arrested; is that

15   right?

16   A    Yes.

17   Q    In connection with this case?

18   A    Yes.

19   Q    When was that?

20   A    The 11th of August, 2015.

21   Q    So shortly after these text messages we just looked at?

22   A    Yes.

23   Q    Do you remember whether on the day of your arrest you

24   spoke to federal agents?

25   A    I spoke, but I don't remember.

1636

DUBOVOY - DIRECT - NESTOR

1    Q    You mean you spoke at some point?

2    A    Yes.

3    Q    You don't remember whether you spoke to them on the day

4    of your arrest?

5    A    Yes.

6    Q    Did you spend time in jail?

7    A    Yes.

8    Q    How long?

9    A    Six months.

10   Q    When you did speak to agents after your arrest, how many

11   times do you think you spoke to agents and -- how many times

12   do you think you spoke to agents?

13   A    A lot of occasions, more than 10, 15.

14   Q    Were prosecutors there as well?

15   A    Yes.

16   Q    What happened during these meetings?

17   A    This -- I was questioned and I told -- I told all -- the

18   entire truth, everything that was true.

19   Q    Were translators used during the meetings?

20   A    Yes.

21   Q    During your first meeting with the government, were you

22   fully truthful about everything you did and everything that

23   others did?

24             MS. WHALEN:  Objection.

25             THE COURT:  I'll permit it.  Overruled.

DUBOVOY - DIRECT - NESTOR

1    A    On the first meeting?

2    Q    Yes.

3    A    Not everything.

4    Q    Explain, please.

5    A    During the first meeting I said that Garkusha and Leona

6    have nothing to do with this.

7    Q    Did you eventually tell the government everything about

8    everyone's involvement?

9    A    Yes, I told them everything.

10   Q    You testified earlier that you pled guilty to wire fraud?

11   A    Yes.

12   Q    Did you plead guilty pursuant to an agreement with the

13   government?

14   A    Yes.

15   Q    What do you understand you're required to do under that

16   agreement?

17   A    I need to tell the truth.

18   Q    What is the government required to do?

19   A    To give me a letter in which it will be stated what good

20   things I did and what bad things I did.

21   Q    Did you plead guilty in connection with your crimes in

22   New Jersey?

23   A    Yes.

24   Q    Was restitution and forfeiture ordered as part of your

25   guilty plea?

1638

DUBOVOY – DIRECT – NESTOR

```
 1   A    Yes.

 2   Q    Do you remember how much?

 3   A    More than a million.

 4   Q    Is that how much you were ordered to pay or how much you

 5   actually paid?

 6   A    That which was frozen.

 7   Q    That's the amount that was seized?

 8   A    Yes.

 9   Q    Do you remember how much you owe in connection with your

10   plea agreement?

11   A    In total, 14 million.

12   Q    And about over a million was seized to date; is that

13   right?

14   A    More than a million.

15   Q    Have you been promised what your sentence -- what

16   sentence you will receive?

17   A    No.

18   Q    Sitting here today, do you know what sentence you will

19   get?

20   A    No.

21   Q    Do you hope that you'll receive a lighter sentence as a

22   result of your cooperation?

23   A    Yes.

24   Q    What happens if you lie here today?

25   A    Nothing will work out.  It just won't work out.
```

DUBOVOY – DIRECT – NESTOR

1   Q    Does your sentence -- I'm sorry, withdrawn.  Does your

2   sentence depend in any way on whether the government gets a

3   conviction in this case?

4            THE INTERPRETER:  I'm sorry.

5   Q    Does your sentence depend in any way on whether the

6   government gets a conviction in this case?

7   A    No.

8   Q    Who ultimately decides your sentence?

9   A    The Judge.

10           MS. NESTOR:  Your Honor, may I have one moment?

11           No further questions.

12           THE COURT:  All right.  We will break for lunch

13   then, ladies and gentlemen.  Be careful.  Please no discussion

14   about the case.  We will resume at 2:05.  Have a pleasant

15   lunch.

16           THE COURTROOM DEPUTY:  All rise.

17           (Jury exits courtroom.)

18           THE COURT:  Okay, enjoy lunch.

19           MR. TUCKER:  Thank you, Your Honor.

20           MS. NESTOR:  Thank you, Your Honor.

21           (Luncheon recess:  1:00 p.m.)

22           (Continued on the next page.)

23

24

25

1640

PROCEEDINGS

```
 1                A F T E R N O O N   S E S S I O N

 2                        (2:00 p.m.)

 3              (In open court; jury not present.)

 4              THE COURT:  I guess we're a couple of minutes early.

 5   We're missing the witness, missing some lawyers.

 6              MS. NESTOR:  Yes, Your Honor, we are grabbing the

 7   witness.

 8              THE COURT:  Okay.

 9              Sit down, folks, I'm guess we're a couple of minutes

10   early.

11              MS. WHALEN:  I'm sorry, Your Honor.

12              THE COURT:  Now everybody is in place.

13              THE COURTROOM DEPUTY:  Do we have the interpreters

14   for your witness?

15              MS. WHALEN:  Sorry, Your Honor, the other half of

16   our team is in the elevator.

17              THE COURTROOM DEPUTY:  Okay.

18              MS. NESTOR:  Your Honor, my understanding is the

19   interpreters are entering the building but have been held up

20   downstairs.

21              THE COURTROOM DEPUTY:  Are they on the line

22   downstairs?

23              MS. NESTOR:  I'm not sure, we're trying to get them

24   up here.

25              They are here, Your Honor.
```

DUBOVOY - CROSS - BRILL

1          THE COURT:  Are they here?

2          MS. NESTOR:  They're walking in.

3          (Jury enters courtroom.)

4          THE COURT:  Please, everyone, be seated.

5          Mr. Brill, when you're ready.

6          MR. BRILL:  Thank you.

7    CROSS-EXAMINATION

8    BY MR. BRILL::

9    Q    Mr. Dubovoy, you lie a lot, right?

10   A    No, I do not.

11   Q    You steal a lot, don't you?

12   A    No.

13   Q    You cheat people a lot, don't you?

14   A    No.

15   Q    You had to hesitate there because there's a lot of

16   evidence of that in this case, isn't there?  Yes?

17   A    No.

18   Q    You do that so you can help yourself, right?

19          I'm sorry, did you hear the question?

20   A    What was the question?

21   Q    I said:  You do those things so you can help yourself,

22   right?

23   A    No, I'm telling the truth.

24   Q    Right.  That's what you tell us now, you're telling the

25   truth, but you told a lot of lies in the past?

DUBOVOY - CROSS - BRILL

1    A    I said only truth.

2    Q    Well, you didn't say only truth.

3    A    I said only truth.

4    Q    Mr. Dubovoy, when you went to speak to the government on

5    that first day, September 17th, 2015 -- do you remember that

6    day?

7    A    When?

8    Q    September 17th, 2015.

9         THE COURT:  September, did you say?

10        MR. BRILL:  Yes.

11   A    I don't recall.

12   Q    Do you remember the first day you went in to speak to the

13   federal government after you were arrested?

14   A    Yes.

15   Q    And do you remember the people that were there?

16   A    Well, there were people, I don't remember everyone.

17   Q    Right.  Do you remember that there were a couple of

18   federal agents from the FBI?

19   A    Yes.

20   Q    Do you remember that there was a federal prosecutor there

21   as well?

22   A    Yes.

23   Q    Do you remember that there were other members of the SEC?

24   A    Yes.

25   Q    And you had your attorneys?

1643

DUBOVOY – CROSS – BRILL

1   A    Yes.

2   Q    And do you remember that before you got started in that

3   meeting, you were told that the number one thing is to tell

4   the truth?

5   A    Yes.

6   Q    Because this was going to be the opportunity for you to

7   save yourself.

8   A    Yes.

9   Q    Yes?

10  A    Yes, it's true.

11  Q    And you knew that the rules were that you have to tell

12  the truth.

13  A    Yes.

14  Q    But you lied.

15  A    No, I didn't lie.

16  Q    You told us that when you spoke to the agents that first

17  day --

18  A    Yes.

19  Q    -- you told them Garkusha and Momotok were not involved?

20  A    Yes, I said everything I said the truth.

21  Q    No.  You told us this morning that you lied when you said

22  Garkusha and Momotok were not involved in this crime.

23  A    I didn't say at the first meeting, but at the second

24  meeting I explained everything --

25  Q    Yes.

DUBOVOY - CROSS - BRILL

1   A    -- the way it was I clarified.

2   Q    But I'm talking about the first meeting, Mr. Dubovoy.

3   A    Because I understood that Garkusha and Momotok were not

4   much involved in this case and they didn't make a lot of money

5   on it.  And then later on I realized then, yes, they are part

6   of the case and I explained everything.

7   Q    You made the decision on your own what truths to tell and

8   what to lie about on that first meeting, yes?

9   A    No.

10  Q    You decided that in your mind Garkusha and Momotok were

11  only a little guilty, so you lied about them?

12  A    Yes, I decided that.  Yes.

13  Q    Yes.  And you decided that even though you were told by

14  all those members of the federal government to tell the truth?

15  A    I was telling the truth.

16  Q    But you also told lies?

17  A    No, I didn't lie, I was telling the truth.

18  Q    Okay.  Mr. Dubovoy, you then you said you clarified later

19  because you had to.

20  A    I explained myself not because I was forced to do that.

21  Q    You knew you had to because it was clear now that

22  Garkusha and Momotok were involved.

23  A    No.  I said the truth.  I stated that they did put

24  something in that process.

25  Q    I'm sorry?

DUBOVOY - CROSS - BRILL

1    A    They were involved in that process.

2    Q    But you lied about it on the first meeting?

3    A    I didn't lie because they were not involved too much in

4    this case, as I understood.  I didn't explain to Leona what is

5    this and I was -- my understanding was he wasn't guilty.

6    Q    So you determined he wasn't guilty so you decided to not

7    tell the government, yes?

8    A    I told the government.

9    Q    Mr. Dubovoy, those meetings continued, yes?

10   A    Yes.

11   Q    And you told us you met approximately 10 to 15 times.

12   A    Yes.

13   Q    And would you agree with me that you met again on

14   October 1st, 2015?

15   A    I don't recall what was the date.

16   Q    So if I told you met on October 1st, November 12th, 2015,

17   November 13th, 2015, May 31st, 2017, August 2nd, 2017,

18   August 3rd, 2017, April 11th, 2018, May 2nd, 2018, and then on

19   May 3rd, 2018, you have no reason to dispute that, right?

20   A    I didn't write down the numbers, I don't recall the

21   dates.  Yes, I did have the meetings, but I don't recall the

22   dates.

23   Q    And on May 3rd, Mr. Dubovoy, you were asked specific

24   questions about your past, do you remember those questions?

25   A    When was I asked?

DUBOVOY - CROSS - BRILL

1   Q    On May 3rd you were asked questions about your past

2   criminal history.

3          THE COURT:  Referring to May 3rd of this year?

4          MR. BRILL:  Yes, May 3rd of this year.

5   A    I was questioned but I don't recall the date.

6   Q    Okay.  Forget the dates, during that meeting, were you

7   asked about the crimes you had committed in the past?

8   A    Yes, well, they did ask, yeah.

9   Q    Yeah.  And when you say they did ask, was it one of the

10  prosecutors that are sitting here in this courtroom?

11  A    Yes.

12  Q    Who was it?

13  A    It was Julia.

14  Q    Ms. Nestor asked you about all the things you had done in

15  your past?

16  A    Yes.

17  Q    And she ran through all the potential crimes and asked

18  you if you've committed them?

19  A    No, she basically asked me what were my priors.

20  Q    What were your priors, you said?

21  A    Yes.

22  Q    What were the things you had done in your past?

23  A    Yes.

24  Q    Not what you've been caught for, right, but anything

25  criminal you may have done that you weren't caught for?

1647

DUBOVOY - CROSS - BRILL

1    A    Why I was -- what I was caught for, I was questioned.

2    Q    I'm not asking you that, Mr. Dubovoy.  I'm asking about

3    the things -- were you asked about things you weren't caught

4    for?

5    A    Yes.

6    Q    It was important for her to know everything that you had

7    done in your past that she didn't know about.

8    A    Yes.

9    Q    You knew you had to tell the truth to that answer, right?

10   A    Yes.

11   Q    A pretty important question?

12   A    Yes.

13   Q    And one of those questions was did you ever commit bank

14   fraud.  Yes?

15   A    Well, we were, related to stock market we were working on

16   with Vitaly, yes.

17   Q    No.  What I'm asking about is, were you asked questions

18   if -- the question, if you ever committed bank fraud in your

19   past?

20   A    No.

21   Q    You weren't asked that?

22   A    No, nobody asked me that question.

23   Q    No.  Were you asked if you ever committed any crimes in

24   your past generally?

25   A    Yes.

DUBOVOY - CROSS - BRILL

1  Q    Okay.  And you said no.

2  A    Whatever I was involved in the past, I gave an

3  explanation about.

4  Q    Yes.  Now you didn't tell them, Mr. Dubovoy, that you and

5  your son did commit bank fraud?

6  A    I explained that we did have money on the account.  We

7  were creating a letter statement first and then we were

8  purchasing.

9  Q    Mr. Dubovoy, I'm not asking what you just told us today,

10  I'm asking what you told the federal prosecutors back when

11  they asked you in May of 2018.  You didn't tell them then, did

12  you?

13  A    Yes, I didn't say that because we were -- when we were

14  committing that I didn't know it was criminal act.  I learn

15  about this later on.

16  Q    And you learned about it later on, Mr. Dubovoy, because

17  you learned that your son, under oath, told us that he

18  committed that crime?

19  A    Yes.

20  Q    That --

21  A    I found out this from my wife.

22  Q    Yeah.  She called you about his testimony, right?

23  A    No, she said that there is one point that that looked

24  like I had no idea that it was considered as a criminal act

25  and she explained to me that it was considered as a criminal

DUBOVOY - CROSS - BRILL

1    act.

2    Q    So we'll get to what you thought, Mr. Dubovoy, but you

3    were called by your son's wife after he testified about this

4    problem.

5              MS. NESTOR:  Objection.

6    Q    Yes?

7              THE COURT:  I'll permit it.  Were you?

8              Sustained as to form.  Just break it up.

9              MR. BRILL:  Sure.

10             THE COURT:  Did you --

11             MR. BRILL:  Son's wife.

12             THE COURT:  Did you speak to your wife after your

13   son testified here in this trial?

14             THE WITNESS:  Yes.

15             THE COURT:  Did she say anything to you about what

16   he testified to?

17             THE WITNESS:  No.

18             MR. BRILL:  Well, I'm may have misspoke.

19   Q    Your son's wife, did she call you?

20   A    Yes.

21   Q    And she told you about what Igor had told us.

22             THE COURT:  The question, please.

23   Q    Did she tell you what Igor told us?

24   A    No.

25   Q    Didn't you tell us this morning that Igor's wife called

DUBOVOY – CROSS – BRILL

1    you and told you that Igor admitted to us about this fraud?

2    A    My wife, Igor's mother, called me and stated that Igor

3    admitted in one act that we release it and forgot about it.

4    We didn't even have a clue that it's punishable act.

5    Q    You said that, but my question, Mr. Dubovoy, is that did

6    your wife tell you that because she felt it was a problem for

7    you?

8    A    No.  She said this to me because she worries about the

9    son, so do I.

10   Q    She didn't tell you about any other part of his

11   testimony, did she?

12   A    No.

13   Q    She just told you about that moment where he admitted to

14   a crime that he never told the government about.

15         THE COURT:  Question?  You're making statements,

16   make a question, please.

17         MR. BRILL:  Thank you, Your Honor.

18         THE COURT:  I don't want to interrupt you.

19         MR. BRILL:  Yes, Your Honor.  I'll make a question.

20   Q    Your wife told you nothing else but what Igor had said

21   that day about the fraud he committed with you, right?

22   A    Nothing.

23   Q    All right, Mr. Dubovoy, you testified that -- well

24   withdrawn.  When you spoke to your wife about your son's

25   testimony, did you and your wife decide what you were going to

DUBOVOY - CROSS - BRILL

1    say here in front of us?

2    A    I didn't understand the question.

3    Q    When you spoke to your wife about your son's testimony,

4    did you and your wife discuss how you were going to deal with

5    this issue?

6    A    No, of course not.

7    Q    Mr. Dubovoy, you told us about -- you told us that you

8    did know it was wrong to alter bank statements, yes?

9    A    At that time right, no.

10   Q    And when you say at that time, do you mean when you spoke

11   to the government in May of 2018?

12   A    Yes, we had this long time ago, yeah.

13   Q    Did you know it was wrong and illegal when you and Igor

14   were actually doing it?

15   A    We didn't know that it was illegal.  Because we had money

16   on different accounts and in order to make the deal, we were

17   moving money from account to account.  In order to buy that

18   real estate.

19   Q    Mr. Dubovoy, did you -- you knew that your son Igor,

20   actually changed a bank account statement in the computer, did

21   you know that?

22   A    I knew that he shows some sum of money on that account.

23   But I have not the accounts with some sums of money on it and

24   I can move the money from account to account in order to

25   purchase that estate.

DUBOVOY - CROSS - BRILL

1  Q   Mr. Dubovoy, I'm not asking about that I'm asking -- my

2  specific question is:  Did you know that your son went into

3  the computer and altered a bank account statement?

4  A   I knew that he was entering and he was showing that we do

5  have money on the account so in order for us to provide this

6  documentation for the deal.

7  Q   Mr. Dubovoy, you didn't have money in that particular

8  bank account, right?

9  A   Correct.

10  Q   And that's why you had to deceive the other parties in

11  that deal to think you did.

12  A   Yes, I do -- it means today that I am guilty, I am guilty

13  and I really regret about what happened.  But back then I

14  didn't know.  I had no knowledge that it was incorrect act.

15  As sitting today here, I understand that it was mistake, it

16  was my mistake.  I'm not going to commit anything like that in

17  my life at all in the future.

18  Q   Mr. Dubovoy, you knew that what your son was doing was

19  deceiving the other people in that deal, yes?

20  A   He didn't deceive anybody.

21  Q   Mr. Dubovoy, he changed a bank account to make it look

22  like there was money in that bank account, yes?

23  A   I already stated we did make mistake about this and I

24  really regret about.  And I am guilty, yes, and I do regret

25  but what I committed but I repeat again, back then I have no

DUBOVOY - CROSS - BRILL

1   idea that it is illegal action but I did have money on

2   different accounts that I was able to move very easier to

3   transfer to that specific account.  It's not the case when I

4   had zero money in order to purchase to make a deal of

5   purchase.  But I had money, I did have money on different

6   accounts that I was able easier to transfer any time.

7   Q    Mr. Dubovoy.

8   A    But as today I know it wasn't legal act I admit this, it

9   was a criminal act.  I didn't know about this and I really

10  regret and I really accept my deal on that.

11  Q    Mr. Dubovoy --

12            THE COURT:  That's enough.  Excuse me, that's

13  enough.  Next question.

14            MR. BRILL:  Thank you, Your Honor.

15  Q    Mr. Dubovoy, you now regret it because you've been

16  caught, yes?

17  A    No.  We admitted ourself Igor admitted.

18  Q    You regret it because now it has called into question

19  your cooperation agreement, yes?

20  A    Yes.

21  Q    You regret it because you didn't get away with what you

22  did.  Yes?

23  A    No.  Back then I didn't know it was a criminal act.  I

24  explained that before.

25            THE COURT:  Yes.

DUBOVOY - CROSS - BRILL

```
 1    A     I didn't know.  I'm telling the truth.

 2              THE COURT:  All right, next question, please.

 3    BY MR. BRILL::

 4    Q     Mr. Dubovoy, your son, Igor, spoke about doing that on

 5    certain occasions.  My question to you is, you had done that

 6    with your son dozens of time, yes?

 7    A     Well, a few times.

 8    Q     Not a few times but dozens of times, right, Mr. Dubovoy?

 9    A     A few times, I don't recall how many times.

10    Q     Well what's a few Mr. Dubovoy, 10?

11    A     I don't recall.

12    Q     You don't recall.  Could it have been 10?

13    A     Maybe.

14    Q     Was it so many times that you would alter bank accounts

15    that you just don't remember?

16    A     It was long time ago, I have no recollection.  And I

17    didn't -- I had no idea that that was a criminal act in order

18    to remember the kind of things.  I always had money to

19    purchase some estate, any time.

20    Q     Mr. Dubovoy, when you did those deals and altered those

21    bank accounts, did you tell the broker, the real estate broker

22    hey, you didn't tell them I'm altering a bank account here,

23    did you?

24    A     No, I didn't tell.

25    Q     And the person that wanted to sell you this building, the
```

DUBOVOY - CROSS - BRILL

1  seller, the seller of the building you were trying to buy, you

2  didn't go up to the seller and say, hey, I'm altering this

3  bank account, I'm going to make it part of the papers here, so

4  let's do the deal.  You didn't do that, did you?

5  A    Why do I have to tell this if I have money in another

6  account?  If I want to purchase something I can pay right

7  away.

8  Q    You didn't tell the other side because if you did you

9  couldn't do the deal, yes?

10 A    Once again the question, please.

11 Q    Sure.  You had to alter the bank account in order to do

12 the deal, yes?

13 A    In order -- in order to get the deal I had to provide

14 certain documentation that I have a sum of money on the

15 account.

16 Q    Yes.

17 A    Otherwise the deal would not go through.

18 Q    Exactly.  So you lied about having the sum of money in

19 that account?

20 A    I had money in different account.

21 Q    And you defrauded the other people to think you had money

22 in that account, yes?

23 A    As I said already, I do accept that I'm guilty in that

24 act and back then I had no knowledge it is a criminal act.

25 And I did have money.  I didn't steal money from anybody.

DUBOVOY - CROSS - BRILL

1    And --

2    Q    Mr. Dubovoy --

3    A    And I didn't cheat anybody.

4         THE COURT:  All right, listen, I'm going to ask the

5    witness to confine his response to the specific question

6    asked, so we can make some progress here.  Listen carefully to

7    the question, do your best to answer the question and then

8    stop:  Go ahead, Mr. Brill.

9         MR. BRILL:  Thank you, Your Honor.

10        THE WITNESS:  Okay.

11   BY MR. BRILL::

12   Q    Now, Mr. Dubovoy, on June 15th, 2018, just last week, you

13   were confronted with this crime you committed by the

14   government, yes?  The government confronted you about it on

15   June 15th.

16        THE COURT:  About it?

17   BY MR. BRILL::

18   Q    About altering bank statements.

19   A    Nobody confronted me.  They asked the question and I

20   revealed all the information.

21   Q    And, right, and they asked the question because they

22   learned about it from your son right here in court, yes?

23   A    Yes.

24   Q    And you had never told them during all of those meetings

25   where you were supposed to tell the truth, did you?

DUBOVOY – CROSS – BRILL

1    A     We were telling the truth.

2    Q     Now, Mr. Dubovoy, as a result of not telling the

3    government during your meetings, your cooperation agreement,

4    as you say, is in question.  Yes?

5    A     Yes.

6                MR. BRILL:  And if I can refer Your Honor to

7    Government's Exhibit 3500-AD-13.  Just for the witness,

8    please.

9                THE COURTROOM DEPUTY:  Just for the witness.

10   Q     Do you see that, Mr. Dubovoy?  Do you see that?

11   A     Yes.

12   Q     That's your cooperation agreement, right?

13   A     Yes.

14   Q     Dated December 21st, 2015?

15   A     Yes.

16   Q     And that's a contract between you, the government, yes?

17   A     Yes.

18   Q     And you signed this?

19   A     Yes.

20   Q     And your lawyer signed this?

21   A     Yes.

22   Q     And the government signed this?

23   A     Yes.

24                MR. BRILL:  Your Honor, I would move to enter this

25   as defense exhibit -- Korchevsky Exhibit, we might be up to D?

DUBOVOY - CROSS - BRILL

1    THE COURT:  D as in dog?

2    MR. BRILL:  Yes, sir.

3    THE COURT:  Any objection?

4    MS. NESTOR:  No, Your Honor, no.

5    MS. WHALEN:  No.

6    THE COURT:  Korchevsky Exhibit D now in evidence.

7    (Korchevsky Exhibit D, was received in evidence.)

8    MR. BRILL:  Thank you, Your Honor.

9  Q    I'm going to turn to page 2, Mr. Dubovoy, and I'm going

10  to read you the paragraph that says, Scope of Cooperation.

11  Okay?

12       Arkadiy Dubovoy shall cooperate fully with this

13  office.  As part of that obligation, Arkadiy Dubovoy shall

14  truthfully disclose all information concerning all matters

15  about which this office, and other government agencies

16  designated by this office, may inquire and shall not commit or

17  attempt to commit any additional crimes.

18       Do you see that?

19  A    Yes.

20  Q    You violated that agreement, right, Mr. Dubovoy, by not

21  telling the government all the things and all the crimes that

22  you have done in your past?  Yes?

23  A    I provided everything I admitted whatever I had.

24  Q    Except the stuff that didn't help you.

25       THE COURT:  Question?

DUBOVOY - CROSS - BRILL

1            MR. BRILL:  I'll withdraw that, Your Honor.

2            THE COURT:  I just don't want to interrupt you, but

3    you're just making statements.

4    BY MR. BRILL::

5    Q    You told them everything except the things that didn't

6    help you, is that correct, Mr. Dubovoy?

7    A    No.  Back then when I committed this, I didn't know it

8    was a criminal act.  I already stated that --

9    Q    We heard you.

10   A    -- and then I understood and, yes.

11   Q    Mr. Dubovoy, we heard you what you thought.  I want talk

12   to you now about another crime that you committed with

13   Mr. Momotok, okay.

14            Mr. Dubovoy, you told us that in 2010 you and

15   Mr. Momotok managed a building, do you remember that?

16   A    What about that house?

17   Q    You told us that you submitted invoices to a building for

18   managing that building.  Do you remember that?

19   A    I don't understand the question.

20   Q    You told us this morning that you and Mr. Momotok would

21   submit invoices in doing work for a building that you managed,

22   do you recall that?

23   A    Yes.

24            (Continued on the next page.)

25

David R. Roy, RPR - Official Court Reporter

DUBOVOY – CROSS – MR. BRILL

1    BY MR. BRILL:

2    Q    And what you did there was falsify the bill for your

3    services, yes?

4    A    Yes.

5    Q    And you did that with Mr. Momotok?

6    A    The invoice.

7    Q    The invoice --

8    A    Yes.

9    Q    -- for your services, yes?

10   A    Yes.

11   Q    And you did that with the assistance of Mr. Momotok,

12   correct?

13   A    Yes.

14   Q    And you did that, Mr. Dubovoy, so you can make the

15   building think that you performed more services than you

16   actually did, correct?

17   A    Yes.

18   Q    You lied to the building, yes?

19   A    Yes.

20   Q    And you did that so you could -- you and Mr. Momotok

21   could make more money, correct?

22   A    In order to take more of our money from the account.

23   Q    Yes, in order to take more money --

24   A    From my account.

25   Q    In order to take more money from them, Mr. Dubovoy, for

DUBOVOY - CROSS - MR. BRILL

1    work that you did not complete, correct?

2    A    We did provided some work, but it cost less than in

3    reality.

4    Q    Right.  And you made the decision, Mr. Dubovoy, to charge

5    more than what you actually did, correct?

6    A    Yes.

7    Q    And you submitted this bill on one of your invoices, yes?

8    A    (No audible response.)

9    Q    Yes; is that correct?

10   A    I didn't understand.

11   Q    And you submitted this bill on one of your business's

12   invoices; is that correct?

13   A    I don't understand how.  What do you mean?

14   Q    Mr. Dubovoy, you told us that in order to bill this

15   building for more than you -- more services than you've

16   actually completed, you submitted a false invoice; is that

17   correct?

18   A    Who did I provide false invoices?

19   Q    Are you now denying what you told us under other this

20   morning; is that what you're doing, Mr. Dubovoy?

21   A    I don't deny anything, but you're not stating the

22   question correctly.

23   Q    What don't -- you tell me what you don't understand,

24   Mr. Dubovoy.  Did you provide a fake invoice to this building

25   or did you not?

DUBOVOY - CROSS - MR. BRILL

1    A    It's my building.  It's my account in the bank that has

2    10 percent on the side for repairs.  That is how -- required

3    by the credit agreement.  It's my money.  The money I received

4    from rent.  I would just take more in order to -- I will take

5    more -- bigger sum by -- the compensation by the amount placed

6    for the labor of repairs.

7    Q    Mr. Dubovoy, you're lying to us, yes?

8    A    No, I don't lie.  I'm telling the truth.

9    Q    Mr. Dubovoy, this morning on direct testimony from the

10   Government you told us that you supplied fake invoices for

11   work that you and Mr. Momotok did in the past, yes or no?

12   A    Yes.

13   Q    And my question is --

14   A    No.

15   Q    -- that's what you did, but you're not denying that now,

16   are you?

17   A    No, I don't deny.

18   Q    And my question then, Mr. Dubovoy, is that you used one

19   of your own firm's invoices to commit that fraud, yes?

20   A    I provided the invoice in order that the money will be

21   available from here.

22   Q    The money --

23   A    But those monies were coming from my account to different

24   bank accounts, to different companies' accounts.

25   Q    Mr. Dubovoy, are you saying that you committed a fraud

David R. Roy, RPR - Official Court Reporter

                    DUBOVOY - CROSS - MR. BRILL

1    there or not?

2    A    I don't even know how to call this.

3    Q    Okay.  You don't know now how to call it because I'm

4    asking you the questions, Mr. Dubovoy?

5    A    No.  Because it comes from my account, to my account

6    because the building belongs to me.

7    Q    Okay.  Mr. Dubovoy, you did that so you can make more

8    money that you didn't earn, yes?

9    A    To take more of -- a bigger sum from the account, yes.

10   Q    You stole the money that you didn't earn; is that

11   correct?

12   A    I didn't steel the money because it's my money.

13   Q    Okay.  And so you felt the need the submit a false

14   invoice to steal your own money; is that your testimony,

15   Mr. Dubovoy?

16   A    Yes.  I already stated that we did -- we did it.

17   Q    You smile, Mr. Dubovoy.  Is this -- is this funny to you?

18   A    No, I'm not smiling.

19   Q    And you commit these acts, Mr. Dubovoy, to altering the

20   bank account and submitting false invoices when it suits you?

21   A    Yes.

22   Q    And you lie when it suits you, yes?

23   A    I try not to lie.

24   Q    But when it suits you, you go for it, yes?

25   A    I try to do the right thing.

                 David R. Roy, RPR - Official Court Reporter

1664
DUBOVOY - CROSS - MR. BRILL

1    Q     You try, but if it doesn't suit you, you do what you have

2    to do to suit yourself; isn't that correct?

3    A     Not always, but I do try.

4    Q     Yeah.

5          Now, Mr. Dubovoy, you had told us about Valeri

6    Pychnenko, do you recall that?

7    A     Yes.

8    Q     And this you said is your cousin?

9    A     No, his wife.

10   Q     Oh, his wife is your cousin?

11   A     Yes.

12   Q     And he's one of the people that's -- who was obtaining

13   stolen press releases from these hackers, yes?

14   A     Yes.

15   Q     And you told us that he is a convicted drug dealer, yes?

16   A     Yes.

17   Q     And isn't it true, Mr. Dubovoy, that Mr. Pychnenko was

18   convicted of possession of drugs with intent to distribute ten

19   kilograms or more of cocaine here in the United States?

20   A     Yes.

21   Q     And this occurred in 2009, correct, Mr. Dubovoy?

22   A     Yes.

23   Q     Okay.  And you learned, Mr. Dubovoy -- or you know,

24   Mr. Dubovoy, that Mr. Pychnenko committed this crime in the

25   state of Florida, yes?

DUBOVOY - CROSS - MR. BRILL

1    A    (No audible response.)

2    Q    Yes?

3    A    I don't know.

4    Q    You don't know that?

5    A    No, I don't.

6    Q    Okay.  You don't know that it took place in Lakeland,

7    Florida?

8              THE INTERPRETER:  Where?

9              MR. BRILL:  Lackland, Florida.

10   A    I don't know.

11   Q    Now, Mr. Dubovoy, you told us this morning that you were

12   not involved in Mr. Pychnenko's drug crime in Florida,

13   correct?

14   A    Correct.

15   Q    Right.  That's what you told us, yes?

16   A    Yes.

17   Q    But isn't it true, Mr. Dubovoy, that you and Mr. Garkusha

18   were in Lakeland, Florida with Mr. Pychnenko in 2009?

19   A    Yeah.  Probably, yeah.

20   Q    Or probably or were you?

21   A    We were in Florida together a few times.

22   Q    Okay.

23   A    We went to Florida with the family.

24   Q    Yeah.  And you now know -- well, withdrawn.

25              You told us -- were you in Florida with

David R. Roy, RPR - Official Court Reporter

DUBOVOY - CROSS - MR. BRILL

1    Mr. Pychnenko to help him smuggle drugs into the

2    United States?

3    A    No.

4    Q    No?  You were down there with him to look at a factory;

5    is that true?

6    A    Yes, we did look at the factory.

7    Q    And did you also learn, Mr. Dubovoy, that as part of

8    Mr. Pychnenko's crime that individuals went to Hawaii to buy a

9    vessel to smuggle drugs with?

10   A    I don't know about that.

11   Q    Well, let me ask you it this way then, Mr. Dubovoy:  Did

12   you go to Hawaii with Mr. Garkusha in 2009?

13   A    Yes.

14   Q    And wasn't it so you could buy a boat to smuggle drugs

15   and help Mr. Pychnenko?

16   A    No.

17   Q    And then did you also learn, Mr. Dubovoy -- you're

18   smiling again.  Is that funny?

19            THE COURT:  Move on.

20   BY MR. BRILL:

21   Q    And you also learned, Mr. Dubovoy, that individuals as

22   part of Mr. Pychnenko's crime went to Panama as part of his

23   crime; do you recall that?  Do you know that?

24   A    I don't know.

25   Q    But, Mr. Dubovoy, in 2009, you and Mr. Garkusha went to

DUBOVOY - CROSS - MR. BRILL

1   Panama, didn't you?

2   A     Yes, we were.

3   Q     Now, you didn't tell the Government about what you did in

4   2009, did you?

5   A     In 2009?

6   Q     What we've just spoke about, you didn't tell the

7   Government that you went to Florida in 2009, to Hawaii in

8   2009, and to Panama in 2009, correct?

9   A     No, I did tell them about it.

10  Q     Yes.  You told them, again, after they confronted you

11  about 2009, yes?

12  A     Nobody confronted me.  I was telling the truth.

13  Q     Mr. Dubovoy, isn't it true that you told the Government

14  about traveling to Florida, Panama, and Hawaii during a

15  meeting on June 1st of 2018 with the Government; isn't that

16  true?

17  A     I didn't understand the question.

18  Q     I'll rephrase the question.

19        Is the first time you told the Government about

20  traveling to Florida with Mr. Pychnenko and Hawaii and Panama

21  in 2009 was when you met with the Government on June 1st of

22  2018?

23  A     The Government asked and I tell -- so I tell them the

24  story.

25  Q     Yes, the Government asked.  You didn't tell them until

DUBOVOY - CROSS - MR. BRILL

1    they asked, yes?

2    A    What shall I tell?  We took some business trip?  We -- we

3    get business trips strictly, no criminal acts.

4              THE COURT:  Excuse me -- excuse me.

5    A    Why would I tell them about it.

6              THE COURT:  Excuse me, madam.

7              THE INTERPRETER:   Yes?

8              THE COURT:  Enough.

9              Next question.

10             MR. BRILL:  Yes, Your Honor.

11   BY MR. BRILL:

12   Q    Mr. Dubovoy, when you were asked about that by the

13   Government on June 1, 2018, your response was that you don't

14   remember any scheme, but it's possible something happened that

15   you don't recall.  Do you remember giving that answer to the

16   Government when they asked you about Pychnenko in 2009?

17   A    Would you ask the question once again, please.

18   Q    Yes, sure.

19   A    I didn't understand it.

20   Q    Sure.

21             When the Government asked you about Pychnenko and

22   Florida in 2009, you said you don't remember any scheme, but

23   it's possible something happened that you don't recall.

24             THE COURT:  That's improper use of that information.

25             MR. BRILL:  Yes, Your Honor.

                    DUBOVOY - CROSS - MR. BRILL

 1              THE COURT:  I don't like that sort of tactic.

 2              MR. BRILL:  Yes, Your Honor.  I can rephrase it if

 3    Your Honor wants.

 4              THE COURT:  Phrasing has nothing to do with it.

 5              MR. BRILL:  Okay.

 6              THE COURT:  Go ahead.  Put the question back to the

 7    witness.

 8              MR. BRILL:  Sure.

 9    BY MR. BRILL:

10    Q    When you met with the Government, Mr. Dubovoy, and they

11    asked you about Pychnenko in Florida in 2009, did you tell

12    them that you don't remember any scheme, but that it's

13    possible something happened, you just don't recall, yes?

14    A    I did say that I -- I didn't deny.  I did have the trip,

15    but it was business trip.

16    Q    That's not my question, Mr. Dubovoy.  My question is:

17    Did you tell them that you don't recall a scheme, but it's

18    possible something happened?

19              MS. NESTOR:  Your Honor --

20    A    No, I didn't say it.

21              THE COURT:  I'm sorry?

22              MS. NESTOR:  Objection, Your Honor.

23              THE COURT:  To?

24              MS. NESTOR:  To the question having -- should we

25    have a sidebar, Your Honor.

                David R. Roy, RPR - Official Court Reporter

DUBOVOY – CROSS – MR. BRILL

1          THE COURT:  Yes, maybe we should.

2          (Continued on the next page.)

16/1

SIDEBAR CONFERENCE

1              (The following occurred at sidebar.)

2         MS. NESTOR:  Your Honor, my objection, I believe

3    that Mr. Brill is using 3500 AD-18, I think he might be

4    completing two difference discussions.

5         MR. BRILL:  I don't think so.

6         MS. NESTOR:  Are you using this piece of 3500 --

7         MR. BRILL:  I'm using a handwritten document --

8         MS. NESTOR:  Okay.

9         MR. BRILL:  -- that describes Palm Cove Marina.

10        MS. NESTOR:  That's correct.

11         So you're using-- you're saying you're using the

12   handwritten version --

13        MR. BRILL:  Yes.

14        THE COURT:  Of 3500 AD-18?

15        MR. BRILL:  I could show it to you.

16        MS. NESTOR:  That would be great.

17        MR. BRILL:  Well, I think you're looking at it.

18        MS. NESTOR:  This is a different scheme, Your Honor.

19        THE COURT:  This is a --

20        MS. NESTOR:  This the discussion of a different

21   scheme altogether.  They happen to be on the same page, but

22   he's referring to a different scheme.

23        THE COURT:  Well --

24        MS. NESTOR:  He is confronting a witness with

25   something that --

David R. Roy, RPR - Official Court Reporter

SIDEBAR CONFERENCE

1          THE COURT:  May I see it?

2          MS. NESTOR:  Sure, Your Honor.

3          THE COURT:  You get confession out of Mr. Dubovoy,

4   and then like any good lawyer, you try to drive the point home

5   using different language.  And whether it's the translation,

6   or I don't know what it is, you get hung up on all of this

7   stuff.  You got your point.  It's in the record and it seems

8   to me, given the difficulties of the witness, just move along.

9          MR. BRILL:  Okay.  So advised.  I'm going to move

10  along.

11         THE COURT:  It's just an observation.

12         MR. BRILL:  I respect the observation.

13         THE COURT:  Okay.  Do you want to go to something

14  different?

15         MS. NESTOR:  Yes, Your Honor.

16         THE COURT:  Is it here?

17         MS. NESTOR:  Palm Cove Marina is something different

18  than the narcotics acquisition.

19         THE COURT:  It seems to be.

20         MR. BRILL:  I'll move on.

21         THE COURT:  That's fine.

22         (End of sidebar conference.)

23         (Continued on the next page.)

24

25

David R. Roy, RPR – Official Court Reporter

                    DUBOVOY - CROSS - MR. BRILL

1              (In open court.)

2              THE COURT:  The objection is sustained.  You may

3    continue.

4              MR. BRILL:  Thank you, Your Honor.

5    BY MR. BRILL:

6    Q     Mr. Dubovoy, was there a time whereas part of your line

7    of work you would place charity boxes around Atlanta for

8    clothes donation?

9    A     It wasn't I who did that, it was my children.

10   Q     Okay.  Well, was it a business that you had any

11   involvement in?

12   A     I assisted them financially.

13   Q     And was the idea of that particular business to accept

14   clothe donations for you to send off to people that could use

15   them?

16   A     We would collect -- we would collect it, and part of it

17   we would donate and part of it we would sell.

18   Q     Okay.  Isn't it true, Mr. Dubovoy, that you yourself

19   stole some of those clothes to sell it and not give away to

20   charity; isn't that true?

21   A     No.

22   Q     And you didn't tell anybody you did that, correct?

23   A     We didn't do it that way.  And I wasn't -- I wasn't

24   executing in that business.

25             THE COURT:  Wait a minute.

            David R. Roy, RPR - Official Court Reporter

DUBOVOY – CROSS – MR. BRILL

1          Sir, again, you had the question.  Answer the

2     question.

3          Next question.

4     BY MR. BRILL:

5     Q    Mr. Dubovoy, you told us you're not a citizen, yes?

6     A    Yes.

7     Q    You are a legal resident here in this country, yes?

8     A    Yes.

9     Q    And that means that as a result of this particular

10    conviction, you can be deported, yes?

11    A    Yes.

12    Q    And, obviously, you don't want that, right?

13    A    I -- I wouldn't want that to happen.

14    Q    No.  You don't want to leave your family, correct?

15    A    Yes.

16    Q    Or your businesses here, right; you don't want to leave

17    that, correct?

18    A    Yes.

19    Q    And would it fair to say, Mr. Dubovoy, that you would do

20    anything it took in order to stay here and not be deported; is

21    that correct?

22    A    Correct.

23    Q    Even if that meant to lie about Vitaly Korchevsky's

24    involvement if it meant staying here, you would do it,

25    wouldn't you?

David R. Roy, RPR – Official Court Reporter

DUBOVOY - CROSS - MR. BRILL

1   A    No, I don't lie.  I -- I tell the truth.

2   Q    If you had to choose, Mr. Dubovoy, between lying or

3   getting deported, you would lie, wouldn't you?

4   A    No.

5   Q    Mr. Dubovoy, do you know Slavic Zayats?

6   A    Yes.

7   Q    Do you know him from Georgia, the state of Georgia?

8   A    Yes.

9   Q    He is also from Russia?

10  A    From the Ukraine, yes.

11  Q    Okay.  And he also lives -- lived in Massachusetts; is

12  that correct?

13  A    Yes.

14  Q    And your uncle used to live in Massachusetts as well; is

15  that correct?

16  A    Well, yes.  A distant uncle, yes.

17  Q    And both you and Mr. Zayats know Vitaly Korchevsky,

18  correct?

19  A    Yes.

20  Q    Now, Mr. -- well, withdrawn.

21       Would it fair to say, Mr. Dubovoy, that you're on

22  goods terms with Mr. Zayats?

23  A    Yes.

24  Q    Now, in the past year Mr. Zayats -- well, withdrawn.

25       Have you spoken to Mr. Zayats since you've been

David R. Roy, RPR - Official Court Reporter

DUBOVOY - CROSS - MR. BRILL

1   arrested in August of 2015?

2   A     Yes.

3   Q     And is it true, Mr. Dubovoy, that you had a conversation

4   with Mr. Zayats within the past year about this case?

5   A     Yes, that this took place.  He asked me how -- how

6   things -- how are your -- how are things going for you, but

7   there was nothing specific.

8   Q     Isn't it true, Mr. Dubovoy, that you told Mr. Zayats that

9   you never told Vitaly Korchevsky where you got the stolen

10  information from because he never would have gone along with

11  it; isn't that true?

12  A     I didn't discuss issues of this sort with Victor.

13  Q     And that you told Mr. Zayats that what you did was ask

14  Vitaly Korchevsky about certain stocks and asked Vitaly what

15  stocks would be better to buy; that's what you did, correct?

16  A     With who?

17  Q     This is what you told Mr. Zayats?

18  A     No, of course not.

19  Q     And you told Mr. Zayats that you would follow Vitaly

20  Korchevsky's lead about what stocks to buy; didn't you tell

21  that to Mr. Zayats?

22  A     No.

23  Q     And you told Mr. Zayats that others would follow your

24  lead about what stocks to buy, correct?

25  A     No.

David R. Roy, RPR - Official Court Reporter

DUBOVOY – CROSS – MR. BRILL

1   Q    And you told Mr. Zayats, Mr. Dubovoy, that you were

2   shocked that Vitaly's even involved; is that correct?

3   A    No.

4   Q    Mr. Dubovoy, where's Pavel?

5   A    (No audible response.)

6   Q    Where's Pavel?

7   A    In the Ukraine.

8   Q    This was his -- this was his scheme, correct?

9   A    Yes.

10  Q    And isn't it correct, Mr. Dubovoy, that your cooperation

11  is the reason why Pavel is not arrested?

12  A    Pavel was arrested.

13  Q    Yeah, where was he arrested?

14  A    In Bella, Russia.  I don't remember when that was.

15  Q    But he free now, right?

16  A    Yes, he was released.

17  Q    And isn't that because you chose to cooperate with

18  the Government here in the United States?

19  A    No.

20  Q    I mean, he's family, correct, Mr. Dubovoy?

21  A    Yes, that's my brother.

22  Q    Brother?

23  A    My brother.

24  Q    And wouldn't think trice about hurting Vitaly Korchevsky

25  if you can help your family, correct?

David R. Roy, RPR – Official Court Reporter

DUBOVOY - CROSS - MR. BRILL

1    A    I'm sorry?

2    Q    Sure.  You wouldn't think twice about hurting Vitaly

3    Korchevsky if that meant you can help your brother?

4    A    No, I speak the truth.

5    Q    Mr. Dubovoy, regarding Pavel, you told us in the past

6    Pavel would come to you with lots of ideas --

7    A    Yes.

8    Q    -- right?

9    A    Yes.

10   Q    But none of them worked out, you told us?

11   A    Yes.

12   Q    And when you say "ideas," Mr. Dubovoy, you mean scams,

13   right?

14   A    No.  Why?

15   Q    You mean crimes he would come to you with, right?

16   A    No.

17   Q    He would come to you with ideas to make easy money; isn't

18   that what you mean?

19   A    No.

20   Q    And ways that you can get ahead of others; that's his

21   idea, correct?

22   A    No.

23   Q    Ideas on how to take advantage of the rest of the public;

24   isn't that correct?

25   A    No.

David R. Roy, RPR - Official Court Reporter

DUBOVOY - CROSS - MR. BRILL

1  Q   Mr. Dubovoy, you're not saying that the first time

2  Pavel -- that -- withdrawn.

3           You're not saying that this was the first time Pavel

4  called you up with a criminal idea, are you?

5  A   Yes.

6  Q   Is this the first time you took a shot and say, Hey, do

7  you want to commit a crime this time?  Is that your testimony?

8  A   He didn't say that this is a crime.

9  Q   Okay.  Well, you know it's a crime, right?

10  A   Initially I didn't know.  Then I found out that it was,

11  yes.

12  Q   So when Pavel came to you about this scheme, it's your

13  testimony that you didn't know it was -- he was talking to you

14  about a crime?

15  A   Yes, the first time I didn't know.

16  Q   When you say "the first time," how long did it take

17  you -- well, withdrawn.

18           You figured it out pretty quick, didn't you,

19  Mr. Dubovoy?

20  A   Yes, that's it.

21  Q   All right.  And so Pavel -- is this -- so again, is it

22  your testimony that this is the first time Pavel came to you

23  about joining him to commit a crime; is that your testimony?

24  A   He didn't -- he didn't offer me anything criminal.

25  Q   Yeah, but Mr. Dubovoy, but what he offered you was the

1680

DUBOVOY – CROSS – MR. BRILL

1    access to stolen press release information, didn't he, that

2    was hacked?

3    A    At that time I didn't know.  I found out later.  And

4    furthermore, I'm not a specialist in that area.  If I offered

5    that to Korchevsky and he -- and he would say that that's

6    criminal, then I would understand it, but because he's a

7    specialist in that field.

8    Q    Mr. Dubovoy, when you say you're not a specialist, you're

9    not a specialist in what's criminal and what's not; is that

10   your testimony?

11   A    At the time when Pavel called me, at that time, I didn't

12   know what it was.

13   Q    So, Mr. Dubovoy, when you learned what it was, you

14   continued to do it?

15   A    Yes.

16   Q    The fact that you say you then learned, didn't change

17   your mind about actually committing this crime, right?

18   A    I -- I made a mistake in life.

19   Q    Well, Mr. Dubovoy --

20   A    We did that together.

21   Q    Mr. Dubovoy, you agreed with Pavel to commit the crime

22   when he asked, yes?

23            THE INTERPRETER:  I'm sorry?

24   Q    To commit the crime when he asked you?

25   A    And with Korchevsky and with Khalupsky, with everyone

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MR. BRILL

1    together.

2    Q    Now, Mr. Dubovoy, you agreed to that because you knew it

3    was a way for you to make money, yes?

4    A    Yes.

5    Q    All right.  It was a way for you to get an angle on

6    others; is that fair to say?

7    A    Yes.

8    Q    You took advantage of an opportunity to help yourself,

9    yes?

10   A    To help myself and to, at the same time, help my friends.

11   Q    Okay.

12   A    Korchevsky and Khalupsky and --

13           THE COURT:  Enough.

14   A    -- Pavel.

15           THE COURT:  Enough.

16           Next question.

17   BY MR. BRILL:

18   Q    Now, Mr. Dubovoy, I want to talk to you about your

19   relationship with Vitaly back in 2000.  You told us you were

20   introduced to him around the year 2000, yes?

21   A    Yes, in '99.

22   Q    Okay.  And around that time, would you describe yourself

23   as a businessman?

24   A    Yes.

25   Q    You owned businesses then?

David R. Roy, RPR – Official Court Reporter

DUBOVOY - CROSS - MR. BRILL

1    A    No, I had one business.

2    Q    Okay.  And would you describe yourself back then as an

3    entrepreneur trying to earn more money?

4    A    Yes.

5    Q    And you knew Vitaly Korchevsky; you knew who he was,

6    correct?

7    A    Yes.

8    Q    He was a Slavic -- a well-known Slavic minister, correct?

9    A    Yes.

10   Q    A religious person?

11   A    Yes.

12   Q    Someone who was trustworthy?

13   A    Yes.

14   Q    And you also knew that he was someone who maybe could

15   help you professionally, help you make some money?

16   A    Yes.  He -- he told me that he was able to.

17   Q    And you agreed?

18   A    Yes.

19   Q    So you opened up a stock brokerage account back then in

20   2000, correct?

21   A    Yes.

22   Q    Okay.  And he would trade stocks in your account,

23   correct?

24   A    Yes.

25   Q    All right.  And the idea was that he would make money for

DUBOVOY – CROSS – MR. BRILL

1    you, yes?

2    A    Yes.

3    Q    He would use his skills and experience and knowledge of

4    trading stocks for you?

5    A    Yes.

6    Q    Now, would you also told us, Mr. Dubovoy, that as he was

7    doing that in your account, you told us that you gave

8    Mr. Momotok access to your account as well, yes?

9    A    Yes.

10   Q    Okay.  And you told us that you allowed Mr. Momotok to

11   copy the trades that Vitaly was making for Momotok to trade,

12   yes?

13              THE INTERPRETER:  I'm sorry.  Could you --

14              MR. BRILL:  Sure.

15   Q    And you told us that you allowed Momotok access to your

16   account to copy the trades that Vitaly was making; is that

17   correct?

18   A    No.  Momotok traded on his own and he just wanted to do

19   an analysis.

20   Q    Okay.  But when Momotok traded on his own, he was able to

21   copy the trades that Vitaly was making in your account,

22   correct?

23   A    Maybe.  I don't know.

24   Q    Well, you know, Mr. Dubovoy, because you gave access  to

25   --

David R. Roy, RPR – Official Court Reporter

1684

DUBOVOY – CROSS – MR. BRILL

1    A    I don't know.

2    Q    You gave access to Momotok -- you gave Momotok access to

3    your account?

4    A    Yes.

5    Q    And the reason for that is so he can see what Vitaly was

6    trading, right?

7    A    He traded on his own.  He just wanted to do an analysis.

8    Q    Okay.  And, Mr. Dubovoy, in return, you took 50 percent

9    of what Momotok made from Momotok's trades, didn't you?

10   A    No.  In the year 2000, I didn't take it.  That was

11   already in '12.

12   Q    And you never told -- withdrawn.

13        So if Momotok says that you took 50 percent of his

14   profits in 2000, he would be lying?

15   A    Yes, he's lying.

16   Q    Yeah.

17        Mr. Dubovoy, you never told Vitaly Korchevsky that

18   you allowed Momotok access to your account to see what he was

19   trading, did you?

20   A    No.

21   Q    And you never told Vitaly Korchevsky that you were taking

22   a piece or a kickback from Mr. Momotok for Momotok copying

23   Vitaly's trades, correct?

24        THE INTERPRETER:  I'm sorry?

25   Q    And you never told Vitaly that you were taking a piece or

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MR. BRILL

1   a kickback from Mr. Momotok for Momotok trading in his

2   account?

3   A     In the year 2000, I didn't get anything from him and

4   there was no such conversation of that sort.

5   Q     And the reason why you didn't tell Vitaly Korchevsky

6   about what Momotok was doing, was because as you told us

7   yesterday, there was no need to tell him?

8   A     There was no reason.  He was just looking at it, maybe

9   over a -- over the course of a month, maybe two months.

10  Q     If you told --

11  A     That was a short period of time.

12  Q     If you told Vitaly Korchevsky what was happening with you

13  and Momotok, then Vitaly wouldn't have traded stocks in your

14  account anymore, correct?

15  A     I don't know.

16  Q     He wouldn't have helped you make money anymore on your

17  account if you told him?

18  A     I don't know.

19  Q     Now, Mr. Dubovoy, you then reconnected with

20  Mr. Korchevsky in 2011, yes?

21          THE INTERPRETER:   I'm sorry.  Could you repeat that

22  question?

23          MR. BRILL:  Sure.

24  Q     You then reconnected with Mr. Korchevsky in around 2011,

25  correct?

DUBOVOY – CROSS – MR. BRILL

1   A    It was 2010 or '11.  I don't remember exactly.

2   Q    And when you reconnected with Mr. Korchevsky, he was

3   still a Slavic minister, correct, Baptist minister?

4   A    Yes, of course.

5   Q    Well known in the community as a Slavic Baptist minister?

6   A    Yes.

7   Q    Well known around the world?

8   A    Yes.

9            THE COURT:  All right.  Why don't we take a short

10  break.

11           If that is okay with you?

12           MR. BRILL:  Of course, Your Honor.

13           THE COURT:  I don't want to interrupt your flow.

14           All right.  We will take a short break.  Do not

15  discuss the case.

16           THE COURTROOM DEPUTY:   All rise.

17           (Jury exits the courtroom.)

18           (The following matters occurred outside the presence

19  of the jury.)

20           THE COURT:  Okay.  Step down.

21           Ten minutes.

22           (Witness exits the witness stand.)

23           (Recess taken.)

24

25

SIDEBAR

```
 1                    (In open court.)

 2                    THE COURT:  Counsel at sidebar, please.

 3                    (Sidebar conference.)

 4                    THE COURT:  If there are going to be any prayer

 5   services conducted during the course of the trial, I want to

 6   make sure they are conduct it far away from the courthouse.

 7   Okay.  Apparently something was going on, I don't know if it

 8   was today or yesterday, with the group of folks.  So word to

 9   the wise, I don't want them anywhere near the courthouse.

10                    MR. BRILL:  I'll advise them.

11                    (End of sidebar conference.)

12                    (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CROSS - DUBOVOY - MR. BRILL

1          (In open court.)

2          (Jury enters the courtroom.)

3          THE COURT:  Please be seated.  I know I don't have

4    to remind you, we start tomorrow at 1:00 o'clock.  Eat before.

5    CROSS EXAMINATION (Continued.)

6    BY MR. BRILL:

7    Q    Mr. Dubovoy where we broke, you told us the Vitaly did

8    not need to know about stolen information in 2000, right?

9    A    Yes.

10   Q    And when you were given this access to stolen information

11   in 2011, Vitaly Korchevsky didn't need to know that either,

12   correct?

13   A    I think in 2011 he should have known.

14   Q    Well, you knew that if you told him he wouldn't help you,

15   right, Mr. Dubovoy?

16   A    I don't know.

17   Q    Well, you knew who he was, so if you told him about this

18   illegal information then you couldn't use him to help you make

19   money; isn't that true?

20   A    Told him what?

21   Q    You knew that there was no need for him to know that you

22   were getting illegal information, correct?

23   A    I think he just looked at it, he saw it and he figured it

24   out himself.  If I'm not a professional and I understood it.

25   Him being a professional, he must have understood it.

CROSS – DUBOVOY – MR. BRILL

1    Q    Mr. Dubovoy, after you started, after the trades started

2    happening in 2011, based on the hacked information, you made

3    the decision very quickly to cheat the hackers, yes?

4    A    Yes.

5    Q    And in order to do that, you opened up brokerage

6    accounts?

7    A    Yes.

8    Q    So that trading can be conducted in those accounts, yes?

9    A    Yes.

10   Q    And that way the hackers would have no access to those

11   accounts and see what is going on, correct?

12   A    Yes, that's the way it is.

13   Q    You could keep all the money?

14   A    Yes.

15   Q    And keep the hackers in the dark, yes?

16   A    Yes.

17   Q    That was good for you, correct?

18   A    Yes.

19   Q    And Mr. Dubovoy, the accounts that you opened were opened

20   with, they were phony accounts, yes?

21   A    No.

22   Q    Well, the accounts that were opened were opened in other

23   people's names, yes?

24   A    No.  Only on my name and my company's.

25   Q    When you say your company's, your company can't walk in

CROSS - DUBOVOY - MR. BRILL

1    and open an account, right?

2    A    I don't understand.

3    Q    A person has to walk in and open up the account as a

4    person, yes?

5    A    Yes.

6    Q    You opened up, you used the manager of Boni to open up

7    some brokerage accounts, didn't you?

8    A    I didn't understand.

9    Q    Did you open up an account in the name of Boni?

10   A    A traders account, brokerage account?

11   Q    Yes.

12   A    I don't remember, but possibly.

13   Q    And the person who went in there and opened that account

14   was the manager of Boni, right, it wasn't you?

15   A    Igor, my Igor, my son.

16   Q    Mr. Dubovoy, did you open, also open up, also open up

17   another account by using the manager of your company called RJ

18   Construction?

19   A    Yes, that was Leona Momotok.

20   Q    That was an interactive brokers account, right?

21   A    But that's my company.

22   Q    And you also opened up other brokerage accounts by using

23   the manager of RJ Construction, didn't you?

24   A    I didn't use anyone, these are my companies.

25   Q    And you did that, Mr. Dubovoy, so trading can occur in

CROSS - DUBOVOY - MR. BRILL

1   those accounts and no one else would have access to them,

2   except you?

3   A     Why?  Loana had access, Igor had access, Korchevsky had

4   access, Khalupsky had access.

5   Q     Mr. Dubovoy, you used all those accounts so the hackers

6   wouldn't know what you were trading; isn't that true?

7   A     That's the way it is, yes.

8   Q     Now Mr. Dubovoy, you told us even this morning that in

9   2015 there was a Valeri Kiev that you met?

10              MS. NESTOR:  Objection.

11              THE COURT:  Objection to?

12              MS. NESTOR:  Your Honor, I don't think that was the

13   testimony.  I don't believe that was the testimony.

14              THE COURT:  Well, let the witness answer the

15   question.

16              THE INTERPRETER:  Can you read back the question.

17   BY MR. BRILL:  :

18   Q     Did you know Valeri Kiev?

19   A     I met with him once.

20   Q     Right.  And you knew he was part of this hacking scheme,

21   right?

22   A     Yes.

23   Q     And you knew Pychnenko was part of the hacking scheme,

24   correct?

25   A     Pychnenko was friends with him.

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CROSS - DUBOVOY - MR. BRILL

1   Q    Right.  And Igor, your son, was part of the hacking

2   scheme?

3   A    No.  Igor doesn't know any of them.

4   Q    I didn't ask that.  I said he was part of the hacking

5   scheme.

6   A    Well, yes.

7   Q    And Mr. Dubovoy, there came a point where you told, you

8   tried to cut out Valeri Kiev and just work with Pychnenko,

9   isn't that true, without letting Valeri Kiev know?

10  A    No.

11  Q    You told us this morning that if Pychnenko told Valeri

12  Kiev, you might lose the information, didn't you tell us that?

13  A    If Pychnenko told Valeri Kiev that he's giving it to me,

14  then he's not going to give any information.

15  Q    That's right.  So you didn't want to tell Valeri Kiev

16  what was going on between you and Pychnenko, correct?

17  A    Because I don't know this Valeri.  I met him once for 15

18  minutes.

19  Q    I didn't ask that, Mr. Dubovoy.  I asked you that you

20  didn't want Valeri Kiev to know what was going on between you

21  and Pychnenko, right?

22  A    No.

23  Q    You told Pychnenko, don't tell Valeri Kiev what you're

24  giving me or else you'll lose the information, didn't you just

25  tell us that?

CROSS - DUBOVOY - MR. BRILL

1  A     No.

2  Q     So you're basically keeping Valeri Kiev in the dark too,

3  correct?

4  A     No.

5  Q     So that you didn't lose the information between you and

6  Pychnenko, correct?

7  A     No, that's not the way it is.

8  Q     Mr. Dubovoy, you've even hid -- well, withdrawn.

9        You've even taken money out of your businesses

10 without telling your partners that you're doing that, haven't

11 you?

12 A     Yes.

13 Q     So for example, with APD you own that company with other

14 partners, correct?

15 A     Was owned in the past.

16 Q     Yes.  And Garkusha was one of the owners?

17 A     Yes.

18 Q     And then there is some Russian owners to Sur, S-U-R, does

19 that name sound familiar?

20 A     Yes.

21 Q     And there was a time during this scheme, Mr. Dubovoy,

22 that you took money out of APD so you could trade on it,

23 correct?

24 A     Yes.

25 Q     Over $2 million you took out of your company to do that,

CROSS – DUBOVOY – MR. BRILL

1    didn't you?

2    A    Yes.

3    Q    Without telling the partner?

4    A    Yes.

5    Q    If you told them, they probably would have said, no,

6    don't do it.  Right?

7    A    I don't know what they would have said.  But they trusted

8    me.  And I decided everything on my own, what needs to be

9    bought, what needs to be withdrawn.  I made the decisions on

10   my own.

11   Q    They trusted you, Mr. Dubovoy, because they didn't know

12   that you embezzled from their company, yes?

13   A    I didn't steal from them.

14   Q    If they knew that you took over $2 million from their

15   company to trade on it, they probably wouldn't have trusted,

16   don't you agree?

17   A    Why?  I'm responsible.

18   Q    What if you lost that money?

19   A    That would be my problem.

20   Q    Mr. Dubovoy, speaking of trust, you also had a secretary

21   named Larissa?

22   A    Accountant.

23   Q    She's the accountant?

24   A    Yes.

25   Q    Okay.  We saw an e-mail this morning, a wire, from

CROSS - DUBOVOY - MR. BRILL

1    Larissa, yes?

2    A    Yes.

3    Q    And so she executed a wire for you, yes?

4    A    Yes.

5    Q    And she wrote e-mails for you?

6    A    Possibly, she might have written some, I don't remember

7    exactly.

8    Q    Now, was she aware that you were in the middle of a

9    scheme when you asked her to do these things?

10   A    No.

11   Q    You put her front and center in the scheme, didn't you?

12   A    No.

13   Q    Mr. Dubovoy, you described during your direct testimony

14   about devices or electronic devices that you said were

15   purchased for Mr. Korchevsky, do you remember those questions?

16   A    Yes.

17   Q    And you told us that a computer was purchased for

18   Mr. Dubovoy, yes?

19         THE INTERPRETER:  You mean Korchevsky?

20         MR. BRILL:  Korchevsky.

21   A    Yes.

22   Q    A phone was purchased for him?

23   A    Yes.

24   Q    An iPad?

25   A    Yes.

CROSS - DUBOVOY - MR. BRILL

1    Q    These items were not purchased all in one time, right,

2    Mr. Dubovoy?

3    A    They weren't.

4    Q    They weren't all bought by you, right?

5    A    No.

6    Q    They were bought by different people at different times,

7    yes?

8    A    Yes.

9    Q    And you know that -- withdrawn.

10            Do you know Mark Dubovoy?

11   A    That's my son.

12   Q    And how old is your son?

13   A    Fourteen years old.

14   Q    Mr. Dubovoy, you told us that Vitaly Korchevsky went to

15   the Ukraine at one point, do you remember that testimony?

16   A    Yes.

17   Q    You told us that the reason why he went there was to

18   trade, yes?

19   A    Yes.

20   Q    But Mr. Dubovoy, you know that as part of

21   Mr. Korchevsky's role as a Slavic Baptist minister that he

22   travels all over the world in that capacity, don't you?

23   A    Yes.

24   Q    That he goes to Ukraine to preach?

25   A    Yes.

1697

CROSS – DUBOVOY – MR. BRILL

```
1    Q    Attend church conferences?

2    A    Yes.

3    Q    Youth conferences?

4    A    Yes.

5    Q    Meetings with other Slavic ministers, yes?

6    A    Yes.

7    Q    And it's not just the Ukraine, right, it's Maldova, yes?

8    A    Yes.

9    Q    Russia?

10   A    Yes.

11   Q    Israel?

12   A    Yes.

13   Q    Turkey?

14   A    Yes.

15   Q    Kazakhstan?

16   A    Yes.

17   Q    You know that he goes for those reasons right,

18   Mr. Dubovoy?

19   A    Yes.

20   Q    Now, I want to talk to you a little about the payment to

21   the hackers, Mr. Dubovoy.  The way the hackers were paid was

22   from you, correct?

23   A    Yes.

24   Q    And it started with you and then money came -- I'm sorry,

25   withdrawn.
```

CROSS - DUBOVOY - MR. BRILL

1          Then from you the money went to Pavel, yes?

2    A    Yes.

3    Q    And then from Pavel it went to the hackers, correct?

4    A    There was a middleman between Pavel and the hackers.

5    Q    Right, was that Pychnenko or Roma?

6    A    Roma.

7    Q    And sometimes those payments would be made in cash you

8    said?

9    A    Yes.

10   Q    Or wire?

11   A    Yes.

12   Q    But that's how the hackers got paid, yes?

13   A    Yes.

14   Q    Vitaly Korchevsky did the trading, correct?

15   A    Yes.

16   Q    Now you were shown a phone chart this morning, which was

17   Government's Exhibit 403A, do you remember that?

18   A    I don't remember right now.

19   Q    Okay.

20   A    Show me.

21   Q    Sure, it's in evidence.  It's this chart.

22   A    Yes.

23   Q    Do you remember that?

24   A    Yes.

25   Q    You were asked several questions about this chart this

CROSS - DUBOVOY - MR. BRILL

1    morning, correct?

2    A    Yes.

3    Q    And you were asked a lot of questions about phone calls

4    between you and this person Roma, yes?

5    A    Yes.

6    Q    But no where on this six-page chart is any communication

7    between Vitaly Korchevsky and Roma, correct?

8    A    Correct.

9    Q    You also told us about a million-dollar transfer from you

10   to Vitaly?

11   A    Yes.

12   Q    And that was for the purposes of trading, yes?

13   A    Yes.

14   Q    The idea was it would go into an account that offered

15   more margin-ability, yes?

16   A    Yes.

17   Q    You know what margin is, right?

18   A    Yes.

19   Q    And the idea would be that Vitaly would trade using that

20   money, that was the idea?

21   A    Yes.

22   Q    Now, Mr. Dubovoy, there were several business ventures

23   that you had proposed to Vitaly Korchevsky, wasn't there?

24   A    Yes.

25   Q    You would often bring him deals, correct?

CROSS - DUBOVOY - MR. BRILL

1    A    Not that often, but I showed him some.

2    Q    And you wanted to use him, maybe he can invest with you,

3    correct?

4    A    In some places, yes.

5    Q    Were you aware that he was impressed by how you projected

6    yourself, are you aware of that?

7    A    No.

8    Q    Were you aware that that's why he would engage you to

9    join more business ventures with you?

10            THE INTERPRETER:  I'm sorry?

11   Q    Were you aware that that's why he would engage with you

12   about doing more business ventures with you?

13   A    Well, yes.

14   Q    And those ventures, we mentioned a couple, one was a fund

15   in the Cayman Islands, yes?

16   A    Yes.

17   Q    One was what you described as a water desalination

18   project, yes?

19   A    Yes.

20   Q    And you traveled around to explore that investment

21   opportunity, didn't you?

22   A    Yes.

23   Q    That was legitimate business opportunity, wasn't it?

24   A    Yes.

25   Q    You told us that there was a a cryosurgery business, ACS?

CROSS - DUBOVOY - MR. BRILL

1   A   Yes.

2   Q   And do you remember a business proposition for Global

3   Money?

4   A   Yes, I remember.

5   Q   How about Cross Warranty?

6   A   Cross Warranty?  I don't remember.

7   Q   How about a restaurant or hotel in the Ukraine to invest

8   in?

9   A   Yes, we spoke about that.

10  Q   How about a bio diesel company?

11  A   I don't know what company is this?

12  Q   And these were all legitimate business ventures, weren't

13  they, Mr. Dubovoy?

14  A   Well, yes.

15  Q   And there was money that would be exchanged for expenses

16  in exploring these opportunities; is that correct?

17  A   Yes.

18  Q   In fact, the Government presented an e-mail this morning,

19  Government's Exhibit 334, which in an e-mail that lays out

20  those expenses, do you see that?

21  A   Yes.

22  Q   There is an $80,000 expense for an interest expense, yes?

23  A   Yes.

24  Q   There is travel to Ukraine to explore one of these

25  business proposals expense is there?

CROSS – DUBOVOY – MR. BRILL

1    A    Vitaly traveled.

2    Q    Yes?

3    A    Yes.

4    Q    And there is an annual filing for AWD Technology.

5    A    Yes.

6    Q    That's the desalination project?

7    A    Yes.

8    Q    There is some expenses that he asked you to pay for, a

9    cryosurgery business?

10   A    Well, yes, it's right here, these expenses here.

11   Q    These are legitimate expenses for legitimate business

12   ventures that he's asking you to pay, right here in an e-mail?

13   A    Yes.

14   Q    The $500,000 that you told us about on direct testimony

15   was also about legitimate business venture, wasn't it,

16   Mr. Dubovoy?

17   A    No.

18   Q    It was about a business called DSP, wasn't it?

19   A    I don't know what business that is.

20   Q    Which is a waterproof dry wall business that you two were

21   going to invest in?

22   A    I don't know anything about that.

23   Q    You actually offered the same deal to Slavic Zayats, do

24   you remember him?

25   A    No.

CROSS – DUBOVOY – MR. BRILL

1    Q    Mr. Dubovoy, that $500,000 wasn't for trading, it was

2    just to explore another business venture like you had done in

3    the past, wasn't it?

4    A    No, that was for trading.

5    Q    Mr. Dubovoy, you have run a lot of scams in your life,

6    haven't you?

7    A    What schemes?

8    Q    You've committed a lot of crimes other than this one in

9    your life, haven't you?

10   A    No, only this one.

11   Q    And you falsified a lot of documents in your life,

12   haven't you?

13   A    I have already disclosed everything.

14   Q    And you have manipulated a lot of people in order to get

15   where you are in your life, haven't you?

16   A    I was engaged in business.

17   Q    Is it when you're confronted with lies you tell, you then

18   admit it, sometimes, yes?

19   A    If I'm deceiving, if I have deceived someone then I admit

20   it.

21   Q    Only when you're caught, yes?

22   A    No.  I tell, I tell the truth.

23   Q    But this, Mr. Dubovoy, here testifying is your biggest

24   con of all, isn't it?

25   A    I didn't understand.

DUBOVOY – CROSS – MS. WHALEN

1   Q     Your testimony in front of us, under oath, before this

2   jury, is your biggest scheme of all, isn't it?

3   A     No, no, I have stayed, everything that I stated was true.

4   I just, step by step I said the truth.

5              MR. BRILL:  No further questions, your Honor.

6              THE COURT:  Ms. Whalen.

7              MS. WHALEN:  Yes, your Honor.

8   CROSS-EXAMINATION

9   BY MS. WHALEN:  :

10  Q     Good afternoon, Mr. Dubovoy.

11  A     Good afternoon.

12  Q     I think you testified that you have a son, Igor?

13  A     Yes.

14  Q     And you are a brother, Pasha?

15  A     Yes.

16  Q     He's also called Pavel?

17  A     Yes.

18  Q     And you were all arrested -- you and Igor were arrested

19  on August 11 in 2015, correct?

20  A     Yes.

21  Q     And you were held in jail from the day of your arrest

22  until the day you pled guilty to this offense, correct?

23  A     Well, yes.

24  Q     So you weren't released until the day you pled guilty?

25  A     Until I put the bail.

1705

DUBOVOY - CROSS - MS. WHALEN

1    Q    But you had an agreement on bail on the day you pled

2    guilty, correct?

3    A    Once again please?

4    Q    You reached an agreement with the prosecutor on bail on

5    the day you pled guilty, correct?

6    A    I don't recall.  I plead guilty right away.

7              THE COURT:  You were released on the day you pled

8    guilty; I should say, were you?

9              THE WITNESS:  Yes, that's the way it was.

10             THE COURT:  I'm sorry?

11             THE WITNESS:  That's the way it was.

12             THE COURT:  That's the way it works.  So you had an

13   agreement.

14             THE WITNESS:  Yes.

15   BY MS. WHALEN:  :

16   Q    That was on February 18, 2016, correct?

17             THE INTERPRETER:  What year?

18             MS. WHALEN:  2016.

19   A    Yes.

20   Q    And before you pled guilty you met at least five times

21   with the Government?

22   A    Yes.

23   Q    And you had a lawyer present every time you met with the

24   Government, correct?

25   A    Yes.

DUBOVOY - CROSS - MS. WHALEN

1    Q    And in these meetings you discussed your crimes, correct?

2    A    Yes.

3    Q    And Arthur Bumburyak, was present for at least one of

4    those meetings, correct?

5    A    Wasn't present, I don't recall.

6    Q    Let me see if I can refresh your recollection.

7         MS. WHALEN:  I'm showing you the witness what is

8    marked as AD5 -- actually on the monitor, just for the

9    witness.

10        COURTROOM DEPUTY:  Just for the witness.

11   Q    This document is in English, correct?

12   A    Yes.

13   Q    I would just ask the interpreter to  read the second

14   paragraph of the document just to Mr. Dubovoy.

15        (Interpreter translates.)

16   A    Well, and what?

17   Q    Does that refresh your recollection that Arthur Bumburyak

18   was present at of that meeting?

19   A    On what meeting?

20   Q    The meeting.  If you look at the top of the document, the

21   meeting on November 13, 2015, and Mr. Bumburyak was present at

22   that meeting, correct?

23   A    I don't recall.

24   Q    Do you recall Mr. Bumburyak ever coming to a meeting with

25   you and acting as an interpreter?

DUBOVOY – CROSS – MS. WHALEN

1   A    He's my relative, he's my son-in-law, he cannot be an

2   interpreter.

3             MS. WHALEN:  I'd ask to the Government to stipulate

4   to the first page of 3500 AD.

5             MS. NESTOR:  We'll need a sidebar.

6             (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1    THE COURT:  Don't ask the Government to stipulate in

2    open court.

3    MS. WHALEN:  I'm sorry.

4    THE COURT:  It's a particular document.  It says

5    prior to start of meeting, he is not listed as an attendee.

6    What is your point?

7    MS. NESTOR:  My point is it's clear from this

8    paragraph that he's being the translator between Mr. Dubovoy's

9    attorney and Mr. Dubovoy.  If you read this carefully that's

10   exactly what it says.

11   THE COURT:  Where does it say that?

12   (Reading the document.)

13   MS. NESTOR:  That's between Mr. Dubovoy and his

14   lawyer, who don't speak English, in private meetings.

15   MS. WHALEN:  He was present at this meeting.

16   THE COURT:  That's all you want?

17   MS. WHALEN:  That's all I want.

18   MS. NESTOR:  It was a conversation prior to.  He's

19   not listed as an attendee at this meeting.

20   THE COURT:  It does say prior to start at meeting.

21   Do you know for a fact?

22   MS. NESTOR:  We don't know that.  We understand the

23   meeting, notes that were taken by federal agents are generally

24   accurate in terms of attendees.  This does not indicate he's

25   in the case.

1709
SIDEBAR CONFERENCE

1          THE COURT:  You can't stipulate.

2               (End of sidebar conference.)

3               (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DUBOVOY - CROSS - WHALEN

1        (In open court.)

2   BY MS. WHALEN:  :

3   Q    Mr. Dubovoy, I'd ask you to look at I believe it's marked

4   two ways, 3500 AD-13, and then Korchevsky D in evidence.  I

5   would ask because this document is in English --

6   A    Yes.

7   Q    -- I'd ask the interpreter to read the RE portion?

8   A    Yes.

9   Q    This is a copy of your cooperation agreement, correct?

10  A    Well, probably.

11  Q    Then I'm just turning to page five of the cooperation

12  agreement.  I'll just read the top paragraph, "I have received

13  this cooperation agreement from my attorneys, Michael

14  Critchley, Sr., Esq. and Michael Critchley, Jr., Esq.  It has

15  been translated for me by Arthur Bumburyak.  And I understand

16  it fully."

17        And the agreement was signed by you, correct?

18  A    Yes.

19  Q    And the document was signed by Arthur Bumburyak, correct?

20  A    Yes.

21  Q    And Arthur Bumburyak is your son-in-law, correct?

22  A    Yes.

23        MS. WHALEN:  This will be just for the witness.

24        COURTROOM DEPUTY:  Witness only.

25  Q    I'm showing you what has been previously marked

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DUBOVOY - CROSS - WHALEN

1    Government's Exhibit 3500 AD-12.  Again, this document is in

2    English.  So I'd ask the interpreter to read the RE line.  And

3    do you recognize this document?

4    A    Well, yes.

5    Q    I'm going to turn to the final page, actually page eight

6    of this document, I would just ask you to review the top

7    paragraph with the interpreter.

8              (Interpreter reading to witness.)

9    Q    So Mr. Dubovoy, you recognize that document?

10   A    Yes.

11   Q    That was your plea agreement, correct?

12   A    Yes.

13   Q    And that was also translated by Arthur Bumburyak,

14   correct?

15   A    I was in jail, Artony was visiting me there with Arthur.

16             THE COURT:  Let me interrupt for a second.

17             The question is rather straight forward.  Regardless

18   of the circumstances, was that document translated to you by

19   Arthur Bumburyak?

20             THE WITNESS:  Yes.

21   Q    Now as part of the plea agreement you agreed to plead

22   guilty to conspiracy to commit wire fraud, correct?

23   A    Yes.

24   Q    But you were charged in an Indictment with 17 other

25   counts that included conspiracy, wire fraud, and money

DUBOVOY - CROSS - WHALEN

1    laundering, correct?

2    A    Well, yes.  I don't recall, but that's it.

3    Q    And those charges will be dismissed on the day that

4    you're sentenced, correct?

5    A    But I still have other charges, yes, the rest will be

6    dismissed, right.

7    Q    And you've agreed to pay $3 million in restitution?

8    A    Yes.

9    Q    And you've agreed to pay $11,495,323 in a money judgment?

10           THE INTERPRETER:  I'm sorry, 11 million?

11           MS. WHALEN:  11 million and change.

12   A    Yes.

13   Q    And you and Igor owe this money together, correct?

14   A    Probably.

15   Q    You're not sure?

16   A    I'm not sure.

17   Q    As part of your plea agreement you were supposed to

18   disclose all of your financial assets, correct?

19   A    Yes.

20   Q    And you're supposed to sign that document under penalty

21   of perjury, correct?

22   A    Yes.

23   Q    Did you sign that document?

24   A    What document?

25   Q    The financial affidavit.

DUBOVOY - CROSS - WHALEN

1  A    When that document was prepared, I was incarcerated in

2  jail.

3            THE COURT:  Does that mean no?

4            THE WITNESS:  No.

5  Q    So you didn't sign the document, correct?

6  A    No, I didn't sign.

7  Q    Who prepared that document?

8  A    It was prepared by the family accountant.  All our

9  documents were confiscated.  They tried to obtain and collect

10 whatever they could.

11 Q    And your accountant attended some of the meetings with

12 the Government, correct?

13 A    Yes.

14 Q    Now, in your cooperation agreement you agreed to be

15 completely truthful, correct?

16 A    Yes.

17 Q    And you agreed to explain your role in this crime?

18 A    Yes.

19 Q    And you had to explain other people's roles in this

20 crime, correct?

21 A    Yes.

22 Q    You had to tell the Government about everyone who was

23 involved in this crime, correct?

24 A    Yes.

25 Q    As we said before, as part of your cooperation agreement

DUBOVOY - CROSS - WHALEN

1    you had to reveal all of your businesses and all of your

2    assets, correct?

3    A    Well, yes.

4    Q    You told the Government that you were honest and truthful

5    in this review, correct?

6    A    I was incarcerated.  I was in jail when that document was

7    in process of preparation.  All documents were confiscated.

8    Whatever documents my family was able to obtain, they collect

9    it.

10   Q    Well, at some of these meetings the Government brought

11   the documents that it had seized, correct?

12   A    I saw those documents just now recently.  And prior to

13   that when I was in jail I never saw those documents.

14   Q    So when did you last see those documents?

15   A    Those documents I saw, well, one week ago.

16   Q    It's your testimony that you had never reviewed them

17   before?

18   A    And prior to I never saw it.

19   Q    At the meeting with the Government, on some of the

20   meetings they asked you about specific companies, correct?

21   A    Yes.

22   Q    They asked you about Carese Trade, correct?

23   A    I don't know, I don't recall.

24   Q    Did they ask you about Dentcom?

25   A    I don't recall.

DUBOVOY — CROSS — WHALEN

1   Q     Did they ask you about Tanigold assets?

2   A     Tanigold, something very familiar, but I don't recall.

3   Q     Did they ask you about Baltex Trade?

4   A     No, I don't remember.

5             MS. WHALEN:  Let me take a moment.

6             THE COURT:  We're getting preciously close, I don't

7   want to interpret you, but if this is a logical point to

8   break.

9             MS. WHALEN:  Yes your Honor.

10            THE COURT:  We will break for the day.  We'll resume

11  at 1:00 p.m. tomorrow.  Come with a full stomach.  Don't

12  discuss the case, please.  Leave your notes with Ellie.  Get a

13  good rest, we'll see you in the morning.

14            COURTROOM DEPUTY:  All rise.

15            (Jury exits.)

16            THE COURT:  One last chit chat with counsel at

17  sidebar. And the witness can step down.

18            (Whereupon, the witness steps down.)

19            (Continued on the next page.)

20            (Sidebar conference.)

21

22

23

24

25

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

SIDEBAR CONFERENCE

1          THE COURT:  It's hard to cross-examine with an

2    interpreter.

3          Apropos of my last comment about prayer service in

4    the park, directly in front by the flowers, also in the

5    courthouse.  Really.  I'm all in favor of prayer but

6    everything in its place.

7          MR. BRILL:  I'll do everything I can.  I'll strongly

8    advise them to stop that.

9          THE COURT:  They better stop it.  So we understand

10   our each other.

11         MS. BRILL:  Your Honor, before you go.  A different

12   scheduling matter, not as lofty.

13         I practice in a different district, that district is

14   in this the First Circuit.  The Federal Public Defender in our

15   district is being reappointed or up for reaappointment and the

16   Circuit has asked to interview me.  This was weeks ago, and

17   anticipating I would be on trial.  The date is next Tuesday,

18   June 26.  I set it up for the lunch hour, but I set it up for

19   12 noon to 1:00 p.m.  I see that your Honor likes to take

20   lunch later.

21         THE COURT:  I'm happy to accommodate you.

22         MS. BRILL:  My question is, should I ask them to

23   move it to 12:30, or is noon okay?

24         THE COURT:  12:30 is better, but if has to be noon

25   that's fine.

SIDEBAR CONFERENCE

1                MS. BRILL:  I'll need the hour.  I'll ask for 12:30

2    and I'll let you know whether they can accommodate.

3                THE COURT:  We'll all be rooting for you.

4                MS. BRILL:  No, for the him, for the Federal

5    Defender.

6                MR. GOPSTEIN:  We have a records custodian from

7    Apple flying in from California tomorrow.  I anticipate his

8    testimony will be five minutes.  I don't know how long the

9    cross is, but if we can get him on he has a flight.

10               THE COURT:  We have to bring him in?

11               MR. GOPSTEIN:  We couldn't get a stipulation.

12               THE COURT:  We'll get him on.

13               MR. GOPSTEIN:  Thank you, your Honor.

14               (Proceedings adjourned to resume on June 21, 2018 at

15   1:00 p.m.)

16

17

18

19

20

21

22

23

24

25

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

```
1                    I N D E X

2    WITNESS                              PAGE

3    ARKADIY DUBOVOY

4    DIRECT EXAMINATION    BY MS. NESTOR    1562
     CROSS-EXAMINATION     BY MR. BRILL     1644
5    CROSS-EXAMINATION     BY MS. WHALEN    1707

6                    I N D E X

7                    EXHIBITS

8    GOVERNMENT                PAGE
     828 & 828T                1565
9    270                       1578
     334                       1579
10   230, 230T, 230A-1 & 230A-1T594
     303                       1606
11

12   DEFENDANT                 PAGE
     305, 305-a1 and 305-a2    1585
13   9                         1587
     241 and 241T              1596
14   257 and 257T              1598

15

16   KORCHEVSKY
     262 and 262T              1601
17   D                         1661

18

19

20

21

22

23

24

25
```

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter