```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                       15-CR-381(RJD)
 3    UNITED STATES OF AMERICA,
                                       United States Courthouse
 4                                     Brooklyn, New York
           -against-                   June 21, 2018
 5                                     1:00 p.m.
      VITALY KORCHEVSKY and,
 6    VLADISLAV KHALUPSKY

 7            Defendants.
      ------------------------------x
 8              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                BEFORE THE HONORABLE RAYMOND J. DEARIE
 9             UNITED STATES SENIOR DISTRICT JUDGE
                          BEFORE A JURY
10    APPEARANCES
      For the Government:      RICHARD P. DONOGHUE, ESQ.
11                             United States Attorney
                               Eastern District of New York
12                             271 Cadman Plaza East
                               Brooklyn, New York 11201
13                             BY:  RICHARD M. TUCKER, ESQ.
                                    JULIA NESTOR, ESQ.
14                                  DAVID GOPSTEIN, ESQ.
                               Assistant United States Attorneys
15
      For Defendant Korchevsky:SULLIVAN BRILL
16                             115 Broadway, 17th Floor
                               New York, NY 10006
17                             BY:  STEVEN G. BRILL, ESQ.
                                    JAMES L. HEALY, ESQ.
18
                               RACHEL BRILL, ESQ.
19                             263 Domenech Avenue
                               San Juan, P.R. 00918
20
      For Defendant Khalupsky: FEDERAL DEFENDERS OF NEW YORK
21                             One Pierrepont Plaza
                               Brooklyn, NY 11201
22                             BY:  MILDRED WHALEN, ESQ.
                                    LaKEYTRIA W. FELDER, ESQ.
23
      Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
24                             718-613-2268 RivkaTeich@gmail.com
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

PROCEEDINGS

1          THE COURTROOM DEPUTY:  All Rise.

2          THE COURT:  Good afternoon, everyone.  Welcome back.

3   We are a victim of the Long Island railroad.  We're down only

4   one juror.  Sit down and relax.  We got three calls earlier

5   today about signal problems on the Long Island railroad.

6   These jurors are very, very responsible.  I don't expect there

7   to be a large delay.

8          The one thing I wanted to raise with Ms. Whalen,

9   with all of you, this fellow had to fly in here from

10  California, short witness?

11         MR. GOPSTEIN:  Yes, your Honor.

12         THE COURT:  Is he here?

13         MR. GOPSTEIN:  He is.

14         THE COURT:  Rather than interpret your

15  cross-examination, shall we take him now?

16         MS. WHALEN:  We've already agreed to let that

17  happen.

18         THE COURT:  You have.  Great minds think alike.

19  He'll be our first witness.

20         MR. GOPSTEIN:  Thank you, your Honor.

21         THE COURT:  Have we seen the interpreters?

22         MS. NESTOR:  Yes, your Honor.  I saw him downstairs,

23  I'll double check.

24         THE COURT:  My plan is to work till about 2:45, take

25  a 15 minute break, then we'll resume to the end.

PROCEEDINGS

1          MR. TUCKER:  The interpreter is here.

2          THE COURT:  As long as they are readily available we

3     don't need them right now.

4          MR. TUCKER:  Thank you, your Honor.

5          MS. NESTOR:  There is only one interpreter today, I

6     believe, that was my understanding as of yesterday afternoon.

7     He said that he was fine with that.  He asked for a longer

8     break.

9          THE COURT:  I'm giving him a slightly longer break,

10    15 minutes.

11         MS. NESTOR:  Yes, your Honor.

12         THE COURT:  We are ready to go?

13         MS. NESTOR:  We understand there are some defense

14    exhibits that are new, we still don't have them.

15         THE COURT:  For this witness?

16         MS. NESTOR:  No, the next witness, Mr. Dubovoy.

17         THE COURT:  And?

18         MS. NESTOR:  We still don't have the exhibits.

19         MS. WHALEN:  My paralegal is printing up the exhibit

20    list.  And the exhibits, all of the exhibits that we're going

21    to use, except for one a public record from Georgia, is in the

22    discovery the Government provided them originally.  This is

23    just an identification out of the voluminous discovery we'll

24    be using.

25         THE COURT:  Can you do that?

PINNER - DIRECT - MR. GOPSTEIN

1              MS. WHALEN:  She's downstairs in our office here

2      printing up the copies.  There was some confusion.

3              THE COURT:  All is forgiven.

4              (Jury enters.)

5              THE COURT:  Please be seated everyone.  Good

6      afternoon.  Welcome back.  Notwithstanding the Long Island

7      railroad, we have you all together for our afternoon session.

8              With Ms. Whalen's consent and cooperation, we're

9      going to interrupted the cross-examination of Mr. Dubovoy with

10     this gentleman.  I expect he'll be relatively short.

11             Call your witness.

12             MR. GOPSTEIN:  The Government calls Sean Pinner.

13             COURTROOM DEPUTY:  Please stand and raise your right

14     hand.

15             (Witness takes the witness stand.)

16     SEAN PINNER, called as a witness, having been first duly

17     sworn/affirmed, was examined and testified as follows:

18             THE WITNESS:  I do.

19             COURTROOM DEPUTY:  Please state and spell your full

20     name for the record.

21             THE WITNESS:  Sean Pinner, S-E-A-N, P-I-N-N-E-R.

22             MR. GOPSTEIN:  May I inquire?

23             THE COURT:  Please.

24     DIRECT EXAMINATION

25     BY MR. GOPSTEIN:  :

PINNER - DIRECT - MR. GOPSTEIN

1   Q     Good afternoon.

2   A     Good afternoon.

3   Q     Where do you work?

4   A     Apple, Inc.

5   Q     How long have you worked at Apple?

6   A     Just about four years.

7   Q     What is your title?

8   A     Legal specialist.

9   Q     As a legal specialist at Apple, what are your

10  responsibilities?

11  A     I respond to requests for customer information from

12  Governments around the world.

13  Q     Where do you work out of?

14  A     Sunnyville, California.

15          MR. GOPSTEIN:  I'm going to show a document just for

16  the witness.

17          COURTROOM DEPUTY:  Just for the witness.

18  Q     Showing you what is marked for identification as

19  Government's Exhibit 812, do you recognize this document?

20  A     Yes.

21  Q     Have you reviewed it before?

22  A     Yes.

23  Q     What is it?

24  A     This is a production return in response to a subpoena

25  request for information that we received from the Government.

PINNER – DIRECT – MR. GOPSTEIN

1   Q    Is the information in this document kept in the ordinary

2   course of Apple's business?

3   A    Yes.

4   Q    Is this a true and accurate copy of the information that

5   Apple provided?

6   A    Yes.

7        MR. GOPSTEIN:  The Government moves to admit

8   Government's Exhibit 812 into evidence.

9        THE COURT:  I assume subject to some sort of

10  connection.

11       Any objection?

12       MS. BRILL:  None, your Honor.

13       THE COURT:  812 in evidence.

14       (Government Exhibit 812, was received in evidence.)

15       MR. GOPSTEIN:  Permission to publish?

16       THE COURT:  Go ahead.

17  BY MR. GOPSTEIN:

18  Q    Mr. Pinner, just directing your attention to the top of

19  page one here, the document says underneath Apple Confidential

20  GCRM data, what does that refer to?

21  A    GCRM stands for Global Customer Relationship Management.

22  Q    What is that?

23  A    That's a database that stores customer information.

24  Q    Working our way down to the first column, it says

25  description, underneath it says iPad 23G, what is that in

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

PINNER – DIRECT – MR. GOPSTEIN

1   reference to?

2   A    The description of the device.

3   Q    Working our way to the next column where it says, serial

4   number an alphanumeric identifier starting with DLX and ending

5   with FJ3, what is?

6   A    A unique identifier assigned to the device.

7   Q    And the serial number here, the unique identifier is

8   assigned to the iPad 23G listed in this document?

9   A    Yes.

10  Q    Moving to the next column, it says purchase date,

11  underneath it says 2011, 08, 27 or August 27, 2011, what does

12  that column tell us?

13  A    That is the date that the device was purchased.

14  Q    Where does that information come from?

15  A    That information is fed through multiple sales channels,

16  such as SAP, and also as well Apple resellers and additional

17  sales data.  It's automatically populated.

18  Q    SAP, does what it that refer to?

19  A    Sales database that Apple uses.

20  Q    Continuing to move over, IMEI number, a long number under

21  that.  What is an IMEI number?

22  A    International Mobile Equipment Identifier, that's a

23  unique number assigned to a device.

24  Q    I'm going to skip to the column that says customer name,

25  underneath S Levchenke, what is this?

PINNER - DIRECT - MR. GOPSTEIN

1  A    User inputted column, and it's supposed be to the name of

2  the customer.

3  Q    At what point is that name input into the Apple system?

4  A    During the device set up.

5  Q    Further to the right an e-mail address lionok@me.com, is

6  that provided by the customer?

7  A    Yes.

8  Q    Address columns and other column that is populated, it

9  says, postal code 30005, is that also information that's

10 provided by the customer?

11 A    Yes.

12 Q    Turning to page two of Government's Exhibit 812,

13 underneath Apple confidential, it says iTunes data, what are

14 we looking at here?

15 A    This is data related to iTunes.

16 Q    What is iTunes?

17 A    ITunes is a digital store front where customers can

18 purchase music, video, television shows, books.

19 Q    Working our way down where it says GUID_name, what is

20 that?

21 A    GUID stands for Globally Unique Identifier.  A unique

22 number assigned to a device.

23 Q    Working our way to the right, where it says,

24 e-mail_addr_txt, what is this column telling us?

25 A    The e-mail address associated with the iTunes account.

PINNER – DIRECT – MR. GOPSTEIN

1    Q    Are the two iTunes accounts listed, here are these iTunes

2    accounts that at some point were logged on through the device

3    with the serial number listed on page one?

4    A    Yes.

5    Q    Moving back where it says signup_ts, what is that, tell

6    us?

7    A    The dates that the iTunes was created.

8    Q    The first iTunes account that is associated with the

9    e-mail address APDcapital1964@gmail.com?

10   A    Yes.

11   Q    And when was that iTunes account signed up?

12   A    December 19, 2012 10:24:20 PST.

13   Q    Pacific Standard Time?

14   A    Correct.

15   Q    The second e-mail address, Dubovoy1@gmail.com, does that

16   indicate that account was signed up on October 28, 2008?

17   A    Yes.

18   Q    So these two signup_ts dates are affiliated with the

19   iTunes accounts specifically?

20   A    Yes.

21   Q    The 2008 date, for example, that is prior to the purchase

22   date of the device?

23   A    Yes.

24   Q    Working our way to the right where there is information

25   here, first name, last name, and address, is that all

PINNER - DIRECT - MR. GOPSTEIN

1   information provided by the user who registered those iTunes

2   accounts?

3   A    Yes.

4         THE COURT:  Is this what we're seeing here, a series

5   of transactions, is this all done online?

6         THE WITNESS:  No, not necessarily.  This is the

7   subscriber's profile that most likely was set up on the device

8   itself, but possibly on iTunes using the application on a

9   computer.

10  Q    In terms of what device it was signed up for, just back

11  to the Dubovoy1@gmail.com, you testified that that account was

12  set up in 2008, correct?

13  A    Correct.

14  Q    So that was prior to the 2011 purchase date we just

15  looked at?

16  A    Yes.

17  Q    If we could move our way to the right, past the address,

18  and we have phone numbers.  Is that also information provided

19  by the users who are setting up the iTunes accounts?

20  A    Yes.

21  Q    Finally, we have this column called

22  billing_profile_create_TS, what is that column telling us?

23  A    That's the date and time that the user set up the billing

24  profile portion of the iTunes account.

25  Q    So the first one it says again December 19, 2012; the

PINNER – DIRECT – MR. GOPSTEIN

1    second one it says March 19, 2013?

2    A    Correct.

3    Q    Again, are those times associated with the iTunes

4    account?

5    A    Yes.

6    Q    Those could have been set up from any device?

7    A    Yes.

8    Q    Finally, turning to the final few pages of the report,

9    page three, device registration and it says no data.  What

10   does device registration mean?

11   A    Device registration is another database where Apple

12   stores registration information.

13   Q    Page four, IOS device activation data, no data.  What is

14   IOS device activation data?

15   A    Database that stores IOS device activation data.

16   Q    Which is what?

17   A    When a cellular device is activated, Apple servers

18   communicate with the device and a log line is created.

19   Q    Finally page five, serial_nr, is that the same on page

20   one of the report?

21   A    Yes.

22            MR. GOPSTEIN:  No further questions.

23            THE COURT:  Any questions of this gentleman?

24            MS. BRILL:  Yes, your Honor.

25   CROSS-EXAMINATION

PINNER – CROSS – MS. BRILL

1   BY MS. BRILL:  :

2   Q    I'm also going to place Exhibit 812 on the document

3   viewer and point to a couple of things.

4             Looking briefly at the first page, Mr. Pinner, the

5   customer name S Levchenke, you said that was input by the

6   customer, correct?

7   A    Yes.

8   Q    But that could also be input at the time of purchase, is

9   that possible?

10  A    Yes.

11  Q    Maybe even at the Apple store where it was purchased?

12  A    Yes.

13  Q    And that "S" would be the someone who's first name begins

14  with "S" probably, right?

15  A    I don't know.

16  Q    Do you know, by the way, where the postal code 30005 is?

17  A    No.

18  Q    Turning to the second page, iTunes data.  We're talking

19  about setting up or using iTunes on this device, right, that's

20  why this information is on this device?

21  A    Correct.

22  Q    And would you need to set up an iTunes account in order

23  to use Skype, for example, on your iPad?

24  A    I don't know.

25  Q    But certainly to purchase music or things like that you

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

PINNER – CROSS – MS. BRILL

1    need the iTunes account, right?

2    A    Yes.

3    Q    So this APDCapital created this first one, APDCapital

4    created it's iTunes account or someone associated with that

5    e-mail address created the iTunes account on December 19,

6    2012, correct?

7    A    Correct.

8    Q    That person -- and that -- December 19, 2012, that's

9    information that comes from the device, right?

10   A    It could.  It can also come from the account itself.  So

11   if the user is setting up the accounts on a Window machine,

12   that they would be reflected there as well.  It doesn't

13   necessarily --

14   Q    It's not something that the user or the purchaser or the

15   customer chooses to put in, it's something that's a function

16   of signing up, right?  It's something that a computer says, a

17   computer indicating when I sign up, correct?

18   A    Yes.

19   Q    Wherever that was created, it was created on December 19,

20   2012, right?

21   A    Yes.

22   Q    And then these next items, the first name, the last name,

23   the address, city and state, that information is input by the

24   user, correct?

25   A    Yes.

PINNER – CROSS – MS. BRILL

1    Q    Different from that other question I got tied up in,

2    which is input by the computer, for lack of a better word,

3    right?

4    A    Yes, correct.

5    Q    The user associated with APD Capital put a first name of

6    Fedor, right.

7    A    Yes.

8    Q    Last name of Dubina?

9    A    Yes.

10   Q    Address of 123 Main Street in Los Angeles, California?

11   A    Yes.

12   Q    That may or may not be a real address, right?

13   A    Correct.

14   Q    It's not something that you at Apple or anybody

15   associated with this iPad verifies, right?

16   A    We have not verified.

17   Q    In fact, probably the only thing that you verified here

18   is the credit card that's used to set up the iTunes account,

19   right?

20   A    No.  We would verify that it's correct the GUID name, the

21   person ID, the sign up TS.

22   Q    I was being short-cut there.

23   A    You would verify --

24   Q    The fact there was a device, the serial number, and the

25   other identifications related to the device.  But you wouldn't

PINNER - CROSS - MS. BRILL

1    verify the name and the address, right?

2    A    Correct.

3    Q    I could set up an iTunes account with my name or address,

4    right?

5    A    That's correct.

6    Q    Then there is a phone number associated with that Fedor

7    Dubina APD Capital beginning with 678, right?

8    A    Yes.

9    Q    Do you know that's an area code from Atlanta?

10   A    I do not.

11   Q    In ends with 2425, right?

12   A    Yes.

13   Q    That, again, is not something that you verify.  It's a

14   phone number that's put in by the person that is setting up

15   the iTunes account, correct?

16   A    Correct.

17   Q    Again, the billing profile is set up on December 19,

18   2012, right?

19   A    Yes.

20   Q    And then there was another billing profile, iTunes

21   account set up on this machine.  And the actual iTunes account

22   was set up, as we already spoke about, as you spoke about with

23   the prosecutor, in October 2008, right?

24   A    Correct.

25   Q    So that's when a person calling himself Igor Dubovoy

PINNER - CROSS - MS. BRILL

1   related to the Dubovoy1@gmail.com address set up an iTunes

2   account, right?

3   A     Yes.

4   Q     That person put in an address that may or not be valid on

5   13366 Freemanville Road, might be a typo in there, from

6   Alpharetta, Georgia, right?

7   A     Yes.

8   Q     There is a zip code of 30004, right?

9   A     Yes.

10  Q     Then we have another phone number associated with that,

11  which is 678 area code, ending in 7771, right?

12  A     Yes.

13  Q     And just to be clear about what this page means, that

14  second iTunes account, the one that is associated with the

15  person who called themselves Igor Dubovoy was set up on this

16  iPad on March 19, 2013, right?

17  A     I can't say that it was set up on the iPad.  I can say

18  the billing profile was created on that date.

19  Q     So the billing profile -- what is the difference between

20  the billing profile and the sign up ID date?  In other words,

21  we've got a billing profile date in 2013, and we've got a sign

22  up for the iTunes account in 2008.

23  A     So the sign up TS date is the date that the iTunes

24  account was created.  And the billing profile create TS is the

25  date that the billing aspect of that profile was created.

1735

PINNER - CROSS - MS. BRILL

1   Q    So something about the billing aspect of that profile the

2   Igor Dubovoy profile, was done on March 19, 2013, right?

3   A    Yes.

4   Q    And why is that information -- let me ask it in a

5   different way.

6        It's correct that that information is on this iPad

7   correct, the information of when that billing information was

8   set up, is on this iPad, correct?

9   A    This billing information came from Apple servers, is

10  where this information is from.

11  Q    The billing information is housed at Apple servers but

12  it's on this iPad because --

13       MR. GOPSTEIN:  Objection.  Asked and answered.

14       THE COURT:  Overruled.  Go ahead.

15  Q    The billing information could haven been set up on any

16  Apple server including this iPad; is that correct?

17  A    Yes.

18       MS. BRILL:  No further questions.

19       THE COURT:  Anything else?

20       MR. GOPSTEIN:  No, your Honor.  Thank you.

21       THE COURT:  Well, sir, safe travels.

22       THE WITNESS:  Thank you, sir.

23       (Whereupon, the witness was excused.)

24       THE COURT:  Bring in Mr. Dubovoy, please.

25       (Witness entered.)

DUBOVOY – CROSS – MS. WHALEN

1          THE COURT:  We are now resuming the

2     cross-examination of Mr. Dubovoy by Ms. Whalen.

3          I remind the witness once again, you've been placed

4     under oath and you remain under oath.  Do you understand?

5          THE WITNESS:  Yes.

6          THE COURT:  Ms. Whalen, when you're ready.

7          MS. WHALEN:  Thank you.  The first document will be

8     shown to the witness only.

9          COURTROOM DEPUTY:  Witness only.

10    CROSS-EXAMINATION

11    BY MS. WHALEN:  :

12    Q    Good afternoon again, Mr. Dubovoy.

13    A    Good day.

14    Q    Yesterday we talked a little about the financial

15    affidavit that you provided as part of your guilty plea.  Do

16    you remember that?

17    A    Yes.

18    Q    I'm just showing you on the screen what's been previously

19    marked as Government's Exhibit 3500 AD-19.  And this is the

20    financial affidavit, correct?

21    A    I don't know.

22    Q    Could the interpreter just read the first, the top of

23    the --

24          THE COURT:  Top two lines.

25          MS. WHALEN:  Yes, the top two lines.

DUBOVOY - CROSS - MS. WHALEN

1          (Interpreter reading to witness.)

2    Q    Now do you recognize it as your financial affidavit?

3    A    Yes, but I didn't fill it out.

4    Q    Who did fill it out?

5    A    Back then, I was in jail.

6    Q    But who completed the document, if you know, your

7    attorney, your accountant?

8    A    I know that this document was required for my bail.  This

9    document was executed by my family, my accountant.

10         MS. WHALEN:  Okay.  So at this point I'd like to

11   move 3500 AD-19 into evidence.

12         THE COURT:  Any objection?

13         MS. NESTOR:  No objection.

14         THE COURT:  Received.

15         (Government Exhibit 3500 AD-19, was received in

16   evidence.)

17   Q    I believe if we go to page 19, and if we could zoom the

18   bottom, I think you testified yesterday that you couldn't sign

19   it because you were in jail; is that correct?

20   A    I don't really remember, but I didn't sign it.

21   Q    Just to clarify, yesterday you testified that you were

22   released from prison in February of 2016, correct?

23   A    Yes.

24   Q    And I believe you also testified yesterday that as part

25   of your plea agreement you had to reveal all the businesses

DUBOVOY - CROSS - MS. WHALEN

1   you own, correct?

2   A    No.

3   Q    It wasn't part of your plea agreement to reveal all of

4   the businesses you owned and all of the property you owned and

5   all of the assets you had?

6   A    Yes, it was required and I disclosed everything.

7   Q    And you disclosed it in this financial affidavit,

8   correct?

9   A    Whatever the accountant and the family could get

10  together, they made available.

11  Q    Since your release from jail, you've met with the

12  prosecutors on a number of occasions, correct?

13  A    Yes, that's the way it is.

14  Q    I believe you testified that you met with them last week

15  and reviewed a number of financial documents, correct?

16  A    Yes.

17  Q    Now you testified yesterday that you knew someone name

18  Valeri Pychnenko?

19  A    Yes.

20  Q    And you testified that Mr. Pychnenko knows Pavel Dubovoy,

21  your brother, correct?

22  A    Yes.

23  Q    And in the summer of 2011, Mr. Dubovoy and Mr. Pychnenko

24  told you they knew about a trader in Odessa, correct?

25  A    Pavel told me that.

DUBOVOY - CROSS - MS. WHALEN

1  Q    Mr. Pychnenko told you as well; isn't that correct?

2  A    No.

3  Q    Isn't it true that the two of them found this person?

4  A    I know that Pavel found him.

5  Q    Well, Pavel told you about Mr. Khalupsky, correct?

6  A    Yes.

7  Q    And he told you Mr. Khalupsky owned a brokerage called

8  Dolphin, correct?

9  A    Yes.

10 Q    He told you Mr. Khalupsky employed a lot of traders,

11 correct?

12 A    Yes.

13 Q    And he told you that Mr. Khalupsky taught classes on

14 trading?

15 A    Yes.

16 Q    He told you that Mr. Khalupsky took on student traders,

17 people who were just learning to trade?

18 A    Yes.

19 Q    And Pavel told you that Mr. Khalupsky gave lectures on

20 trading, correct?

21 A    Yes.

22 Q    And Pavel also told you that Mr. Khalupsky had taken Alex

23 Ledovskiy on as a trader?

24 A    I don't know who Ledovskiy, that surname is not familiar

25 to me.

DUBOVOY - CROSS - MS. WHALEN

1   Q    I may also be mispronouncing.  It for the record,

2   L-E-D-O-V-S-K-I-Y in Latin alphabet?

3   A    The family name is not familiar to me.

4            MS. WHALEN:  Okay.  Ms. Mulqueen, I'd like to show

5   what is marked as Defendant's exhibit KK, just to the witness.

6            COURTROOM DEPUTY:  Defendant's exhibit KK just to

7   the witness.  And that's going through your computer?

8            MS. WHALEN:  Yes.

9   Q    Mr. Dubovoy, I just would like to draw your attention to

10  the header of the e-mail where it says from and to and CC.

11           THE COURT:  You want to translate it for him?

12           MS. WHALEN:  No.

13  Q    Do you recognize your e-mail address on that?

14  A    The last CC, yes.

15  Q    And the address above it, do you recognize that one?

16  A    Dekhtyarenkok, that's a familiar name, yes.

17  Q    You know an individual Konstantin Dekhtyarenkok?

18  A    Yes.

19  Q    And you recognize this e-mail as having both your address

20  and his address on it?

21  A    I don't recall the e-mail, but.

22  Q    Okay.  Well, let's look at the body of the e-mail.  Could

23  you look at the attachment line?

24  A    I don't know what that is?

25  Q    We'll put that aside.

DUBOVOY – CROSS – MS. WHALEN

1          MS. WHALEN:  Do we have the first page of the

2    attachment?

3    Q    If I tell you this is the attachment to the e-mail, do

4    you recognize it?

5    A    Yes.

6    Q    And seeing that attachment, does it refresh your

7    recollection as to the e-mail address, who this was being sent

8    to?

9    A    That's a document reflecting the fund that we opened with

10   Vitaly Korchevsky.

11         MS. WHALEN:  At this point I would move Defendant's

12   exhibit KK and Defendant's exhibit KK-1 into evidence.

13         THE COURT:  Any objection?

14         MS. NESTOR:  No objection.

15         THE COURT:  Received.

16         (Defendant Exhibit KK & KK-1, was received in

17   evidence.)

18         MS. WHALEN:  If we could bring up on page one bring

19   up the body of the e-mail, KK.

20   Q    I'm sorry that I don't have a Russian translation but I

21   can read it to you and the interpreter can say it.

22         "Good morning, Konstantin.  My name is Vitaly

23   Korchevsky.  I am the manager for SNT Capital Fund.  I just

24   spoke with Arkadiy and he asked me to send you PPM and

25   subscription documents for the fund."

DUBOVOY – CROSS – MS. WHALEN

1          So at some point did you tell Mr. Korchevsky to send

2    the SNT fund documents to Mr. Dekhtyarenkok?

3    A    I don't remember.  I sent it to him myself.

4               (Continued on next page.)

DUBOVOY – CROSS – MS. WHALEN

1    CROSS EXAMINATION (CONTINUED)

2    BY MS. WHALEN:

3    Q    Okay.  And do you know that Mr. -- going back to

4    Alex Ledovskiy.  Konstantin Dekhtyarenkok is Alex Ledovskiy's

5    uncle, correct?

6    A    I don't know.

7    Q    Okay.

8              So going back to your first meeting with

9    Mr. Khalupsky.  You met with him at the Dolphin address in

10   Odessa, correct?

11   A    Yes.

12   Q    And he explained to you what the Dolphin trading strategy

13   was, correct?

14   A    Yes.

15   Q    And you told him that you had a program for trading,

16   correct?

17   A    Yes.

18   Q    And you told him that -- like you told Momotok and like

19   you told your son, Igor, you were using a trading program?

20   A    No, I didn't say it that way.

21   Q    Well, do you recall meeting with the Government, the very

22   first time you met with the Government, back in September

23   of 2015, correct?

24   A    I don't remember the date, but I remember the meeting.

25   Q    And at that very first meeting, you told the prosecutors

David R. Roy, RPR – Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

1    that you did not tell Mr. Khalupsky directly that you were

2    using stolen press releases?

3    A    I don't remember saying that.

4    Q    Well, when you met with Mr. Khalupsky, you told him you

5    were interested in earnings trading, correct?

6              THE INTERPRETER:   I'm sorry?

7    Q    When you first met with Mr. Khalupsky, you told him you

8    were interested in what's called earnings trading, isn't that

9    correct?

10   A    Well, yes.

11   Q    And you told him you had special research, correct?

12   A    Well, yes.

13   Q    And you told him it cost $15,000 a month, correct?

14   A    No.

15   Q    Mr. Khalupsky told you that his traders did their own

16   research, correct?

17   A    Yes.

18   Q    And he told you that his traders could do earnings

19   trading, correct?

20   A    Well, yes.

21   Q    And then he introduced you to three of his best traders,

22   correct?

23   A    I remember that he introduced me to one.  I remember

24   that.

25   Q    Okay.  Does the name Mikhail Panchenko ring a bell?

DUBOVOY – CROSS – MS. WHALEN

1    A    No.

2    Q    Alex Fedchenko?

3    A    No.

4    Q    And Alexander Ledovskiy?

5    A    I remember there was a Sacha.  I didn't know their last

6    name.

7    Q    Okay.  But Sacha's a common nickname or Alexander?

8    A    Yes.

9    Q    And you knew that Mr. Khalupsky himself didn't do the

10   trading on the stocks anymore, correct?

11   A    Well, yes.  He had people working for him.

12   Q    Right.

13            Mr. Khalupsky's role at this time was generally

14   running the office, correct?

15   A    Yes.

16   Q    And the office -- Dolphin's office is actually big, it's

17   actually a number of floors, correct?

18   A    Well, big, yes.

19   Q    And Mr. Khalupsky worked, for the most part, on finding

20   investors for Dolphin to trade on with accounts?

21   A    I don't know.

22   Q    Now, you testified that you and Mr. Khalupsky came to an

23   agreement about trading your account, correct?

24   A    Yes.

25   Q    And the agreement was that Dolphin would trade in your

DUBOVOY - CROSS - MS. WHALEN

1   accounts?

2   A    Well, the agreement was that Khalupsky would, not

3   Dolphin.

4   Q    Well, you knew Mr. Khalupsky didn't trade anymore,

5   correct?

6   A    Yes.

7   Q    And he introduced you to a trader at your first meeting

8   saying this would be the person trading?

9   A    He brought me in and said Sacha would do it.

10  Q    Okay.  And the agreement was that Dolphin would keep 10

11  to 12 percent of the profits they earned on the trading,

12  correct?

13  A    Yes.

14          MS. WHALEN:   And could you bring up

15  Government Exhibit 805 already in evidence so we can show

16  everyone?

17          THE COURTROOM DEPUTY:   805?

18          MS. WHALEN:   Yes.

19          THE COURTROOM DEPUTY:  Okay.

20          MS. WHALEN:   Just a moment.  We're waiting for it

21  to come up, Your Honor.

22  BY MS. WHALEN:

23  Q    And this is the trading authorization that you had with

24  Mr. Khalupsky, correct?

25  A    Is that it?

DUBOVOY – CROSS – MS. WHALEN

1          MS. WHALEN:   Well, could you read the top line,

2   Mr. Interpreter?

3          THE INTERPRETER:   The "top line" meaning the

4   trading --

5          MS. WHALEN:   Trading --

6          THE INTERPRETER:   -- authorization agreement?

7          MS. WHALEN:   Yes -- well, actually, I can read it.

8   It's in evidence.   Trading authorization agreement.

9   Q    And then it says, I, Arkadiy P. Dubovoy, the undersigned?

10  A    Yes.

11  Q    Yes.   So you remember this as your trading authorization

12  agreement, correct?

13  A    Yes.

14  Q    And you recognize your signature at the bottom of the

15  document?

16  A    Yes.

17  Q    And document was signed -- is that January 8th or

18  August 1st?

19  A    I can't say for sure.

20  Q    Okay.   Well, Mr. Khalupsky told you that you needed this

21  document for an American account, correct?

22  A    No.   I asked Khalupsky to draw up a document of this

23  type.

24  Q    But you did that because you knew if you had someone,

25  foreign traders in your account, they would have to be

DUBOVOY – CROSS – MS. WHALEN

1    authorized, correct?

2    A    Yes.

3    Q    And you had this document prepared to give to your trader

4    in your brokerage account in the United States, correct?

5    A    No.

6    Q    Well, let's look at the date again.  In the

7    United States, we put the day, the month, and the year in our

8    dates, correct?

9         MS. WHALEN:  I don't think that's right.

10   Q    I'm sorry.  It's the other way around.  We put the month,

11   the day, and the year, correct?

12   A    The month?

13   Q    Yes.  In the United States, we put the month, the day,

14   and year?

15   A    Well, yes.

16   Q    And in Europe, they go day, year, month -- or day, month,

17   year?

18   A    Yes.

19   Q    So if this document was going to be used in the

20   United States, this date probably means August 1st, 2011,

21   correct?

22   A    Yes.  But when I signed the document, it was already a

23   pre-prepared document from Khalupsky.  This -- this must --

24   this might have been drawn up in another place before.  When

25   he -- when he came to give me the document, he just pulled it

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1   out, he just pulled it out and had me sign it.

2   Q    Okay.  Did you show this document to your son, Igor?

3   A    I no longer recall.

4   Q    Okay.  Did you show it to the brokerage company that you

5   used?

6   A    No.

7   Q    And did you --

8          MS. WHALEN:   If we could bring that back up?

9   Q    Did you have a trading authorization agreement with

10  anyone else?

11  A    I didn't understand.  Could you repeat that?

12  Q    Okay.  This document is a trading authorization

13  agreement?

14  A    Yes.

15  Q    Did you have a document like this with anyone else who

16  was trading for you?

17  A    No.

18  Q    Now, part of the agreement, or part of your plan was to

19  open a new trading account for the Dolphin trader, is that

20  correct?

21  A    I didn't have any plan like that.

22  Q    Okay.  Well, you were going to do most of the trading in

23  a TD Ameritrade account, correct, with Dolphin?

24          THE INTERPRETER:  What?  Could you repeat that,

25  please.

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1    MS. WHALEN:   Sure.  Let me rephrase it.

2    Q    You were going to have a TD Ameritrade account for the

3    Dolphin trader, correct?

4    A    Well, I don't remember.  I don't remember anything like

5    that.

6    MS. WHALEN:  Could we bring up Government

7    Exhibit 1008-2 already in evidence?

8    BY MS. WHALEN:

9    Q    Mr. Dubovoy, do you recognize this document?

10   A    (No audible response.)

11   MS. WHALEN:  Well, let's go to the last page.

12   Q    Do you recognize this signature on that last page of this

13   document?

14   A    Yes.

15   Q    And whose signature is that?

16   A    Mine.

17   Q    Okay.  And the date it was signed is September 9th, 2011?

18   A    Well, yes, probably.  Yes.

19   MS. WHALEN:  Okay.  And if we could go back to the

20   first page?

21   Q    And I'll read the top line for you.  It's a business

22   account application.

23   THE COURT:  You might need to read the line to the

24   immediate left of that?

25   Q    And there's a TD Ameritrade business account application.

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1    And going down to the middle of the document, it was opened

2    for APD Developers, Incorporated, correct?

3    A    Well, yes.

4    Q    Okay.  So this was an account that you opened to trade

5    on, correct?

6    A    Yes.

7    Q    It's an account that you opened on September 9th, 2011,

8    correct?

9            MS. WHALEN:   If we can go to the last page?

10   A    Well, yes.

11   Q    Okay about a month after you signed the trading

12   authorization document, correct?

13   A    I don't remember that.

14   Q    Okay.

15           Now, I'm showing you what has been marked as Defense

16   Exhibit --

17           MS. WHALEN:  Oh, just for the witness.  I'm sorry.

18           And if we could make it a little bit bigger,

19   especially the heading?

20   BY MS. WHALEN:

21   Q    So I'm showing you what has been marked for

22   identification as Defense Exhibit LL.  Do you recognize the

23   top email?

24   A    Pavel Dubovoy.

25   Q    And the email in the middle?

David R. Roy, RPR – Official Court Reporter

DUBOVOY — CROSS — MS. WHALEN

1   A      Well, it seems like it's mine.

2   Q      And the date?

3   A      8/5/11.

4   Q      Okay.

5              MS. WHALEN:   I would now move Defense Exhibit LL

6   into evidence.

7              THE COURT:  Any objection?

8              MS. NESTOR:  No.

9              THE COURT:  Defendant's LL now received in evidence.

10             (Defendant Exhibit LL, was received in evidence.)

11             MS. WHALEN:  Okay.  I'm also going to be introducing

12  LL-T, which is the translation of this document, Your Honor.

13             THE COURT:   And very well.  Received LL-T in

14  evidence.

15             (Defendant Exhibit LL-T, was received in evidence.)

16             MS. WHALEN:   Okay.

17             And if we could just bring up both documents.

18             Okay.

19  BY MS. WHALEN:

20  Q    Okay.  So Mr. Khalupsky [sic], if you could look at the

21  text of the Russian version?

22             MS. WHALEN:  And we'll bring up the text of text of

23  the English version for the jury.

24  Q    And you can see that this is a forwarded email, correct?

25             THE COURT:  Is it on your screens?

David R. Roy, RPR — Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

1        THE JURY:  No.

2        THE COURT:  It's not on the screens.

3        MS. WHALEN:  If we could just switch from the jury,

4    I'm sorry -- actually, maybe go back a step.

5        So Mr. Ledovskiy -- if we could blow up the message

6    and the header on the Russian version?

7        Okay.

8    BY MS. WHALEN:

9    Q    All right.  So as you can see, this is a forwarded email

10   from Pavel to you, correct?

11   A    Yes, I see it.

12   Q    And it's from an individual named Alexander Ledovskiy,

13   correct?

14   A    That's what it -- that's what's written.

15   Q    And there's a number beneath his name, correct?

16   A    Yes.

17   Q    And that's the telephone number, or appears to be a

18   telephone number, correct?

19   A    It looks like it, but I don't know.

20   Q    Okay.

21       MS. WHALEN:  If we could just also show the English

22   Language version now for the jury?

23       Now I would like to take that down and go to

24   Government's Exhibit 403-1.

25       THE COURT:  In evidence?

David R. Roy, RPR - Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1        MS. WHALEN:   In evidence, Your Honor.

2        And if we could bring up the phone number for

3   Mr. Dubovoy -- I'm sorry.  My little time thing is floating --

4   if we could go back to Page 1 so we can confirm the phone

5   number with Mr. Ledovskiy?

6        So I think-- yeah, that's great.

7   BY MS. WHALEN:

8   Q    So yesterday you testified that on Lines 20 and 21 that

9   was your phone number, correct?

10  A    Yes.

11  Q    And this is a printout of the contents of your telephone,

12  correct, as far as you know?

13  A    Well, probably.

14  Q    Okay.

15        MS. WHALEN:   And if we could go to Page 2?

16        And we're bringing up for the record, Lines 557,

17  558, 559.  And if you could highlight the specific ones we're

18  looking at?

19  BY MS. WHALEN:

20  Q    And is this shows a Sacha T Odessa in your phone as a

21  contact?

22  A    Sacha T Odessa, that's an employee of Vladimir Khalupsky,

23  but I had a relationship with Khalupsky.

24  Q    Okay.  But you can see that the mobile phone number where

25  Sacha T in Odessa is the same as on the prior email we looked

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1   at, Defense Exhibit LL.  And we'll bring that up for you so

2   you don't have to imagine.

3          MS. WHALEN:  Yeah, there we go.

4   Q    So the number in the email is 063 328 65 91, and the

5   contact for Sacha T is 38, which is the country code for

6   Ukraine, correct?

7   A    Yes.

8   Q    Then 063 -- 063 328 65 91?

9   A    Yes.

10  Q    So this is the same person's phone number; isn't that

11  correct?

12  A    Yes.

13  Q    And "T" in your contact stands for trader, correct?

14  A    Yes.  That's an employee of Vladimir Khalupsky.

15         MS. WHALEN:  And if we could also pull up 415-1 in

16  evidence?

17  Q    And do you understand that your son Igor's phone was

18  seized on the day he was arrested, correct?

19  A    I don't know, but...

20  Q    You believe so; isn't that correct?

21         MS. NESTOR:  Objection, Your Honor.

22         THE COURT:  Well, no.  I'll permit it.

23  A    I don't know.

24  BY MS. WHALEN:

25  Q    Okay.  Well, let's move to Page 98 of this document

David R. Roy, RPR – Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

```
 1   assuming --
 2            MS. NESTOR:  Objection, Your Honor.
 3            THE COURT:  What's the objection?
 4            MS. NESTOR:  Your Honor, the objection is he just
 5   said he doesn't know.
 6            THE COURT:  I'm sorry?
 7            MS. WHALEN:   It's a document that's in evidence as
 8   415-1.  I'm just going to draw his attention to an entry in
 9   that document.
10            MS. NESTOR:  It's not in evidence.
11            MR. TUCKER:  There is no Exhibit 415-1.
12            THE COURT:  Is this exhibit in evidence or is it
13   not?
14            MS. WHALEN:   It's the report for Igor's phone.
15            MS. NESTOR:  I'm sorry.  Can we --
16            MR. TUCKER:  If we could have a brief sidebar?
17            THE COURT:  I think you need to talk to each other.
18            MR. TUCKER:  Can we confer, Your Honor?
19            THE COURT:  Sure.
20            (Pause in proceedings.)
21            THE COURT:  We have 415-B-1 in evidence.
22            MS. WHALEN:   Okay.  I'm sorry, Your Honor.  Then
23   I'm having -- I misidentified it.  I thought it was 415-1.
24   But if it's 415-B-1, then we can pull it up.
25            MR. TUCKER:  I think it's an honest mistake,
```

DUBOVOY - CROSS - MS. WHALEN

1    Your Honor.

2              THE COURT:  Only honest mistakes, please.

3              MR. TUCKER:  Okay.  I apologize.

4              THE COURT:  Can you imagine there would be a little

5    confusion with all this paper and all these exhibits?  I can't

6    imagine such a thing.  But we will resolve it.

7              B-1.

8              MR. TUCKER:  B-1.

9              Thank you, Your Honor.

10             MS. WHALEN:   If the Government has it -- are we

11   ready to proceed?

12             MS. NESTOR:  You got it.

13             MS. WHALEN:   Oh, we got it?  Oh, okay.  Traffic.

14   Thank you.

15             THE COURT:  So the objection -- I don't

16   understand -- the witness said he doesn't know.

17             MS. WHALEN:   That's correct.

18             THE COURT:  So then we've straightened out the

19   objection?

20             MS. WHALEN:   Right.

21             Your Honor, I'll clarify for the record.  I had

22   identified it as 415-1.  It is, in fact, 415-B-1.

23             THE COURT:  All right.  In evidence.

24             MS. WHALEN:   And if we could go to Page 98 of that

25   document?

David R. Roy, RPR - Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

1              (Pause in proceedings.)

2              MS. WHALEN:  You know what?  It's actually an

3    exhibit we can come back to later on, so...

4              THE COURT:  All right.

5              MS. WHALEN:  Okay.  So I apologize.

6    BY MS. WHALEN:

7    Q    Now, Pavel Dubovoy and Valera Pychnenko told you that

8    Alexander Ledovskiy was their contact person at Dolphin,

9    correct?

10   A    No.

11   Q    They told you that he was the person who would trade on

12   the stolen press releases, correct?

13   A    No.  I don't remember.  We were working, and I -- I

14   authorized Vladimir Khalupsky to work for me and all of the

15   accountings were done between me and him.

16   Q    But Mr. --

17             MS. WHALEN:  Well, let's go to the accounting, then.

18   Let's bring up Government Exhibit 230, and 203-T -- or --

19   yeah, Government 230 and 230-T.

20             THE COURT:  Previously admitted.  230 and 230-T.

21             MS. WHALEN:   And 230-T, if we could bring it up as

22   well?

23             Okay.

24   BY MS. WHALEN:

25   Q    And so you recognize -- I think you talked about this

David R. Roy, RPR - Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1   document yesterday?

2   A    Yes.

3   Q    From Mr. Khalupsky?

4   A    To me.

5   Q    To you.  And it's dated February 12th, 2011?

6   A    Well, yes.

7   Q    Well, I'm sorry.  Actually, no.  I believe I've made a

8   mistake.  I believe it's dated December 2, 2011.

9        And the content talks about trading done in

10  November, correct?

11  A    Yes.

12  Q    And Mr. Khalupsky is telling you how much money was made

13  in the account, correct, $418,200?

14  A    Yes.

15  Q    And telling you you owed him $41,820 for November,

16  correct?

17  A    Yes.

18  Q    And this is an honest accounting, correct?

19  A    Yes.

20  Q    And he reminds you that you overpaid him last month,

21  correct?

22  A    Yes.

23  Q    And he subtracts that from what you owed him this month,

24  correct?

25  A    Yes.  He subtracts that amount from the -- this other

DUBOVOY - CROSS - MS. WHALEN

1    amount.

2    Q    Okay.  And so in the end, he said you actually only owed

3    him $28,601, correct?

4    A    Yes.

5    Q    Okay.

6          MS. WHALEN:  And if we go to 230, I believe it's

7    dash A1?

8    Q    He sent you his wire transfer details, correct?

9    A    Yes.

10   Q    And the money is supposed to be sent to the account of

11   Carese Trade & Investment, Limited, correct?

12   A    Yes.

13   Q    And you later learned that that was Mr. Khalupsky's

14   mother's company, correct?

15   A    I don't know.

16   Q    You also sent payment to Mr. Khalupsky via

17   SK Intertrading, correct?

18   A    I don't remember.  I don't know.

19   Q    Okay.  But you later learned that you would have to send

20   the money to his stepfather's company, correct?

21   A    No.

22   Q    Well, looking at the address of the bank on 230-A1.

23         MS. WHALEN:  No, no, that's the wrong address.  The

24   address of the bank, Number 4.

25   Q    It's located in the country of Cyprus, correct?

David R. Roy, RPR - Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

1   A    I don't know.

2   Q    At least on the wire transfer it says that that's the

3   location of the bank, correct?

4   A    I don't know.

5   Q    Well, it's true that many Ukrainian businesses keep bank

6   account outside of Ukraine; isn't that correct?

7   A    I don't know.

8   Q    Well, isn't it true that if you send money to a bank

9   account in the Ukraine, it's automatically converted into the

10  Ukrainian currency called -- I think it's gryvna?

11  A    If you have a hard currency account in the Ukraine, you

12  can receive dollars, to the extent that I'm aware of.

13  Q    Hard currency accounts are expensive, though, aren't

14  they?

15  A    I don't know.

16  Q    Many individuals keep hard currency outside of Ukraine so

17  that it doesn't lose value, correct?

18  A    Possibly.  I don't know.

19  Q    Now, at some point your TD Ameritrade account was closed

20  down?

21         MS. WHALEN:   You can take down this exhibit.

22  A    Yes.

23  Q    And the company, TD Ameritrade, closed those accounts,

24  correct?

25  A    I don't recall now, but probably.

David R. Roy, RPR - Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

1    Q    And Mr. Khalupsky came to you with another offer using

2    the Dolphin brokerage, correct?

3    A    What offer?

4    Q    He came and offered you a 50 percent interest in the

5    Dolphin brokerage, correct?

6    A    Yes.

7    Q    And he told you he needed the money right away, correct?

8    A    Well, yes, that he needs the money.

9    Q    Okay.  And that was because his mother was sick?

10   A    No, he didn't say that.

11   Q    And he also explained to you that he was going through a

12   very bad divorce?

13   A    Yes, he did talk about a divorce.

14   Q    And so he wanted to get a partner to get new investment

15   capital for the Dolphin brokerage?

16   A    Well, possibly.  It's possible.

17   Q    And you also learned from Alexander, or Sacha Ledovskiy

18   that Mr. Khalupsky was no longer coming to the brokerage every

19   day, correct?

20   A    He didn't say anything.

21   Q    Didn't he explain that Mr. Khalupsky was out of the

22   office because of his personal problems?

23              MS. NESTOR:  Objection, Your Honor.

24              THE COURT:  Sustained.

25   Q    Now, you agreed to purchase your half interest in Dolphin

David R. Roy, RPR - Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

1  for a million dollars, correct?

2  A    When we spoke, yes.

3  Q    And you gave an initial down payment of $200,000,

4  correct?

5  A    No.

6  Q    You didn't pay $200,000 for the brokerage?

7  A    200,000, yes.

8  Q    Okay.

9         MS. WHALEN:   And I would like to bring up what's

10  been marked as Defense Exhibit A for identification to the

11  witness only, please.

12         THE COURTROOM DEPUTY:   Witness only.

13         MS. WHALEN:   And if we could bring up the header?

14  BY MS. WHALEN:

15  Q    And do you recognize the emails on this document, the

16  email addresses?

17  A    Vladimir Khalupsky is directing something to me.

18  Q    Okay.

19         MS. WHALEN:   And I move this document into

20  evidence, Defense Exhibit A.

21         MS. NESTOR:  No objection.

22         THE COURT:  Defense's A now in evidence.

23         (Defendant Exhibit A, was received in evidence.)

24         (Continued on next page.)

25

David R. Roy, RPR - Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1          MS. WHALEN:  If we could also bring up A-T, the

2  translation.

3          THE COURT:  A-T now in evidence.

4          (Defendant Exhibit A-T, was received in evidence.)

5  MS. WHALEN:

6  (Continuing.)

7  Q    And looking for you, Mr. Dubovoy, and the jury at the

8  English version, Mr. Khalupsky is sending you an accounting

9  for a month in the business; correct?

10  A    Yes.

11  Q    Is it typically monthly expenses?  And he was letting you

12  know as a partner what they were; correct?

13  A    Yes.

14  Q    And he indicated some traders were on salaries?

15  A    Yes.

16  Q    Some traders earned from their trading?

17  A    Yes.

18  Q    He accounted for the rent?

19  A    Yes.

20  Q    The Internet?

21  A    Yes.

22  Q    His research reports, Advance Get?

23  A    Yes.

24  Q    And some other trading expenses; correct?

25  A    Yes.

DUBOVOY - CROSS - MS. WHALEN

1   Q    He also indicated the platforms that he was using for

2   trading at that point?

3   A    Where is that?

4   Q    GrayBox, Sterling, and Fusion?

5   A    I don't know what that is.

6   Q    You also, at this point -- we can take this down -- you

7   also had a Merrill-Lynch trading account at this point;

8   correct?

9   A    I don't remember.

10  Q    But, at some point, you allowed Dolphin to start trading

11  in your Merrill-Lynch account; correct?

12  A    I don't remember.  I don't know what account that is.

13  Q    Okay.  Well, you had -- that's because you had a number

14  of Merrill-Lynch accounts; correct?

15  A    I also don't remember.

16  Q    Okay.  Now, at some point --

17          MS. WHALEN:  Let's bring up Government Exhibit 280

18  in evidence.

19  Q    And this is an e-mail from Mr. Khalupsky to you?

20  A    Yes.

21          MS. WHALEN:  Is it not in evidence?

22          COURTROOM DEPUTY:  No.

23          MS. WHALEN:  Take it down.

24          MS. NESTOR:  Your Honor, we have no objection to it

25  being in evidence.

DUBOVOY - CROSS - MS. WHALEN

```
1        THE COURT:  Okay.  The marking once again.

2        COURTROOM DEPUTY:  I believe Ms. Whalen that was

3   280, Government Exhibit 280.

4        MS. WHALEN:  Yes.  It's been previously marked as

5   Government Exhibit 280.

6        THE COURT:   Now in evidence.

7        (Government Exhibit 280, was received in evidence.)

8   EXAMINATION BY

9   MS. WHALEN:

10  (Continuing.)

11  Q    And this e-mail is in English, isn't that correct,

12  Mr. Dubovoy?

13  A    Yes.

14  Q    Do you understand what it says?

15  A    No.

16       MS. WHALEN:  Showing the witness only Government

17  Exhibit 314.  And if we could bring that up?

18  Q    Do you recognize this as an e-mail?

19       MS. NESTOR:  Your Honor, we consent to this e-mail

20  coming in as well.

21       MS. WHALEN:  Great.

22       THE COURT:  I'm sorry.

23       MS. NESTOR:  All Government Exhibits we consent to

24  coming in.

25       THE COURT:  That saves a lot of time.  Received in
```

DUBOVOY – CROSS – MS. WHALEN

1   evidence.

2               (Government Exhibit 314, was received in evidence.)

3   Q    So we're looking at Government Exhibit 314.

4   And that's an e-mail to you or from you to Mr. Khalupsky?

5   A    Yes.

6   Q    And I think your message to him is "Working on it."

7   Correct?

8   A    I don't know.  I don't remember this.

9   Q    Okay.  Well, I'll have the interpreter translate it to

10  you.  That says, where I put the green dot, that says,

11  "Working on it?"

12  A    Probably.  But I didn't write that.

13  Q    Okay.  Who wrote it?

14  A    I don't remember.  I don't know.  I don't write English.

15  Q    So it would have been, I think you testified yesterday,

16  that the people who were writing your e-mails were be Igor

17  Dubovoy?

18  A    Igor Dubovoy, Larissa.

19  Q    That's Larissa Pludovsky.  She's your accountant?

20  A    Yes.

21  Q    And Alex Garkusha wrote e-mails for you as well; correct?

22  A    Yes, there were occasions.

23  Q    Okay.  I'd like to bring up what has not yet been

24  admitted into evidence as -- oh, no, I think this is in

25  evidence.  Government Exhibit 317.

DUBOVOY - CROSS - MS. WHALEN

1           THE COURT:  Well if it isn't, it is now.

2           MS. NESTOR:  Fair enough.

3           THE COURT:  Right.

4           MS. NESTOR:  Correct.

5           THE COURT:  317 in evidence.

6           (Government Exhibit 317, was received in evidence.)

7           MS. WHALEN:  And if we could just bring up the

8     header.

9     Q    And, again, you recognize the e-mail address dubovoy1.

10    Isn't that your son Igor's e-mail address?

11    A    I don't know.

12    Q    Okay.  We can take it down.  Now, bringing up going 303

13    which is in evidence.  We looked at this yesterday.  This is

14    an accounting and Mr. Dubovoy, Mr. Khalupsky sent this to you

15    in May of 2013; correct?

16    A    Yes.

17    Q    And if we could also bring up 303-T.  And I think you

18    testified yesterday that this was an accounting to keep you

19    posted on your investment; correct?

20    A    No.

21    Q    You didn't review this?  Didn't you testify yesterday

22    that this was his accounting to you of the money that you paid

23    into his business?

24    A    It's not.  The accounting is not for money.  He

25    didn't -- the money that I paid for the business he took that

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

1   money for himself.  He did not put it into the business.  And

2   he didn't account -- he didn't give me an accounting for these

3   monies.

4   Q    Let's look at this e-mail it's from Mr. Khalupsky to you;

5   correct?

6   A    Yes.

7   Q    It's dated May 29, 2013; correct?

8   A    Yes.

9   Q    And it's labeled "payouts."  Correct?

10  A    Yes, payments.

11  Q    So the top line he's indicating for the $200,000 deposit

12  for business that you gave him?

13  A    Yes.

14  Q    He then accounts for another three deposits totaling

15  156,000 that you gave him for trading?

16  A    Yes.

17  Q    And he then talks about the payments to the guys;

18  correct?

19  A    Yes.

20  Q    Okay.  And he uses the word for guys rabiatami; correct?

21          THE INTERPRETER:  Excuse me.

22          MS. WHALEN:  If you could give it the Russian

23  pronunciation, that was the best I can do.

24  A    Yes.

25  Q    Again what's the Russian pronunciation of that word?

1770

DUBOVOY - CROSS - MS. WHALEN

1    A    Rabiatami.

2    Q    That's a word for guys; correct?

3    A    The guys.  Young people.

4    Q    But it's not petsani, is it?

5    A    No.  This is the guys.

6    Q    And you testified yesterday that when you referred to the

7    hackers, you called them "petsani."  Correct?

8    A    That's I call them that.

9    Q    Mr. Khalupsky, then, at the bottom of this document,

10   gives an accounting, isn't that correct?

11   A    Yes.

12   Q    He tells you what the profit on the account was?

13   A    Yes.

14   Q    And then he takes 60 percent of that profit; correct?

15   A    Yes.

16   Q    And that percentage is what he pays the traders on the

17   profit, isn't that correct?

18   A    No.  He pays this to the guys he says he has in Peter

19   that has similar information like these guys.

20   Q    Well, your prior accountings before you joined, before

21   you tried to invest in Dolphin brokerage, you received

22   accountings from Mr. Khalupsky about what the profit was and

23   what is his percentage of profit; correct?

24   A    I didn't receive anything.  I received one accounting and

25   then I decided not to participate in the business.

DUBOVOY – CROSS – MS. WHALEN

1   Q    Let's bring up Government Exhibit 230.

2             This is an accounting you received from

3   Mr. Khalupsky back in December of 2011; correct?

4   A    Yes.

5   Q    Okay.  And in it, he's explaining what the profit was;

6   correct?

7   A    Yes.

8   Q    And he's telling you that he is owed ten percent of this

9   profit; correct?

10  A    Yes.

11  Q    But at the time you received this, you were not an

12  investor in Dolphin; correct?

13  A    I wasn't.

14  Q    Okay.  And if we can just bring up Government Exhibit 303

15  again.

16            But, at this point, Government Exhibit 303 you're

17  actually an investor; correct?

18  A    This document during this -- during the time of this

19  document, I had already told Khalupsky to return me the

20  $200,000, I no longer want to be involved in the business.

21            I gave him 165,000 which he played with, and then I

22  gave him access to another account of mine in order for him to

23  make back the money and pay me that he's able to work and

24  settle accountings with me.

25  Q    Mr. Dubovoy, isn't it true that at this point you were an

1772

DUBOVOY - CROSS - MS. WHALEN

1    investor in Dolphin; correct?

2    A    At this point, I was already waiting for him to return

3    the money to me.

4    Q    At this point, he was advising you as an investor what he

5    was paying as the business expenses?

6                MS. NESTOR:  Objection.

7                THE COURT:  I beg your pardon.

8                MS. NESTOR:  Objection.

9                THE COURT:  Overruled.

10               THE INTERPRETER:  Can you repeat the question.

11   Q    At this point, at the time of Government Exhibit 303,

12   Mr. Khalupsky was advising you as an investor what the

13   expenses were for running the business?

14   A    No.  Here.

15               THE COURT:  Wait a second.  You answered the

16   question.

17   Next question.

18   Q    Now, at this point, you and Pavel had continued your

19   relationship with Alexander Ledovskiy and Sasha Ledovskiy?

20   A    No.  What relationship?

21   Q    Well, Mr. Ledovskiy continued to trade for you while

22   working at Dolphin; correct?

23   A    I was working with Khalupsky.  The employees that

24   answered to him, I trusted Khalupsky.

25   Q    At this point, Igor Dubovoy is also trading in the

DUBOVOY - CROSS - MS. WHALEN

1   Merrill-Lynch account; correct?

2   A    No, I don't know anything about that.

3   Q    You didn't know that Igor was in Georgia and also trading

4   in the Merrill-Lynch account?

5   A    I don't know.

6   Q    Now, trading stopped in the Merrill-Lynch account in

7   November he 2013; correct?

8   A    I don't remember.  Possibly.

9   Q    There was in trading in November and there was no trading

10  in December; correct?

11  A    I don't remember.

12  Q    Well, at some point, you told Mr. Khalupsky you wanted

13  information on earnings; correct?

14  A    He sent accountings it me on his own.

15  Q    No.  When I mean earnings, on earnings reports from

16  companies; correct?

17  A    What various companies.

18       MS. WHALEN:  Well, let's put up what's been

19  previously marked as Defendant's Exhibit G for the witness?

20       THE COURT:  E as in Edward?

21       MS. WHALEN:  No G as in George.  Actually, let's

22  pull up Exhibit H it's easier to read.

23  Q    And if we can look at the header of this document.

24  Do you recognize the e-mail addresses on this document?

25  A    From Khalupsky to me.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1          MS. WHALEN:  I move Defendant's Exhibit H into

2     evidence.

3          MS. NESTOR:   No objection.

4          THE COURT:  Defendant's H to in evidence.

5          (Defendant Exhibit H, was received in evidence.)

6   Q    So Mr. Khalupsky is sending you, I don't know if you can

7   see it, do you recognize what Mr. Khalupsky is sending you?

8   A    I see that he sent me something, but what it is he sent

9   me I don't know.

10  Q    Well, it's an earnings report for Sienna, a company?

11  A    This doesn't say anything to me.

12  Q    Then could we also call up Defendant's Exhibit G just for

13  the witness only.  And if we could bring up the header.

14  And do you recognize the e-mail addresses on this document?

15  A    From Khalupsky to and me, Dubovoy.

16         MS. WHALEN:  I would move Defendant's Exhibit G into

17  evidence.

18         MS. NESTOR:  No objection, your Honor.

19         THE COURT:  Defendant's G in evidence.

20         (Defendant Exhibit G, was received in evidence.)

21  Q    And let's bring up the middle portion of the document if

22  possible.

23  Do you recognize what this is?

24  A    I have no clue what this is.

25  Q    Okay.  We can take it down.

DUBOVOY - CROSS - MS. WHALEN

1          There was no trading in the Merrill-Lynch account

2    again until January of 2014, isn't that correct?

3          THE INTERPRETER:  Can you repeat that question?

4          MS. WHALEN:  Sure.

5    Q    There was no trading in the Merrill-Lynch account again

6    until January 2014; correct?

7    A    I don't remember.

8    Q    Well, in January of 2014, Mr. Khalupsky introduced you to

9    a new trader; correct?

10   A    No.  I don't remember anything like that.

11   Q    He introduced you to a man named Alexei Voitek?

12         MS. NESTOR:  Objection, your Honor.

13         THE COURT:  I'm sorry.  Objection to the question

14   whether he introduced the witness to a certain individual?

15         MS. NESTOR:  He just -- I don't want to he just

16   indicated that he did not Mr. Khalupsky did not introduce him

17   to anybody else.

18         THE COURT:  I understand.  This is

19   cross-examination.  Let him answer the question.

20   Q    Alexei Voitek?

21   A    I don't know anyone like that.

22         THE COURT:  At a logical point.

23         MS. WHALEN:  Yes, very logical.  Thank you.

24         THE COURT:  Right now.

25         MS. WHALEN:  Just a few more questions?

SIDEBAR CONFERENCE

1        THE COURT:  Okay.

2    Q    Mr. Khalupsky told you that Voitek was a trader at

3    Dolphin?

4        MS. NESTOR:  Objection, your Honor.

5        THE COURT:  Sustained.

6    Q    At some point Mr. Khalupsky told you that the trading in

7    the Merrill-Lynch account was going to change?

8    A    I don't remember anything like that.

9    Q    He told you that the Merrill-Lynch account was going to

10   trade the S&P index and Coca-Cola?

11       MS. NESTOR:  Objection, your Honor.

12       THE COURT:  Sustained.

13       MS. WHALEN:  Judge, may we approach?

14       THE COURT:  Sure.

15       MS. WHALEN:  Just for a moment.

16       (Continued on the next page.)

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1

2          (Sidebar conference held on the record in the

3    presence of the Court and counsel, out of the hearing of the

4    jury.)

5          MS. WHALEN:  I'm just confused because I thought the

6    Government's theory was that these individuals were

7    co-conspirators and they would be -- this is a statement.

8          THE COURT:  I don't know who this other speaker is.

9          MS. WHALEN:  Mr. Khalupsky, I'm sorry.  I could

10   rephrase the question if that wasn't clear.

11         THE COURT:  The question was Khalupsky told you.

12         MS. WHALEN:  Yes.

13         THE COURT:  I beg your pardon.

14         MS. NESTOR:  Your Honor, I think my concern is that

15   Ms. Whalen has brought in a number of questions to this

16   witness.  There's nothing wrong with cross-examination, I

17   understand what she is doing.  What is the main reason

18   Mr. Khalupsky's testimony instead of testifying.  I ask the

19   Court instruct the jury that questions are not evidence.

20         THE COURT:  I have already and I will repeat it.

21         MS. NESTOR:  Thank you, your Honor.

22         (End of sidebar conference.)

23         (Continued on the next page.)

24

25

DUBOVOY - CROSS - MS. WHALEN

1          (In open court.)

2          THE COURT:  Just as a reminder, folks, I will repeat

3  my instructions.  Questions themselves, questions standing

4  alone, are not evidence.

5          All right, Ms. Whalen.

6  EXAMINATION BY

7  MS. WHALEN:

8  (Continuing.)

9  Q    I'll repeat the question.  In January 2014, Mr. Khalupsky

10 told you this trading strategy in the Merrill-Lynch account

11 would change, isn't that correct?

12 A    No, I don't recall anything like that.

13 Q    Isn't it true that Mr. Khalupsky told you the account

14 would be trading the S&P index and Coca-Cola?

15 A    No.

16 Q    Isn't it true that the trading was successful but it

17 wasn't what you wanted?

18 A    I didn't understand the question.

19 Q    Isn't it true that the reason you terminated your

20 investment in Dolphin is because Mr. Khalupsky would no longer

21 trade the way you want?

22 A    No.  When I made the deposit, I studied how things

23 whether going at this company, this company Dolphin, and I

24 recognized that they have a lot of debt and I didn't want to

25 be involved with it.

DUBOVOY - CROSS - MS. WHALEN

1           MS. WHALEN:  Your Honor, this is a good time for a

2     break.

3           THE COURT:  And we'll take our break.  A little

4     longer.  We're going to treat you to an extra five minutes,

5     15-minute break.  We will resume by my watch, which is the

6     ultimate authority at ten after 3:00, 15 minutes.

7     Do not discuss the case, folks.

8           COURTROOM DEPUTY:  All rise.

9           (Jury exits courtroom at 2:58p.m.)

10          THE COURT:  15 minutes.

11          (Witness leaves the witness stand.)

12          (A recess in the proceedings was taken.)

13          MS. FELDER:  Your Honor, may we approach?

14          THE COURT:  I heard a voice.

15    Yes.

16          MS. FELDER:  Thank you.

17          (Continued on the next page.)

18          (Sidebar conference.)

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  Yes.

5          MS. FELDER:  Your Honor, I ask the Court to remind

6    everyone including counsel to be mindful of facial expressions

7    and head gestures while seated or presenting.  I've noticed it

8    and it's been brought to our attention by our colleagues in

9    the gallery as well.

10         THE COURT:  Colleagues in the gallery?

11         MS. FELDER:  Yes.

12         THE COURT:  I see.

13         MS. FELDER:  I just want to say that we would

14   appreciate just a gentle reminder that, you know, be mindful.

15         THE COURT:  Word to the wise.

16         MS. FELDER:  Thank you.

17         THE COURT:  Sometimes we do it without realizing it,

18   but that's no defense.

19   How is the graduate?

20         MR. BRILL:  Thank you so much.  It was great.

21         THE COURT:  Is he a wealthy man coming.

22         MS. BRILL:  He got the math prize, Steven won't tell

23   you.

24         THE COURT:  I guess it skips a generation, huh.

25         MS. FELDER:  Thank you.

SIDEBAR CONFERENCE

1           (End of sidebar conference.)

2           (Continued on the next page.)

DUBOVOY – CROSS – MS. WHALEN

1              (In open court.)

2              THE COURT:  Ms. Whalen give me some idea as to how

3       longer you're going to be.

4              (Witness takes the witness stand.)

5              MS. WHALEN:  Your Honor, I think I'm going to take

6       the rest of the afternoon of into I'm about halfway through.

7              THE COURT:  All right.  Are we still on a projected

8       completion of your case by some time next week?

9              MS. NESTOR:  Yes, Your Honor.

10             MR. TUCKER:  Yes, Your Honor.

11             (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DUBOVOY – CROSS – MS. WHALEN

1          THE COURTROOM DEPUTY:  All Rise.

2          (Jury enters.)

3          THE COURT:  Please be seated.  Ms. Whalen, when

4    you're ready.

5          MS. WHALEN:  Thank you.

6    CROSS EXAMINATION (continued.)

7    BY MS. WHALEN:

8    Q    So we left with, Mr. Dubovoy, you saying that you wanted

9    to terminate your business with Dolphin, correct?

10   A    Yes.

11   Q    That was because it wasn't what you expected, it wasn't

12   successful, it had a lot of debt?

13   A    Yes, it was not a large debt, but there was some debt.

14   Q    Mr. Khalupsky drew up another final accounting for you

15   about your investment in Dolphin, correct?

16   A    What accounting?

17   Q    For the witness only, let me show you what is marked as

18   Defendant's exhibit B and Defendant's exhibit B-T.

19          Looking at the document on your left, Defendant's

20   exhibit B, do you recognize this document, Mr. Dubovoy?

21   A    Yes.

22   Q    And this is the accounting that Mr. Khalupsky prepared

23   for you at the dissolution of your investment?

24   A    I don't remember whether that was then or not.

25   Q    Well, let's look at the top line.  You see a date on the

DUBOVOY - CROSS - MS. WHALEN

1   document?

2   A     No.  I just remembered this document.  When he was

3   working he gave me this document to show how everything was

4   falling together in order to return the 200,000 to me.

5          MS. WHALEN:  I move Defendant's exhibit B and B-T

6   into evidence.

7          THE COURT:  Any objection?

8          MS. NESTOR:  No, your Honor.

9          THE COURT:  They are received.

10         (Defendant Exhibit B & B-T, was received in

11   evidence.)

12  Q     As you said, this is the document that Mr. Khalupsky gave

13  you to account for the money that you had invested in Dolphin,

14  correct?

15  A     No.

16  Q     Well, let's look at the top line.  It says the date

17  April 15, 2014?

18  A     Yes.

19  Q     Then it says transfers?

20  A     Yes.

21  Q     Then he gives a list of dates and dollar amounts after

22  that, correct?

23  A     Where?

24  Q     Right there?

25  A     That's the amount, that's the amount I gave him for the

DUBOVOY - CROSS - MS. WHALEN

1   business.

2   Q     Right.  And then beneath it there are a series of

3   numbers?

4   A     Yes.

5   Q     And this is additional money you gave him over the year

6   2013, correct?

7   A     I don't remember.

8   Q     Next, under those lines there is another line called

9   profit, correct?

10  A     Yes.

11  Q     And these first three letters under that appear to be

12  M-E-R, correct?

13  A     M-E-R, well, yes.

14  Q     And that was short for the Merrill Lynch account,

15  correct?

16  A     I don't know.

17  Q     You don't recall that there was a profit of approximately

18  $635,000 in the Merrill Lynch account?

19  A     I don't remember.

20  Q     At the far side you see he gives half of that -- let me

21  break it up.

22        He adds some other profits in and it appears it's

23  for SPY and Cola, correct?

24  A     No.

25  Q     Well, we come to the end of that line and we see a total

DUBOVOY – CROSS – MS. WHALEN

1    of $649,091, correct?

2    A     Yes.

3    Q     And then that number is divided in half, correct?

4    A     Yes.

5    Q     That's the half that each of you get for your investment;

6    you have 50 percent, he had 50 percent?

7    A     I don't remember what that is.

8    Q     Let's go down to the bottom of the document where it says

9    200,000.  Do you see that, Mr. Dubovoy?

10   A     Yes.

11   Q     And then there looks like there is a subtraction of

12   88,616 from that 200,000?

13   A     Yes.

14   Q     Then that leaves $11,384 and it's called debt, correct?

15   A     Yes.

16   Q     Then there are additional numbers under that, correct,

17   40,000 and $20,000.

18   A     Yes.

19   Q     That's your handwriting, isn't it?

20   A     40,000 and 20,000, that's my handwriting.

21   Q     Correct?

22   A     Yes.  That's that was the remaining, the remaining debt.

23   When he added everything up he forgot two sets of numbers.

24   And he called me and said I forgot to include an amount of

25   40,000, and 20,000.  And that the remaining balance that he

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1    owed me was $171,354.

2    Q     And the way -- this is -- you -- he told you he made a

3    mistake and he made it right, correct?

4    A     Yes, he called me to inform me of that.

5    Q     But he also told you that he couldn't pay the debt right

6    now, correct?

7    A     Yes.

8    Q     And he offered to let the traders at Dolphin continue to

9    trade for you until the debt was paid off, correct?

10   A     No.  He took that on himself.  He was organizing that

11   himself.

12   Q     But you told him you weren't interested, you just wanted

13   the debt paid, correct?

14   A     At this point I don't recall any longer.  But, towards

15   the end I just told him to settle the debt.

16   Q     Now Mr. Khalupsky never funded any of your trading

17   accounts, correct?

18   A     No.

19   Q     He never invested in any business with you, correct?

20   A     No.

21   Q     And if we can bring up Government's Exhibit 305 and

22   305-A.  This is the e-mail saying that you wanted him to

23   invest in SNT, correct?

24   A     This is an e-mail regarding Khalupsky and that he has

25   friends that could possibly invest.

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

1    Q    But no one invested, correct?

2    A    No.

3    Q    And over the year, the next year or so, Mr. Khalupsky

4    stayed in touch with you, correct?

5    A    Yes.

6    Q    He wants you to know that he hasn't forgotten his debt,

7    correct?

8    A    Yes.

9    Q    But he just never had the money to repay it, correct?

10   A    Yes.

11   Q    And at that point you never traded with Mr. Khalupsky

12   again, correct?

13   A    From what point?

14   Q    I'm sorry.  From the point of the end of your agreement,

15   the dissolution of your investment?

16   A    He traded.  After -- I didn't understand the question.

17   Q    Mr. Khalupsky continued his trading business, correct,

18   but he didn't trade for you any more?

19   A    He did it during a period of time that he wanted to

20   return the money to me.

21   Q    Sacha Ledovskiy continued to trade for you, correct?

22   A    Sacha, no.  I had dealings with Khalupsky.  Sacha was

23   answering to Khalupsky.

24        MS. WHALEN:  If I could have a moment, your Honor.

25   Q    Mr. Dubovoy, I'm going to bring up what is in evidence as

DUBOVOY – CROSS – MS. WHALEN

1    Government's Exhibit 403-1.  If we could go to the contact

2    page, if we can zoom that out.

3              We've established that Sacha Ledovskiy is a contact

4    in your phone, correct?

5    A    Yes.

6    Q    You continued to be in contact with Mr. Ledovskiy after

7    your Dolphin business terminated, correct?

8    A    I don't remember exactly.  I just know that during the

9    course of working together, Sacha would call me and he would

10   complain to me that Khalupsky was not paying them their

11   salary.

12   Q    Well, let's move to page 927, please.  If we can bring

13   this up.  A call from you to Sacha on March 25, 2015, correct?

14   A    Yes.

15   Q    Next page, please.  Another call from you to Sacha on

16   March 30?

17   A    Yes.

18   Q    Next page.  Call on March 31?

19   A    Yes.

20   Q    A call on April 21, 2015?

21   A    During that period of time that Sacha was making those

22   calls, he had a restaurant and he tried to talk me into

23   opening up an additional restaurant.  He had a restaurant, he

24   wanted an additional restaurant.  And he tried to convince me

25   about working together and opening a restaurant.

DUBOVOY - CROSS - MS. WHALEN

1   Q    Mr. Dubovoy, these calls are from you to Sacha, not

2   Sacha to you, correct?

3   A    Maybe it was during the time that I traveled and I was

4   setting up times to meet.  He brought me a business plan

5   regarding the restaurant.  He was, at that time he was already

6   telling me he wasn't working for Khalupsky any longer.

7   Khalupsky told me himself, told me that this nasty person

8   opened the restaurant on his own.  He earned money with me but

9   opened the restaurant.

10  Q    Mr. Dubovoy, I'm just trying to establish that you were

11  in contact with Sacha Ledovskiy through 2015, correct?

12  A    Yes, that's the time that he was making me a restaurant

13  offering.

14  Q    Let's move to page 997.  You also texted Mr. Ledovskiy,

15  correct?  On May 13, 2015, you called Mr. Ledovskiy and you

16  texted Mr. Ledovskiy, correct?

17  A    Well, yes.  I think we were supposed to meet.  There was

18  probably some meeting that was scheduled and it probably

19  didn't take place.

20  Q    Mr. Dubovoy, yesterday you testified that working related

21  to stolen press releases?

22  A    Why?  No.  Working is business.  I'm a businessman.

23  Q    Let's go to -- you can take this down now.

24       Let's go to what is marked Defendant's exhibit TT

25  and TT-1 for identification.  You recognize this document as

DUBOVOY – CROSS – MS. WHALEN

1    an e-mail?

2          MS. WHALEN:  This is the for the witness only.

3          COURTROOM DEPUTY:  Witness only.  TT and TT-1?

4    Q    You recognize who this e-mail is from?

5    A    Alexander, SLedovskiy.

6          MS. WHALEN:  I move Defendant's exhibit TT and TT-1

7    into evidence.

8          MS. NESTOR:  No objection.

9          COURTROOM DEPUTY:  I think you may have misspoke.  I

10   think the exhibit is TT-T, as in Thomas, not TT-1.

11         MS. WHALEN:  That's a typo on our part but we'll

12   accept the designation as TT-T.

13   Q    This is an accounting from Alexander Ledovskiy, correct.

14   A    It's not an accounting, he was trying to show me, I don't

15   remember specifically.  He showed me on a number of occasions

16   his restaurant earnings.  I don't remember, that's possible.

17         MS. WHALEN:  Let's take this down.  And bring up

18   Defendant's exhibit UU for identification.

19         COURTROOM DEPUTY:  UU for witness only.

20   Q    You recognize this document, just for identification, you

21   recognize your e-mail address on this document?

22   A    Yes, I'm sending something to Igor.

23         MS. WHALEN:  I move Defendant's exhibit UU into

24   evidence.

25         THE COURT:  Any objection?

DUBOVOY — CROSS — MS. WHALEN

1          MS. NESTOR:  No, your Honor.

2          THE COURT:  Received in evidence.

3          (Defendant Exhibit UU, was received in evidence.)

4    Q    This is Mr. Ledovskiy's bill and UU-T as well?

5    A    What bill?

6    Q    You see the bill from Alexander dated March 20, 2014?

7    A    I don't remember exactly.  I think he just gave me a

8    break down of things to do with his restaurant.

9    Q    You didn't -- it's your testimony you weren't forwarding

10   this to Igor for payment?

11   A    No, I wasn't forwarding it.  Maybe I consulted with Igor,

12   whether to get into the restaurant business or not.  Regarding

13   any business matter I would seek advice from Igor.

14   Q    Let's take this down.  And let's bring up Government's

15   Exhibit 1025-1, which I believe the Government has consented

16   being introduced in evidence.  Mr. Dubovoy, this is an

17   Interactive Brokers activity statement, correct?

18   A    Yes.

19   Q    It's in the name of M&I Advising Associates?

20   A    Yes.

21   Q    That's the account of one of your and Igor's businesses,

22   correct?

23   A    I don't remember.

24   Q    Let's move to the second page of this document, please.

25   Let's bring up deposits and withdrawals.  This shows a deposit

DUBOVOY - CROSS - MS. WHALEN

1   of $1,881,950.10 into this account on April 29, correct?

2   A    I don't know.  I don't remember.

3   Q    Let's bring this down.

4          Go to Defendant's exhibit BB for identification

5   only.

6          COURTROOM DEPUTY:  BB for witness only.

7   Q    Let's blow up the header.  You recognize the addresses on

8   this e-mail?

9   A    Well --

10  Q    You recognize your e-mail address on this document?

11  A    No, no.  It's not there.

12  Q    I think it is, if you look at the arrow?

13  A    Now I see it, yes.

14  Q    You recognize Igor's e-mail address on this document?

15  A    Yes.

16         MS. WHALEN:  I move Defendant's exhibit BB and BB-T

17  into evidence at this point.

18         MS. NESTOR:  No objection.

19         THE COURT:  Received.

20         (Defendant Exhibit BB & BB-T, was received in

21  evidence.)

22  Q    This is a wire from Igor to Alexander and you're CC'd,

23  correct?

24         THE INTERPRETER:  Could you repeat that please?

25  Q    This is an e-mail from Igor to Alexander and you're also

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

1   on the address as Dad, correct?

2   A    Yes.

3   Q    It's forwarding an e-mail from Alexander Ledovskiy on

4   April 29, 2014, correct?

5   A    Yes.

6   Q    It says, "Igor, greetings.  Arkadiy said that today he

7   will send a copy of the payment transaction.  We need to show

8   it to the people who you made the transfer to."

9        Correct?

10  A    I don't remember this.  I don't know what transfer this

11  refers to.

12  Q    Let's bring down the zoom.  Let's take these two

13  documents down for a minute.

14       And then for the witness only, let's bring up

15  Defendant's exhibit BB-1.  If we could zoom up on that.  Do

16  you recognize what kind of a document this is?

17  A    No.

18  Q    Isn't it a wire transfer?  Let me call your attention to

19  the top.  Isn't this a wire transfer from your son, Igor

20  Dubovoy?

21  A    Yes.  But I don't recall anything of this at all.

22  Q    You recognize the business that the money is coming from?

23  A    Boni, Inc.

24  Q    That's your business; isn't it, correct?

25  A    Yes.

DUBOVOY - CROSS - MS. WHALEN

1    MS. WHALEN:  I move BB-T into evidence.

2    MS. NESTOR:  No objection, your Honor.

3    MS. WHALEN:  BB-1, I'm sorry.

4    THE COURT:  BB1-T in evidence.

5    (Defendant Exhibit BB-1, was received in evidence.)

6    MS. WHALEN:  No, bring in BB-1 next to BB-T.

7    THE COURT:  Now you got me confused.

8    MS. WHALEN:  I'm asking Mr. Lee to bring up

9  Defendant's exhibit BB-T, and Defendant's exhibit BB-1.

10  Q    Let's focus on BB-1 for a moment.  So this is a wire

11  transfer, isn't it, Mr. Dubovoy?

12  A    Yes.  I don't remember this transfer.

13  Q    Well, this is a transfer from Igor Dubovoy at Boni,

14  correct?  The money is going to Interactive Brokers, correct?

15  A    Maybe, but I don't remember.

16  Q    And the amount is $1,881,950.10, correct?

17  A    Well, yes.

18  Q    If we could keep the wire up, and put 1025-1 back up.

19  This is the Interactive Brokers statement, correct?

20  A    Yes.

21  Q    Showing a deposit of 1,000,881 -- $1,881,948.21, correct?

22  A    Yes.

23  Q    It shows there was a deposit $1,881.09 -- $1,89 --

24  $1,881,950.10, correct?

25  A    Well, yes.

DUBOVOY - CROSS - MS. WHALEN

1    Q    They charged the $2 commission, which is why the amount

2    is lower on the statement, correct?

3    A    Well, probably, yes.

4    Q    So in April of 2014 you funded an Interactive Brokerage

5    for Alexander Ledovskiy to trade in; isn't that true?

6    A    No.  I don't recall anything like that.

7    Q    You don't recall, or no?

8    A    I don't remember that I could trust him with an account I

9    trusted Khalupsky.  I don't remember.

10   Q    You trusted Mr. Khalupsky, but you were trading with

11   Mr. Ledovskiy, correct?

12   A    I trusted Khalupsky.

13        MS. WHALEN:  We can take down these documents.

14   Q    Now you never told the Government that Alexander

15   Ledovskiy was trading for you, did you?

16   A    I stated that Khalupsky has an employee, Alexander.

17   Q    You were specifically asked by the Government on

18   September 17, 2015, who got stolen press releases.  And you

19   never told them about Alexander Ledovskiy, did you?

20   A    Because I gave them to Khalupsky.

21   Q    You then had a meeting with the Government on

22   November 12, 2015, correct?

23   A    I don't remember the dates.

24   Q    But at a second meeting they asked you who had access to

25   the press releases, correct?

DUBOVOY - CROSS - MS. WHALEN

1   A    I don't remember whether there was a question like that

2   or not.

3   Q    So it's your position they never asked you to tell them

4   everyone who traded on the stolen press releases?

5        Let me break it down.  It's your position that the

6   Government never asked you to tell them everyone, the name of

7   everyone, who was trading --

8   A    I told them that.

9   Q    You never told them about Alexander Ledovskiy, did you?

10  A    Yes, I told them.  I said that Sacha works there.  I

11  didn't know his family name.

12  Q    Let's look at -- let's let me back up -- withdrawn.

13       Igor continued to pay Mr. Ledovskiy through 2014

14  through 2015, correct?

15  A    I don't know anything like that.  I don't remember

16  anything like that.  I don't know.

17  Q    Igor was directed by you to pay Mr. Ledovskiy through a

18  company called Baltex; isn't that correct?

19  A    I don't know a company like that.

20       MS. WHALEN:  Could we bring up DX SS for the witness

21  only?

22  Q    Do you recognize Igor Dubovoy's address on this e-mail?

23  A    No.

24  Q    Sorry, it's your address on this e-mail.

25  A    Yes.

                    DUBOVOY - CROSS - MS. WHALEN

1    Q    Okay.  And this e-mail is from Alexander Ledovskiy,

2    correct?

3    A    Yes.

4              MS. WHALEN:  And I'd move this document into

5    evidence.

6              MS. NESTOR:  No objection, your Honor.

7              THE COURT:  I can't see the marking.

8              MS. WHALEN:  DX SS.

9              THE COURT:  Received.

10             (Defendant Exhibit SS, was received in evidence.)

11   Q    And the e-mail, the date of this e-mail, is February 3rd,

12   2014?

13   A    Yes.

14   Q    And it appears to have two attachments, correct?

15   A    I don't know, probably.

16   Q    Let's put this down.  Let's put up DX-Y and DX-Y1?  Do

17   you recognize DX-Y?

18   A    What is DX-Y?

19   Q    DX-Y is what we just magnified.  Now you recognize the

20   two e-mail addresses on that document?

21   A    Igor.

22   Q    And the other one is Mr. Ledovskiy?

23   A    Yes.

24             MS. WHALEN:  I move DX-Y into evidence.

25             MS. NESTOR:  No objection.

DUBOVOY – CROSS – MS. WHALEN

1         THE COURT:  Received, DX-Y.

2         (Defendant Exhibit DX-Y, was received in evidence.)

3         MS. WHALEN:  Still not publishing to the jury.

4    Q    If I could have you look at DX-Y1, Mr. Dubovoy, do you

5    recognize what this document is?  Do you recognize it as a

6    wire transfer?

7    A    Yes.

8    Q    You recognize who is sending it?

9    A    Igor Dubovoy.

10        MS. WHALEN:  I move Defendant's exhibit Y1 into

11   evidence.

12        MS. NESTOR:  No objection.

13        THE COURT:  Y1 in evidence.

14        (Defendant Exhibit Y1, was received in evidence.)

15        COURTROOM DEPUTY:  To publish?

16        MS. WHALEN:  Yes, thank you.

17   Q    So this was an e-mail from Igor to Mr. Ledovskiy?

18   A    Yes.

19   Q    From February 5, 2014?

20   A    Well, probably.

21   Q    It had a photo attached?

22   A    It's written there, probably, I don't know.

23   Q    Let's look at another document, DX-Y1.  It's a wire

24   transfer dated February 5, 2014?

25        THE INTERPRETER:  What was the date?

DUBOVOY – CROSS – MS. WHALEN

1    Q    February 5, 2014.  Do you see that Mr. Dubovoy?

2    A    Yes.

3               (Continued on next page.)

DUBOVOY - CROSS - MS. WHALEN

1    CROSS-EXAMINATION (CONTINUED)

2    BY MS. WHALEN:

3    Q    And you see it's being sent from Igor Dubovoy?

4    A    Yes.

5    Q    Being sent from Boni, which is your company, correct?

6    A    Yes.

7    Q    And it's being sent to a company called Baltex Trade

8    Corporation, correct?

9    A    Yes, but I don't remember this.

10   Q    But you saw from Defense Exhibit SS that there was an

11   email from Mr. Ledovskiy to you on February 13, 2014?

12            THE INTERPRETER:  I'm sorry.  Can you --

13            MS. WHALEN:   Well, actually, can you take this

14   down?  Can you put up and DX SS-1.

15   A    I didn't see that this was an email.

16            THE COURT:  Okay.

17            MS. WHALEN:   I'm sorry.  Can I bring up another

18   document, DX SS-1?

19            Okay.  So just for the witness only.

20            THE COURTROOM DEPUTY:   Witness only.

21   BY MS. WHALEN:

22   Q    Do you recognize this document DX SS-1?

23   A    No, I don't recognize it.

24   Q    Is it a wire address?

25   A    It looks like one.

David R. Roy, RPR - Official Court Reporter

DUBOVOY - CROSS - MS. WHALEN

1    Q    Okay.

2              MS. WHALEN:    And then could we bring -- could we

3    move SS-1 into evidence, DX SS-1 into evidence.

4              MS. NESTOR:  Sure.

5              THE COURT:  Admitted.

6              (Defendant Exhibit DX SS-1, was received in

7    evidence.)

8              MS. WHALEN:  Okay.

9              And then can you bring up DX SS?

10             And can we publish everything to the jury, please.

11             THE COURTROOM DEPUTY:    Certainly.

12   Q    So, Mr. Dubovoy, you got an email from Mr. Ledovskiy to

13   you on February 3rd, 2014, correct?

14   A    Yes.

15   Q    And it has wire transferred information --

16   A    Where?

17   Q    -- to Baltex Trade as an attachment, correct?

18   A    I don't -- I don't know.  I don't see it.  I don't

19   remember this at all.  This was some kind of services.  I

20   don't recall this.

21             THE COURT:  Wait a minute.  Wait a minute.

22             Listen to the question.  Answer the question.

23             Next question.  Go ahead with your next question,

24   Ms. Whalen.

25   BY MS. WHALEN:

David R. Roy, RPR - Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1  Q     This is SS-1, is information for a wire transfer that was

2  attached to Government Exhibit -- Defense Exhibit SS, correct?

3  A     I don't know.

4         MS. WHALEN:  Let's go to Defense Exhibit Y and

5  Defense Exhibit Y-1.

6  Q     Defense Exhibit Y is an email from Igor Dubovoy to

7  Mr. Ledovskiy.  It's date two days after the email to you.

8  The attachment to that email, Defense Exhibit Y-1, is a

9  photograph of a wire transfer for $70,000 and it was sent to

10  Baltex Trade, correct?

11  A     I don't remember.

12         MS. WHALEN:   Let's bring up for identification

13  purposes only, Defense Exhibit DD and DD-1.

14         Could we bring up the header?

15  BY MS. WHALEN:

16  Q     Mr. Dubovoy, do you recognize your email address on this

17  document?

18  A     Yeah, at the end there.

19  Q     Do you recognize your son's email on this document?

20  A     Yes.

21         MS. WHALEN:  I move Defense Exhibit DD into

22  evidence.

23         MS. NESTOR:  No objection.

24         THE COURT:  Received.

25         (Defendant Exhibit DD, was received in evidence.)

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1      MS. WHALEN:   Before we go to publishing to the

2  jury, I would like to go through Defense Exhibit DD-1.

3  Q    And you recognize what this document is, correct?

4  A    (No audible response.)

5  Q    Do you recognize it to be another wire transfer,

6  Mr. Dubovoy?

7  A    Well, yes.

8      MS. WHALEN:   I would move Defense DD-1 into

9  evidence.

10      THE COURT:   Didn't I just admit that?

11      MS. WHALEN:   You just did DD, I think.

12      THE COURT:   Oh.

13      MS. WHALEN:   But if you did both, that's great.

14  They're both hopefully now in evidence..

15      MS. NESTOR:  We have no objection.

16      THE COURT:   There are now received.

17      (Defendant Exhibit DD-1, was received in evidence.)

18      MS. WHALEN:   And if we could zoom out and publish

19  them to the jury?

20      And actually could we also bring up DD-T?

21      THE COURTROOM DEPUTY:   Ms. Whale, are you moving

22  that do evidence, DD-T?

23      MS. WHALEN:   Yes.  As part of plain DD.

24      THE COURTROOM DEPUTY:   Okay.

25      MS. WHALEN:   If you can bring up the body of that

David R. Roy, RPR – Official Court Reporter

1805

DUBOVOY – CROSS – MS. WHALEN

 1    in English or both.

 2    BY MS. WHALEN:

 3    Q    And this is a forwarded email.  And it reads:  Igor,

 4    greetings.  Arkadiy said this today.  He will send a copy of

 5    the payment transaction.  You need to show it to people that

 6    made that transfer to -- or you need to show it to people who

 7    you made that transfer to.

 8    A    I don't remember this.

 9              MS. WHALEN:   Then let's also bring up DD-1.  You

10    can take this down.

11    BY MS. WHALEN:

12    Q    And again, this is a wire transfer from Igor Dubovoy,

13    correct?

14    A    Yes.

15    Q    From the business of Boni, which is your business?

16    A    Yes.

17    Q    For $80,000?

18    A    Yes.

19    Q    And again, going to Baltex.  But it's your testimony that

20    you're not familiar with Baltex Trade, correct?

21    A    No, it's not familiar to me.

22              MS. WHALEN:   Just a moment.

23              (Pause in proceedings.)

24              MS. WHALEN:   We can take these exhibits down.

25    Q    Now, Mr. Dubovoy, you at one time employed a Certified

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1   Public Accountant, correct?

2   A     Yes, I have an accountant.

3   Q     Well, you had Larissa Pludovsky, who worked in your

4   office, correct?

5   A     Yes.

6   Q     And you also had a Mr. Singleton who worked outside of

7   your office, correct?

8   A     Who?

9   Q     I believe his name is Douglas Singleton.

10  A     Yes.

11  Q     And he was a Certified Public Accountant, correct?

12  A     Yes.

13  Q     Okay.

14          MS. WHALEN:   At this point, I would like to bring

15  up 3500-AD-19, which is in evidence.

16          Okay.  And I would like to turn to, I believe, it's

17  Page 20 -- maybe 21.

18          And this can be published to the jury.

19          THE COURTROOM DEPUTY:   Okay.

20          MS. WHALEN:   Go to the next page on 21, please.

21          Okay.  And if we could bring up the top document,

22  please?

23  BY MS. WHALEN:

24  Q     And Mr. Dubovoy, this Exhibit A to your financial

25  affidavit, this is a listing of the properties that you told

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1   the Government you owned, correct?

2   A     Yes.

3   Q     Okay.   And are these some of the properties that Igor

4   Dubovoy forged bank documents for?

5   A     I don't know.

6   Q     Now, just as a brief aside, you testified yesterday about

7   a deal to buy a Latvian hotel, correct?

8   A     Yes.

9   Q     And you testified that Igor Dubovoy was a witness in that

10  case, correct?

11  A     Yes.

12  Q     But we can just confirm that you know Igor Dubovoy is no

13  longer a witness, correct?

14  A     I can't.

15  Q     Isn't it true that Igor Dubovoy has been charged with

16  criminal fraud in Latvia for that deal?

17  A     I don't know anything like that.

18            MS. WHALEN:   Let's move to Page 2.

19            Bring it up.

20  BY MS. WHALEN:

21  Q     This is a list of your business assets, correct?

22  A     Yes.

23  Q     And it lists Boni, correct?

24  A     Yes.

25  Q     And the Interactive Broker account with $1,100,000 in it?

DUBOVOY - CROSS - MS. WHALEN

1    A    Yes.

2    Q    It shows Interactive Broker under M & I Advising,

3    correct?

4    A    Yes.

5    Q    And it shows the asset that you indicating, I believe, on

6    two days ago belonged to Boni, an ice cream company, correct?

7    A    Yes.

8    Q    Okay.

9              MS. WHALEN:   And if we can go back to the first

10   page again?

11   Q    It lists your other business, APD Developers, correct?

12   A    Yes.

13   Q    And some other companies, Universe, LLC?

14   A    Yes.

15   Q    Fortress Investment Group?

16   A    Yes.

17   Q    And RJ General Maintenance?

18   A    Yes.

19   Q    Southeastern Holding & Investments?

20   A    Yes.

21   Q    And Dubovoy Management, LLC?

22   A    Yes.

23   Q    Now, you also owned a company named MID Group, correct?

24   A    No.

25             MS. WHALEN:   Could we please bring up for

DUBOVOY – CROSS – MS. WHALEN

1  identification only -- I'm sorry, Your Honor.  I just need a

2  document for identification only.

3          THE COURT:  Oh.  Can you come -- you don't want to

4  rely on me to do this.

5          MS. WHALEN:   I'm sorry.

6          THE COURTROOM CLERK:   Okay.  Just for the witness.

7          MS. WHALEN:   Could we bring up -- yeah --

8  Defense Exhibit XX for identification?

9  BY MS. WHALEN:

10 Q    Mr. Dubovoy, do you see the business name?

11 A    Yes, MID Group.

12 Q    Do you see the principal office address, correct?

13 A    MID Group rented a -- half of our office.  This is Igor's

14 business and his friend, his partner.

15 Q    Well, the business office is 3374 Cedar Farms Court,

16 correct?

17 A    Yes.

18 Q    And that was your personal residence, correct?

19 A    Yes.

20         MS. WHALEN:   I'd move Defense Exhibit XX into

21 evidence.

22         MS. NESTOR:   No objection.

23         THE COURT:  No objection?

24         MS. NESTOR:  No objection.

25         THE COURT:  XX is in evidence.

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1          (Defendant Exhibit XX, was received in evidence.)

2   Q     Going back to --

3          THE WITNESS:  This is a large office --

4          THE COURT:  Wait for the next question.

5          THE WITNESS:  This is large office split up --

6          THE COURT:  Wait for the next question.

7          This will move a lot more quickly if you just answer

8   the question.

9          MS. WHALEN:   Could I publish Defense Exhibit XX to

10  the jury?

11  Q     This is a record of business incorporation in the State

12  of Georgia, correct -- well, if you know?

13         THE COURT:  In English?

14         MS. WHALEN:   Let me just ask.

15  Q     The business name is MID Group, LLC, correct?

16  A     Yes.

17  Q     It's got a business purpose of none, correct?

18  A     Well --

19  Q     But the principal office address is your residence

20  address; isn't that correct?

21  A     No.

22  Q     That's not your residence?

23  A     No, that's my office.

24         MS. WHALEN:   Can we go back to Exhibit A of the

25  financial affidavit?

David R. Roy, RPR – Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1          Page 21.  Can we zoom in on that -- no, I'm sorry.

2   Here.

3   BY MS. WHALEN:

4   Q    Your personal residence is listed at 3374 Cedar Farms

5   Court, Alpharetta, Georgia, correct?

6   A    That's my house.

7          MS. WHALEN:   And let's go back to DX XX, please.

8   Q    This business, MID Group, their office address is your

9   home address; isn't that correct?

10  A    Yes.  That's my son's business with his partner, and he

11  probably indicated my address.  I don't know.  He brought

12  back -- at that time, he was probably living with me.

13         MS. WHALEN:  Let's go back to -- back to Exhibit A,

14  Exhibit A 3500-AD-19.

15  Q    Now, this is listing property that you own; is that

16  correct?

17  A    Yes.

18  Q    And you also have an apartment in Ukraine, correct?

19  A    Yes.

20  Q    Do you have an apartment in Odessa or Kiev or both?

21  A    I don't have an apartment in Kiev/Odessa.  I -- I stay

22  there, but that's my father's apartment.

23  Q    You also have bank accounts in Ukraine, correct?

24  A    No.

25         MS. WHALEN:   Could we bring -- could you take this

DUBOVOY – CROSS – MS. WHALEN

1    down, and for the witness only, bring up Defense Exhibit WW?

2    Q    Do you recognize this document, Mr. Dubovoy?

3            MS. WHALEN:   Can we bring it up a little bit?

4    A    What is this?

5    Q    Do you recognize it?

6            THE COURT:   Ms. Whalen, I just don't think it's

7    appropriate to ask him in English.

8            MS. WHALEN:   Okay.

9            THE COURT:   At least get the interpreter to read

10   some portion of it.

11           MS. WHALEN:   Okay.

12           Could you read the top line, the highlighted, could

13   you read that line to him?

14           THE INTERPRETER:   (Complies.)

15           MS. WHALEN:  And if you could also let him know what

16   year this is?

17           THE INTERPRETER:  I'm sorry?

18           MS. WHALEN:   Could you let him know what year it

19   is?

20           THE INTERPRETER:   (Complies.)

21           MS. WHALEN:   And then could you translate Part 2

22   for him?

23           THE INTERPRETER:  Could you enlarge that?

24           MS. WHALEN:   Yes.

25           THE INTERPRETER:   (Complies.)

DUBOVOY - CROSS - MS. WHALEN

1    A    So what is it?

2    BY MS. WHALEN:

3    Q    Mr. Dubovoy, do you recognize this as a tax document?

4    A    I don't recognize it.

5    Q    Well --

6    A    Regarding this document, my accountant was called in and

7    provided it -- provided an explanation.

8    Q    Okay.

9    A    These monies never existed there and they don't exist

10   now.

11          MS. WHALEN:  Well, then could we move Defense

12   Exhibit WW into evidence.

13          THE COURT:  Received.

14          MS. NESTOR:  Sure.

15          (Defendant Exhibit WW, was received in evidence.)

16          MS. WHALEN:   So could we publish that to the jury,

17   please?

18   BY MS. WHALEN:

19   Q    So, Mr. Dubovoy, this is a report of a foreign bank

20   account, correct?

21   A    Yes, but that money was never there.

22   Q    Okay.

23   A    And I never had an account there.  That's a company

24   account.

25   Q    Okay.  But it's for two and a half million dollars,

DUBOVOY – CROSS – MS. WHALEN

1    correct?

2    A    No.

3    Q    The document reflects that the maximum value of the

4    account was two and a half million dollars, correct?

5    A    No.  Well, my accountant was here and explained what this

6    is.

7    Q    Mr. Dubovoy, this isn't for a business, though, it's for

8    you individually; isn't that correct?

9    A    This is –– when it was submitted for taxes, I don't know.

10   I never had any money there, and I never had any accounts in

11   any banks.  My accountant was brought in here to the –– to the

12   attorney's office regarding this document and he explained

13   everything to them.

14   Q    So, Mr. Dubovoy, this document a forgery?

15   A    No, it's not a forgery.  My accountant explained it.  I

16   can't explain it.

17   Q    Okay.

18        MS. WHALEN:    We can take it down.

19   Q    You also had another business in the Ukraine called

20   Atlanta Investing, correct?

21   A    Yes.

22   Q    And you told the Government about the Atlanta Investing

23   account, correct?

24   A    I told them that it –– that they exist, but at the time

25   of the arrest, I had nothing to do with them.

DUBOVOY - CROSS - MS. WHALEN

1    Q    Isn't it true that you told them that you had a

2    controlling interest in the Atlanta account?

3    A    No.

4    Q    Isn't it true that the Government asked you to verify the

5    bank account balance and your controlling interest in that

6    account?

7    A    They asked me what my share was, but at the time of my

8    arrest, that was no longer my company.  We had gone our

9    separate ways with my partners.

10   Q    When did that happen?

11   A    I don't remember exactly, either at the end of '14 or

12   2015.  I think 2015.  I don't remember.

13   Q    Now, Mr. Dubovoy, you testified yesterday, and I think

14   we've seen it here, that you direct your son, Igor, to wire

15   funds for you, correct?

16   A    Yes.

17   Q    And you don't wire funds yourself, correct?

18   A    No.

19   Q    You've also testified that you direct Larissa Pludovsky

20   to wire funds for you?

21   A    Yes.

22   Q    And you testified that Igor Dubovoy and Larissa Pludovsky

23   were sent email on your behalf because you don't have a

24   command of computers, correct?

25   A    Yes.

David R. Roy, RPR - Official Court Reporter

DUBOVOY – CROSS – MS. WHALEN

1    Q    And Alexander Garkusha was your business partner in APD?

2    A    Yes.

3    Q    He was also your friend?

4    A    Yes.

5    Q    And he was also arrested as part of this crime?

6    A    Yes.

7    Q    And, again, before your arrest, Mr. Garkusha was sent

8    emails on your behalf because you don't have a command of

9    computers?

10   A    There were occasions.

11   Q    Well, I think you said you testified -- I think you

12   testified that he sent emails on your behalf because you

13   weren't familiar with the computer?

14   A    Yes.  I don't know how -- I don't know how to use a

15   computer.

16   Q    You testified yesterday and again today that you know

17   Valera Pychnenko, correct?

18   A    Yes.

19   Q    And you testified that you knew that Mr. Pychnenko was

20   convicted of a narcotics crime in the United States, correct?

21   A    Yes.

22   Q    And you testified that you knew that Mr. -- well, let me

23   rephrase.

24        You know that Mr. Pychnenko was arrested for that

25   narcotic offense in July of 2009, correct?

DUBOVOY – CROSS – MS. WHALEN

1    A    I don't remember that.

2    Q    But you testified you had nothing to do with that crime?

3    A    Yes.  I didn't have anything to do with it.

4    Q    And you testified you didn't pay for his attorney,

5    correct?

6    A    I just sent his wife $3,000.

7            MS. WHALEN:  So for the witness only, could we bring

8    up what has been marked as Defense Exhibit JJ?

9    BY MS. WHALEN:

10   Q    Do you recognize the email address that the person the

11   email is from?

12   A    Garkusha to Igor.

13   Q    To Igor?

14           MS. WHALEN:   I now move Defense Exhibit JJ into

15   evidence.

16           THE COURT:  Any objection?

17           MS. NESTOR:  None.

18           THE COURT:

19           JJ is in evidence.

20           (Defendant Exhibit JJ, was received in evidence.)

21           MS. WHALEN:  Can we please publish it to the jury?

22   A    What does it say here?

23   BY MS. WHALEN:

24   Q    It says:  Igor, we have to wire 35K to this guy ASAP so

25   he can meet Valera on Saturday and start working on this case.

DUBOVOY – CROSS – MS. WHALEN

1    Please wire both wires and please email me either confirmation

2    number or the copy of the wiring page.

3              And the attachment is a retainer agreement with

4    wiring information, correct?

5    A    Yes.  I didn't pay anything.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DUBOVOY - CROSS - MS. WHALEN

1            MS. WHALEN:  Please take this down.  Could you bring

2     up the attachment for the witness only.

3            COURTROOM DEPUTY:  Witness only.

4            MS. WHALEN:  DX JJ-1.  And for the interpreter,

5     would you read the header?  Would you also read the docket

6     information.

7            I move JJ-1 into evidence.

8            MS. NESTOR:  No objection.

9            THE COURT:  Received JJ-1 into evidence.

10           (Defendant Exhibit JJ-1, was received in evidence.)

11     EXAMINATION BY

12     MS. WHALEN:

13     Q    Mr. Dubovoy, this is a retention letter, correct, to hire

14     lawyers for Mr. Pychnenko on July 24, 2009; correct?

15     A    Yes.

16     Q    And let's go to the last page of that document.  I think

17     the very last page.  My apologies.

18           MS. WHALEN:  Could we bring up JJ-2 for the witness

19     only.

20           I'd ask the interpreter to read the circled line.

21     A    Yes.

22           MS. WHALEN:  I move defense JJ-2 into evidence.

23           MS. NESTOR:  No objection.

24           THE COURT:  JJ-2 into evidence.

25           (Defendant Exhibit JJ-2, was received in evidence.)

DUBOVOY - CROSS - MS. WHALEN

1           MS. WHALEN:  And I ask that it be published to the

2   jury.

3   Q    And these are wiring instructions to the law firm;

4   correct?

5   A    I don't know.

6           MS. WHALEN:  Could we take this down and bring up

7   Defense Exhibit II for the witness only.  And could you bring

8   up the header.

9   Q    And you recognize the e-mail addresses on this document?

10  A    Igor is writing something to Garkusha.

11          MS. WHALEN:  I ask it move DX II, into evidence.

12          MS. NESTOR:  No objection.

13          THE COURT:  Received.

14          (Defendant Exhibit II, was received in evidence.)

15  A    What's written there?

16  Q    I'll explain to you in a minute.

17          This appears to be an e-mail sending wire

18  information.  Let me read to you the e-mail.

19          The subject says:  "Confirmation of Wire."  It's

20  sent January 22, 2010.  It's got some typos, but it appears to

21  say, "Sorry.  For some reason it won't attach in their system,

22  but here's the same information in text.  If you need any more

23  info on this please let me know, I'll do my best to get it."

24  And it shows a wire amount of $20,000.  Going from Midgroup,

25  LLC and it appears to have been sent on July 27, 2009.

DUBOVOY – CROSS – MS. WHALEN

1          It then shows a second wire.  If we can go to the

2   next page.  That appears to have been sent on July 31, 2009.

3   The amount of the wire is $35,000 and it's coming from

4   Midgroup and it's going to the law firm.

5          Mr. Dubovoy, you testified you don't send wires, you

6   have Igor do it for you; correct?

7   A     Yes.

8   Q     You testified that Garkusha writes your e-mails; correct?

9   A     Yes.

10  Q     Midgroup is a company registered at your home address;

11  correct?

12  A     Yes.

13  Q     And $55,000 was sent from these accounts to pay for

14  Mr. Pychnenko's attorney; correct?

15  A     I don't know.  I just know.  All I know is that I sent

16  $3,000 to his wife.  All the other monies, I just know that

17  people pitched in collectively.  They got money here, they got

18  money there.  There was money that was gotten from the Ukraine

19  and they sent it over.  I don't know, I don't remember any of

20  these transfers.  I know that everyone was collecting money.

21  My share was $3,000 that I sent to his wife because she was

22  crying and I have nothing to do with anything else having to

23  do with him.

24  Q     Mr. Dubovoy, Mr. Pychnenko was arrested in possession of

25  $219,000 in cash; correct?

DUBOVOY – REDIRECT – MS. NESTOR

1    A    I don't know.

2    Q    That cash was supposed to be used to purchase ten kilos

3    of cocaine; correct?

4    A    I don't know.

5    Q    The reason you paid for his attorney is because that cash

6    was your cash, isn't that correct?

7    A    No.

8            MS. WHALEN:  No further questions.

9            THE COURT:  Okay.

10           MS. NESTOR:  May I redirect, your Honor?

11           THE COURT:  By all means.

12   REDIRECT EXAMINATION

13   BY MS. NESTOR:

14   Q    Mr. Dubovoy, Ms. Whalen was just cross-examining you a

15   little while ago about a number of transfers in 2014.

16           Do you recall that?

17   A    Yes, I remember them.

18   Q    It Baltex Trading?

19   A    I don't know that.

20   Q    You don't remember the questions or you don't remember

21   the company Baltex Trading?

22   A    I don't remember that company.

23   Q    You remember the questions, though?

24   A    Yes.

25   Q    Mr. Dubovoy, do you remember when you lost access to the

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1823

DUBOVOY – REDIRECT – MS. NESTOR

1    stolen press releases?

2    A    I remember that I lost access, but when I don't recall.

3    Q    Do you remember that you regained access in 2015?

4    A    Yes, through Valera Pychnenko.

5    Q    Prior to regaining access in 2015, did you have access to

6    press releases?

7              MS. WHALEN:  Objection to the leading.

8              THE COURT:  I didn't hear it.  You clipped off the

9    end of the question.  Let me hear the whole question, please.

10   Q    Prior to gaining access to the stolen press releases

11   again in 2015, did you have access to stolen press releases?

12             THE COURT:  Overruled.

13   A    Me?  Not me.

14   Q    My question is, did anybody in your group of traders have

15   access to stolen press releases in 2014?

16   A    It seems that Valera sent it to Igor, and then Igor would

17   forward it to Vitaly Korchevsky.

18   Q    When was that?

19   A    That was in 2015.

20   Q    And before that, Mr. Dubovoy, did you lose access to

21   stolen press releases?

22   A    Yes.

23   Q    Thank you.

24             When you entered into the agreement with

25   Mr. Khalupsky, what was your understanding regarding what

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1824

DUBOVOY – REDIRECT – MS. NESTOR

1    Mr. Khalupsky would be trading on?

2    A    Using that information that I gave him access to.

3    Q    Was your understanding that Dolphin was going to be

4    trading on that information for Mr. Khalupsky?

5    A    The way that I understood it is I was conducting things

6    with Khalupsky.

7    Q    Mr. Dubovoy, would you have given Mr. Khalupsky money to

8    trade on legal information?

9    A    No.  Back then, at that time, no.

10   Q    You were asked a number of questions about your financial

11   disclosure?

12   A    Yes.

13   Q    Are you aware of what your forfeiture obligations are?

14   A    Yes.

15   Q    14 million.  You testified to that; right?

16   A    Yes.

17   Q    If you fulfill your cooperation agreement, do you still

18   have to pay back that 14 million?

19   A    No.

20   Q    You don't have to pay back the 14 million if you don't

21   fulfill your cooperation agreement?

22   A    I need to pay it.

23   Q    Can you tell us who Arthur Bumburyak is?  Who is that?

24   A    That's my daughter's husband.  My son-in-law.

25   Q    What does he do for you a daily basis?

DUBOVOY – REDIRECT – MS. NESTOR

1    A    He assists me in work.

2    Q    Did he serve the same role Igor used to serve?

3    A    No.

4    Q    I want to show you Government Exhibit 334.

5         THE COURT:  Is 334 in evidence?

6         MS. NESTOR:  Yes, your Honor.  I'm looking for it.

7    One moment.  Sorry, your Honor.  I have it.

8    Q    Now, I believe yesterday Mr. Brill asked you about this

9    first line.

10   A    Yes.

11   Q    What was that payment -- what was that $1 million for?

12   A    Vitaly borrowed that money from someone in order to

13   trade.

14   Q    It's your understanding that the trading you've done on

15   legitimate information or the stolen press releases?

16   A    Using stolen information.

17   Q    Yesterday, you were asked questions about Slavic Zayats

18   who is Slavic Zayats?

19   A    I know Slavic.

20   Q    Who is he?

21   A    A churchgoer.  Sometimes he drops in, he drops by as a

22   guest.  He lives in Macon.

23   Q    He lives in Georgia?

24   A    Yes.

25   Q    Has he recently stopped by?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DUBOVOY – REDIRECT – MS. NESTOR

1    A    Yes.

2    Q    And what happened?

3    A    We spoke.  What he's up to.  What's he doing.  How things

4    are going for my.

5    Q    Did he tell -- did you tell him that you were testifying

6    here?

7    A    No.

8    Q    Why not?

9    A    I didn't say anything about it because I understood that

10   being he was my friend as well as Vitaly Korchevsky's.

11   Q    Sitting here today, do you remember everything that you

12   guys discussed that day?

13   A    What day.

14   Q    The day he came to your house.  You said he came to your

15   house recently.

16   A    We didn't really speak about much.  Nothing specific.

17   Q    There were three trips mentioned on your

18   cross-examination.

19        Tell us why you were in Hawaii.

20   A    I traveled to Hawaii together with Garkusha.  We wanted

21   to buy a couple of boats, some fishing boats to set up a

22   fishing operation.

23   Q    And you already testified or remind us why you were in

24   Lakeland, Florida?

25   A    Lakeland?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DUBOVOY - RECROSS - MR. BRILL

1   Q     I believe you were asked by Mr. Brill on cross.  You had

2   indicated you had been to Florida a number of times.

3   A     I traveled many times it -- I traveled there many times.

4   Q     How about Panama?  Why have you been to Panama?

5   A     Together with Garkusha, we traveled to Panama because we

6   had a friend there.  Our partner's partner who is a home

7   builder there and builds homes.  We traveled to take a look at

8   how business is going there for him.  I traveled there

9   together with my wife.  And I also traveled there with my

10  partner and I also traveled there to vacation.

11          MS. NESTOR:  No further questions.

12          THE COURT:  Anything else?

13          MR. BRILL:  A couple.

14  RECROSS-EXAMINATION

15  BY MR. BRILL:

16  Q    Mr. Dubovoy, these trips to Hawaii, Florida, and Panama

17  that you were just asked about, they all took place in 2009;

18  correct?

19          MS. NESTOR:  Objection.

20          THE COURT:  What's the objection?

21          MS. NESTOR:  Your Honor, I don't want to say

22  to -- it's fine.  Go ahead.

23          THE COURT:  Come to the sidebar if you want to say

24  it.  I'm not pushing it.

25          (Continued on the next page.)

1828

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record in the

2   presence of the Court and counsel, out of the hearing of the

3   jury.)

4          THE COURT:  Educate me.

5          MS. NESTOR:  I want to make sure Mr. Brill was

6   asking the question in good faith.  There were many trips.  He

7   testified about a number of trips.  He said went on holiday

8   with his wife.

9          MR. BRILL:  I'm talking about a trip he took that he

10  mentioned yesterday which is in 2009.  He said went to

11  Florida, he went to Panama, and he went to Hawaii.  Not about

12  the trips that you asked him about all vacations, but the

13  trips we were referring to during the questioning yesterday

14  and Pychnenko's case as well.

15         THE COURT:  What's the big deal?  He asked a

16  question.  All the witness has to say is, no, it wasn't just

17  2009.  I don't understand the objection.

18         MS. NESTOR:  Your Honor, I didn't understand the

19  question.  I don't think it was limited to 2009.  The question

20  was broad.

21         THE COURT:  It was.

22         MS. FELDER:  It was.

23         THE COURT:  Let me ask you.  How long are you going

24  to be?

25         MR. BRILL:  Not long.

1829

SIDEBAR CONFERENCE

1          MS. WHALEN:  Just a few more questions.

2          MR. BRILL:  We'll finish up.

3          THE COURT:  Try to finish up.

4          (End of sidebar conference.)

5          (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DUBOVOY – RECROSS – MR. BRILL

1          (In open court.)

2          THE COURT:  If we can impose upon you all for just a

3    couple more minutes.  If it's a problem, you raise your hand

4    you're out of here.  But if you can give us a couple of

5    minutes we're finished with this witness, okay?

6          A couple years ago I was trying a case, a civil

7    case, and I told the jury, as I told you, if they have a

8    problem at any time to raise their hand and we'll certainly

9    excuse them.  And we were listening to the testimony of a

10   witness, and as I sat there, I noticed in the jury box there

11   was somebody missing.  That person had, when our attention was

12   directed elsewhere, had simply gotten up and walked out.  Not

13   a problem in the civil case that we couldn't fix.  You won't

14   do that to me I'm sure.

15         Go ahead, Mr. Brill.

16         MR. BRILL:  Thank you, your Honor.

17   EXAMINATION BY

18   MR. BRILL:

19   (Continuing.)

20   Q    Would you like me to repeat the question?

21         THE COURT:  I think we all would.  Go ahead is.

22         MR. BRILL:  Okay.  Sure.

23   Q    In 2009, Mr. Dubovoy, you went to Hawaii, Florida, and

24   Panama; correct?

25   A    I don't remember specifically what year it is, but I

DUBOVOY – RECROSS – MS. WHALEN

1   traveled there on more than one occasion.

2   Q    Mr. Dubovoy, you were just asked about your cooperation

3   agreement; correct?

4             Do you remember that on redirect?

5   A    Yes.

6   Q    You told us on your direct testimony that you said that

7   your cooperation agreement was still in question; correct?

8   A    Yes.

9   Q    You still have it today, don't you?

10  A    Well, probably.

11  Q    And you still expect to get the benefit from that

12  cooperation agreement, don't you?

13  A    Yes, I hope so.

14  Q    It hasn't been ripped up even though you lied?

15  A    I didn't lie.  I told the truth.

16            MR. BRILL:  Thank you, Mr. Dubovoy.

17            THE COURT:  Ms. Whalen, anything?

18            MS. WHALEN:  Yes, just a minute.

19  RECROSS-EXAMINATION

20  BY MS. WHALEN:

21  Q    Mr. Dubovoy, you testified on redirect that you told

22  Mr. Khalupsky that he would be trading on stolen press

23  releases.  That's your testimony?

24  A    That he would be trading using information that he would

25  have access to before other people had access to it.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DUBOVOY – RECROSS – MS. WHALEN

1   Q    Mr. Dubovoy, you met Mr. Khalupsky in the summer of 2011;

2   correct?

3   A    Well, yes, probably, it's possible.  I don't remember

4   exactly.  I don't remember.

5   Q    How many years have you known -- prior to 2011, how many

6   years have you known Leonid Momotok.

7   A    A lot of years.

8   Q    And he was a friend?

9   A    Well, yes.

10  Q    And he was a business partner?

11  A    Yes.

12  Q    And you didn't tell him that these were stolen press

13  releases, did you?

14  A    No.

15  Q    But it's your testimony that you told Mr. Khalupsky, a

16  man you met for the first time in 2011, a man who was a

17  well-known broker in Odessa?

18  A    Yes.

19  Q    A man who employed a lot of traders?

20  A    Yes.

21  Q    A man who taught classes on trading?

22       THE COURT:  We're not here to summarize prior

23  testimony but go ahead.

24  A    Yes.

25  Q    And it's your testimony that you walked in and told him

DUBOVOY – RECROSS – MS. WHALEN

1   about this scheme?

2   A    Yes.

3   Q    It's your testimony that you didn't trade on legal

4   information; correct?

5   A    Me.

6   Q    Yes, you.

7   A    I didn't trade at all.

8   Q    But you didn't give people money to trade on legal

9   information, did you?

10  A    I gave it to Korchevsky trading using legal information.

11  Q    When was that?

12  A    That was in 2000.

13  Q    And once you got access to stolen information, you no

14  longer gave people money to trade on legal information, isn't

15  that true?

16  A    Vitaly would ask me can I trade on things that would come

17  up and I would say, "Yes, you can."  I don't know if I had a

18  conversation like this with Khalupsky, I might have, I might

19  not have, I don't recall.  Maybe Khalupsky called and said

20  there's some company that we can make a purchase.

21          THE COURT:  We're not interested in maybe, okay.

22          Go ahead, Ms. Whalen.

23  Q    Mr. Dubovoy in April of 2014 you opened a trading account

24  for Alexander Ledovskiy, isn't that correct?

25          MS. NESTOR:  Objection, your Honor.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DUBOVOY – RECROSS – MS. WHALEN

1          THE COURT:  This is something new.  I don't think it

2    was covered on redirect.

3    Q     Then let's go to pictures.  3500-19-A, Exhibit A.

4          These two pages list properties and value, isn't

5    that correct, Mr. Dubovoy?

6    A     Yes, I think so at that time.

7    Q     And each of these piece of property will be sold to pay

8    off your judgment; correct?

9    A     I think so.

10   Q     And once all of these properties have been sold, if the

11   recovery rate is more than $14 million, you get to keep the

12   rest of the money; correct?

13   A     I don't know.

14         MS. WHALEN:  No further questions.

15         THE COURT:  Anything else.

16         MS. NESTOR:  No thank you.

17         THE COURT:  All right.  Ladies and gentlemen, thanks

18   for your patience.  We complete the session for the week.  I

19   can report to you that we will complete the Government's case

20   next week, so we're making excellent process.

21         We're going to separate now for three days, so

22   please be very careful about any possible press accounts and

23   certainly do not discuss the case with anyone and get some

24   rest.  Be safe.  See you Monday morning at 9:30.

25         *** COURTROOM DEPUTY:  All rise.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

DUBOVOY - RECROSS - MS. WHALEN

1           (Jury exits courtroom.)

2           THE COURT:  Now, give a special hand to the

3  interpreter who was all by himself today.  Much appreciated.

4           THE INTERPRETER:  It's an honor, sir.

5           MR. TUCKER:  Is the witness excused?

6           THE COURT:  The witness is excused, yes.  Please.

7           (Witness leaves the witness stand.)

8           THE COURT:  So, folks, what can I expect on Monday.

9           MR. TUCKER:  Your Honor, I think we were going to

10  have a short CBP witness who will put in travel records.  And

11  then I expect Dr. Canjels, the Government's trading expert

12  from the SEC will testify.  That will take us, certainly,

13  through lunch and we'll get the rest of the lunch to counsel

14  and the Court over the weekend.

15           Can I just ask two quick questions, your Honor?

16           THE COURT:  Yes, sir.

17           MR. TUCKER:  The first point is, I'm confident that

18  counsel wants a little time to think about this testimony.  We

19  would request that counsel let us know their final decision

20  with respect to Igor Dubovoy, if possible, over the weekend.

21           THE COURT:  He can probably tell us.

22           Is anybody interested.

23           MS. BRILL:  In light of today, we still have a

24  couple of loose ends to confer about.  I don't have any

25  problem with that question from Mr. Tucker.

DUBOVOY - RECROSS - MS. WHALEN

1    THE COURT:  You'll let them know over the weekend.

2    MS. BRILL:  I will let him know over the weekend.

3    THE COURT:  Ms. Whalen, do you have further

4  questioning of Igor?

5    MS. WHALEN:  No, your Honor.

6    THE COURT:  All right.  So I had one other question

7  for you but it slipped my mind as usual so I'll let you go.

8    MR. TUCKER:  Sorry, your Honor.

9    THE COURT:  Mr. Brill, are you going to give me jury

10  instructions?

11    MR. BRILL:  Yes.  My apologies for that.  We'll have

12  that to you by tomorrow.

13    THE COURT:  Good enough.

14    MR. BRILL:  Would the Court allow a couple days on

15  this?

16    THE COURT:  As long as I get it early next week.

17    MR. BRILL:  You'll get them before the weekend is up

18  if that's okay with the Court.

19    THE COURT:  I want to put a draft together.

20    MR. BRILL:  And I apologize for the lateness.  We

21  are sorry for that but we will have to rectified.

22    MS. NESTOR:  Last thing.

23    If we can get copies of today's exhibits from

24  Mr. Khalupsky's counsel.  We didn't get the vast majority of

25  those beforehand.  I understand counsel has a lot to do and we

DUBOVOY – RECROSS – MS. WHALEN

1    were able to sort of run along and identify records in our own

2    system.  But if we could get the marked copies.  It got away

3    from us and I want to make sure we got matter record.

4                THE COURT:  Ms. Whalen, you'll take care that.

5                MS. WHALEN:  Yes, your Honor.

6                THE COURT:  Thank you, folks.  I'll see you Monday

7    morning.

8                (WHEREUPON, this matter was adjourned to June 25,

9    2018 at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2   WITNESS                             PAGE

 3   SEAN PINNER

 4   DIRECT EXAMINATION    BY MR. GOPSTEIN   1725
     CROSS-EXAMINATION     BY MS. BRILL      1733
 5

 6   ARKADIY DUBOVOY

 7   CROSS-EXAMINATION     BY MS. WHALEN     1739
     REDIRECT EXAMINATION  BY MS. NESTOR     1825
 8   RECROSS-EXAMINATION   BY MR. BRILL      1830
     RECROSS-EXAMINATION   BY MS. WHALEN     1834
 9                          EXHIBITS

10   GOVERNMENT                PAGE
     812                       1727
11   3500 AD-19                1740
     280                       1769
12   314                       1770
     317                       1771
13
     DEFENDANT             PAGE
14   KK & KK-1             1744
     LL                    1755
15   LL-T                  1755
     A                     1766
16   18                    1767
     H                     1777
17   G                     1777
     B & B-T               1787
18   UU                    1795
     BB & BB-T             1796
19   BB-1                  1798
     SS                    1801
20   DX-Y                  1802
     Y1                    1802
21   DX SS-1               1805
     DD                    1806
22   DD-1                  1807
     XX                    1813
23   WW                    1816
     JJ                    1820
24   JJ-1                  1822
     JJ-2                  1822
25   II                    1823
```

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter